UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STACIA S. BOGDAN and FRANK BOGDAN, | : | CIVIL ACTION NO: 3:02CV637 (JCH) |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ZIMMER, INC., | : | |
| | : | |
| Defendant. | : | MARCH 7, 2006 |

**MEMORANDUM OF LAW IN SUPPORT OF
ZIMMER, INC.'S MOTION FOR SUMMARY JUDGMENT**

Defendant, Zimmer, Inc. ("Zimmer"), respectfully submits this memorandum of law in support of its motion for summary judgment.

**I.
INTRODUCTION**

In this medical device product liability action, Plaintiffs Stacia and Frank Bogdan (the "Bogdans") claim an artificial hip component manufactured by Zimmer and implanted into Ms. Bogdan, the Zimmer Centralign femoral stem, is defective under the Connecticut Product Liability Act ("CPLA"). Zimmer's present motion demonstrates that Ms. Bogdan's CPLA claim is time-barred under the applicable Connecticut statute of limitations, Conn. Gen. Stat. §52-577a, and for that reason Mr. Bogdan's derivative loss of consortium claim fails as a matter of law. Thus summary judgment in Zimmer's favor is appropriate.

**II.
PROCEDURAL HISTORY**

**A.    Original Proceedings.**

On April 10, 2002, Plaintiffs filed their three count complaint:  (1) a claim under the Connecticut Product Liability Act, Conn. Gen. Stat. §§ 52-572m – 52-572q; (2) a claim under

**ORAL ARGUMENT REQUESTED**

the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110b; and (3) a claim for common law fraud.  Mr. Bogdan stated a derivative claim for loss of consortium.  The parties agreed that discovery initially should be limited to statute of limitations issues and "merits" discovery stayed.  After conducting that discovery, Zimmer moved for summary judgment arguing that all three of Ms. Bogdan's claims were time-barred by the applicable Connecticut statutes of limitations.  On March 29, 2005, this Court granted that motion, held that the three claims were time-barred, and entered judgment in Zimmer's favor.  *Dunn v. Zimmer, Inc.*, No. 3:00cv1306, 2005 WL 752214, at *1 (D. Conn. Mar. 29, 2005).

**B.    Plaintiffs' Appeal**

Plaintiffs appealed the District Court's grant of summary judgment to the United States Court of Appeals for the Second Circuit.  On January 6, 2006, the Second Circuit issued its order affirming in part and vacating in part the District Court's judgment.  *Bogdan v. Zimmer, Inc.*, No. 05-2087, 2006 WL 41286, at *1 (2d Cir. Jan. 6, 2006).  The Second Circuit held that this Court "correctly determined that plaintiff's claims under the Connecticut Unfair Trade Practices Act ("CUTPA") and for common law fraud were time-barred."  *Id.* at *3.   As to Plaintiff's CPLA claim, and as more fully discussed below in Section IV.B.(3), the Second Circuit held that this Court stated an incorrect standard:  "namely, that plaintiff 'could' have discovered her cause of action no later than 1998."  *Id.* at *2.  The Second Circuit "remand[ed] so that the District Court may consider plaintiff's [CPLA claim] under the proper standard."  *Id.*

Zimmer's present motion gives the Court the opportunity to so consider Ms. Bogdan's only remaining claim under the "proper standard."  When it does, the Court will conclude, as it did before, that Plaintiff's CPLA claim indeed is time-barred.  Because Ms. Bogdan's CPLA claim is time-barred, Mr. Bogdan's derivative loss of consortium claim also must be dismissed.

**III.**
**STATEMENT OF FACTS**

The following facts are relevant to this motion, supported by Zimmer's Local Rule 56(a)1 Statement ("Stmt.") and attached materials, and cannot genuinely be disputed by any admissible evidence.

**A.    Total Hip Replacement**

Total hip arthroplasty generally involves substituting metal and ultra-high-molecular-weight-polyethylene implants for the surfaces of bone making up the total hip joint.  (Stmt. ¶ 1.) The hip joint is one of the most mobile of the body's joints, while at the same time being one of the most heavily loaded.  (*Id.*)  The mobility derives from its ball and socket configuration which accounts for its high range of motion in all directions.  (*Id.*)  The ball is situated at the proximal (near) end of the femur on an angular protrusion known as the femoral neck.  (*Id.*)  The socket, known as the acetabulum, is located in the pelvis.  (*Id.*)  (*See* Illustration 1.)



(Illustration 1)

During the surgery the patient's diseased femoral head is replaced by the femoral component, which consists of a stem implanted into the patient's femur and a femoral head, which is a sphere that serves as the ball.  (Stmt. ¶ 2.)  The patient's hip socket is replaced by a

metal shell implanted into the patient's hip into which is placed a liner; together these components are known as the acetabular component.  (*Id.*)  *(See* Illustration 2.)



(Illustration 2)

If, as in Ms. Bogdan's case, the hip surgery involves a cemented femoral stem, the surgeon places PMMA bone cement into the femur prior to placing the stem.  (Stmt. ¶ 3.)  (*See* Illustration 3.)



(Illustration 3)

B.    **Ms. Bogdan's Total Right Hip Replacement**

Prior to 1994, Ms. Bogdan began experiencing pain in her right hip.   (Stmt. ¶ 4.) Ms. Bogdan's pain, difficulty sleeping, and limited function in her right hip began to bother her enough that she and her physician, Dr. Bruce H. Moeckel, decided to go forward with her hip replacement surgery.  (Stmt. ¶ 5.)  Dr. Moeckel replaced her right hip with a Zimmer Centralign femoral stem (the "Centralign") on October 6, 1994.  (Stmt. ¶ 6.)  Dr. Moeckel made the decision

to use the Centralign prior to Ms. Bogdan's surgery.  (Stmt. ¶ 7.)  Prior to that surgery, Dr. Moeckel knew Zimmer manufactured and sold the stem.  (Stmt. ¶ 8.)  Ms. Bogdan had expected the Centralign to last ten years.  (Stmt. ¶ 9.)

At the time of her surgery, "peel-n-stick" labels were placed in Ms. Bogdan's operative records.  (Stmt. ¶ 10.)  These labels identify the components used during surgery, and the manufacturer of the component.  (Stmt. ¶ 11.)  The peel-n-stick labels in Ms. Bogdan's operative records reveal that Ms. Bogdan received a Centralign femoral stem, size 2 and a 28 mm diameter femoral head, both manufactured by Zimmer.  (Stmt. ¶ 10.)  Dr. Moeckel was able to determine a Centralign stem was used during her surgery from the peel-n-stick labels contained in Ms. Bogdan's medical records.  (Stmt. ¶ 12.)  Prior to November 2001, Ms. Bogdan did not ask Dr. Moeckel for the name of the manufacturer of Centralign stem.  (Stmt. ¶ 13.)

**C.     The Medical Device At Issue**

The Centralign is a femoral stem forged from cobalt-chromium-molybdenum alloy with macro-surface texturing on the proximal one-third of the stem anteriorly and posteriorly, a collar near the proximal end, PMMA spacers affixed to the proximal and distal sections of the stem, and PMMA precoating intended for cemented use.  (Stmt. ¶ 11.)  Zimmer offers the surgeon a choice of Centralign sizes, ranging from size 1 (smallest) to size 6 (largest).  (*Id.*)  (*See* Illustration 4.)



(Illustration 4)

**D.    Post-1994 Surgery Events And The 1996 Revision Surgery**

Soon after her operative pain subsided, Ms. Bogdan was able to resume her normal daily activities and no longer had the pain in her right hip that she had experienced prior to the hip replacement.  (Stmt. ¶ 14.)  However, within a year of her surgery, Ms. Bogdan began to feel increasing pain in her right hip.  (Stmt. ¶ 15.)  She reported this increasing thigh pain to Dr. Moeckel during an October 18, 1995 visit.  (*Id.*)  The pain began when she took her first few steps and would then get better as she continued walking.  (*Id.*)

During that same office visit, Dr. Moeckel saw on Ms. Bogdan's x-rays signs of the Centralign loosening.  (Stmt. ¶ 16.)  Dr. Moeckel shared these findings with Ms. Bogdan. (Stmt. ¶ 17.)  Dr. Moeckel informed Ms. Bogdan at that visit that he was seeing symptoms of loosening earlier than he would have expected from a cemented stem.  (Stmt. ¶ 18.)  He also informed Ms. Bogdan that she needed a second operation.  (Stmt. ¶ 19.)  Dr. Moeckel also ordered a bone scan for Ms. Bogdan, the results of which further indicated that Ms. Bogdan's Centralign was loose.  (Stmt. ¶ 20.)

Ms. Bogdan saw Dr. Moeckel again on November 17, 1995.  (Stmt. ¶ 21.)  At that visit Ms. Bogdan noted that she was still having pain in her thigh, and during the physical exam she had some pain with range of motion.  (*Id.*)  Dr. Moeckel reviewed with Ms. Bogdan her bone scan result, which was consistent with early loosening.  (Stmt. ¶ 22.)

Dr. Moeckel next saw Ms. Bogdan on December 15, 1995.  (Stmt. ¶ 23.)  X-rays taken that day showed the same signs of loosening.  (*Id.*)  Dr. Moeckel reviewed the x-rays with Ms. Bogdan, and again explained to her that the x-rays showed that her Centralign implant was loosening.  (Stmt. ¶ 24.)

On April 15, 1996, Dr. Moeckel again saw Ms. Bogdan.  (Stmt. ¶ 25.)  X-rays taken that day showed further loosening of the prosthesis, and Ms. Bogdan was experiencing increased

difficulty walking.  (Stmt. ¶ 26.)   Dr. Moeckel reviewed the x-rays with Ms. Bogdan, and explained to her that her x-rays showed that the loosening was getting worse.  (Stmt. ¶ 27.) Dr. Moeckel also explained to Ms. Bogdan that he was concerned about the progressive bone loss, and that the stem needed to be revised.  (Stmt. ¶ 28.)   Ms. Bogdan believes she asked Dr. Moeckel during her April 15, 1996 why her device had failed.  (Stmt. ¶ 29.)  Dr. Moeckel "did not have a good explanation" about why it loosened more quickly than she otherwise would have expected.  (Stmt. ¶ 30.)

Dr. Moeckel next saw Ms. Bogdan on June 17, 1996.  (Stmt. ¶ 31.)  During that visit Ms. Bogdan complained of increasing pain in her hip and noted that her leg was getting shorter. (*Id.*)  The pain was impacting her ability to walk and live her life.  (Stmt. ¶ 32.)  Dr. Moeckel attributed these negative symptoms to the Centralign stem and he therefore recommended to Ms. Bogdan that she have the stem removed and replaced with another device.  (Stmt. ¶ 33.)  Ms. Bogdan agreed to this revision surgery.  (Stmt. ¶ 32.)  Dr. Moeckel performed revision surgery on Ms. Bogdan on July 16, 1996.  (Stmt. ¶ 34.)  Following her revision surgery in July 1996, Ms. Bogdan was able to resume her normal daily activities.  (Stmt. ¶ 35.)

Dr. Moeckel stopped using the Centralign in 1995 or 1996 because of the "failures" he had with Centralign stems, but he did not tell Ms. Bogdan that he had stopped using them. (Stmt. ¶ 36.)  It was not until November 2001, that Dr. Moeckel telephoned Ms. Bogdan to tell her there "had been some other problems with this prosthesis and there was a class action lawsuit."  (Stmt. ¶ 37.)

### E.    Procedural History And Ms. Bogdan's Complaint

On April 10, 2002 Ms. Bogdan filed a complaint (the "Complaint") against Zimmer.  The Complaint alleges three causes of action:  (1) a claim under CPLA, Conn. Gen. Stat. § 52-572m,

*et seq.*, (2) a claim under CUTPA, Conn. Gen. Stat. § 42-110b, *et seq.*, and (3) a claim for common law fraud.

More specifically, Ms. Bogdan alleged that she "underwent a replacement of her right hip, which replacement included the installation of the Zimmer Centralign Precoat Hip prosthesis, size 2 femoral stem (catalog #9800-02)." (Compl. ¶ 7.) According to Ms. Bogdan the "hip replacement system failed, and was loose and causing other problems to the plaintiff within one year of its installation." (*Id.*) She was required to undergo a revision surgery to replace the failed Centralign stem on July 16, 1996. (*Id.*) Ms. Bogdan believed the Centralign was faulty solely because it loosened and needed to be replaced so soon after it was installed. (Stmt. ¶ 38.)

As stated earlier, the Second Circuit affirmed this Court's grant of summary judgment on the CUTPA and common law fraud claims. *Bogdan v. Zimmer, Inc.*, No. 05-2087, 2006 WL 41286, at *3 (2d Cir. Jan. 6, 2006). The Second Circuit did not reverse this Court's grant of summary judgment on the CPLA claim. Instead, it vacated that portion of this Court's judgment and remanded "so that District Court may consider plaintiff's [CPLA] claims under the proper standard." *Id.* at *2.

## IV.
## ARGUMENT

We show below that because Ms. Bogdan did not bring her lawsuit within three (3) years of the date she suffered actual harm, her CPLA claim is time-barred (Part B.) We also show that Mr. Bogdan's derivative loss of consortium claim fails as a matter of law (Part C.)

### A.    Summary Judgment Standard

This Court recently set forth in *Mody v. General Electric, Inc.*, No. Civ.A. 304CV358JCH, 2006 WL 413439 (D. Conn. Feb. 21, 2006) (Hall, J.), the familiar summary

judgment standard: "[a] court must grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any show that there is no genuine issue of material fact" and the moving party is entitled to judgment as a matter of law. *Id.* at *1 (citations omitted). *See also* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, (1986); *SCS Commc'ns, Inc. v. Herrick Co.,* 360 F.3d 329, 338 (2d Cir. 2004).

### B.    Ms. Bogdan's CPLA Claim is Time-Barred

#### 1.    Applicable Three Year Statute of Limitations

The statute of limitations for claims brought pursuant to the CPLA is three years "from the date when the injury, death or property damage is first sustained or discovered or in the exercise of reasonable care should have been discovered." Conn. Gen. Stat. §52-577a. Connecticut courts have construed injury to denote "actionable harm," which "occurs" when the plaintiff discovers, or in the exercise of reasonable care should have discovered, the essential elements of a cause of action. *Bellsouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 610-11 (2d Cir. 1996); *Gnazzo v. G.D. Searle*, 973 F.2d 136, 138 (2d Cir. 1992); *Lagassey v. State*, 846 A.2d 831, 846 (Conn. 2004).

The essential elements of Ms. Bogdan's CPLA claim are tortious conduct, actual injury and a causal connection between the two. *Bellsouth Telecomms.*, 77 F.3d at 611 (quoting *Catz v. Rubenstein*, 513 A.2d 98, 102 (Conn. 1986)). "Accordingly, a plaintiff's claim accrues when the plaintiff has knowledge of facts that would put a reasonable person on notice of the nature and extent of any injury, and that the injury was caused by the negligent conduct of another." *Bogdan*, 2006 WL 41286, at *1 (citations and internal quotations omitted).

"In determining whether a plaintiff's claim has accrued, the focus is on the plaintiff's knowledge of facts, rather than on discovery of applicable legal theories." *Bellsouth Telecomms.*, 77 F.3d at 611 (citations and internal quotations omitted); *Catz*, 513 A.2d at 102. Moreover, "the harm complained of need not have reached its fullest manifestation in order for the limitation period to begin to run; a party need only have suffered some form of actionable harm." *Lagassey,* 846 A.2d at 847.  In short, "[t]he true test to determine accrual for statute of limitations purposes is to establish the time when the plaintiff first could have successfully maintained an action." *Gaylord Hosp. v. Massaro*, 499 A.2d 1162, 1163 (Conn. Ct. App. 1985), *quoted in Bellsouth Telecomms.*, 77 F.3d at 610; *accord*, *Dennis v. ICL, Inc.*, 957 F. Supp. 376, 379 (D. Conn. 1997).

### 2.    In Medical Device Cases Such As This, Actionable Harm Occurs At The Latest On the Date of Revision Surgery

It is well-established that a plaintiff in a medical device product liability case discovers or should have discovered actionable harm long before a physician tells her the device is "defective" or the subject of lawsuits.  *Norris v. Baxter Healthcare Corporation*, 397 F.3d 878, 887-88 (10th Cir. 2005); *Michals v. Baxter Healthcare Corporation*, 289 F.3d 402, 407-08 (6th Cir. 2002); *Sawtell v. E.I. du Pont de Nemours and Co.*, 22 F.3d 248, 252 (10th Cir. 1994); *Gnazzo*, 973 F. 2d at 138.  As in this matter, the device is removed because the plaintiff already has discovered injury, *i.e.* pain or physical symptoms leading the plaintiff to believe that the device has not performed as expected.   In these cases, courts consistently have held that the statute was triggered on the date of removal surgery because by that date the plaintiff already believed her injuries were caused by the medical device.  *See, e.g., Norris*, 397 F.3d at 887-88; *Michals*, 289 F.3d at 407-08; *Sawtell*, 22 F.3d at 252.

In *Michals*, the Sixth Circuit applied the discovery rule in a case alleging injury from silicone breast implants to affirm summary judgment, holding that the plaintiff knew all the facts necessary to trigger the statute of limitations at the latest by the date of revision surgery. *Michals*, 289 F.3d at 407-08. In *Michals*, the plaintiff sued Baxter under a product liability theory claiming that she had suffered injury as a result of silicone breast implants that had been implanted in 1974. *Id.* at 404. In 1976, the plaintiff had visited her doctor complaining that her "breasts hurt and they were still hard and still red and they were immobile and [she] was getting red rashes across them." *Id.* On her doctor's recommendation, the plaintiff underwent surgery in March 1977 to have the implants removed and replaced with others. *Id.* In 1993, the plaintiff sued the manufacturer of the implants on theories other than product liability. *Id.* at 404-05. In 1996, the plaintiff received a notification of status letter regarding a class action product liability suit regarding the same implants. *Id.* at 405. She opted out of the class action and amended her complaint to include a product liability claim in October 1996. *Id.*

In response to the defendant's motion for summary judgment on statute of limitations grounds, the plaintiff argued that she did not know that a defective product caused her injuries until she received the class notice in 1996. *Id.* at 407. The court rejected that argument, holding:

> Plaintiff in the matter at hand was fully aware that the harm she experienced was attributable to the Heyer-Schulte implants, *as evidenced by her decision to have them removed and replaced at the advice of her physician in order to ameliorate the injury*. In addition, Plaintiff's argument in the district court, attributing the problems associated with her breasts due to a foreign substance in her body and not specifically to the Heyer-Schulte implants, flies in the face of her decision to have the implants replaced with implants manufactured by Dow Corning. Hence, the date of accrual for purposes of the statute of limitations is March 9, 1977, at the latest, and the statutory period ran on March 9, 1987, thereby rendering Plaintiff's 1993 complaint and the allegations made therein untimely.

*Id.* at 407-08 (citations omitted) (emphasis added) (applying Kentucky's one year statute of limitations).

The Tenth Circuit applied the same reasoning in another product liability case relating to silicone implants, affirming summary judgment on the discovery rule issue. *Norris*, 397 F.3d at 887-88. Similar to the facts in *Michals*, the plaintiff had her implants removed in 1978, but had not filed suit until 1991. *Id.* at 880. The court held that the plaintiff should have known of her injury and had an obligation to investigate any claims based on the failure of the implants beginning in 1978:

> Plaintiff testified that, as early as 1978, she felt that something was not "normal" in her right breast (not the left which is the subject of this litigation). Plaintiff also admits that her doctor told her that he believed that her implants were causing the problem and informed her that both of her implants needed to be removed. Plaintiff had both implants (including the one at issue) removed on May 26, 1978, and replaced with implants manufactured by Dow Corning. She admitted that there was scarring of the breasts at the time of this surgery. Based on these facts, Plaintiff had an obligation, beginning in 1978, to investigate the problems with her breast implants. Plaintiff did not file suit until 1991, thirteen years later – ten years past the expiration of the statute of limitations for product liability and misrepresentation. The district court did not err in granting summary judgment to Baxter on Plaintiff's product liability and misrepresentation claims.

*Id.* at 888 (citations omitted) (applying Colorado's three year statute of limitations). *See also Sawtell*, 22 F.3d at 252 (affirming summary judgment for defendant manufacturer and explaining that reasonable minds could not differ that the plaintiff knew or should have known of the specific cause of her pain by the time of her surgery to remove her temporomandibular joint prostheses).

District courts also have applied the discovery rule to conclude as a matter of law that a plaintiff discovers actionable harm at the latest on the date of her revision surgery when she

believes she has been injured by a medical device and knows that the device must be removed. *See McCollin v. Synthes Inc.*, 50 F. Supp. 2d 1119, 1123-24 (D. Utah 1999) (granting the defendant summary judgment and holding that the plaintiff's cause of action accrued on date of revision surgery); *Conger v. Danek Med., Inc.*, No. 4:96-CV-739-A, 1998 WL 1041331, at *7 (N.D. Tex. Dec. 14, 1998) (same); *Dunlap v. Medtronic, Inc.*, 47 F. Supp. 2d 888, 892 (N.D. Ohio 1999) (granting summary judgment for defendant manufacturer and stating that the plaintiff was "clearly put on notice as of the [revision] surgery of the need to pursue . . . possible remedies").

In *Breaux*, a case strikingly similar to this case, the District Court for the Eastern District of Louisiana granted summary judgment in the defendant's favor, rejecting an argument that the plaintiff did not discover his injury until he saw a news report on television regarding a possible defect in the medical device that had been implanted in his spine. *Breaux v. Danek Med., Inc.*, No. Civ.A. 95-1730, 1999 WL 64929, at *4-*5 (E.D. La. Feb. 4, 1999). There, the plaintiff had suffered ongoing back problems. *Id.* at *1. In July 1988, his doctor had implanted a pedicle plate and screw device during spinal fusion surgery. *Id.* A month after the implantation, the plaintiff reported that he was experiencing abnormal movement in his back. *Id.* at *2. By February 1989, the plaintiff reported a snapping sensation in his back and repeated his allegations of abnormal movement. *Id.* By 1989, the plaintiff's doctor had stated that the plaintiff's back had not fused and that the plaintiff should be considered totally disabled. *Id.* The plaintiff contended, however, that he did not discover his injury until December 1993 after viewing a report on the ABC News program 20/20, which concerned complications resulting from the pedicle device. *Id.* at *4. The court rejected that argument, holding:

> The record in this case shows that Mr. Breaux knew or should have
> known of his cause of action prior to the ABC broadcast. By 1991,

> Mr. Breaux knew the device had been implanted into his back,
> knew he experienced increased and unusual pain since its
> implantation, and believed the device was unstable.  He was also
> told by his doctor that his spine had not and would not fuse.  His
> complaint alleges that the device was defective because his spine
> did not fuse.  Mr. Breaux did not need the ABC report to alert him
> to his cause of action.

*Id.* at *5.

The Second Circuit's decision in *Gnazzo* also illustrates the application of the discovery

rule in medical device product liability cases.  In *Gnazzo*, the Court applied the CPLA statute of

limitations and affirmed summary judgment, holding that the plaintiff discovered "some form of

actionable injury" long before her doctor told her that her injuries had resulted from her previous

use of an IUD.  973 F.2d at 138.  The plaintiff in *Gnazzo* had an IUD implanted in 1974.  *Id.* at

137.  The plaintiff was treated for IUD-associated pelvic inflammatory disease (PID) once in

1975, was treated again for PID less than a year later, had the IUD removed in 1977, and in 1981

began having trouble becoming pregnant and heard that IUDs could be damaging.  *Id.*  It was not

until eight years later (in 1989), however, that the plaintiff's doctor informed her that she was

infertile because of PID-induced adhesions caused by her prior use of the IUD.  *Id.*  The Second

Circuit held that the plaintiff's 1990 lawsuit was time-barred because the plaintiff knew by 1981

when the IUD was removed that she had "*some form* of actionable harm":

> Therefore, as Gnazzo's responses to the questionnaire indicate, she
> suspected "sometime in 1981" that the IUD had caused her harm
> because she had been experiencing trouble becoming pregnant and
> had "started hearing [and] reading about how damaging IUD's
> could be . . . [and had] figured that was [the] problem . . . ."  Thus,
> by her own admission, Gnazzo had recognized, or should have
> recognized, the critical link between her injury and the defendant's
> causal connection to it.  In other words she had "discover[ed] or
> should have discover[ed] through the exercise of reasonable care,
> that . . . she ha[d] been injured and that [Searle's] conduct caused
> such injury."   However, as Gnazzo acknowledged in the
> questionnaire, she did not pursue the "issue" at the time because of

> her marital problems.  Thus, even when viewed in the light most favorable to Gnazzo, the non-moving party, we are constrained to find that she knew by 1981 that she had "*some form* of actionable harm."  Consequently, by the time she commenced her action in 1990, Gnazzo was time-barred by the Connecticut statute of limitations.

*Id.* at 138 (citations omitted) (emphasis in original).

The *Gnazzo* case was somewhat unusual in that Ms. Gnazzo, unlike a typical plaintiff in a medical device product liability case, could not have discovered her alleged injury until the IUD was removed.  Ms. Gnazzo sued because she discovered she was infertile.  She could not have discovered that injury until the IUD was removed and she tried to get pregnant.  *Gnazzo* nonetheless stands for the proposition that a diagnosis of causation and discovery of evidence of an alleged defect are not necessary to discovery of actionable harm.

*Gnazzo*, *Michals*, and *Norris* stand for the proposition that the plaintiff has enough information to spur her to investigate further and file a claim once she knows that a medical device has not performed as expected, believes the device has caused her injury and knows that the device must be removed.  In a case involving a hip implant, like this one, a plaintiff obtains that information where the early loosening of the implant has caused her pain; she has consulted with her doctor; her doctor has advised her that her pain resulted from the early loosening; and her doctor has told her that she must undergo surgery to replace the implant.  By the time she undergoes the replacement surgery, she is no longer in the dark regarding the fact that she believes something about the implant has caused her to be injured.  Her doctor has told her as much.  She has sufficient information to inquire further and develop her potential claims against the manufacturer of the device, even if she does not yet know what legal theories she may be able to assert.  The holdings in these cases establish the appropriate balance between the interest in making sure a plaintiff has had a chance to discover her claim before it is barred and the

interest in promoting finality in litigation that is the primary policy reason underlying statutes of limitations.  *See Pintavalle v. Valkanos*, 581 A.2d 1050, 1052 (Conn. 1990) (purpose of statutes of limitations is to promote finality in litigation).

At the time of her revision surgery Ms. Bogdan discovered, or in the exercise of reasonable care should have discovered, the essential elements of her cause of action.  Ms. Bogdan knew at the time of her revision surgery the following facts:  the Centralign stem failed; the stem had come loose; the stem caused pain and other problems (bone loss, leg length discrepancy, and difficulty walking, to name a few) within one year of its installation.  She thought the stem was going to last for at least 10 years.  Her physician told her that her problems were due to the stem coming loose and he recommended she undergo another operation to replace it.  She agreed to that operation.  Ms. Bogdan was fully aware that the harm she experienced was attributable to the Centralign implant, *as evidenced by her decision to have it removed and replaced at the advice of her physician in order to ameliorate the injury*.  Indeed, she believed it was faulty because it came loose so soon after it was installed.  As in *Michaels*, any claim by Ms. Bogdan that she did not know at the time of her revision surgery that the Centralign stem had failed, come loose, and caused her pain and other problems within one year of its installation flies in the face of her decision to have it removed and replaced.

No one, moreover, seriously can doubt that Ms. Bogdan could have successfully maintained an action against Zimmer on Wednesday, July 17, 1996—the day after her revision surgery took place.  No one seriously can doubt that Ms. Bogdan could have made the precise allegations on that day she made nearly 6 years later:  "the stem failed, was loose, caused pain and other problems within one year of its installation;" and "because of this failure [I] underwent revision surgery to replace the failed stem." (Compl., ¶ 7).  "The true test to determine accrual

for statute of limitations purposes is to establish the time when the plaintiff first could have successfully maintained an action." *Gaylord Hosp*, 499 A.2d at 1163. Applying this true test to the undisputed facts, the Court should find that Ms. Bogdan's CPLA claim is time-barred because it accrued more than three years before she filed her complaint.

### 3.    "Could" vs. "Should"

In its decision to remand, the Second Circuit observed that this Court's conclusion that Ms. Bogdan's CPLA claim had accrued as of July 16, 1996, the date of her revision surgery, was premised on two determinations.

> First, the District Court rejected plaintiff's argument that her claims began to accrue when she was informed by her doctor in November 2001 "that her initial hip prosthesis was the subject of lawsuits alleging a defective design," finding instead that "Bogdan knew, as of July 1996, that her hip had failed, that the failure occurred unusually early in the life of her hip and that the failure had caused her injury." The District Court thus concluded that plaintiff "had clear knowledge of her injury and its cause [by July 1996], even if she could not articulate the precise legal theory that would support her claim." Second, the District Court determined that "[t]he facts show that any gap in Bogdan's knowledge was due primarily to a lack of diligence." Citing what it described as "publicly available" information . . . that indicated "a potential flaw" in the Zimmer product "as early as 1997," the District Court stated that plaintiff's actual knowledge at the time of her revision surgery in July 1996, combined with a reasonably diligent investigation thereafter, "could" have informed her as to the basis of her claim. Specifically, the District Court concluded: "Given the knowledge Bogdan possessed in 1996—that her hip had failed unusually early causing her pain and difficulty of a revision surgery—it would not be unreasonable to think that a diligent effort to discover the cause of her injury *could* have led her to the necessary information no later than 1998. The record is clear that Bogdan undertook no steps to pursue this suit until November 2001 at the earliest, more than five years after her injury and more than three years after she *could* have discovered her claim."
>
> We conclude that this latter determination by the District Court---namely, that the plaintiff "could" have discovered her cause of action no later than 1998—stated an incorrect standard[.]

*Bogdan,* 2006 WL 41286, at *2 (quoting *Dunn*, 2005 WL 752214, at *4) (internal citations omitted, emphasis in original). The Second Circuit remanded "so that the District Court may consider plaintiff's claims under the proper standard." *Id.*

As we established in Section IV(B)(2) above, in the context of a removed medical device such as an artificial hip, actionable harm *occurs at the latest* at the time of the removal of the device. *See, e.g., Norris*, 397 F.3d at 887-88; *Michals*, 289 F.3d at 407-08; *Sawtell*, 22 F.3d at 252. Thus, there is no need to examine post-revision events. Yet, Ms. Bogdan argues that she did not discover actionable harm until 2001 because she did not know Zimmer's identity and did not know that the Centralign might be defective until that date. Ms. Bogdan's alleged failure to discover both of these facts is irrelevant to any analysis of when actionable harm accrued. However, if this Court were to consider the question of when Ms. Bogdan in the exercise of reasonable care should have discovered those facts, summary judgment still would be proper. Under the undisputed facts Ms. Bogdan "should" have discovered Zimmer's identity and allegations regarding a possible defect more than three years before she filed her lawsuit.

### a.    "Could" and "Should" Are Interchangeable Where the Plaintiff Has Conducted No Investigation

This Court used the word "could" when it was addressing Plaintiffs' arguments that Ms. Bogdan did not know Zimmer's identity (discussing *Tarnowsky v. Socci*, 816 A.2d 728 (Conn. App. Ct. 2003), *aff'd*, 856 A.2d 408 (Conn. 2004)) and did not discover causation (discussing *Catz v. Rubenstein*, 513 A.2d at 101) until 2001. At the core of the Second Circuit's apparent concern was the distinction between this Court's holding that Ms. Bogdan "could" have discovered causation and Zimmer's identity, and the applicable standard, which requires the Court to determine whether Ms. Bogdan "should" have discovered those facts.

18

The distinction, if any, between "could" and "should" for purposes of applying the discovery rule was discussed at length by the First Circuit in *Cambridge Plating Co. v. Napco, Inc.*, 991 F.2d 21, 28 (1st Cir. 1993). Among other things, the Court concluded that in a case, like this one, where the plaintiff has made no effort to investigate the cause of her injuries, there is no distinction between what she "could" have discovered and what she "should" have discovered. *Id.* At the outset, the court restated the Massachusetts discovery rule it was applying:

> This rule prescribes as crucial the date when a plaintiff discovers, *or any earlier date when she should reasonably have discovered*, that she has been harmed or may have been harmed by the defendant's conduct.

*Id.* at 27 (emphasis added).

In applying the rule, the Court was presented with a factual scenario quite different from the one in this case. The plaintiff had filed suit seeking to recover damages caused by a faulty water treatment system installed by the defendant. *Id.* at 23. Before filing, the plaintiff had attempted to discover why the system had failed. *Id.* The first expert hired by the plaintiff had failed to discover the cause of the problem. *Id.* Subsequently, the plaintiff hired another expert who, through a more thorough inspection was able to discover the problem. *Id.* The Court was faced with the question whether the plaintiff exercised reasonable care in hiring the first expert such that the discovery rule would toll the statute of limitations. *Id.* at 26. In analyzing that question, the Court considered whether the fact that the plaintiff "could" have taken other actions that might have led it to discover the problem sooner was a basis for finding the plaintiff did not exercise reasonable care and, therefore, "should" have discovered actionable harm sooner. *Id.*

The Court distinguished the analysis in several cases where the plaintiff had undertaken no efforts to discover the cause of her injury. *Id.* at 28. The Court concluded that where the

plaintiff has done nothing to investigate her injury, there is no difference between what she "could" and "should" have known for purposes of applying the discovery rule. *Id.* In other words, the things she "could" have discovered upon investigation are effectively things she "should" have discovered. *Id.* The Court explained:

> These cases, instead, uniformly involve plaintiffs who were *not* diligent, and that circumstance, we believe, has led the courts to describe the rule imprecisely. When a plaintiff has made no reasonable efforts to discover the harm or its cause, considering whether a plaintiff reasonably *should* have discovered his claim will produce the same result as considering whether he reasonably *could* have discovered it. For example, if a court found that a claim could *not* be discovered through reasonable diligence, it would be precluding as well a finding that he reasonably should have discovered it.
>
> Similarly, a court might find that, if the plaintiff had been diligent, she *could* have discovered her claim. From this conclusion, lacking contrary information, it also is logical to presume that the plaintiff *should* have discovered her claim. Having failed to act, the plaintiff has no basis for disputing the court's sensible presumption that reasonable actions would have produced results. "Could" and "should" effectively are interchangeable in this context, and the courts' particular usage is of no significance.
>
> Only when a plaintiff has done what he is supposed to do, and still comes up empty, is a court faced with a possible disjunction between what he theoretically ***could* have known** if he had chosen a **different** reasonable path, and what he ***should* have known** based on the reasonable inquiry he did make.

*Id.* (internal citations omitted) (emphasis in original).

Ms. Bogdan likely will argue, relying on *Lagassey*, that the analysis of *Cambridge Plating* is inapplicable because the Connecticut Supreme Court has held that a plaintiff has no affirmative duty to investigate the cause of her injury. But, in fact, the analysis in *Lagassey* directly supports application of the analysis set forth in *Cambridge Plating*. In *Lagassey*, the

Connecticut Supreme Court stated the discovery rule in terms nearly identical to those iterated by the First Circuit in *Cambridge Plating*:

> "Actionable harm" occurs when the plaintiff discovers, *or in the exercise of reasonable care, should have discovered* the essential elements of a cause of action.

*Lagassey*, 846 A.2d at 846-47 (emphasis added). Accordingly, inherent in the *Lagassey* analysis is a consideration of what the plaintiff "should" have discovered had she exercised reasonable care – the same question considered in *Cambridge Plating*.

The portion of *Lagassey* on which Ms. Bogdan has relied is actually a very narrow holding regarding the quantum of proof necessary to establish as a matter of law that the plaintiff should have discovered her harm. In synthesizing the Connecticut cases, the Court discussed *Merly v. State*, 558 A.2d 977 (Conn. 1989), a case in which it had held that a plaintiff's failure to investigate, without more, established as a matter of law that the plaintiff had not exercised reasonable care. *Lagassey*, 846 A.2d at 846. The *Lagassey* Court retreated from that holding, stating the discovery rule "imposes no specific duty upon a plaintiff to investigate a potential claim of malpractice." *Id.* In short, the Court held that when a defendant presents, without more, evidence that a plaintiff did not investigate her injuries, the court cannot jump to the conclusion that the plaintiff failed as a matter of law to exercise reasonable care. Importantly, the Court did not hold that the failure to investigate, combined with evidence about what the plaintiff could have discovered if she had investigated, could not form the basis for a conclusion that the plaintiff "should" have discovered actionable harm. Indeed, if the *Lagassey* holding were interpreted to preclude such an inquiry, the question whether a plaintiff "in the exercise of reasonable care, should have discovered the essential elements of a cause of action" would be read out of the discovery rule entirely. This Court should reject any attempt to suggest that it

cannot, under the holding in *Lagassey*, consider what Ms. Bogdan "could" and "should" have discovered had she undertaken a reasonable investigation.  That is the essence of the discovery rule.

When the practical logic of *Cambridge Plating* is applied to the issues raised by Ms. Bogdan, it becomes clear that Ms. Bogdan should have discovered Zimmer's identity and the possibility of a defect more than three years before she filed suit.

### b.    Zimmer's Identity

In an attempt to skirt the conclusion that actionable harm occurred, at the latest, at the time of revision surgery, Plaintiffs previously argued that Ms. Bogdan did not know Zimmer's identity until 2001.  That is when her doctor told her the Centralign was the subject of a class action lawsuit.  But under the analysis in *Cambridge Plating*, she should have discovered Zimmer's identity long before that date.  As this Court correctly held, Ms. Bogdan "could have discovered [Zimmer's identity] with ease."  *Dunn*, 2005 WL 752214, at *3.  At any time before or after her revision surgery, she "could" have asked her doctor to identify the company that manufactured her hip implant.  She could have discovered Zimmer's identity from the peel-n-stick labels attached to her medical records.  It is undisputable that her medical records contained the identity of the stem and its manufacturer.  Her doctor knew what stem he had implanted in her, knew he stopped using it in 1995 or 1996, and indeed easily found Zimmer's name when he wanted to refresh his memory.  Instead of inquiring until she received an answer, she did nothing.  Because Ms. Bogdan undertook no investigation, the analysis in *Cambridge Plating* applies.  Therefore, the fact that she "could" have discovered Zimmer's identity leads to the

unmistakable conclusion that as a matter of law she "should" have discovered Zimmer's identity more than three years before she filed her lawsuit.[1]

Ms. Bogdan has premised her identity argument on *Tarnowsky*. But her reliance on or discussion of *Tarnowsky* is misplaced. That decision is not instructive here. *Tarnowsky* involved a slip and fall on an icy sidewalk. *Tarnwosky*, 856 A.2d at 409-410. At the time the plaintiff in *Tarnowsky* commenced his action he was unaware that someone besides the owner and tenant of the property played a role in the removal of the snow. *Id.* at 410. The Court concluded that the two year negligence statute of limitations does not begin to run until a plaintiff knows, or reasonably *should* have known, the identity of the tortfeasor. *Id.* at 416. In so holding, the Court carefully articulated the reach of its decision: "[T]he rule that we adopt in this case applies only when the plaintiff did not know, and reasonably *could* not have known, the identity of the tortfeasor. We trust that such cases are the exception, not the general rule." *Id.* at 295 (emphasis added). *See also Lindsay v. Pierre*, 879 A.2d 482 (2005) (failure to identify must be "blameless").

This case is not one of those exceptional cases. Unlike the plaintiff in *Tarnowsky*, who did not know that another person was involved with removing the snow, Ms. Bogdan knew or should have known on the date of her revision surgery that some entity manufactured the stem that was being removed from her hip. She did not have to discover that another party likely was involved. She merely needed to ask the name of the party who manufactured the implant that had been causing here pain. Accordingly, this is not a case where the plaintiff "reasonably could not have known" Zimmer's identity. All she needed to do was ask. Ms. Bogdan knew or under

---

[1] Ms. Bogdan argued on appeal that she asked her doctor to identify the manufacturer of her implant and he did not respond. She admits that upon his refusal to respond, she did nothing more. It is incredible for her to argue that she simply accepted his silence as the only answer to which she was entitled. Should she attempt to resurrect the argument here, this Court should hold as a matter of law that she did not exercise reasonable care in accepting her doctor's alleged refusal to tell her Zimmer's name.

the exercise of reasonable care should have known Zimmer's identity on the date of her revision surgery or immediately thereafter.

### c.    Diagnosis of Defect Not Required for Actionable Harm

The other place where this Court used the word "could" was in addressing Plaintiff's argument, based on *Catz*, that she lacked knowledge of causation until 2001. *Dunn*, 2005 WL 752214, at *4. Again, given the context of this case, Ms. Bogdan had knowledge of causation and hence actionable harm at the time of her revision surgery or she "should" have had such knowledge. *See, e.g., Norris*, 397 F.3d at 887-88; *Michals*, 289 F.3d at 407-08; *Sawtell*, 22 F.3d at 252.

Here, Plaintiff cannot credibly argue that at the time of her revision surgery she did not know of the causal link between her pain, bone loss, resulting revision surgery and the stem. As the Court in *Michals* pointed out, "Plaintiff's argument in the district court, attributing the problems associated with her breasts due to a foreign substance in her body and not specifically to the Heyer-Schulte implants, flies in the face of her decision to have the implants replaced[.]" *Michals*, 289 F.3d at 407-08. Ms. Bogdan was fully aware of the harm attributed to the Centralign stem as evidenced by her decision to have it replaced. Indeed, the facts that underlie Ms. Bogdan's belief that the stem is faulty solely because early loosening and replacement were known by her, at the latest, at the time of the July, 1996 revision surgery.

Likewise, Ms. Bogdan's argument that she did not suspect the Centralign might be defective until her doctor mentioned the pending lawsuits in 2001 was expressly rejected in *Breaux*:

> The record in this case shows that Mr. Breaux knew or should have known of his cause of action prior to the ABC broadcast. By 1991, Mr. Breaux knew the device had been implanted into his back, knew he experienced increased and unusual pain since its

> implantation, and believed the device was unstable.  He was also
> told by his doctor that his spine had not and would not fuse.  His
> complaint alleges that the device was defective because his spine
> did not fuse.  Mr. Breaux did not need the ABC report to alert him
> to his cause of action.

*Breaux,* 1999 WL 64929, at *5.  Like the plaintiff in *Breaux*, Ms. Bogdan knew she had

experienced unusual pain, which she and her doctor attributed to the Centralign.  She knew she

had chosen to have the Centralign removed because it was loosening prematurely.  She did not

need to learn of allegations regarding a possible defect to alert her to her cause of action.

Contrary to Ms. Bogdan's repeated assertions, *Catz* is readily distinguishable.  Here,

unlike the Plaintiff in *Catz*, Ms. Bogdan knew at the time of her revision surgery, at the latest, the

relation between the Centralign stem and her injury.  The facts pled in her complaint--the stem

loosened early, caused injury including a revision surgery--were well known to her on the date of

her revision surgery.   (Compl. ¶ 7.)   *Catz* was a medical malpractice case involving a

misdiagnosis, subsequent lack of treatment, and the metastasis of her cancer.  513 A.2d at 99.

There was a question about the new growth or mass she had and its relationship to what the

physician did or did not diagnose earlier.  *Id.* at 100.

Even if this Court were to hold that Ms. Bogdan did not suffer actionable harm until she

knew or in the exercise of reasonable care should have known of allegations that the Centralign

was defective, the undisputed facts establish that Ms. Bogdan should have discovered that fact

more than three years before she filed suit.  To begin with, there were only three likely sources of

her premature loosening:  (1) the stem was defective; (2) her doctor had improperly implanted

the stem; or (3) natural forces (her body makeup and her activity level) had caused the stem to

loosen prematurely without any culpable conduct on the part of a third party.  Armed with this

knowledge, Ms. Bogdan should have discovered allegations regarding a potential defect shortly after they became publicly available.  As this Court pointed out:

> The facts show that any gap in Bogdan's knowledge was due primarily to a lack of diligence.  Information became publically available as early as 1997 (indeed, according to plaintiff's brief, Zimmer knew of defects in the Centralign by 1996) that indicated a potential flaw in the Centralign hip prosthesis.  Given the knowledge Bogdan possessed in 1996-that her hip had failed unusually early causing her the pain and difficulty of a revision surgery-it would not be unreasonable to think that a diligent effort to discover the cause of her injury could have led her to the necessary information no later than 1998.  The record is clear that Bogdan undertook no steps to pursue this suit until November 2001 at the earliest, more than five years after her injury and more than three years after she could have discovered her claim.  At best, Bogdan has proved that she did not know the precise legal theory supporting her claim until 2001, but that is not the relevant inquiry when applying the statute of limitations.

*Dunn*, 2005 WL 752214, at *4.  Under the analysis of *Cambridge Plating*, because Ms. Bogdan did nothing to investigate the cause of her injuries, the fact that Ms. Bogdan "could" have discovered information about allegations of a defect necessarily leads to the conclusion that she "should" have discovered that information.  Therefore, even if Ms. Bogdan needed to discover allegations of defect to have knowledge of actionable harm, which Zimmer believes she did not, this Court should hold that as a matter of law that Ms. Bogdan should have discovered those facts more than three years before she filed suit.

## C.    Mr. Bogdan's Derivative Loss of Consortium Claim Also Fails

The Bogdans concede that Mr. Bogdan's loss of consortium claim is derivative of Ms. Bogdan's claims under the CPLA.  *See Jacoby v. Brinckerhoff*, 735 A.2d 347, 350 (Conn. 1999); *Hopson v. St. Mary's Hosp.*, 408 A.3d 260, 264 (Conn. 1979).  The derivative loss of consortium claim fails as a matter of law when the court grants summary judgment on the injured spouse's claims.  *See, e.g., Mazureck v. Great Am. Ins. Co., Inc.*, No. X02CV010177433S, 2005 WL

647836, at *8 (Conn. Super. Ct. Feb. 10, 2005) (granting summary judgment on wife's loss of consortium claims because husband's product liability and negligence claims failed as a matter of law).

Accordingly, Zimmer is entitled to judgment as a matter of law on Mr. Bogdan's derivative loss of consortium claim because his wife's claim is time-barred as shown above.

### V.
### CONCLUSION

For the foregoing reasons, Zimmer respectfully requests that the Court enter summary judgment in its favor, dismiss this action with prejudice and award Zimmer all available relief including its costs.

Dated:  March 7, 2006                    Respectfully submitted,


/s/_____Albert J. Dahm_____
Albert J. Dahm (ct21710)
**DAHM & ELVIN, LLP**
9604 Coldwater Road, Suite 201
Fort Wayne, IN 46825
Telephone:  (260) 497-6000
Facsimile:  (260) 497-6019
E-mail:  albert.dahm@dahmelvin.com

Francis H. Morrison, III (ct04200)
Robert E. Koosa (ct26191)
**DAY BERRY & HOWARD, LLP**
CityPlace I
Hartford, CT 06103-3499
Telephone:  (860) 275-0100
Facsimile:  (860) 275-0343
E-mail:   fhmorrison@dbh.com
              rekoosa@dbh.com

Attorneys for Defendant Zimmer, Inc.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 7, 2006 I electronically filed the foregoing **Memorandum of Law in Support of Zimmer, Inc.'s Motion for Summary Judgment** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

        Robert I. Reardon, Jr.
        The Reardon Law Firm, P.C.
        160 Hempstead Street
        P.O. Drawer 1430
        New London, Connecticut  06320

I further certify that on [] I have mailed by United States Mail the document to the following non-CM/ECF participants:

        None

        /s/_____Albert J. Dahm_____
        Albert J. Dahm (ct21710)
        **DAHM & ELVIN, LLP**
        9604 Coldwater Road, Suite 201
        Fort Wayne, IN 46825
        Telephone:  (260) 497-6000
        Facsimile:  (260) 497-6019
        E-mail:  albert.dahm@dahmelvin.com