# EXHIBIT C

```
 1         UNITED STATES DISTRICT COURT
 2            DISTRICT OF CONNECTICUT
 3
 4   DOLORES DUNN;              )
     DONALD DUNN,                )
 5                               )
           Plaintiffs,           )
 6                               )
       vs.                       ) Civil Action No.
 7                               ) 3:00CV1306 (DJS)
     ZIMMER, INC.,               )
 8                               )
           Defendants.           )
 9   _____)
10
11
12
13
14
15        DEPOSITION OF RICHARD SANTORE, M.D.
16               San Diego, California
17              Monday, June 25, 2001
18
19
20
21
22
23
     Reported by:
24   MONIQUE OLIGNY
     CSR No. 10818
25   JOB No. 20517
                                                    1
```

```
 1   APPEARANCES:
 2
 3   For Plaintiffs:
 4      THE REARDON LAW FIRM, P.C.
        BY:   ROBERT I. REARDON, JR.
 5      Attorney at Law
        160 Hempstead Street
 6      New London, Connecticut 06320
        (860) 442-0444
 7
     For Defendant Zimmer, Inc.:
 8
        BAKER & DANIELS
 9      BY:   ALBERT J. DAHM
        Attorney at Law
10      111 East Wayne Street
        Fort Wayne, Indiana 46802
11      (219) 424-8000
12      ZIMMER, INC.
        BY:   DAVID N. ROYSTER
13      Attorney at Law
        P.O. Box 708
14      Warsaw, Indiana 46581-0708
        (219) 372-4712
15
16
17
18
19
20
21
22
23
24
25
                                                    3
```

```
 1         UNITED STATES DISTRICT COURT
 2            DISTRICT OF CONNECTICUT
 3
 4   DOLORES DUNN;              )
     DONALD DUNN,                )
 5                               )
           Plaintiffs,           )
 6                               )
       vs.                       ) Civil Action No.
 7                               ) 3:00CV1306 (DJS)
     ZIMMER, INC.,               )
 8                               )
           Defendants.           )
 9   _____)
10
11
12
13
14
15         Deposition of RICHARD SANTORE,
16   M.D., taken on behalf of Plaintiff,
17   at 7910 Frost Street, Suite 202,
18   California, beginning at 8:06 a.m.
19   and ending at 10:42 a.m. on Monday,
20   June 25, 2001, before MONIQUE OLIGNY,
21   Certified Shorthand Reporter No.
22   10818.
23
24
25
                                                    2
```

```
 1                    INDEX
 2   WITNESS                              EXAMINATION
 3   RICHARD SANTORE, M.D.
 4
 5       BY MR. REARDON                      5, 109
 6       BY MR. DAHM                             95
 7
 8                   EXHIBITS
 9   PLAINTIFF                                  PAGE
10   1    CV                                       5
11   2    Journal of Arthroplasty article          6
12   3    Notice of Deposition                    10
13   4    Subpoena                                10
14   5    Letter from Dr. Santore to Mr. Reardon  15
15   6    Orthopedics Today article               21
16   7    Western Orthopedic Association meeting comments  21
17   8    Article by Dr. Harris                   70
18   9    Centralign brochure                     75
19   10   Versys Prosthetic Femoral Component Sheet  77
20   11   January 23, 1998 letter                113
21
22              REFERENCE REQUESTED
23                 Page Line
24                  51   25
25
                                                    4
```

Richard Santore, M.D.                                                                 06/25/01

```
 1        San Diego, California, Monday, June 25, 2001
 2                   8:06 a.m. - 10:42 a.m.
 3
 4              RICHARD SANTORE, M.D.,
 5   having been first duly sworn, was examined and testified
 6   as follows:
 7                       EXAMINATION
 8        MR. REARDON: May I have Exhibit 1?
 9        (Deposition Exhibit 1 was marked for
10        identification by the court reporter.)
11   BY MR. REARDON:
12        Q   Doctor, would you state your name and address
13   for the record, please?
14        A   Yes, sir. Richard Santore, S-a-n-t-o-r-e.
15        Q   Your address?
16        A   Sorry. It's 7910 Frost Street, Suite 202,
17   San Diego, California 92123.
18        Q   Doctor, you've provided me with your curriculum
19   vitae, and it's been marked as Exhibit 1.
20            Is that a complete and up-to-date curriculum
21   vitae?
22        A   Reasonably so, yeah.
23        Q   Does it include the article which has been
24   marked as Exhibit 2, which you have in front of you?
25        A   No, it does not.
                                                            5
```

```
 1        A   Approximately ten days ago.
 2        Q   And how long did you spend with them?
 3        A   Approximately 35 to 40 minutes.
 4        Q   And what was the purpose of the meeting?
 5        A   They requested a meeting to -- I assume to
 6   explore with me what I was going to be addressing in my
 7   deposition. And I just answered all of their questions
 8   to the best of my ability.
 9        Q   And, Doctor, have you ever met with me or any
10   other attorney representing any plaintiffs who have
11   brought a lawsuit against Zimmer as a result of the
12   Centralign hip prosthesis?
13            MR. DAHM: Objection. Form. Vague.
14            Go ahead, Doctor.
15   BY MR. REARDON:
16        Q   Have you met with any other -- any plaintiffs'
17   counsel regarding any lawsuits concerning the Zimmer
18   Centralign?
19            MR. DAHM: Same objection.
20            THE WITNESS: Yes. I have been contacted by a
21   number of attorneys over the years, and did not -- and
22   had -- respectfully declined to become involved in cases
23   on either side. And I do recall having met with one
24   attorney on one of my patients approximately four or
25   five years ago.
                                                            7
```

```
 1        (Deposition Exhibit 2 was marked for
 2        identification by the court reporter.)
 3   BY MR. REARDON:
 4        Q   I noticed -- I went to the end and I didn't see
 5   it there, so -- so there are a few things that are not
 6   on it?
 7        A   Yes.
 8        Q   Have you been deposed before, Doctor?
 9        A   Yes, I have.
10        Q   And have you been deposed in relation to any
11   lawsuits that involve the Zimmer Centralign?
12        A   I have not.
13        Q   And have you met any of us before today that
14   are here in the room?
15        A   Yes, I have.
16        Q   And who have you met?
17        A   I've met Mr. Royster and Mr. Dahm on one
18   occasion.
19        Q   Here in --
20        A   Yes.
21        Q   -- in your office?
22        A   Yes.
23        Q   And had you ever met either one before?
24        A   No.
25        Q   Okay. And when did you meet with them?
                                                            6
```

```
 1   BY MR. REARDON:
 2        Q   Do you remember the name of that attorney?
 3        A   No, I do not. I remember the patient's name,
 4   but I can't disclose that for confidentiality. And if
 5   it were important, I could look it up. But I do not
 6   have an independent recollection of that attorney's
 7   name.
 8        Q   Was it a San Diego attorney?
 9        A   No, it was not.
10        Q   Was it a Nevada attorney?
11        A   No, it was not.
12        Q   Can you tell me where the attorney came from?
13        A   I believe that he was headquartered out of
14   Sacramento, but that's not a precise recollection.
15        Q   Okay. So, north of here in California?
16        A   Yes.
17        Q   And do you know if that -- that case that that
18   lawyer from Northern California met with you regarding
19   resulted in a lawsuit?
20            MR. DAHM: Objection. Vague and assumes facts
21   not in evidence. Case.
22            Go ahead, Doctor.
23            MR. REARDON: Well, case can be medical case
24   also.
25            MR. DAHM: That's why it's vague.
                                                            8
```

2 (Pages 5 to 8)

**Page 9**

```
 1    THE WITNESS: The status, in terms of that,
 2 were never disclosed to me for confidentiality reasons.
 3 BY MR. REARDON:
 4    Q  Very well. Doctor, how many times would you
 5 say you've been deposed?
 6    A  Over a hundred, but less than a thousand. I do
 7 not make it a practice to focus on a medical/legal
 8 career, but I've probably been deposed over a hundred
 9 times.
10    Q  And, have any of those depositions involved
11 product liability cases, or have they been principal --
12 have they been all involving your patients?
13    A  They have mostly been in -- I have never been
14 involved, to my recollection, in a product-liability
15 case. Most have been involved in matters that are
16 directly related to my patients, many of whom were
17 involved in serious injuries and required expert
18 testimony for establishment of damages. And I will, on
19 some -- on infrequent occasions, take on a case as an
20 expert witness upon request. But I limit that to just a
21 few occasions a year.
22    Q  Have you served as an expert witness for
23 Bristol-Myers Squibb or Zimmer?
24    A  I have not.
25    Q  And, so, I take it from what you've said up to
```

**Page 10**

```
 1 this point, so we're clear on the record, that you have
 2 not testified against or for Zimmer, or in any capacity,
 3 regarding the Centralign hip prosthesis?
 4    A  That is correct.
 5    Q  Doctor, the notice of deposition that was
 6 served upon you asked you to produce certain documents.
 7 I think it's been marked as exhibit -- it's right over
 8 there. I don't know. I think it's 3, isn't it?
 9    A  Yes.
10       (Deposition Exhibit 3 was marked for
11       identification by the court reporter.)
12 BY MR. REARDON:
13    Q  Did -- can you take a look at page 2?
14    A  Yes.
15    Q  Have you produced the documents that are
16 requested in that notice?
17       MR. DAHM: Excuse me, Doctor. Just for the
18 record, the objection is, A, assumes it's been served on
19 him, that particular notice. And about B, there's no
20 subpoena attached to that notice -- I just want to
21 finish on the record.
22       MR. REARDON: We'll mark it as 4. It's good
23 for 60 days.
24       (Deposition Exhibit 4 was marked for
25       identification by the court reporter.)
```

**Page 11**

```
 1       MR. DAHM: Let me make my record, Bob. I don't
 2 want to interrupt you.
 3       Now we're marking as Exhibit 4 a subpoena which
 4 may or may not have been served on the doctor. It never
 5 was served on Zimmer, and it was issued out of the
 6 District of Connecticut. So we'd object to the use of
 7 that subpoena in any way, particularly asking this
 8 witness to produce documents.
 9 BY MR. REARDON:
10    Q  Let me show you Exhibit 4 and Exhibit 3. I
11 think they're virtually the same. One is an earlier
12 notice of this deposition in May, and with a subpoena
13 duces tecum, which means to bring with you certain
14 documents.
15    A  Right.
16    Q  And I think, other than the subpoena, you'll
17 find, if you compare it to Exhibit 3, it's the same,
18 except, of course, for the date and location of the
19 deposition.
20       Do you recall that being served upon you?
21    A  I do. Yes, I do.
22    Q  And have you produced the -- the documents that
23 are requested in Exhibit 3 and 4?
24       MR. DAHM: I'm sorry, Doctor. Again, for the
25 record, A, they're not the same. And, B, Zimmer would
```

**Page 12**

```
 1 object to any use of Exhibit 4, because it was never
 2 served on Zimmer.
 3       But go ahead.
 4       MR. REARDON: I thought under the federal rules
 5 your objections were preserved to the time of trial
 6 except as to the form of the question.
 7       MR. DAHM: Well, it goes to form because you
 8 misstated the --
 9       MR. REARDON: Well, I think you just object to
10 the form and then we move on. Only because we have a
11 very limited time here. And if you're going to
12 verbalize every objection, it's going to use up an awful
13 lot of that time. And I don't want to come back to
14 California again, and I'm sure the doctor doesn't want
15 to go through this again.
16       So, if you'd just object to the form of the
17 question, you can say whatever you want to a federal
18 judge as to why you objected to the form and what I did
19 wrong at a later time, and save a considerable amount of
20 time. You do what you want. I'm going to move on.
21    Q  Doctor, have you produced the documents that
22 are requested in Exhibits 3 and 4?
23       Your objection is noted.
24    A  In response to this, I would say that, number
25 one, there are some matters of investigations that are
```

Richard Santore, M.D.                                                              06/25/01

**Page 13**

 1  attached to the one case, which I already disclosed that
 2  I had met with an attorney about. And that is part of a
 3  privileged record that is now sealed. I have not done
 4  any independent studies, research, mechanical testing,
 5  or any other activities directly related to this
 6  prosthesis, other than to carefully study the patients
 7  in our own practice, which -- and this information was
 8  reported in an open forum and then published in an open
 9  forum.
10          The actual background information and source
11  material are in the possession of Dr. Mark Sylvain, who
12  was my clinical fellow at the time, and is now residing
13  and practicing in Las Vegas. And those are not in this
14  office.
15      Q   Okay. So, all of the data upon which your
16  article, which is Exhibit 2, was based is in the
17  possession of Dr. Sylvain?
18      A   Right.
19      Q   And, is his office still located at 701 South
20  Tonopah, Las Vegas, Nevada?
21      A   Yes.
22      Q   That's T-o-n-o-p-a-h, for the court reporter.
23          Doctor, he was one of your fellows, you said?
24      A   Yes, he was.
25      Q   And he's now in private practice?

**Page 15**

 1  there that you have in your possession?
 2      A   That is correct.
 3      Q   Now, during that meeting ten days ago, was
 4  there a discussion of repeated cancellation of this
 5  deposition?
 6      A   Yes.
 7      Q   And did Mr. Dahm or Mr. Royster represent to
 8  you that it was canceled on all occasions by my law
 9  firm?
10      A   No, they did not.
11      Q   I got a letter from you, Doctor, as you know,
12  that I called you on as soon as I got. And I want to
13  mark that as an exhibit, if I could, because it
14  indicated some concerns on your part, rightly so, that
15  this deposition had been canceled on a number of
16  occasions and that you wished it to go forward. And I
17  certainly can't -- let me see if I can find that letter,
18  actually. Here it is. Bottom of the pile, rather than
19  the top.
20          If you don't mind, I will mark that as
21  Exhibit 5, Doctor.
22          (Deposition Exhibit 5 was marked for
23          identification by the court reporter.)
24          THE WITNESS: It's my understanding, to address
25  that issue, I believe that the deposition was scheduled

**Page 14**

 1      A   Yes, he is.
 2      Q   Doctor, I want to go back very briefly to your
 3  meeting with Mr. Royster and Mr. Dahm.
 4          What did Mr. Royster -- did Mr. Royster and
 5  Dahm provide you with any documents during that meeting?
 6      A   The only document that was provided to me was a
 7  copy of the subpoena -- no. I mean, I provided that to
 8  them. They asked to see the subpoena, and they informed
 9  me at that time that, in their opinion, it was not an
10  enforceable subpoena. But I indicated my willingness to
11  cooperate, since I was not a -- an expert on either
12  side, and was willing to be a fair witness to the facts
13  of the case.
14      Q   Very well. Other than that, did they provide
15  you with any documents -- did they give you anything to
16  read or to keep?
17      A   No, nothing.
18      Q   And did you provide them with any documents?
19      A   Just the subpoena.
20      Q   Okay. And so, I take it that -- from what
21  you've just said -- that despite their advice to you
22  that the subpoena was not enforceable, you had done your
23  best to comply with the subpoena?
24      A   Yes.
25      Q   And there are no documents that are listed

**Page 16**

 1  and rescheduled six or seven times, and -- and I --
 2  BY MR. REARDON:
 3      Q   We have nine times, but --
 4          MR. DAHM: Wait. Let him finish and then you
 5  can ask another question.
 6          THE WITNESS: The exact number is not, you
 7  know, so important. But once it gets in that range,
 8  it -- it becomes difficult to continue to comply with
 9  requests, especially since I'm not an -- an expert, and
10  had to set aside time each time for this. And I
11  contacted your office, and your office was very gracious
12  and said that, to their knowledge, it had been the
13  inability to get a commitment for a firm date from the
14  Zimmer attorneys. When I had a chance to meet the
15  Zimmer attorneys, they indicated that they were not
16  responsible for all the cancellations, and that's where
17  it stands.
18  BY MR. REARDON:
19      Q   And I think that's where it ought to stand.
20  But I will say, on behalf of the plaintiffs in this
21  case, that we apologize for any inconvenience we've
22  caused you. And I'm sure Mr. Dahm feels the same way.
23      A   He expressed the same concern.
24      Q   Very well. Doctor, how many hip replacement
25  surgeries have you done over your career? Could you

Richard Santore, M.D.                                                                                     06/25/01

**Page 17**

1  just estimate roughly?
2      A    Several thousand.
3      Q    And how many are primary and how many
4  revisions, percentage?
5      A    Roughly, 15 to 20 percent would be revisions,
6  and the rest would be primary.
7      Q    Is that principally the surgery that you are
8  performing?
9      A    No, it is not.
10     Q    What is the principle surgery you perform?
11     A    The principal surgery that I perform is an
12 osteotomy of the hip. That's a procedure that I have
13 devoted considerable professional --
14     Q    You can use the word --
15     A    -- concern, or considerable interest in the
16 lifelong study of the role of this type of surgery in
17 prolonging the life span of biological hip joints. I
18 think, as I -- in my most recent review of the
19 statistics for the past few months, I've done 28 hip
20 osteotomies since May 1st of this year. And that's in
21 the span of less than two months. I feel fairly certain
22 that I have the largest practice of that kind -- of this
23 kind in the world, and continue to pursue this with
24 great interest and -- but I also maintain a strong
25 interest in the full spectrum of adult reconstructive

**Page 18**

1  hip and knee surgery, which would include primary and
2  revision total knee replacements.
3          And, in fact, for approximately six or seven
4  years I chaired the American Academy of Orthopedic
5  Surgeons' courses on revision hip surgery at the
6  Learning Center in Rosemont.
7      Q    Let me go through quickly with you the
8  physicians that were involved with you in the article,
9  which has been marked as Exhibit 2.
10         Dr. Sylvain you already indicated was a fellow
11 here with you?
12     A    Yes.
13     Q    And I take it that was through the University
14 of California San Diego?
15     A    Correct.
16     Q    And how about Dr. Kassab?
17     A    Same.
18     Q    And where is Dr. Kassab now?
19     A    Dr. Kassab is now in the midwest, practicing in
20 Michigan.
21     Q    Do you know where in Michigan?
22     A    I have his address on file.
23     Q    Before we leave, if you could provide that, I'd
24 appreciate it.
25         How about Dr. Coutts? I take it we're in his

**Page 19**

1  office right now, from the diplomas on the wall. He's
2  associated in the same group as you?
3      A    Yes.
4      Q    And has there -- was there anyone else that was
5  involved in the article that isn't recognized in the
6  article itself?
7      A    No.
8      Q    How many of the -- how many times have you used
9  a Zimmer Centralign hip prosthesis in a hip replacement
10 surgery, Doctor?
11         MR. DAHM: Vague and ambiguous.
12 BY MR. REARDON:
13     Q    You can estimate.
14         MR. DAHM: Same.
15         THE WITNESS: I would estimate approximately
16 60 times.
17 BY MR. REARDON:
18     Q    There is -- in your article there's a reported
19 98 primary hip arthroplasties between March of 1992 and
20 December of 1995.
21         Were those -- were all 95 (sic) with the use of
22 the Zimmer Centralign hip prosthesis?
23     A    Yes.
24     Q    And some of those, obviously, were not
25 performed by you, but were performed by other -- your

**Page 20**

1  co-authors?
2      A    They were all cases of mine and Dr. Coutts's.
3      Q    So, 60 were yours and perhaps, roughly, 35 were
4  his? Is that --
5      A    I would -- roughly 60 percent were mine --
6      Q    Sixty percent. I'm sorry.
7      A    -- and 40 percent were probably Dr. Coutts's.
8      Q    Which probably comes to almost the same amount,
9  since there are 98.
10     A    Very close. Very close.
11     Q    In addition to the -- the article, there is --
12 there was -- as I'm sure you well know, there was
13 reported in Orthopedics Today your opinions concerning
14 the Zimmer Centralign, Doctor. I'm sure you're
15 acquainted with that, right?
16         MR. DAHM: Objection. Facts not in evidence.
17 Foundation.
18         THE WITNESS: Yes. I am aware of that November
19 1997 publication, of that particular manuscript.
20         MR. REARDON: Let me just mark --
21         MR. DAHM: While you're looking for that, Bob,
22 I'll just ask, Exhibit 5 asks about a fee. Was such a
23 fee tendered to you?
24         THE WITNESS: I'm sorry. I don't have
25 Exhibit 5 in front of me.

**Page 21**

1  MR. DAHM: It's your letter to Mr. Reardon.
2  THE WITNESS: Yes, it was.
3  MR. DAHM: What was the amount of that fee,
4  Doctor?
5  THE WITNESS: It was $1200 for representing, in
6  advance, payment for two hours of deposition time.
7  MR. DAHM: And your fee schedule is attached?
8  THE WITNESS: Yes, it is.
9  MR. DAHM: Thanks.
10  MR. REARDON: Would you mark those as the next
11  two exhibits?
12  (Deposition Exhibits 6 and 7 were marked for
13  identification by the court reporter.)
14  BY MR. REARDON:
15  Q  Doctor, since Mr. Dahm went back to
16  Exhibit No. 5, I might as well now, too.
17  Have you ever received any compensation
18  directly or indirectly from Zimmer, Inc., or
19  Bristol-Myers Squibb, including grant money for
20  research?
21  A  To the best of my recollection, the only
22  compensation I've ever received was back in the late
23  1980s, when, at the request of Dr. Coutts, I was a
24  co-investigator for the local site clinical trial of the
25  Zimmer Bias, B-i-a-s, total hip stem. And that was a

**Page 22**

1  nominal fee to cover the costs for the added time spent
2  in the follow-up of the patients. I don't have a
3  precise recollection, but I believe it was somewhere in
4  the range of $300 per patient, and -- and we did 20 or
5  so patients.
6  Q  It might be about $6,000 total?
7  A  And most of that, at that time, went to
8  Dr. Coutts, because I had a minority of the cases.
9  Q  I see. And, you've never received any
10  compensation from Zimmer for any research regarding the
11  Zimmer Centralign?
12  A  I have not.
13  Q  Do you know Roy Crowninshield?
14  A  I do.
15  Q  And have you met personally with him?
16  A  I have.
17  Q  And how many times have you met with him?
18  A  Oh, over the years, frequently. I have always
19  had a great deal of respect for him, and we will chat
20  occasionally for just a few minutes at major orthopedic
21  meetings. I would say cumulatively, over the years I've
22  talked with him probably 20 times.
23  Q  And has he been here to your office?
24  A  Yes, he has.
25  Q  Has he met with you regarding the Zimmer

**Page 23**

1  Centralign and the controversy concerning it?
2  A  Yes, he has.
3  MR. DAHM: Vague. Excuse me. Foundation.
4  Sorry, Doctor.
5  BY MR. REARDON:
6  Q  Well, let me just cut to the quick here,
7  Doctor.
8  Would you say that your November '97 comments,
9  and your comments at the -- excuse me, Doc -- at the
10  Western Orthopedic Association meeting on September 8th,
11  1997, caused some controversy?
12  A  I believe they did, yes.
13  Q  So, when I speak of controversy, I'm referring
14  to that controversy.
15  And, has Mr. Crowninshield met with you
16  regarding that controversy?
17  A  Yes. Dr. Crowninshield came here on, I think,
18  two occasions.
19  Q  Okay. And, to your office here in San Diego?
20  A  Yes.
21  Q  And, were those both after September 8th, 1997,
22  when you made your comments at the meeting?
23  A  Yes.
24  Q  And, could you tell me briefly what the
25  substance was of the discussions that you had with

**Page 24**

1  Mr. Crowninshield?
2  A  Well, I know that he was at the meeting in
3  September when this was presented. Whether he -- you
4  know how at medical meetings -- I'm sure it's the same
5  at large legal gatherings and other professional
6  meetings -- members of the -- who are not presenting at
7  the time in the audience, whatever, will wander in and
8  out for side conversations, to get a cup of coffee, go
9  to the rest room, et cetera. And I do not have any
10  independent recollection of whether he was in the
11  auditorium at the time this presentation was made, but
12  he was at the meeting. And subsequently thereafter, he
13  requested an opportunity to come out to meet with me,
14  and I accommodated that expeditiously.
15  Q  So, at the meeting in September of 1997, you
16  did speak with Mr. Crowninshield regarding your remarks
17  at the meeting?
18  A  Yes, we had a brief exchange.
19  Q  Does Exhibit No. 7 accurately summarize your
20  comments at the meeting?
21  A  Please give me an opportunity to read this
22  again, because I haven't seen this in some time.
23  Yes, it does.
24  Q  And did you have written remarks, Doctor, when
25  you presented them in September of 1997?

Richard Santore, M.D.                                             06/25/01

**Page 25**

1    A    No. This was the only written formal component
2  of the presentation. The rest would have been done -- I
3  did not make this presentation. This was made by
4  Dr. Sylvain. I often, as do most people in my position,
5  try to give young people coming up an opportunity to
6  take the spotlight and give them a chance to formally
7  present at major meetings.
8    Q    Okay. But you -- you did not make it, but I
9  take it you joined Dr. Sylvain, your fellow, in agreeing
10 with the information that he was reporting at the
11 meeting?
12   A    Oh, yes. Of course. I'm in full agreement
13 with that information as written, but I did not make the
14 presentation.
15   Q    Very well. Do you know Dr. William Harris?
16   A    Yes, I do.
17   Q    Before we leave, Doctor, is
18 Dr. Crowninshield -- is he a physician?
19   A    He's a Ph.D. He's a highly regarded
20 biomaterial scientist who was an academic researcher
21 before being retained or recruited by Zimmer. I would
22 think it would go back now probably 15 to 17 years ago.
23   Q    And, did you understand that he was on the
24 development committee for the Zimmer Centralign?
25        MR. DAHM: Foundation.

**Page 26**

1         THE WITNESS: I have no such knowledge of that.
2  BY MR. REARDON:
3    Q    You understood he was a senior vice-president
4  of Zimmer when you met with him?
5         MR. DAHM: Foundation.
6         THE WITNESS: I do not -- I do not have regular
7  ongoing relations with Zimmer as an entity, and I -- I
8  know that he's a highly-placed executive within Zimmer.
9  His exact title would be unknown to me.
10 BY MR. REARDON:
11   Q    Okay. And, when you met with him, you
12 understood that; that he was a highly placed executive
13 within Zimmer?
14        MR. DAHM: Vague now.
15        THE WITNESS: It's my understanding that he was
16 primarily on the research side. Any other information I
17 just am not privy to.
18 BY MR. REARDON:
19   Q    Very well. Fair enough.
20        Doctor, you said you met with him. In addition
21 to meeting with him at the meeting itself in September
22 of 1997, you met with him -- did you say twice here at
23 your office?
24   A    There were several meetings that took place in
25 my office with representatives of Zimmer. I know

**Page 27**

1  Dr. Bill Rohr, who was functioning in an executive
2  capacity with Zimmer at the time, came on, I believe,
3  two occasions. And I think that Dr. Crowninshield came
4  on both occasions but he may have only came once -- come
5  once. Excuse me for the grammatical error. But he --
6  so I don't have -- I know that he came here at least
7  once, and I think twice.
8    Q    Dr. Bill Rohr. Could you spell Rohr?
9    A    R-o-h-r.
10   Q    And, he also was employed by Zimmer, as you
11 understood it?
12   A    Yes.
13   Q    And, what was your understanding of the
14 purposes for those meetings?
15   A    They wanted to understand if there were any
16 additional factors, if there were -- I assume they
17 wanted to know if there was additional bad news that was
18 going to come forth. And I, you know, expressed to them
19 the fact that -- that all the information that I had
20 available had been forthrightly presented; that there
21 were no additional failures that I was aware of at the
22 time of the meeting. And I expressed my concern
23 personally to them that this was a very high failure
24 rate for a -- for a prosthesis.
25   Q    Was there anything that came out of that

**Page 28**

1  meeting that changed your opinions that were eventually
2  reported in Exhibit 2, the article published in the
3  Journal of Arthroplasty?
4    A    Well, I remember that Dr. Crowninshield said,
5  you know, we -- we were very concerned, you know. We
6  have a high -- we have a great deal of respect for you,
7  as does Dr. Harris. You know, we're scratching our
8  heads about this. We know that there are multiple
9  variables involved. We don't really understand what's
10 going on yet. Please keep an open mind about the fact
11 that there may be all kinds of factors contributing to
12 this failure rate, and -- and I agreed to do so.
13        And, in fact, at the time that I met with him,
14 we did not have a full statistical analysis of the
15 relevant -- of the statistical significance of the
16 various elements that we thought might be contributing
17 factors. And I have been careful at every step along
18 the way to separate what is a certain factual
19 identification of a failure from a failure pattern with
20 imprecisely identified risk factors and/or precipitating
21 events. And I think the latter is the fair way to
22 categorize the Centralign event.
23        I am not a biomaterial scientist, I do not have
24 my own laboratory. We are not aware of a specific
25 failure of machining or tooling or preparation,

Richard Santore, M.D.                                                                 06/25/01

**Page 29**

```
 1  impurities, et cetera, that would be responsible for
 2  this failure rate. And we try to look at as many
 3  variables as possible.
 4          And there were a lot of uncontrolled wild cards
 5  in this series, including different cups, different
 6  plastics, that make it very difficult to draw, you know,
 7  precise conclusions about what was responsible for the
 8  failure.
 9      Q   I understand. Doctor, do you stand by your
10  article that was published in -- I believe it was March
11  of 2001, in the Journal of Arthroplasty?
12      A   I stand behind the abstract from the Western; I
13  stand behind the article in Orthopedics Today, which, I
14  think, was very fairly and accurately portrayed; and I
15  stand behind the article in the Journal of Arthroplasty.
16      Q   Very well, Doctor. And all of those have now
17  been marked as exhibits in this case, correct?
18      A   Yes.
19      Q   Doctor, have -- you mentioned that, at the time
20  that you met with Dr. Crowninshield and possibly Mr. --
21  or Dr. Rohr, you did not have a statistical analysis of
22  contributing factors.
23          Has any other information, such as a
24  statistical analysis of contributing factors, been
25  provided to you, or have you prepared any since then?
```

**Page 30**

```
 1      A   It's all included in the article of February.
 2      Q   So, there's been nothing further that you've --
 3  that you've assembled, since that article was published?
 4      A   Correct.
 5      Q   I said March. Was that actually published in
 6  February?
 7      A   February.
 8      Q   Now, I -- Doctor, as I have noted in the
 9  footnote on page 1 of the article, which is actually
10  page 141 of the Journal, you did not receive, nor did
11  any of the other co-authors receive any benefits or
12  funds to support the study that you undertook that
13  resulted in this article, correct?
14      A   That is correct. This was self-funded by our
15  own personal funds.
16      Q   And, is the Journal of Arthroplasty a
17  peer-reviewed journal?
18      A   Yes, it is.
19      Q   And, do you -- was this article subject to peer
20  review before it was published?
21      A   It was.
22      Q   And, was it published in the form that was
23  submitted for peer review?
24      A   It was.
25      Q   And, how long have you known Dr. William
```

**Page 31**

```
 1  Harris?
 2      A   I've known Dr. Harris since 1977, which would
 3  now include a span of some 24 years.
 4      Q   Have you ever been associated with him at all
 5  in any capacities?
 6      A   Yes, I have.
 7      Q   And tell me how.
 8      A   We share a long-standing friendship which has
 9  unusual bonds, since we both went to the same medical
10  school, same college, same residency program.
11      Q   I noticed that quickly when I read through your
12  CV.
13      A   And, you know, Dr. Harris actually facilitated
14  my entry into the Harvard residency program. And I
15  worked with him as his resident on service for six weeks
16  during the course of my years as a resident in Boston.
17  And we had a somewhat special relationship. We were
18  much closer than most residents going through at the
19  time, and he was, in fact, responsible for introducing
20  me to Dr. Coutts and for arranging my position here in
21  San Diego.
22      Q   So, you've had a long-standing relationship
23  with him that includes Haverford College, being
24  coincidently -- he's a little older than you, I
25  believe -- the same college, same medical school, and
```

**Page 32**

```
 1  then you actually were associated with him when you were
 2  at Harvard?
 3      A   He was a Harvard resident, so -- so was I.
 4  And, when I was there, I actually served under him.
 5  And, you know, we were -- we had not become, obviously,
 6  close friends. There was a -- a respectful difference
 7  between a resident and a full professor at Harvard,
 8  but --
 9      Q   Sure.
10      A   -- we nonetheless enjoyed each other's company
11  a great deal and continue to do so.
12      Q   And, I take it that, since Orthopedics Today
13  reported discussions that occurred between you and
14  Dr. Harris, that you did, in fact, have some discussions
15  since September of 1997, regarding the Centralign?
16      A   We did.
17      Q   And, could you tell me whether or not you've
18  met personally with Dr. Harris concerning the
19  Centralign?
20      A   Yes, I have.
21      Q   And, how many times has that occurred?
22      A   I believe on two occasions.
23      Q   Has he ever come to San Diego to meet with you?
24      A   No.
25      Q   Where have those meetings taken place?
```

**Page 33**

1  A  When I became aware of this pattern of failure,
2  I brought a number of the cases with me and asked for an
3  opportunity to meet with him for a few minutes in -- at
4  one of the national meetings. I don't recall the venue
5  at this time. It was approximately -- I would say
6  sometime in 1996, would be the best recollection.
7  February or March.
8      And -- and I, you know, shared with him my
9  concern, and he -- he seemed very taken aback and -- and
10 said, you know -- He said, Richard, these look like good
11 early X rays. I'm kind of at a loss to explain this.
12 We haven't seen this in our -- in our series, and we'll
13 certainly, you know, look at this to see if we can
14 resolve what's going on here.
15     And then we met again at another orthopedic
16 meeting of some kind. I see Dr. Harris all the time.
17 It was probably a hip society meeting. And he again
18 indicated his interest in getting to the bottom of this,
19 and didn't have -- he said that he felt that there were
20 a number of confounding variables in our series that
21 made it difficult to sort out the culprit. I agreed
22 with him, but I also respectfully, you know, asserted
23 our position that we had not been on the receiving end
24 of a failure pattern like this in the past.
25  Q  Very well. Doctor, you reported in your

**Page 34**

1  article in the Journal of Arthroplasty a failure rate
2  of -- I think it was 11.4 percent. Is that correct,
3  Doctor? I think you rounded it to 12 percent, maybe?
4  A  Yes. In the abstract, it's 12 percent. But in
5  the body, I believe the number you have quoted is
6  correct.
7  Q  Okay. And -- and you would characterize that
8  as you did in your -- in your article, as an
9  unacceptable failure rate; is that fair to say, Doctor?
10 A  Yes, it is.
11     MR. DAHM: Vague. Excuse me, Doctor.
12 BY MR. REARDON:
13 Q  Now, what would you consider to be -- with your
14 years of experience in the field of hip arthroplasty,
15 what would you consider to be an acceptable failure
16 rate?
17     MR. DAHM: Vague and ambiguous.
18     THE WITNESS: At the time frame under analysis
19 here, we --
20 BY MR. REARDON:
21 Q  I apologize. I should have asked you that.
22 During the period of '92 through '95.
23     MR. DAHM: Same objections. Sorry, Doctor.
24     THE WITNESS: That's okay.
25     One percent or less.

**Page 35**

1  BY MR. REARDON:
2  Q  Very well. And, prior to using the Zimmer
3  Centralign in '9- -- I take it you began using it in
4  '92, and I also take it you ended in December '95, when
5  you reported a failure, right?
6  A  No. We didn't report the failure in '95, but I
7  believe that's when we ended our personal use of the
8  prosthesis.
9  Q  Right. And, before you used the -- let's take
10 it in three time frames. Before '92, during the period
11 that you were using Zimmer, and then after.
12     Before March of '92, what types of hip
13 prosthesis were you using in your practice?
14 A  We had --
15     MR. DAHM: I'm sorry. For cemented or --
16     MR. REARDON: For anything.
17 Q  What manufacturers?
18 A  We used a number of hip prosthesis manufactured
19 by DePuy, Howmedica, Zimmer, primarily. And then, on
20 occasion, some others. But those were the main ones.
21 Q  During the period which is the subject of your
22 study, reported in Exhibit 2, which is March of '92 to
23 December of '95, were you also using other
24 manufacturers' hip prosthesis, besides the Zimmer?
25 A  Yes.

**Page 36**

1  Q  And then, afterwards, did you continue to use
2  any Zimmer products after December of 1995?
3  A  Yes. We -- we still were doing -- I think I
4  need to clarify that we didn't stop the prosthesis in
5  December of '95. December of '95 was the cut-off date
6  for inclusion in the series because we needed a minimum
7  two-year follow-up.
8  Q  I see.
9  A  So, there were patients that continued on after
10 that. And we had a very favorable experience with the
11 Zimmer acetabular component, which was used in many of
12 these cases and --
13 Q  Is that the Zimmer Galante?
14 A  Yes. And the Harris Galante acetabular
15 component.
16 Q  I'm sorry. Harris Galante by Zimmer?
17 A  Right. We -- many of the patients in this
18 series had that acetabular component. There were also
19 some others. There was not one failure in any of the
20 acetabular components, and Zimmer products are
21 continued -- are still in use in our practice -- and I
22 speak for Dr. Coutts and myself -- to this day.
23 Q  Which Zimmer femoral component are you using in
24 your practice today?
25 A  The fully porous-coated stem is being used, as

Richard Santore, M.D.                                                                                  06/25/01

**Page 37**

```
 1  well as the current acetabula component, which is the
 2  successor to the Harris Galante.
 3      Q   And I take it you're -- you're using the VerSys
 4  femoral --
 5      A   VerSys is some of -- the VerSys includes an
 6  entire array of prosthesis, and some are used and some
 7  are not.
 8      Q   Now, you said -- let's distinguish between the
 9  acetabular component and the femoral component.
10          As I understand it, from Exhibit 2, you have
11  not had any failures of the acetabular component in your
12  study?
13      A   That is correct. Of any manufacturers.
14      Q   Of any manufacturers. And -- and -- but, all
15  of the failures that are reported in the study, which is
16  Exhibit 2, were of the femoral component, correct?
17      A   Correct.
18      Q   And, all of the femoral components that are
19  reported in Exhibit 2 were Zimmer Centralign femoral
20  component; is that correct?
21      A   Yes.
22      Q   And, that is, in fact, the 11.4 or rounded to
23  12 percent failure rate that you speak of in the
24  article?
25      A   Yes.
```

**Page 38**

```
 1      Q   Now, are you aware that the -- the Zimmer
 2  Centralign femoral component is no longer marketed, and
 3  has not been since 1998?
 4          MR. DAHM:  Objection.  Vague and ambiguous.
 5  Foundation.
 6  BY MR. REARDON:
 7      Q   Answer the question, Doctor.
 8      A   Yes.  I was never informed of that, and
 9  didn't -- never did have a precise understanding of when
10  that component was withdrawn from the market.
11      Q   Okay.  During your meetings with
12  Dr. Crowninshield, Dr. Rohr, as well as your meeting
13  with Mr. Dahm and Mr. Royster, have you been informed
14  that -- that no Zimmer Cetraligns have been sold by
15  Zimmer since 1998?
16      A   I have not.
17          MR. DAHM:  Objection.
18  BY MR. REARDON:
19      Q   When you met with Mr. -- excuse me --
20  Dr. Harris -- when you met with Dr. Harris about the --
21  the Zimmer Centralign and your public remarks concerning
22  the Centralign, you mentioned a meeting -- one meeting
23  that took place in either February or March of 1996.
24          Was there follow-up meetings that occurred
25  after that, Doctor?
```

**Page 39**

```
 1      A   There may have been, but not -- not in the
 2  sense of a formal meeting.  We may have exchanged
 3  remarks at various times when we crossed paths.
 4      Q   Okay.  Where -- again, where was that meeting
 5  in February or March of 1996?
 6      A   It was at the annual meeting of the American
 7  Academy of Orthopedic Surgeons.  And I do not recall in
 8  which city that took place.
 9      Q   And, how long would you say that the meeting
10  between you and Dr. Harris took place that discussed the
11  Centralign?
12      A   I would estimate approximately 15 to
13  20 minutes.
14      Q   And, did you report the information that is --
15  in general terms, obviously, in the 15 to 20 minutes --
16  that is in your article, in terms of the statistical
17  information you had assembled?
18      A   No.  We had not -- had not gotten to that point
19  yet.  In fact, we had not even called all our patients
20  back at that point.  This was the earliest point in
21  which yellow lights were going off, and we wanted to
22  take it to a key source who would have knowledge of,
23  perhaps, patterns elsewhere, feedback that he was aware
24  of.
25      Q   Can you tell me what you've said to Dr. Harris?
```

**Page 40**

```
 1  Understanding you're not going to be able to remember
 2  verbatim, but generally what you told him in February or
 3  March of 1996, at the annual meeting of the American
 4  Academy of Orthopedic Surgeons.
 5      A   I would have said something like, You know,
 6  Dr. Harris, we're really concerned about this --
 7      Q   "This" meaning the Zimmer Centralign femoral
 8  component?
 9      A   The outcomes that we had experienced.
10      Q   With that femoral component?
11      A   Yes.  And, you know, we're at a loss to explain
12  what's -- what's going on here.  We've been told that
13  we're the only ones who have ever had this problem, and,
14  you know, I need to bring it to your personal attention.
15  And, you know, I -- we're going to start calling back
16  all of our patients to get a more precise handle on
17  what's going on.  And he applauded us for looking at all
18  of our patients, and he supported the call-back.
19      Q   And, did you show him any X rays at that time?
20      A   Yes, I did.
21      Q   You brought some with you?
22      A   Yes.
23      Q   And, those X rays showed loosening of femoral
24  components?
25      A   Yes.
```

Richard Santore, M.D.                                                                                          06/25/01

```
 1    Q   Had you, at that point, performed any revision
 2  surgery on any of your patients and removed a
 3  Centralign?
 4    A   Yes.
 5    Q   And roughly how many at that point? Do you
 6  remember?
 7    A   I could not give you a precise number. At
 8  least a few.
 9    Q   Okay. And, did you consider that extraordinary
10  enough that it should be discussed with Dr. Harris at a
11  meeting?
12    A   Obviously. I mean, I went to the point of
13  requesting a meeting with him.
14    Q   Okay. And bringing the X rays from San Diego
15  to -- to the meeting?
16    A   Yes.
17    Q   And, did Dr. Harris follow up with you and have
18  further discussions with you about what you reported to
19  him in February or March of 1996, after that date?
20    A   When we would -- when we would get together.
21  Yes.
22    Q   So, you continued to report, when you saw him,
23  on the progress of your study?
24    A   Uh-huh.
25    Q   I'm sorry. You have to answer audibly.
```
                                                                                              41

```
 1    A   Yes. I'm sorry. I know that.
 2    Q   And, after February or March of 1996, did you
 3  have any communications from Zimmer, or from any Zimmer
 4  representatives?
 5    A   The ones that I've already mentioned are the
 6  only ones to my knowledge. You know, a couple of visits
 7  here to this office, an occasional telephone call from
 8  either Dr. Crowninshield or Dr. Rohr. Those were the
 9  only contacts.
10    Q   My -- really, I'm more focused on February or
11  March of 1996. As a result of the comments you made to
12  Dr. Harris, did you have any -- did you get any contact,
13  whether by phone or by letter or in person, from anyone
14  from Zimmer?
15    A   I think it was within a few months of that that
16  the first meeting here in San Diego took place. You
17  know, I don't have a precise log of when that took
18  place, but I would estimate that it was in the late
19  spring of that same year.
20    Q   So, within a few -- within -- by June of 1996,
21  there was a meeting here in San Diego?
22    A   I would think so, yes.
23    Q   And, that would be with Dr. Crowninshield and
24  perhaps others?
25    A   I think it was with Dr. Crowninshield and
```
                                                                                              42

```
 1  Dr. Rohr.
 2    Q   Very well. And, you reported the same
 3  information to them that you had reported to Dr. Harris?
 4    A   Yes.
 5    Q   And, what would -- what did -- what did they
 6  tell you about what they were doing, if anything, as a
 7  result of the information that they had acquired from
 8  Dr. Harris concerning your study?
 9        MR. DAHM: Objection. Foundation.
10        MR. REARDON: I'll withdraw the question. It's
11  kind of a badly-worded question.
12        MR. DAHM: Thanks.
13  BY MR. REARDON:
14    Q   Did you contact Zimmer or Dr. Crowninshield or
15  Dr. Rohr at any time after you spoke with Dr. Harris at
16  the meeting in February or March?
17    A   No.
18    Q   So, they --
19    A   Not to my recollection.
20    Q   They were the ones that made the initial
21  contact with you?
22    A   Yes.
23    Q   And did they mention that they had spoken with
24  Dr. Harris?
25    A   Yes.
```
                                                                                              43

```
 1    Q   So they were aware, through Dr. Harris, as you
 2  understood it, that -- of your concerns?
 3    A   Yes.
 4    Q   And, they came here to San Diego and met with
 5  you sometime in -- in the spring of 1996; is that
 6  correct?
 7    A   That is to the best of my recollection, without
 8  confirmation. Yes.
 9    Q   Is there anything that you could look at which
10  would confirm the time of that meeting or date?
11    A   At this point in time, probably not.
12    Q   But you believe it to be before the summer of
13  1996?
14        MR. DAHM: Asked and answered. Talk about
15  time.
16  BY MR. REARDON:
17    Q   Okay. Just confirming that, Doctor. Is that
18  right?
19    A   Right.
20        MR. DAHM: Same.
21  BY MR. REARDON:
22    Q   Now, have you communicated with any -- other
23  than Dr. Crowninshield -- with any biomedical engineers
24  or biomechanical engineers regarding the -- your
25  experience with the Zimmer Centralign?
```
                                                                                              44

11 (Pages 41 to 44)

Esquire Deposition Services
619-233-0633    800-829-6159

           A   I've had numerous conversations. I mean, I
know so many of the principals, I mean, that I will
occasionally talk to various people. I'll talk to --
Roy Broybown (phonetic) from Utah is a good friend.
Phil Noble from Baylor is a good friend. And we'll
just -- we will often just be having a drink together in
a meeting talking about all kinds of things, and this
will often surface as a subject matter for discussion,
because, you know, my name is now inextricably linked
with this because I was, you know, responsible for this
publication.
           Q   Well -- so people frequently will -- people
that are interested, scientists that attend your
meetings, will likely bring the subject up?
           A   Right. And, you know, -- you know, it's not a
particular badge of honor to be remembered for something
that was a failure and -- but that's the responsibility
of a good surgeon, to report the good and the bad.
           Q   Understand.
              MR. DAHM: Move to strike. Nonresponsive.
              MR. REARDON: No, no.
              MR. DAHM: Bob, I want to make my record.
              MR. REARDON: That's not even a proper
objection under the federal rules. You can take care of
that later. You know, you want to move to strike at a

                                                              45

later time, you can move to strike. You don't have to
do that for the benefit of the witness.
           Q   Who is the Zimmer representative that you
typically deal with who comes in here?
           A   Mrs. Trudy Jackson.
           Q   And does she come out of Indiana, or is she
based somewhere in California?
           A   No, she's based locally.
           Q   And, have you been working with Trudy Jackson
for a number of years?
           A   Yes. She's a highly competent, very well
regarded industry rep. Certainly one of the best we
have in San Diego.
           Q   Okay. When you met with Dr. Crowninshield and
Dr. Rohr, can you -- in the spring of 1996, can you tell
me essentially whether or not -- well, I'll withdraw
that.
              After you met with Dr. Crowninshield and Mr. --
or Dr. Rohr in the spring of 1996, did you continue to
have contact with them from time to time thereafter
about the prognosis of your study and your concerns
about the Centralign?
           A   Yes.
           Q   Was that including telephone conversations, as
well as person-to-person meetings?

                                                              46

           A   Yes.
           Q   Did you ever get any correspondence from them,
or did you send them any correspondence or documents
from the spring of 1996, through to when your article
was published in 2001?
           A   Yes. There was one occasion when Dr. Harris
was about to make a major address at one of the national
meetings, and I -- I think it was in 1999, to the best
of my recollection, that he asked me for an update on
the statistical analysis that we had. And so I
forwarded to him, I think, via email a preliminary, but
fairly accurate list of the risk factors in the
statistical analysis. And we didn't have it ready to go
completely yet, but -- but we shared with him the
information that we had up-to-date.
           Q   Okay. And that was sometime in '99?
           A   To my -- to the best of my recollection, yes.
Spring of '99.
           Q   When Dr. Harris had these discussions with you
back in '96, and then again thereafter in '99, had he
ever disclosed to you, or were you aware that he had
received either directly or through his family trust and
his foundation over $7 million from Zimmer?
           A   No, I was -- I mean, I -- I -- everybody in
orthopedics knows the enormous contributions Dr. Harris

                                                              47

has made, and the fact that, you know, this is the
United States, and people are entitled to be rewarded
for their hard work. Dr. Harris works just about as
hard as any orthopedic surgeon I've ever known. And the
payment of royalties and consulting agreements is -- is
an accepted part of the role he has in the field.
           Q   Have you received royalties from any
manufacturers?
           A   No.
           Q   And you're in private practice as well as
Dr. Harris is?
           A   Yes, I am.
           Q   And, while I appreciate the comments, getting
back to the question at hand, Doctor, were you aware,
when you talked with Dr. Harris in the spring of -- or
February or March of 1996, that at that time he had
already either directly or indirectly received over
$7 million from Zimmer, Inc. --
              MR. DAHM: Objection. Asked and answered.
BY MR. REARDON:
           Q   -- regarding -- excuse me -- regarding the
development of the Centralign?
           A   I have not.
              MR. DAHM: Same objections. Excuse me, Doctor.
BY MR. REARDON:

                                                              48

Richard Santore, M.D.                                                                   06/25/01

```
 1    Q   Do you think that that would be significant or
 2  important to you in knowing that -- let me withdraw
 3  that.
 4         Were you aware that he had received substantial
 5  royalties from Zimmer for the development of the
 6  Centralign?
 7         MR. DAHM: Third time now.
 8         THE WITNESS: I was not, but it would have been
 9  my assumption that that was taking place, based on the
10  degree of involvement that he had in the project.
11  BY MR. REARDON:
12    Q   Okay. You were aware that he was -- his name
13  was used in the Zimmer brochures and that he was
14  involved in the project?
15    A   Of course I was. The magnitude of the
16  financial package was, of course, not known to me. But
17  I was aware that, in general, that was the relationship
18  that existed.
19    Q   Can you tell me the names of others that you
20  have discussed this high failure rate with, besides
21  Dr. Harris, Dr. Crowninshield, and Dr. Rohr?
22    A   You mean within the Zimmer family or --
23    Q   Let's break it down to first within the Zimmer
24  field and -- family, and then within the medical
25  communities.
                                                        49
```

```
 1    A   Well, sure, because, you know, this is a
 2  complex issue, and -- and I was also aware, right from
 3  ground zero, that not every center using this prosthesis
 4  was having a comparable problem.
 5         I talked with Rick White, who's an orthopedic
 6  surgeon for whom I have enormous respect in New Mexico,
 7  and he had been having a very favorable experience. I
 8  think one failure over the same period of time. I
 9  talked with Paul Leshevitz in the Carolinas, also highly
10  respected surgeon, who was having virtually no
11  difficulties. I talked with John Callahan, my good
12  friend in Iowa. I've talked to my friends at the Mayo
13  Clinic. They were having problems and seeing revisions
14  from elsewhere, or seeing problems from elsewhere.
15         So it was a very mixed picture. We were seeing
16  some -- some surgeons, like -- who would -- also with
17  very strong and loyal ties to Dr. Harris, like
18  Dr. Rubash, Dr. Wilson, who were having problems. We
19  were seeing others, like Dr. Leschevitz, Dr. White, and
20  others, with no problems. We couldn't figure out what
21  was going on. I mean, we knew that all the surgeons
22  were -- were competent. And there was a
23  difficult-to-understand scatter of -- of -- of results
24  that we couldn't make sense out of.
25         And -- and we still don't know if it was the
                                                        50
```

```
 1  way we were using the cement. For instance, we had
 2  shifted to vacuum-mixing cement. Dr. Harris and some of
 3  his --
 4  BY MR. REARDON:
 5    Q   Well, you know --
 6         MR. DAHM: Let him finish his --
 7         MR. REARDON: I understand.
 8         MR. DAHM: Bob, you don't like what he's
 9  saying. Let him finish.
10         MR. REARDON: I'm not going to let him finish
11  because I'm going to say something. I'm paying for
12  this. I'm paying $1200, plus the court reporter.
13         MR. DAHM: You're paying for his testimony; is
14  that what you're now saying?
15         MR. REARDON: I'm paying for his time, and I'm
16  going to use it effectively, because he indicated that
17  he had to leave at 10:30. And so I -- I will get to
18  your experiences, Doctor, but the question was --
19         MR. DAHM: Hold on a second.
20         MR. REARDON: The names of -- I will get to the
21  answer to that question.
22         MR. DAHM: Would the court reporter --
23         MR. REARDON: You can "hold on" all you want,
24  but I'm going to continue to talking.
25         MR. DAHM: Will the court reporter mark this?
                                                        51
```

```
 1         (Reference requested.)
 2  BY MR. REARDON:
 3    Q   What I'm asking you is to identify the names of
 4  the people you have spoken to. And again, I will get to
 5  the issues that are reported in your article. And you
 6  mentioned Dr. White in your article. I want to go
 7  through the article systematically, rather than jumping
 8  into this early on. And I plan to go through it page by
 9  page with you. But to save time, I'm just looking for
10  names now of --
11    A   Sorry for -- I apologize for elaborating, but
12  those are the names, and there were others, too. I
13  mean, this was a frequent source of conversation at all
14  of our major gatherings.
15    Q   Okay. With respect to Zimmer, first, people
16  who were involved with Zimmer or worked for Zimmer, do
17  you recall the names of any other people, other than the
18  ones you've given me?
19    A   I do not.
20    Q   Okay. And with respect to people in the
21  medical community, you've mentioned a few names already,
22  Dr. White, Dr. Rubash, do you --
23    A   Dr. Rubash, R-u-b-a-s-h, Dr. Wilson.
24    Q   Dr. Steven Wilson?
25    A   Right. Dr. Berry -- Berry, B-e-r-r-y, at the
                                                        52
```

13 (Pages 49 to 52)

Richard Santore, M.D.                                                          06/25/01

| | |
|---|---|
| 1  Mayo Clinic.<br>2  Q  I was going to ask you, they had some bad<br>3  results in the Mayo, and Dr. Berry reported those to<br>4  you?<br>5       MR. DAHM: Objection. Foundation, vague and<br>6  ambiguous.<br>7       THE WITNESS: I was a co-author on that study.<br>8  BY MR. REARDON:<br>9  Q  Do you have a copy of that study, Doctor?<br>10 A  I don't. I'm sorry.<br>11 Q  Where was that study reported?<br>12 A  It was reported at the academy, and then I<br>13 believe it was published in the Journal of Arthroplasty.<br>14 Q  Okay. And the lead author was Dr. Berry?<br>15 A  Yes, Dan Berry.<br>16 Q  Do you know Dr. Sporer?<br>17 A  No, I do not. How do you spell that.<br>18 Q  S-p-o-r-e-r.<br>19 A  I do not.<br>20 Q  Dr. Trakru, I think it's pronounced. Trakru.<br>21 Trakru. T-r-a-k-r-u.<br>22 A  I think he was the lead author on Dr. Rubash's<br>23 study. He was probably a resident or a fellow.<br>24 Q  How about Dr. Ong, O-n-g?<br>25 A  I believe I --<br><br>                                    53 | 1  Dr. Crowninshield and Dr. Harris aware that this article<br>2  was coming?<br>3  A  I don't believe so. I mean, they knew it<br>4  was -- they knew it was coming, but I didn't let them<br>5  know. I didn't even know when it was going to be -- the<br>6  Journal never let me know when it was going to be<br>7  published.<br>8  Q  Doctor, did -- did -- do you know who was --<br>9  peer-reviewed it? Did anybody --<br>10 A  That's never disclosed.<br>11 Q  I know it's not, but sometimes people tell you<br>12 that they looked at your article.<br>13 A  I have no such knowledge.<br>14 Q  Do you have an update on your experiences from<br>15 late '99 or early 2000, when the data was presented in<br>16 this article, to present? Have you got additional<br>17 information on any of your patients?<br>18 A  No. We're planning another formal review at a<br>19 minimum five-year, but we do not have any updated<br>20 information right now.<br>21 Q  This is considered to be a minimum three-year<br>22 review?<br>23 A  Minimum two.<br>24 Q  Minimum two-year review. And you're doing --<br>25 you're expecting to do a minimum five-year review, which<br><br>                                    55 |
| 1  Q  You mentioned Dr. Ong in your article?<br>2  A  But I don't know him personally. I just know<br>3  of the work and the literature.<br>4  Q  You do know Dr. Rubash personally?<br>5  A  I certainly do.<br>6  Q  Dr. Wilson?<br>7  A  Yes.<br>8  Q  How about Dr. Haber, who was with Wilson on the<br>9  article that Wilson authored. Do you know him?<br>10 A  No.<br>11 Q  According to Exhibit 2, it was submitted to the<br>12 Journal in March -- the end of March, March 31st of<br>13 2000, and accepted on September 19th, 2000.<br>14     So, all of the data that is the -- was the<br>15 basis for that article was -- had been assembled, the<br>16 article had been in its final form, reviewed by the<br>17 co-authors, and submitted by -- by March of 2000?<br>18 A  That is correct.<br>19 Q  When would you say, before March of 2000, all<br>20 of the data was together, and you were in the process of<br>21 drafting for the article?<br>22 A  Oh, probably for several months.<br>23 Q  Okay. So I might have --<br>24 A  Maybe the latter part of '99.<br>25 Q  Very well. And I take it that you made<br><br>                                    54 | 1  would be finished, what, next year?<br>2  A  We'll probably do that as part of next year's<br>3  academic load.<br>4  Q  So, you're following the same patients?<br>5  A  Yes, we are.<br>6  Q  Have any of the patients died since then, if<br>7  you know, if you recall?<br>8  A  I'm not aware of any deaths.<br>9  Q  Do you know Dr. Grady-Benson in Hartford,<br>10 Connecticut?<br>11 A  Yes, I do.<br>12 Q  How do you know Dr. Grady-Benson?<br>13 A  He's a fine young man who actually worked at<br>14 UCSD for a few years as a full-time assistant professor.<br>15 I had the pleasure of interacting with him on frequent<br>16 occasions at that time, and then he took a -- I believe<br>17 a very prominent orthopedic surgeon in Connecticut died,<br>18 and he was offered the opportunity to take over this<br>19 high-volume practice. He resigned from his position<br>20 here to go back there to take over that position, and<br>21 I've never, unfortunately, had any contact with him<br>22 since.<br>23 Q  Did you know that Dr. Grady-Benson's patients<br>24 were the plaintiffs in this case?<br>25     MR. DAHM: Foundation.<br><br>                                    56 |