Richard Santore, M.D.                                                                 06/25/01

**Page 57**

1  MR. REARDON: I'll withdraw that and save time.
2  Q  Do you know that Dolores Dunn, who's the main
3  plaintiff in this case, was Dr. Grady-Benson's patient?
4  A  I did not.
5  Q  So, you haven't had any direct communication
6  with him regarding the lawsuit that is the subject of
7  this deposition?
8  A  No.
9  Q  Do you know Dr. Steven Schutzer of the same
10  group as Dr. Grady-Benson?
11  MR. DAHM: Schutzer.
12  THE WITNESS: Not well, but I do know him.
13  BY MR. REARDON:
14  Q  Okay, Doctor. Now I will go through the
15  article with you.
16  MR. DAHM: And before you do, I just need a
17  two-minute break.
18  (Recess.)
19  BY MR. REARDON:
20  Q  Doctor, I would like to ask you some questions
21  about Exhibit 2, the article that -- peer-review article
22  that has been published now in the Journal of
23  Arthroplasty in 2001.
24  First of all, Doctor, in the article it's been
25  indicated that the interface between the cement and the

**Page 58**

1  prosthetic is the weakest link in the femoral construct.
2  Would you agree with that? A weak link?
3  MR. DAHM: Object.
4  MR. REARDON: I'll withdraw it and reword it.
5  MR. DAHM: Wait. There's no question pending.
6  MR. REARDON: I'll reword it because I want to
7  follow the language in it.
8  MR. DAHM: Thank you.
9  BY MR. REARDON:
10  Q  The interface between the metal and acrylic
11  cement represents a weak link in the femoral construct
12  in the cemented hip arthroplasty.
13  Would you agree with that, Doctor?
14  A  Yes.
15  Q  And, that's based upon your experience over the
16  years, as well as this particular study that was
17  conducted by you?
18  A  I would like to, right at the outset,
19  disqualify myself as an expert in biomaterial science.
20  I am an -- I am a blue collar orthopedic surgeon. I am
21  not a material scientist.
22  Q  All three of us are blue collar here, other
23  than Mr. Royster.
24  A  And -- and this information was culled from the
25  literature and properly referenced, attributing

**Page 59**

1  statements of scientific fact to the appropriate
2  authors. We do not take credit for these statements as
3  independently scientifically proven in our institution
4  or under our auspices.
5  Q  Having said that, and I understand that you're
6  not a biomechanical engineer, you haven't undertaken any
7  scientific studies; you are simply reporting your
8  experience with this particular hip prosthesis; is that
9  correct?
10  A  That is correct.
11  Q  Now, having said that, you can now say again,
12  as we go through this, you still, I take it, in the
13  course of your practice, have, by your readings, by your
14  studies, and by your experience, developed opinions
15  regarding hip prosthesis, and they're included in this
16  article, right?
17  A  Right. Opinions, as well as knowledge from the
18  literature.
19  Q  Right. And, from the literature and from your
20  own personal experiences, do you consider this interface
21  to be the weak link in the femoral construct --
22  MR. DAHM: Foundation.
23  BY MR. REARDON:
24  Q  -- of cemented hip arthroplasty?
25  A  I consider it to be a weak leak, not the weak

**Page 60**

1  link.
2  Q  You indicated in the first page of the article
3  that, we are unaware of any studies that have
4  established this theoretical advantage of the
5  PMAA-precoated rough-finish prosthesis as an attempt to
6  improve this weak link.
7  You see that? Any studies in vivo?
8  A  That is correct.
9  Q  Is that true, Doctor, to date, that you're not
10  aware of any studies in vivo that have demonstrated the
11  advantages of the rough finish PMAA-precoated
12  prosthesis?
13  A  Yes, it is.
14  Q  Now, you're aware that Zimmer has represented,
15  I take it, in their brochures that this, the
16  PMAA-precoated prosthesis with a rough finish, is a
17  better finish, in order to improve upon this so-called
18  weak link?
19  MR. DAHM: Objection. Foundation, ambiguous,
20  facts not in evidence, and vague.
21  BY MR. REARDON:
22  Q  You're aware of that, aren't you?
23  MR. DAHM: Same.
24  THE WITNESS: In general terms, yes.
25  BY MR. REARDON:

Richard Santore, M.D.                                                                  06/25/01

---

1   Q   It's been promoted -- the Centralign was
2   promoted as a rough-finished PMAA-precoated prosthesis
3   which -- which provided a better bond between the
4   femoral component and the cement than those that were
5   not precoated and were not rough finished?
6       MR. DAHM:  Same.
7   BY MR. REARDON:
8   Q   Is that correct, Doctor?
9       MR. DAHM:  Same.
10      THE WITNESS:  Yes, that is my understanding.
11  BY MR. REARDON:
12  Q   But you haven't been able to find, in your
13  research, any studies that have established this
14  theoretical advantage in vivo?
15      MR. DAHM:  Same.  Now, asked and answered.
16  BY MR. REARDON:
17  Q   Is that correct?
18  A   Yes.
19  Q   And, have you discussed with Dr. Crowninshield
20  and Dr. Rohr whether or not there are in vivo studies
21  that have established this theoretical advantage?
22  A   No.
23  Q   When you -- could you define for me what you
24  meant in your article as an "in vivo study"?
25  A   In human patients.

61

---

1   Q   Okay.  So, the study -- are you aware of any
2   studies that have been performed on -- or conducted with
3   cadavers?
4   A   I'm aware of studies that have been done in a
5   controlled laboratory environment with the precoat of
6   the same thickness and type on -- on pegs, showing a
7   dramatically increased resistance to torque failure.
8   And I understand, but I have no personal awareness of
9   cadaver studies that were done.
10  Q   Okay.  When you say with pegs, you mean where
11  the cement is put into something like a PVC pipe, and
12  then the femoral component is placed in the cement?
13  A   No.  I'm talking about using a metal or plastic
14  peg, coating that with the cement precoat, and then
15  cementing that into a hole, and then using a torque
16  wrench to weaken that bond, and comparing that to an
17  identical peg without a precoated surface, that was also
18  cemented.
19  Q   Were these Zimmer studies?
20  A   Yes.
21  Q   Okay.  And were you informed of those studies
22  by Dr. Crowninshield and others from Zimmer?
23  A   I was aware of those by being present as a
24  faculty member on several occasions at Dr. Harris's
25  annual hip course in the early 1990s.

62

---

1   Q   Okay.  The hip course, is that conducted in
2   Boston?
3   A   Yes, it is.
4   Q   And, you've been going to those hip courses
5   over the years?
6   A   Usual only when invited.  I've been invited, I
7   believe, on approximately four or five occasions to join
8   the faculty, and those are the only occasions on which
9   I've -- at which I have attended the course.
10  Q   And, those hip courses that you've attended,
11  have they been before 1992, when you started using the
12  Zimmer Centralign?
13  A   Some were before and some were after.
14  Q   Were some during '92 to '95?
15  A   I just don't remember the exact years.
16  Q   Okay.  Let me ask you about the surgical
17  techniques, Doctor.  You have a section on that, if I
18  could.
19      Do you believe that the surgical technique used
20  in the arthroplasties of the 98 patients -- or the
21  98 arthroplasties, I should say.  I think some -- there
22  were some that were bilateral.  I'll withdraw that.
23      Do you -- do you believe, Doctor, that the
24  98 arthroplasties that were the subject of your study
25  were performed with a proper surgical technique?

63

---

1       MR. DAHM:  Objection.  Foundation.  Sorry,
2   Doctor.
3       THE WITNESS:  Yes, I would -- I would disagree
4   with that characterization, because it assumes a certain
5   amount of self-congratulation.  I would say that we
6   attempted, to the best of our ability, to properly
7   insert the prosthesis in accordance with the protocol
8   recommended at that time.
9   BY MR. REARDON:
10  Q   And the -- and the physicians who inserted the
11  prosthesis or prosthetic devices, especially the femoral
12  component, which is the subject of your article, were
13  either you or Dr. Coutts; is that correct?
14  A   In all cases, yes.
15  Q   And, could you -- since we've discussed you,
16  and have your CV, could you tell us briefly what -- how
17  many times over the years your -- your colleague,
18  Dr. Coutts, has done hip arthroplasties?
19  A   Dr. Coutts is one of the most distinguished
20  orthopedic surgeons in adult reconstruction in the
21  United States; he recently finished a two-year stint as
22  chairman of the board of the Orthopedic Research and
23  Education Foundation; he is immediate past president of
24  the Oxford University Orthopedic Alumni Association;
25  immediate -- he's past president, I think, three years

64

---

Richard Santore, M.D.                                                          06/25/01

**Page 65**

1  ago, of the Hip Society; is a full adjunct professor of
2  orthopedics at UCSD; he is one of very few orthopedic
3  surgeons to hold simultaneously more than one NIH-funded
4  grants in the field of orthopedic research; and has
5  devoted his career to hip and knee surgery since
6  beginning practice in 1971.
7       Q    I saw Roger Maris's -- apparently signed an
8  autograph photograph that's here in Dr. Coutts's office.
9  That is Roger Maris, isn't it?
10      A    Yes, it is.
11      Q    And I couldn't tell the signature, but I
12 could --
13      A    Is it -- no, no. That is someone from the
14 Boston Red Sox.
15      Q    I know. I'm trying to figure out --
16      A    Going way back before -- this is Roger Craig.
17           MR. DAHM: You want to get out of here?
18           THE WITNESS: Dr. Coutts was the surgeon for
19 Roger Craig, who was a major league player of some
20 renown, who was the manager of the San Francisco Giants,
21 and --
22 BY MR. REARDON:
23      Q    And that -- did he do a hip replacement on him?
24      A    Yes.
25      Q    And, he came from the east coast, that patient,

**Page 66**

1  to have that done?
2       A    I think from the San Francisco bay area.
3       Q    Okay.
4       A    Dr. Coutts has many famous patients who come in
5  from some distance.
6            (Discussion off the record.)
7  BY MR. REARDON:
8       Q    You indicated in your article that you use the
9  so-called third generation cementing technique. Could
10 you explain -- for the femoral components.
11           Can you explain what that is?
12      A    Yes. It's a combination of many factors, many
13 of which were actually introduced by Dr. Harris, which
14 include inserting a cement restrictor approximately
15 15 millimeters below the tip of the stem; introducing
16 the cement in a cement gun in a retrograde fashion;
17 filling from the bottom to the top; and then
18 pressurizing from above both with a device and with the
19 finger; and then inserting -- and then -- and prior to
20 that, the canal's prepared by pulse lavange irrigation
21 drying with sponges; and then the prosthesis is
22 introduced with every attempt made to avoid any blood or
23 tissue contamination on the way down in the center of
24 the canal.
25      Q    Doctor, do you teach surgical technique for

**Page 67**

1  the -- for hip arthroplasty?
2       A    Yes, I do.
3       Q    And -- at the University of California
4  San Diego?
5       A    Uh-huh. Yes.
6       Q    And, do you -- have you participated in a
7  faculty -- as a faculty member in various meetings among
8  nationally-known orthopedists concerning hip
9  arthroplasty surgical technique?
10      A    Yes. I'm occasionally asked to join scientific
11 forums of different kinds. I think I had 41 out-of-town
12 speaking trips last year.
13      Q    Wow. You're flying a lot.
14      A    Too much.
15      Q    Do you have any reason to believe, Doctor, that
16 in any of the instance -- the 98 instances that are
17 reported in your -- in your peer-reviewed article, that
18 you or Dr. Coutts placed a Centralign in a patient's
19 femur using a wrong technique?
20           MR. DAHM: Objection.
21 BY MR. REARDON:
22      Q    Based upon your experience.
23           MR. DAHM: Objection. Form. Sorry, Doctor.
24           THE WITNESS: Sure. I would never make a
25 public or private statement that my surgical technique

**Page 68**

1  is flawless or above the possibility of surgeon-related
2  errors. Errors are ubiquitous, and we try to keep them
3  to a minimum, but I would never state before you or
4  anyone else that we might not, on occasion, do something
5  incorrectly, such as create an air bubble in the canal,
6  unintentionally; place the prosthesis in a slightly
7  skewed angle, unintentionally; have too much blood in
8  the canal at the time of insertion, unintentionally. We
9  never intentionally do something incorrectly, but we
10 have no capacity to do every case flawlessly.
11 BY MR. REARDON:
12      Q    I'm not asking about flawlessly.
13           Do you have any reason to believe, based upon
14 your discussions with Dr. Harris, and keeping in mind
15 you showed him X rays of your cases, your discussions
16 with Dr. Crowninshield and Dr. Rohr -- do you have any
17 reason to believe, or has it been suggested to you by
18 any of them, that the technique that was used in
19 cementing was in some way not carried out properly?
20           MR. DAHM: Excuse me. Objection. Form. Asked
21 and answered, and also compound and vague.
22           THE WITNESS: If I may answer by saying that,
23 after review of the X rays, Dr. Harris said to me
24 privately, and has also said publicly that he thought
25 the cement technique was fine.

**Page 69**

BY MR. REARDON:
 Q  Now, in the course of your article, you assessed the mantle grade.
    Do you recall that, Doctor? Could you find that?
 A  Uh-huh.
 Q  I think it's on page -- actually, on the exhibit it's typed No. 5.
 A  I think it's page 4. I think it's on page 4. Let me see if I can find it.
    MR. DAHM: It's on 144, Doctor, up in the upper left-hand corner.
BY MR. REARDON:
 Q  144. Radiographic Analysis is the --
 A  143, isn't it?
 Q  I think you start out with a discussion on 143.
 A  I mention the mantle on 143, I know, at one point.
 Q  But I think you use -- you grade it on 144, Doctor. Just calling your attention to the Radiographic Analysis section.
 A  Fine.
 Q  Now, the grading system that you used is what grading system?
 A  It is a commonly used cement mantle grading

**Page 70**

system. I'm not sure to whom it should be properly attributed.
 Q  Let me show you --
 A  I think it was -- Charnley was responsible for a cement mantle grading system.
 Q  Let me show you an article by Dr. Harris with -- we'll mark that as an exhibit.
    (Deposition Exhibit 8 was marked for identification by the court reporter.)
BY MR. REARDON:
 Q  If you look at Table 5, which is on page 159, is that the grading system you used?
 A  Yes.
 Q  And that would be Exhibit No. 8.
    Are you familiar with the article which is now marked as Exhibit 8 -- you can look at it -- written by Dr. William Harris?
 A  Yes.
 Q  Now, you -- using the tape -- the grading system that is in the Harris article at Table 5, as I understand it, that you assessed, among the failures, 70 percent were radiographically an A grade, which is the highest grade, in terms of the cement mantle; is that correct?
 A  Right. Yes.

**Page 71**

 Q  And 20 percent were a B grade among the failures; is that correct?
 A  Yes.
 Q  So, 90 percent were either A or B grade, correct?
 A  Yes.
 Q  And, so, B grade would be -- A grade would be a complete cement mantle, and B grade would -- well, I think the table speaks for itself. I don't need to read the table into the record.
    MR. DAHM: Well, that's not a -- do you have a question?
    MR. REARDON: No, I --
 Q  Would you agree that the table that is part of Exhibit 8, Table 5, is the same measure of A grade and B grade that you have used in your analysis of your patients?
 A  Yes. And I would also further qualify that by saying that Dr. Coutts and I did not participate in this grading to avoid the bias that would be inherent in the surgeon. These were -- this rating system was done by the two fellows, independent of us and without interference from us. And none of these fellows -- neither of these fellows was involved in the surgery for any of these patients.

**Page 72**

 Q  Okay. And, of the remainder -- that is, the 10 percent of the 98 -- actually, 84 were the ones that you analyzed because of those that were not -- did not finish the study.
    Of the 84 that you analyzed, the remaining 10 percent were C1 grade, correct?
 A  Right.
 Q  None were C2 and none were D grade?
 A  No.
 Q  Now, with respect to the -- the total number of the 84 -- so, let me just summarize so I understand.
    Am I correct, Doctor, that of the failures that -- that are reported in the article, which were ten failures by aseptic mechanical loosening of femoral component on an average of 30.6 months postoperatively -- of those ten failures, all but one were either an A or B grade cement femoral component mantle?
 A  Yes.
 Q  Okay. And the remaining one was a C1 grade?
 A  Yes.
 Q  Which would be -- indicates the presence of voids or bubbles in the cement mantle?
 A  Correct.
 Q  Now, in general, with respect to the -- I'll

Richard Santore, M.D.                                                                  06/25/01

**Page 73**

1  withdraw that.
2       You report on page 143, Doctor, that of the ten
3  hips that failed, with clinical and radiographic
4  evidence of failure, all showed debonding of the
5  prosthesis at the cement prosthesis interface.
6       MR. DAHM: Hey, Bob, where are you reading?
7       MR. REARDON: Page 143. Bottom of the first
8  column starts out, the very last sentence, The ten hips,
9  and goes over to the top of the second column.
10      MR. DAHM: Thank you.
11 BY MR. REARDON:
12      Q  So, with respect to all of these -- all of
13 these failures, you found consistently that the failure
14 occurred at the -- at the cement prosthesis interface;
15 is that correct, Doctor?
16      MR. DAHM: Objection. Foundation, assumes
17 facts not in evidence.
18      THE WITNESS: Yes. The X rays indicated
19 eventually, although not at the time of initial
20 symptomatic presentation, that there was a radiolucency
21 usually in the lateral portion of the cement prosthesis
22 bond area.
23 BY MR. REARDON:
24      Q  Okay. "Lateral" meaning -- if you could
25 describe for me where that would be, Doctor, on the

**Page 74**

1  femoral component?
2       A  Upper lateral, by the shoulder of the
3  prosthesis.
4       Q  On the outside of the shoulder?
5       A  Outside of the shoulder.
6       MR. DAHM: Zone 1, Doctor?
7       THE WITNESS: Yes.
8  BY MR. REARDON:
9       Q  Zone 1. And -- and the debonding appeared to
10 originate, approximately, in the PMMA-precoated region,
11 you have reported; is that right?
12      A  There is -- there is no way to know precisely
13 where the PMA region is on a radiograph, because there
14 is no identifiable change in appearance.
15      Q  But you can, from your --
16      A  We can infer.
17      Q  -- infer from your knowledge of the
18 prosthesis --
19      A  Yes.
20      Q  -- and your viewing of the prosthesis and its
21 shape on a radiographic analysis, where -- where it is
22 on the prosthesis --
23      A  Right.
24      Q  -- that the failure occurred, right?
25      A  Right. The area of failure always involved, to

**Page 75**

1  some degree, the area of the proximal precoated region.
2       Q  Just so we're clear, Doctor, what I'd like you
3  to do is -- I'm going to mark this Centralign brochure,
4  which has been previously marked at Dr. Harris's
5  deposition -- let me -- if you could.
6       (Deposition Exhibit 9 was marked for
7       identification by the court reporter.)
8  BY MR. REARDON:
9       Q  Doctor, you're familiar -- have you seen the
10 Centralign brochure before?
11      A  Yes.
12      Q  I take it that one was sent to you, or you had
13 copies somewhere around?
14      A  I've seen it, yes.
15      Q  Now, let's take -- actually, you know what I'd
16 like to do? Since I'm -- I'm going to ask you to mark
17 it, I'm going to ask you to mark a different one,
18 because I don't want the one that was -- I don't want to
19 tamper with the evidence.
20      MR. DAHM: Thank you, Bob.
21      MR. REARDON: I'm going to get one here that --
22      MR. DAHM: But you are allowed to mark an
23 exhibit, so I won't object.
24      MR. REARDON: You won't object?
25      MR. DAHM: You're allowed to mark an exhibit.

**Page 76**

1  BY MR. REARDON:
2       Q  That's Exhibit No. 9.
3       I want you to take Exhibit No. 9 and mark the
4  area in a blue pen, because that's a black-and-white --
5  I have a blue pen right here, if you can.
6       A  A blue, not a black?
7       Q  A blue so it can be seen differently from the
8  photostat.
9       On the second page, where it shows the
10 Centralign, can you mark the area where you felt there
11 was a failure, approximately, on the lateral?
12      Okay. Good. So, you've drawn a line along the
13 lateral side of the prosthesis in blue?
14      A  Yes.
15      Q  And, since that photostat doesn't really depict
16 the -- very well the roughened area, let me -- let me
17 ask you, Doctor, is that the area, based upon your
18 experience with the Centralign, where the roughened area
19 is, as well as the precoat?
20      A  Yes, it is.
21      Q  And, is it also the -- the area where the
22 proximal central liners are --
23      A  Centralizers.
24      Q  -- centralizers are located?
25      A  Yes, it is.

Richard Santore, M.D.                                                                    06/25/01

**Page 77**

1  Q  Now, on the -- are you aware of whether --
2  you've indicated that you have been using the VerSys
3  Zimmers.
4      Have you used the femoral components?
5  A  Yeah. They are in use in our practice. I can
6  point out the ones that are currently --
7  Q  Let me show you this brochure and see if you --
8  if that's familiar to you.
9  A  Yes, it is.
10 Q  Are those cemented femoral components in use in
11 your practice?
12 A  No. There is a much wider array of stems
13 than -- than depicted in this brochure. There. Here's
14 the full spectrum.
15 Q  All right. On the back?
16 A  Not the three on the cover only.
17 Q  Why don't you go to the back of that particular
18 one, which shows the full spectrum of VerSys prosthetic
19 femoral components, and identify which ones are in use
20 in your practice.
21     Okay. So you've checked above two components?
22 A  Yes.
23     MR. DAHM: Would you, Bob, mark this as
24 Exhibit 10?
25     (Deposition Exhibit 10 was marked for

**Page 78**

1      identification by the court reporter.)
2      THE WITNESS: There's another one, too. It's a
3  semi-experimental design that is a fiber composite stem
4  that's not really included in here. A flexible stem.
5  BY MR. REARDON:
6  Q  Are the -- with any of the VerSys that you are
7  aware of, are there any of the teardrop PMAA-coated
8  central liners?
9      MR. DAHM: Objection. Vague.
10     THE WITNESS: Sorry. I don't understand.
11 BY MR. REARDON:
12 Q  Any of the teardrop-shaped central liners on
13 the VerSys hip systems that are now being sold by
14 Zimmer?
15 A  I do not believe so.
16 Q  Have you seen any of the central liners --
17 teardrop central liners approximately on any of -- any
18 of the hip prosthesis that are currently being marketed?
19     MR. DAHM: By whom?
20     MR. REARDON: By any manufacture.
21     THE WITNESS: Well, Howmedica has a hip system
22 which has a PMAA spacer medial -- not quite a teardrop
23 design, but it's very similar, along the medial border.
24 BY MR. REARDON:
25 Q  The medial being the other side, right?

**Page 79**

1  A  Correct.
2      MR. DAHM: Well --
3  BY MR. REARDON:
4  Q  What about on the lateral border?
5      MR. DAHM: That's fine. Go ahead, Doctor.
6  Sorry.
7      THE WITNESS: I'm not aware of it on the
8  lateral border.
9  BY MR. REARDON:
10 Q  Have you noted any differences in the shape of
11 the VerSys femoral component, as compared to the
12 Centralign?
13     MR. DAHM: Objection. Vague and ambiguous.
14     THE WITNESS: I'm not in a position to comment
15 on that without an ability to cross compare the two side
16 by side.
17 BY MR. REARDON:
18 Q  What about the area of roughened surface on the
19 VerSys, as compared to the Centralign? Are you in a
20 position to comment on that?
21     MR. DAHM: Same. And now with foundation.
22     MR. REARDON: I'm asking if he's in a position
23 to comment.
24     THE WITNESS: We tend to avoid roughened
25 prosthesis in our practice at this time. Not that there

**Page 80**

1  are not some published art with a series of good
2  results, but we have gone back to either satin or very
3  smooth finish or roughened cementless finishes.
4  BY MR. REARDON:
5  Q  Do you use mesh?
6      MR. DAHM: Object. Vague and ambiguous.
7      THE WITNESS: Fiber mesh is -- the fiber mesh
8  is more commonly used on the acetabular components.
9  BY MR. REARDON:
10 Q  How about porous devices? Doctor, have you
11 been using those?
12     MR. DAHM: Same.
13     THE WITNESS: Yes, for cementless insertion.
14 BY MR. REARDON:
15 Q  Do you know of any other studies, Doctor, that
16 are being undertaken at this time -- retrospective
17 studies regarding the Centralign, besides the one that
18 you're engaged in?
19 A  No. I assume that there's ongoing interest in
20 this at the Mayo Clinic, but I have no confirmation of
21 any active studies.
22 Q  That would be Dr. Daniel Berry?
23 A  Berry.
24 Q  Have you ever seen debonding at the --
25 approximately on the lateral side of the -- of a femoral

Richard Santore, M.D.                                                                 06/25/01

**Page 81**

 1  component with a failure rate as high as this in any --
 2  any of the other components that you've inserted in your
 3  many years of practice?
 4       MR. DAHM: Excuse me. For the record,
 5  objection. Compound, vague and ambiguous.
 6  BY MR. REARDON:
 7     Q  If you understand the question, answer it,
 8  Doctor.
 9       MR. DAHM: Same.
10       THE WITNESS: Not to this extent.
11  BY MR. REARDON:
12     Q  Okay. And, it is in Zone 1 in all instances,
13  all of the ten failures that you saw?
14     A  That's the zone that is most readily
15  identifiable on the radiograph. But at the time of
16  surgical exploration, it tends to be circumferential
17  around the upper portion of the prosthesis.
18     Q  You report an average preoperative Harris hip
19  score for the 84 hips of 37.7, Doctor.
20       Could you explain that, as well as the average
21  postoperative score at final follow-up of '86?
22       MR. DAHM: "That" being what the hip score is,
23  and then what the specific --
24       MR. REARDON: Exactly.
25     Q  Both what the hip score is, as you understand

**Page 82**

 1  it, and then what the significance is of those
 2  particular scores?
 3     A  Right. There was a grading system in Europe,
 4  D'Aubigne-Postel system, that was frequently used and is
 5  still used. And Dr. Harris, a number of years ago, came
 6  up with the idea of incorporating many of the elements
 7  of that study and assigning a numerical score to these
 8  in such a way that a perfect hip function would add up
 9  to a hundred, and a poor hip function would be
10  substantially less than that.
11       And it's provided a -- an opportunity for
12  surgeons to cross-compare, to some degree, the status of
13  patients pre- and post-surgery, and at various times in
14  the postoperative period. And, an average score of
15  39 would be considered an appropriate-type score for a
16  patient population about to undergo hip replacement due
17  to a combination of pain and disability factors.
18       The Harris hip score is heavily tilted towards
19  pain, ascribing 44 points for pain, and the rest to
20  various functional attributes.
21       MR. DAHM: Do you mind if I ask a question
22  right now?
23       MR. REARDON: Sure.
24       MR. DAHM: Are there any alternative measures
25  of the same factors, other than the Harris hip score.

**Page 83**

 1       THE WITNESS: Sure. There's the UCLA hip score
 2  rating which Amstet (phonetic) has popularized, but has
 3  never gained wide acceptance. There are still those
 4  that use the original D'Aubigne-Postel system for rating
 5  hip score functions. There's an Iowa hip scale. There
 6  are other rating systems that are in use, but not to the
 7  same degree. There is a WOMAC, which is the Western
 8  Ontario McMaster University Disease Specific Functional
 9  Outcome Tool, which we are now using routinely as well,
10  but there's nothing that has replaced the Harris score
11  in terms of widespread popularity, and it gives
12  historical linkage to papers from the last 20 years, 15
13  years at least.
14  BY MR. REARDON:
15     Q  Doctor, let me ask you about some of the other
16  studies that you mentioned earlier in your deposition,
17  and also have been mentioned in the article.
18       You -- you've described in your article those
19  studies that were conducted and reported before you
20  published your article. Those that -- where you felt in
21  some way related to your study. Is that fair to say?
22     A  We reported in our discussion a fair and
23  representative sample of studies that supported our
24  position and studies that refuted our position.
25     Q  Right. And -- and I see that you reported, and

**Page 84**

 1  you mentioned earlier Dr. Rubash's study, which noted
 2  about an 8 percent failure rate of precoated stems at an
 3  average of 45 months?
 4     A  Correct.
 5     Q  Now, Dr. Rubash -- do you know what Dr. Rubash
 6  attributed his failures to?
 7     A  He attributed his failures to a failure of the
 8  bonding of the prosthesis to the cement.
 9     Q  Right. And that study was published in 1996,
10  before your -- you made your comments at the annual
11  meeting of the Western Orthopedic Association?
12     A  Yes.
13     Q  So, you were aware of that study before you
14  made your comments?
15     A  Yes.
16     Q  And, did that study also involve the Zimmer
17  Centralign?
18     A  It was the antecedent prosthesis. It was the
19  Zimmer precoat, as I understand.
20     Q  The Harris precoat?
21     A  The Harris precoat, yes.
22     Q  Manufactured by Zimmer, the Harris precoat?
23     A  Yes.
24     Q  And, you indicated that you met with
25  Dr. Crowninshield and Dr. Rohr in the spring and spoke

Richard Santore, M.D.                                                                         06/25/01

---

**Page 85**

with Dr. Harris in the spring of 1996.
   Q  Was this article available to you at the time you met with them?
   A  I do not recall. I know it wasn't the subject of anything we discussed.
   Q  Okay.
   MR. DAHM: Just for the record, Bob, you say "the article." The cite is to, I think, a presentation. And I'm not sure if it actually cites Dr. Rubash's article.
   MR. REARDON: I think you're right. Let me see.
   THE WITNESS: It's a presentation at the academy.
BY MR. REARDON:
   Q  It's a presentation at the academy, yeah, on February 26th, 1996.
   A  Right.
   Q  Were you -- I imagine since it was at the annual meeting, you were probably present?
   A  No. At the annual meeting it's much more than a three ring circus. There may be 75 things of interest going on simultaneously, and it's rare for me to be present for more than one of those 75.
   Q  Are you aware -- you know Dr. Rubash, correct?

---

**Page 86**

   A  Yes, I do.
   Q  And Harry Rubash, in fact, was -- has been associated with Dr. Harris, correct?
   A  He was a fellow with Dr. Harris and had a very distinguished career at the University of Pittsburgh before accepting an appointment as the chief of orthopedics at the Massachusetts general about three or four years ago.
   Q  So, by '98, when you made another presentation, he was back in Boston?
   A  Yes.
   Q  And that, of course, meets --
   A  I believe so. In that three- to four-year time frame. But I think he was in Boston in '98.
   Q  Working with Dr. Harris?
   A  Yes.
   Q  Okay. I think I have just a few more questions, Doctor, and I'll be finished and allow counsel to question you.
   You mentioned in your article, bottom of page 146?
   A  Yes. Which column?
   Q  Second column near the bottom. It is hypothesized that it may be the age or greater demand of the patient that is the most likely variable to

---

**Page 87**

contribute to the mechanical failure of the femoral component. Although associated with failure cases, these elements may not have proximate cause of failure.
   I -- I'm, first of all, guessing that there might be -- been -- may not have been the proximate cause of failure; is that correct?
   A  I would accept that as an improved way of expressing the thought.
   Q  Okay. Thank you. I think we all understood. But apparently the reviewers didn't pick that up, but --
   A  We'll take responsibility for that.
   Q  Okay. So, I take it that your -- that it's your opinion and that of your co-authors that the -- the age or greater demands of a patient are not the proximate cause of the failures that you are noting in your study?
   MR. DAHM: Objection. That's not what's written.
BY MR. REARDON:
   Q  Why don't you explain what's written and just save time. Why don't you explain what you meant by that in your article.
   A  Let me go back to the statistical analysis. I think it's clear that younger aged patients had a higher failure rate, and that reached a very high degree of

---

**Page 88**

statistical significance, as so stated on page 143, paragraph 3, right-hand column, where it states that, The hips and the mechanical failure group had an average patient age of 48.2 years at implantation, whereas the hips in the nonfailure group had an average patient age of 63.5 years at the time of implantation with a P value of .0008. And statistical significance is roughly attributed to P values of .05 or less. And this is way less than that. More than an order of magnitude.
   So clearly, there were more failures in the young age group. The point is that the young aged patients are high risk for all kinds of problems. And they're not a higher risk of failure for this particular prosthesis, they're a high risk of failure for all kinds of problems in all series with total hips.
   Q  There are -- I take it by that you mean they're at a high risk for failure of the acetabular component, they're at a high risk of failure for fractures?
   A  Exactly.
   Q  High risk of failure in any number of other ways that hip replacements can fail?
   A  Right.
   Q  Wearing out bones?
   A  Because they're going to put more demands on the hip.

```
 1     Q    Wear out the plastic, the bones, the femur,
 2  wear out the acetabular component in some way?
 3     A    Correct.
 4     Q    And so on. All the different possibilities for
 5  failure?
 6     A    Right.
 7     Q    Which are included in that acceptable --
 8     A    Yes.
 9     Q    -- less than one percent failure rate, correct?
10     A    Right. Now, wait. The less than one percent
11  failure rate is in total hip patients of a standard
12  garden variety community practice. The failure rate at
13  ten years for young patients has been higher in almost
14  every series ever published.
15     Q    Okay. And what is the -- roughly, the failure
16  rate? I know that the studies vary but --
17     A    The studies vary all over the place. I tell my
18  patients who are about to undergo a total hip
19  replacement, who are under the age of 45, who have no
20  other medical diseases that would slow them down, that
21  they will not live up to their commitment to take care
22  of themselves because it's -- it's a violation of human
23  nature; that they will do everything that they promised
24  that they will not do once they're feeling well; and
25  that -- and that most new technology is unreliable; and
                                                              89
```

```
 1  that they have a probable -- probably, not probable --
 2  probably, more or less, a 50 percent chance of having a
 3  failure of some significance by seven years out. And I
 4  warn them of that every time.
 5     Q    Okay. Now, Doctor, the -- of the ten years --
 6  the ten failures that you had out of 84 that are in the
 7  study, you, I take it, had a -- well, I think that the
 8  ages are listed in here, but they ran from older
 9  patients down to younger patients?
10     A    Full spectrum.
11     Q    The full spectrum?
12          MR. DAHM: Well, of the total group, Bob, or of
13  the failure group?
14  BY MR. REARDON:
15     Q    The failure group as well as the total group,
16  correct?
17     A    Well, there were more younger patients in the
18  failure group, but the series did not discriminate.
19     Q    Right. Now, Doctor, in the -- in the last page
20  of your article, which is page 147, you have identified
21  some causative factors. And I understand you've already
22  given us your caveat that you're not a scientist, you're
23  not a biomedical or biomechanical engineer, but you've
24  identified a few different possible causes of this high
25  failure rate, based upon, I take it, your knowledge of
                                                              90
```

```
 1  the field and -- and your --
 2     A    Right.
 3     Q    -- your experience with this particular
 4  prosthesis device. And they are as -- am I correct in
 5  saying, the roughened surface, the PMAA-precoated
 6  surface, and the stem design; is that fair to say,
 7  Doctor?
 8          MR. DAHM: Objection.
 9          THE WITNESS: Among other things.
10  BY MR. REARDON:
11     Q    What are the others? I'm sorry. The -- and
12  the central -- centralizers as well?
13          MR. DAHM: Object. Same objection.
14  BY MR. REARDON:
15     Q    Why don't you -- I'll withdraw to save the
16  objection.
17          Why don't you tell us what you've identified as
18  the particular causative factors for this high failure
19  rate that were seen in your study?
20          MR. DAHM: Well, that just misquotes the
21  article.
22          MR. REARDON: I just read the first -- the
23  first sentence. It's not possible for him to --
24          MR. DAHM: Right.
25          MR. REARDON: Well, I've given that caveat.
                                                              91
```

```
 1     Q    So, understanding that you're not an engineer,
 2  you're an orthopedic surgeon who has assembled data,
 3  give us your opinion, Doctor, as to what the possible
 4  causative factors are for this high failure rate?
 5          MR. DAHM: Objection. Foundation, speculation.
 6  BY MR. REARDON:
 7     Q    Go ahead, Doctor.
 8     A    What I said -- what I think I was saying here
 9  is that we cannot identify any sole causative factor,
10  but there may be a cumulative contribution from elements
11  that include the type of PMAA coating on a surface that
12  was rough -- relatively rough; that the design of which
13  was somewhat small, short, and perhaps not as
14  rotationally stable as some others.
15          But there may be variables that have nothing to
16  do with the prosthesis such as curing of the cement; the
17  way in which we used vacuum cement and not centrifuge
18  cement; the way in which the stem was inserted into the
19  canal; the voids that might be present between the stem
20  and the canal, which we attempted to carefully assess by
21  using the Harris system, which I erroneously confused
22  for a moment with the ABC Charnley patient status
23  grading system.
24     Q    You used the Harris grading system?
25     A    Right. We used the Harris grading system. The
                                                              92
```

Richard Santore, M.D.                                                                  06/25/01

**Page 93**

1  Charnley is the ABC version. Unilateral, bilateral,
2  general medical problems. And I apologize for that
3  momentary confusion. But there are multiple factors
4  that we felt were potentially responsible, in terms of
5  the way in which the prosthesis was put in, the way in
6  which the cement was prepared and/or used, as well as
7  design features of the prosthesis that did not live up
8  to expectations.
9      Q    Let me identify the design features that -- or
10 have you identify the design features, again,
11 understanding that you've mentioned the mantle
12 technique -- the surgical technique and the mantle,
13 meaning the cement that is surrounding the femoral
14 component. But I'd like you to identify what you
15 believe to be the possible different design features
16 that may contribute.
17     MR. DAHM: Form. Foundation.
18     THE WITNESS: It's all -- I state it right
19 here, which is, the presence of a hole in the tip of the
20 stem that can lead to the introduction of an air bubble;
21 the design, i.e, somewhat short and small surface type;
22 perhaps problems between the broach design and the final
23 stem position; the fact that it's very difficult to
24 replicate precisely the position in space of the broach
25 and the prosthesis; and rotation errors could be

**Page 94**

1  responsible for some element of the -- of the
2  difficulty; position in space of the prosthesis.
3      But, in terms of the design elements we're
4  talking about, the shortness, the narrowness, the
5  surface finish, principally.
6  BY MR. REARDON:
7      Q    And the PMAA coating?
8      A    Yes. Which may or may not have added anything
9  of value to the fixation reliability.
10     Q    Okay. Doctor, the -- at the very end of the --
11 the article you again mention -- and I quote, We are not
12 aware of any series, however, in which the theoretical
13 advantages of roughened prosthetic surface with PMAA
14 precoat have provided superior results to conventional
15 cemented, smooth, or highly polished stems.
16     Do you still feel that way today, Doctor? That
17 you're not aware of any such series and you haven't
18 found -- found any reason to believe that the -- there
19 is a superior advantage to the -- to the roughened
20 surface PMAA precoat?
21     MR. DAHM: Compound.
22     THE WITNESS: I believe that we covered this
23 before, but, yes, I am not aware of any MVO studies
24 showing a superior clinical result over time in
25 patients.

**Page 95**

1  BY MR. REARDON:
2      Q    The last sentence that you've indicated,
3  Caution must be exercised when deciding on a roughened-
4  surface PMAA-precoat prosthesis until the mechanisms of
5  failure seen in these series are understood better.
6      You still feel that way today, Doctor?
7      A    Yes.
8      MR. REARDON: I don't have any other questions,
9  Doctor. Thank you.
10     MR. DAHM: Doctor, for housekeeping purposes
11 I'm not sure how you're splitting your time. So, if we
12 owe you anything for your time today, let me know and
13 we'll get you paid.
14     THE WITNESS: Thank you, sir.
15     MR. DAHM: You're welcome.
16                 EXAMINATION
17 BY MR. DAHM:
18     Q    You mentioned that Dr. Coutts was a
19 distinguished surgeon. You mentioned Dr. Harris's
20 contribution to this field, talked about Dr. Rubash's
21 contribution, Dr. Grady-Benson's contribution and his
22 surgical skills.
23     A    Yes.
24     Q    And that's a predicate for my question. And
25 that is, you mentioned, in response to counsel's

**Page 96**

1  questions, about cementing -- cement technique?
2      A    Yes.
3      Q    And so, even though you could attempt -- not
4  you, Dr. Santore, but you orthopedic surgeons could
5  attempt to flawlessly execute a total hip arthroplasty,
6  even an excellent surgeon like yourself, Dr. Harris, or
7  others can have suboptimal results with the technique,
8  with cementing, with the ultimate performance of the
9  total hip; is that correct?
10     A    Yes.
11     Q    And so, that's why, even though we can have a
12 fine cement technique, we can still have suboptimal
13 cement mantles, correct?
14     A    Yes.
15     Q    And indeed, you, as well as others, have
16 reported data showing a statistical significance between
17 suboptimal cement technique and the loosening of cement
18 stems?
19     A    Yes.
20     Q    Not related to Centralign, but all cemented
21 stems, correct?
22     A    Yes.
23     Q    And indeed, the area of loose -- incidentally,
24 are you using "loosening" and "debonding" the same in
25 your paper?

Richard Santore, M.D. 06/25/01

```
 1   A   No.
 2   Q   Tell me how you use the term "debonding."
 3   A   Debonding means a radiographically visible
 4  separation. And it is presumed that that is associated
 5  with loosening. But one can not confirm loosening,
 6  based on a radiograph.
 7   Q   And so, when you talk about debonding, there
 8  was loosening -- loosening necessarily that occurred
 9  before that?
10   A   Yes.
11   Q   And, the debonding that you note in your paper
12  has -- having occurred in Zone 1, you are aware, Doctor,
13  that there is data going back at least as to 1979,
14  showing the same debonding in that same zone for a
15  variety of cemented stems?
16   A   Yes.
17   Q   So, loosening in that zone is not unique to
18  Centralign?
19   A   Correct.
20   Q   You talked a number of times about the multi --
21  the multiple factors that are potentially responsible
22  for the results that you saw. And, indeed, is it
23  your -- do you stand by your view today that it's
24  impossible to identify a particular causal factor for
25  the results that you saw in this series?
```
97

```
 1   A   Yes.
 2       MR. REARDON:  Object to the form of that
 3  question.
 4  BY MR. DAHM:
 5   Q   And, indeed, you stand by your position that
 6  it's difficult to condemn the separate concepts, the
 7  separate design concepts, based on a series with a
 8  single prosthesis?
 9   A   Yes.
10   Q   Why is that?
11   A   In this series in particular, because there
12  were too many uncontrolled variables.
13   Q   And, indeed, when we talked about size of the
14  stems, in terms of the overall size of the stems, your
15  report indicates that, while there was a trend, size was
16  not of statistical significance in your series; is that
17  correct?
18   A   We actually showed there was no statistical
19  significance to smaller stems failing at a higher rate
20  than larger stems. It was a trend, and it was close to
21  statistical significance, but it didn't hold up.
22   Q   And, indeed, you noted what you found -- or
23  reported, rather, what you found to be of statistical
24  significance, or rather what the data showed to be of
25  statistical significance?
```
98

```
 1   A   We showed everything, whether it was supportive
 2  or did not support our assumptions.
 3   Q   And, the things that reach statistical
 4  significance -- if you want to go back to your report,
 5  Doctor, feel free -- were age, correct?
 6   A   Yes.
 7   Q   Gender?
 8   A   Yes.
 9   Q   Hylamer cup, which is a DePuy acetabular
10  component?
11   A   Hylamer liner.
12   Q   Hylamer liner in a DePuy acetabular shell.
13  That did reach significance?
14   A   Yes.
15   Q   And, indeed, you talked about all of those
16  things as being -- that these present confounding
17  variables because they reach statistical significance in
18  the failure group, correct?
19   A   Correct.
20   Q   And, it's for those and other reasons why it
21  was impossible to conclude a particular causative
22  factor, correct?
23   A   Correct. It's a lot different than a series of
24  stems where there is a fracture just at the point of a
25  manufacturing process, at a certain point on the lateral
```
99

```
 1  side, for instance, among other things.
 2   Q   Exactly. And, indeed, that's why you referred
 3  to the results of surgeons like Dr. White and
 4  Dr. Leschevitz, who have reported excellent results with
 5  this same stem, correct?
 6   A   Correct. We tried to create a very balanced
 7  and fair review that looked at an equal number of
 8  positive and favorable reports, and then placed ours out
 9  there for scrutiny, but without a crusade to make.
10   Q   I don't think either side portrays it as a
11  crusade. We appreciate that.
12       Doctor, of the -- you've heard the expression
13  "multifactorial analysis," with respect to loosening of
14  cemented stems, correct?
15   A   Yes.
16   Q   And, among the factors that are included under
17  that general rubric are patient specific factors,
18  correct?
19   A   Correct.
20   Q   And those include what, for example?
21   A   Height, weight, activity level, general medical
22  condition, osteoporosis of the bone. It goes on and on.
23   Q   You talked about osteoporosis of the bone.
24  That includes --
25   A   General quality of the bone.
```
100

25 (Pages 97 to 100)

**Page 101**

Q -- the size of the canal, the quality of the canal, how much endosteal bone is or is not present. All of those kinds of things, correct?

A Yes.

Q And those, obviously, because they're patient-specific, vary from patient to patient to patient?

A Correct.

Q And, there are also, under this multifactorial analysis, variables that have been generally described as surgical technique variables, some of which you've touched upon today, referencing your paper, and also in your deposition testimony -- i.e. the cementing technique, doughy versus liquid, the humidity in the operating suite, the temperature in the operating suite, how the bone cement is mixed, vacuum mixed versus -- you mentioned another method?

A Centrifuge.

Q All of those vary, not only from surgeon to surgeon, but with a particular surgeon?

A They can vary from case to case depending on the scrub nurse that's involved. That changes almost every case.

Q So, when we look at the failure of a total hip arthroplasty, it really is an individual failure of that total hip, is it not?

**Page 102**

MR. REARDON: I'm going to object to the form. Go ahead, I'm sorry. I didn't mean to interrupt.

MR. DAHM: I trail off, so I understand, Bob.

Q Because of the multifactorial nature of the analysis; is that correct, Doctor?

MR. REARDON: Object to the form.

THE WITNESS: Each case has its own unique variable set.

BY MR. DAHM:

Q And, with respect to the data, you said that Dr. Harris looked at some of the films. Do you recall how many films he --

A Approximately four cases.

Q Would that be four hips or four patients who may have had bilaterals?

A Four patients, one of whom, I think, had bilaterals.

Q So maybe five different hips?

A Correct.

Q The -- the grading system that you and Mr. Reardon discussed, the A through the D, although no Ds were reported, does that grading system also include an evaluation of the amount of cement mantle and the degree to which there is complete cement mantle?

A It doesn't specify the thickness, although it's

**Page 103**

generally believed that anything less than two millimeters is unacceptable for a cement mantle at any one point.

Q And, when you were implanting these stems, what amount of mantle were you shooting for?

A Two to three millimeters everywhere.

Q And, I assume the same is true -- do you know whether the same is true for Dr. Coutts?

A Yes.

Q In reviewing some of the papers of other stems, I see the same grading system, you know, A through C, some Ds -- in fact, even Dr. Harris reported some Ds, I think he had. And hence, the data supporting the statistical significance between suboptimal cement and predictor of early loosenings.

But I saw in those discussions an evaluation of how much cement was present on a radiograph, apart from the grading system itself.

Was that latter analysis undertaken here by the reviewers?

A I do not believe it was.

Q I also noticed in the paper, Doctor, that the films were APs -- standard APs and frog leg laterals; is that correct?

A Correct.

**Page 104**

Q Were there any obliques reviewed?

A No.

Q Was there --

A Not -- there were some laterals that were, in fact, obliques, because they were incorrectly taken laterals, but they were not intentional obliques.

Q In terms of your standard clinical follow-up of films, what typically do you order and why?

A It's changed somewhat now, but it's not relevant to this report. We now obtain an AP of the hip and femur down to the end of the stem and beyond -- tip of the stem and beyond; and a false profile, which gives us a partial lateral of the socket, as well as a true standing lateral of the femur. But all of these patients were done prior to the change to that technique, and these patients were all analyzed using supine non-standing AP pelvis, AP hip and lateral X rays.

Q Were the X rays or the radiographs digitized?

A No.

Q And, Dr. Sylvain retains all of the original films?

A Data. No, we have the films here. He has the data.

Q What's the difference between the films and the

**Page 105**

```
 1  data?
 2    A   The data is the scoring on, you know,
 3  spreadsheets and -- and the films are just the raw
 4  X rays, which are --
 5    Q   Okay.
 6    A   -- kept here because many of these patients are
 7  still in our active practice.
 8    Q   I've not seen someone go through and do a
 9  series like this and create the material. The material
10  that Dr. Sylvain retains is the grading sheets, so to
11  speak?
12    A   Right.
13    Q   And, that's based on his review of the
14  operative reports?
15    A   Right. And I have a copy that have. I used to
16  have a full copy of that, but my computer was stolen.
17  And I can get another copy back from him, but he has
18  that information.
19    Q   I'm just trying to figure what it is.
20        What the "it" is, so to speak.
21    A   It's basically an Excel data sheet from a
22  computer, where you set up all the variables you have to
23  study, then you set up all the patients, and you go
24  through a checklist, and you rate every patient for
25  every variable. And then there are statistical programs
```

**Page 106**

```
 1  that will do the student T test and the other
 2  multivariable analysis to create statistical
 3  significance.
 4    Q   Okay. And, the data that you and others rely
 5  on to reach conclusions, that data that reaches
 6  statistical significance?
 7    A   We also rely on data that doesn't reach
 8  statistical significance, because that can also be just
 9  as important.
10    Q   How so, Doctor?
11    A   A true negative is -- for instance --
12    Q   A true negative?
13    A   We may assume that the patient's height is a
14  factor, but the statistical significance study may
15  dictate otherwise. We assumed that the small size stems
16  were a greater problem. The statistical analysis
17  disproved that assumption.
18    Q   Do you know Dr. Albert Bernstein?
19    A   Of course I do.
20    Q   No, I mean --
21    A   Personally, no. I know of him by reputation.
22    Q   What do you understand his reputation to be?
23    A   He's one of the foremost biomaterial scientist
24  and designers in the field of total joints, was
25  responsible for many critical studies along the way
```

**Page 107**

```
 1  during and throughout in the entire history of total
 2  joint replacement history, going back to the '70s.
 3    Q   Do you know Dr. Jorge Galante, or Dr. Jorge
 4  Galante, as he goes by?
 5    A   Yes, I do.
 6    Q   Can you tell us what you understand his
 7  reputation to be?
 8    A   He's one of the preeminent orthopedist
 9  clinician scientists who has an advanced degree from
10  Sweden in orthopedic science, over and above his
11  training in orthopedics. And I believe he is credited
12  as the principal innovator of the fiber mesh technology,
13  and is also well known as a superb orthopedic surgeon.
14  I believe now retired.
15    Q   Do you know a physician in his group by the
16  name of Dr. Richard Burger or know of him?
17    A   Yes, I do.
18    Q   Do you know of his reputation?
19    A   He's an up-and-coming superstar in the field of
20  total joint surgery.
21    Q   Earlier you were asked about the amount of
22  royalties under -- or payments to Dr. Harris.
23        Do you find anything whatsoever untoward about
24  that?
25    A   Based on --
```

**Page 108**

```
 1        MR. REARDON: I'll object to the form of that
 2  question. I mean, that calls for an opinion of the --
 3        MR. DAHM: Are you going beyond just a form
 4  objection, Mr. --
 5        MR. REARDON: Yeah, I am. Because I figured,
 6  what the heck. If you were going to do it, I was going
 7  to do it, too.
 8  BY MR. DAHM:
 9    Q   Go ahead, Doctor.
10    A   Well, you know, a little bit like Tiger Woods
11  and Magic Johnson. Bill Harris is a Tiger Woods/Magic
12  Johnson equivalent in the field of hip surgery. And his
13  input, his opinions, his contributions are worth
14  something economically.
15    Q   Do you find that those economics have ever
16  swayed his beliefs?
17        MR. REARDON: I'll object to that.
18        THE WITNESS: I can't answer that question
19  because I'm not in a position to answer that question,
20  but I doubt it very much.
21  BY MR. DAHM:
22    Q   You have not seen any evidence of that?
23    A   No.
24    Q   Thank you, Doctor. Appreciate your time.
25              FURTHER EXAMINATION
```

Richard Santore, M.D.                                                               06/25/01

**Page 109**

BY MR. REARDON:
Q  Couple questions, Doctor. And we're already three minutes after, but I think we'll be finished within five minutes. I'm not going to ask a great deal.
With respect to all of the variables that are brought out just now by Mr. Dahm in testimony, in hip arthroplasty, such as the mantle, the patient-specific factors and so on, without going through each and every one of them again, did you take all of those into consideration in your study in reaching the opinion that you reached, that it was an unacceptable high failure rate of 12 percent, with respect to the Zimmer Centralign?
A  I did.
Q  And so, therefore, when you say an acceptable failure rate is less than one percent, you are including in that statistic of less than one percent all of the same variables that were brought out by Mr. Dahm on his cross-examination, correct?
A  Yes.
Q  Now, with respect -- I do have one other thing I wanted to ask you about, Doctor.
There's a letter that has been disclosed to us that is in the disclosing materials from Zimmer, dated January 23rd, 1998. A form letter, two pages in length.

**Page 110**

Did you receive that letter or have you seen it before?
MR. DAHM: That would be No. 11?
THE WITNESS: I do recall seeing this, yes.
MR. REARDON: And why don't we mark it at the end of the deposition to save time, with your permission.
MR. DAHM: Sure.
BY MR. REARDON:
Q  It will be Exhibit 11.
It indicates in the fourth paragraph, fourth full paragraph -- there's a sub-paragraph in there -- Dr. Santore's report focuses attention on the cemented total hip treatment of relatively young, active, and/or heavy patients.
Would you agree with that, that your study focused on -- on that particular type of patient?
A  No, I wouldn't.
Q  Okay. It focused on all patients, correct?
A  It did.
Q  And, the recommendations that were made in that letter on page 2, which are, one, use the -- Zimmer recommends the following should be considered in the treatment of these patients. One, use the largest femoral component stem size reasonably possible for the

**Page 111**

patient, and two, use a cementless femoral implant where bone quality and other factors indicate appropriate usage.
Do you agree with those recommendations?
MR. DAHM: Why don't you let him read it for a second.
MR. REARDON: Sure.
THE WITNESS: Under recommendation No. 1, there's a great degree of debate in the orthopedic community about whether or not femoral bone should be reamed away with a power reamer to facilitate insertion of a larger stem, because that also degrades the quality of the bone that the cement will integrate with. And it also could, for inexperienced surgeons, promote them to use a stem that's larger than the rasp that was inserted down, which would potentially cause a very thin cement mantle.
And, under No. 2, there have been numerous debates and numerous published articles extolling the virtues of cemented and cementless prosthesis of various kinds. And in the few controlled studies that have been done, there's basically been shown to be no difference in outcomes between cementless and cemented stems, and both can be associated with excellent results.
And so, I don't think one would want to bias

**Page 112**

towards one or the other for -- based solely on the quality of the bone. Good quality bone can be associated with excellent results with cemented or cementless results. And there are even studies showing excellent results with cementless prosthesis in osteoporotic bone. So it's an unresolved issue.
BY MR. REARDON:
Q  So, you wouldn't necessarily agree with either one of those recommendations, correct?
A  No.
Q  You would not?
A  I would not. And, our study, in fact, shows that there was no statistical significance with regard to a failure rate with the smaller sizes.
Q  Very well. Regardless of weight, Doctor?
A  Well --
Q  I'll withdraw that, because I don't want to go off in a new area at this late time. We're short, and it's probably something that should be taken up at another time with another witness.
Doctor, this is also a letter dated February 19th, 1998, which appears to be a follow-up letter from Zimmer.
Are you familiar with that letter? Likewise, that was disclosed to us by Zimmer in this lawsuit.

```
 1    A    I do not recall having seen this one.
 2    Q    You want to take a moment to look at it?
 3    A    Sure.
 4         I don't recall having seen this, but it would
 5  clearly be a confirmation of my feeling that that
 6  recommendation had to be clarified.
 7    Q    That is -- you just testified that the
 8  recommendation that was made -- Recommendation No. 1 --
 9  needed to be clarified. And, in fact, it was clarified
10  approximately three weeks later in a February 19th
11  letter; is that correct?
12    A    Yes.
13         MR. REARDON: I have no other questions. Thank
14  you.
15         MR. DAHM: We have none, Doctor. Thank you for
16  your time.
17         (Deposition Exhibit 11 was marked for
18          identification by the court reporter.)
19  BY MR. ATTN:
20    Q
21  //
22  //
23
24
25
                                                          113
```

```
 1
 2
 3
 4
 5
 6
 7
 8         I, RICHARD SANTORE, M.D., do hereby declare
 9  under penalty of perjury that I have read the foregoing
10  transcript; that I have made any corrections as appear
11  noted, in ink, initialed by me, or attached hereto; that
12  my testimony as contained herein, as corrected, is true
13  and correct.
14         EXECUTED this _____ day of _____,
15  20____, at _____, _____.
                 (City)              (State)
16
17
        _____
18          RICHARD SANTORE, M.D.
19
20
21
22
23
24
25
                                                          114
```

```
 1
 2
 3         I, the undersigned, a Certified Shorthand
 4  Reporter of the State of California, do hereby certify:
 5         That the foregoing proceedings were taken
 6  before me at the time and place herein set forth; that
 7  any witnesses in the foregoing proceedings, prior to
 8  testifying, were placed under oath; that a verbatim
 9  record of the proceedings was made by me using machine
10  shorthand which was thereafter transcribed under my
11  direction; further, that the foregoing is an accurate
12  transcription thereof.
13         I further certify that I am neither financially
14  interested in the action nor a relative or employee of
15  any attorney of any of the parties.
16         IN WITNESS WHEREOF, I have this date subscribed
17  my name.
18
19  Dated: _____
20
21
22       _____
         MONIQUE OLIGNY, RPR
23       CSR No. 10818
24
25
                                                          115
```

```
 1    A   I do not recall having seen this one.
 2    Q   You want to take a moment to look at it?
 3    A   Sure.
 4        I don't recall having seen this, but it would
 5  clearly be a confirmation of my feeling that that
 6  recommendation had to be clarified.
 7    Q   That is -- you just testified that the
 8  recommendation that was made -- Recommendation No. 1 --
 9  needed to be clarified. And, in fact, it was clarified
10  approximately three weeks later in a February 19th
11  letter; is that correct?
12    A   Yes.
13        MR. REARDON: I have no other questions. Thank
14  you.
15        MR. DAHM: We have none, Doctor. Thank you for
16  your time.
17        (Deposition Exhibit 11 was marked for
18         identification by the court reporter.)
19  BY MR. ATTN:
20    Q
21  //
22  //
23
24
25
                                                       113
```

```
 1
 2
 3
 4
 5
 6
 7
 8        I, RICHARD SANTORE, M.D., do hereby declare
 9  under penalty of perjury that I have read the foregoing
10  transcript; that I have made any corrections as appear
11  noted, in ink, initialed by me, or attached hereto; that
12  my testimony as contained herein, as corrected, is true
13  and correct.
14        EXECUTED this _____ day of _____,
15  20____, at _____, _____.
                (City)              (State)
16
17
         _____
18            RICHARD SANTORE, M.D.
19
20
21
22
23
24
25
                                                       114
```

```
 1
 2
 3        I, the undersigned, a Certified Shorthand
 4  Reporter of the State of California, do hereby certify:
 5        That the foregoing proceedings were taken
 6  before me at the time and place herein set forth; that
 7  any witnesses in the foregoing proceedings, prior to
 8  testifying, were placed under oath; that a verbatim
 9  record of the proceedings was made by me using machine
10  shorthand which was thereafter transcribed under my
11  direction; further, that the foregoing is an accurate
12  transcription thereof.
13        I further certify that I am neither financially
14  interested in the action nor a relative or employee of
15  any attorney of any of the parties.
16        IN WITNESS WHEREOF, I have this date subscribed
17  my name.
18
19  Dated: _____
20
21
22        _____
             MONIQUE OLIGNY, RPR
23           CSR No. 10818
24
25
                                                       115
```