# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DOLORES DUNN;                    )    <u>CONFIDENTIAL</u>
DONALD DUNN,                     )
                                 )    **CONDENSED**
              Plaintiff(s),      )    **TRANSCRIPT**
                                 )
       -vs-                      )    CIVIL ACTION NO:
                                 )    3:00CV1306 (DJS)
ZIMMER, INC.,                    )
                                 )
              Defendant(s).      )    COPY
--------------------------------

### The Deposition of ROY CROWNINSHIELD

**DATE:**    Monday, November 19, 2001

**TIME:**    9:45 a.m.

**PLACE:**   Offices of Baker & Daniels
             111 East Wayne Street
             Fort Wayne, Indiana


Called as a Witness herein, in
Accordance with the Rules of Civil
Procedure.


Before Toni L. VanSyckle
Certified Shorthand Reporter,
Notary Public


SUMMIT CITY REPORTING
Certified Shorthand Reporters
3518 Stellhorn Road
Fort Wayne, Indiana 46815
(219) 486-3954



**2**

APPEARANCES:

ROBERT I. REARDON, JR., ESQ.
The Reardon Law Firm
160 Hempstead Street
New London, Connecticut 06320
(860) 442-0444

      On behalf of the Plaintiffs.

ALBERT J. DAHM, ESQ.
MICHAEL S. ELVIN, ESQ.
Baker & Daniels
111 East Wayne Street, Suite 800
Fort Wayne, Indiana 46802
(219) 424-8000

      On behalf of the Defendant.

ALSO PRESENT:  David N. Royster,
      Assistant Counsel,
      Zimmer, Inc.

**4**

EXHI   CONTINUED

Exhibit 8.................... Page 118
(January 15, 1998 Dear Distributor
Letter)

Exhibit 9.................... Page 119
(January 23, 1998 Dear FIELD
Letter)

Exhibit 10................... Page 122
(February 19, 1998 Dear FIELD
Letter)

Exhibit 11................... Page 137
(Centralign Precoat Hip Prosthesis,
20% Enlarged, Size 2, 9800-02)

Exhibit 12................... Page 141
(Label from Centralign Precoat
Hip Prosthesis)

Exhibit 13................... Page 152
(Copy of a brochure for the
Centralign Precoat Hip Prosthesis)

Exhibit 14................... Page 171
(Copy of a brochure for the VerSys
Cemented Hip Prostheses)

Exhibit 15................... Page 187
(Information from Internet)

**3**

## INDEX

THE DEPOSITION OF

## R O Y   C R O W N I N S H I E L D

DIRECT EXAMINATION
by Mr. Reardon.................... Page 5


### EXHIBITS

CROWNINSHIELD:

Exhibit 1.................... Page 6
(Fifth Re-Notice of Deposition
Duces Tecum)

Exhibit 2.................... Page 11
(Curriculum Vitae of Roy D.
Crowninshield, Ph.D.)

Exhibit 3.................... Page 67
(Uncertified/Unedited Transcript,
Page 33)

Exhibit 4.................... Page 71
(Uncertified/Unedited Transcript,
Page 36-38)

Exhibit 5.................... Page 75
(Orthopedics Today)

Exhibit 6.................... Page 78
(1998 HOA Annual Meeting Paper
Presenters, Tuesday, Sept. 8)

Exhibit 7.................... Page 93
(Early Failure of a Roughened
Surface, Precoated Femoral
Component in Total Hip Arthro-
plasty article)

**5**

1
2  Crowninshield Deposition Exhibits 1 & 2 marked
3      for identification.
4      - - -
5    R O Y   C R O W N I N S H I E L D,
6  Having been first duly sworn, was examined and
7  testified as follows:
8      - - -
9      DIRECT EXAMINATION
10 BY MR. REARDON:
11 Q.  Would you state your full name and address for the
12    record, sir?
13 A.  My name is Roy Crowninshield.  I live at
14    11115 Burnhill Court, Fort Wayne, Indiana.
15 Q.  And as I understand it, you are a Ph.D.?
16 A.  I have a Ph.D.
17 Q.  You have a Ph.D., excuse me.
18    And so would you prefer that I refer to you
19    as Mr. or Dr. Crowninshield?
20 A.  Whatever makes you comfortable, I don't care.
21 Q.  I'll call you Dr. Crowninshield because you earned
22    it.
23    Dr. Crowninshield, I represent Dolores and
24    Donald Dunn, among others, in the lawsuits that
25    have been brought against Zimmer, Inc., I'm sure



6

1   you're aware of that, correct?
2 A.   I am aware of that.
3 Q.   And I take it you understand the purpose of this
4      deposition is to you questions about the
5      Centralign hip implant?
6 A.   I understand that.
7 Q.   Okay.
8          MR. REARDON:  Before we get started,
9      stipulations in accordance with the Federal Rules?
10         MR. DAHM:  Please, thank you.
11         MR. REARDON:  Now, Dr. Crowninshield, --
12         MR. DAHM:  I'm sorry, Bob, also, for the
13     court reporter, that there is a protective order
14     in place governing the production of documents
15     deemed confidential, and that includes depositions
16     in which documents so stamped may be used, and
17     this is obviously going to be one of those
18     depositions, as I will give to the court reporter,
19     before we're done, a copy of that protective order
20     because it provides, among other things, that the
21     transcript itself be deemed a confidential
22     document.  Thank you.
23 BY MR. REARDON:
24 Q.   Dr. Crowninshield, I have marked as Exhibit 1 a
25     fifth renotice of deposition duces tecum, and I

7

1      think you've probably seen a copy of this already,
2      have you not?  I'm passing it to you now.
3 A.   I probably have.
4 Q.   Take a look through it, particularly the pages
5      that deal with what you're supposed to produce
6      today.
7          MR. DAHM:  And on that topic, it's clear that
8      the witness did not produce and will not have been
9      producing any documents today, we've talked about
10     that before.  But in terms of categories of the
11     areas of testimony, that's a different issue and
12     the witness can look at that.
13 BY MR. REARDON:
14 Q.   Now, Doctor, you've had an opportunity to look at
15     Exhibit 1?
16 A.   Yes.
17 Q.   With respect to the documents to be produced, I
18     understand from Mr. Dahm, your attorney, that you
19     hadn't brought anything with you today but there
20     had been documents produced previously.
21         Do you have any documents in your personal
22     possession, outside of documents in the control of
23     Zimmer, that would be responsive to Exhibit 1?
24 A.   No.
25 Q.   And, Dr. Crowninshield, you've been designated, in

8

1      accordance with Rule 30(B)(6) of the Federal
2      Rules, that you are the person most knowledgeable
3      at Zimmer, Inc. --
4          MR. DAHM:  Well, --
5          MR. REARDON:  Let me finish the question, I
6      know you're nodding your head, but --
7          MR. DAHM:  Well, you looked at me and stopped
8      so I thought you were --
9          MR. REARDON:  Well, you were nodding your
10     head so you distracted me --
11         MR. DAHM:  Sorry, Bob.
12         MR. REARDON:  Let me finish the question,
13     then you can make a statement for the record.
14         MR. DAHM:  All right.
15         MR. REARDON:  You have been designated by
16     Zimmer, Inc. as the person most knowledgeable with
17     respect to the design and manufacture of the
18     Zimmer Centralign implant.
19         Do you believe yourself to be the person
20     most knowledgeable at Zimmer, Inc. in those
21     particular areas?
22         MR. DAHM:  And for the record, Rule 30(B)(6)
23     does not talk about the, quote unquote, person
24     most knowledgeable.  And he is not being treated
25     under any kind of standard that requires -- that

9

1      would have that in it.
2          He's being produced pursuant to
3      Rule 30(B)(6), period.
4          MR. REARDON:  Do you consider yourself the
5      person most knowledgeable in Zimmer, Inc. with
6      respect to the design and manufacture of the
7      Zimmer Centralign implant, Doctor?
8          MR. DAHM:  Objection, form.
9          MR. REARDON:  You can answer the question,
10     Doctor.
11         I should explain, if Mr. Dahm has not,
12     that if he objects, unless he instructs you
13     specifically not to answer, you should answer.
14         THE WITNESS:  I consider myself very
15     knowledgeable on the design and manufacture of the
16     Centralign implant.  And I'm not aware of an
17     individual who perhaps is, on balance, more
18     knowledgeable.
19         MR. REARDON:  Fair enough.
20 BY MR. REARDON:
21 Q.   I have a copy of your CV here that you've provided
22     me with today.
23         And before we get started reviewing it, have
24     you been deposed before, Dr. Crowninshield?
25 A.   Yes, I have.

10

1 Q. And how many times would you say you've been
2   deposed?
3 A. More than 10 times.
4 Q. More than 20 times?
5 A. I doubt if it's more than 20.
6 Q. All right. And on each of the occasions that
7   you've been deposed, have you been deposed as an
8   employee of Zimmer or have you been deposed before
9   you were an employee of Zimmer?
10 A. I have been deposed before prior to being an
11   employee of Zimmer.
12 Q. And have you been deposed since you have been an
13   employee of Zimmer?
14 A. Yes, I have.
15 Q. On the occasions that you've been deposed, have
16   you ever been deposed with respect to a lawsuit
17   that involved the Zimmer Centralign implant?
18 A. No, I don't think so.
19 Q. This is the first time you've been so deposed?
20 A. I believe so.
21 Q. Okay. How about with respect to hip implants?
22 A. With respect to hip implants, yes, I've been
23   deposed.
24 Q. That's an area of expertise for you, am I correct,
25   sir?

11

1 A. I have considerable experience in that. I
2   consider myself quite knowledgeable, if not
3   expert.
4 Q. I take it that the depositions have been in
5   lawsuits of one kind or another that you've
6   referred to, the ten or so depositions?
7 A. Many of them have been, yes; they're associated
8   with lawsuits, yes.
9 Q. And the lawsuits that they're associated with, are
10   they lawsuits that involved hip implants?
11 A. Some were.
12 Q. What other subjects were the topic of your
13   depositions, besides hip implants?
14 A. I've been deposed in matters of spinal surgery and
15   spinal implants, perhaps a knee implant, a
16   fracture device, plating systems, fracture
17   devices.
18 Q. I see from a quick look at your CV that you
19   started your career, looks like, in Iowa, is that
20   correct?
21 A. Prior to working for Zimmer I was on the faculty
22   of the University of Iowa.
23 Q. And looks like you started with Zimmer in March of
24   '83, is that right?
25 A. That sounds right, yes.

12

1 Q. And if you need to look at your own CV, looks like
2   there's another copy over there; sometimes dates
3   are hard to remember.
4   Doctor, you mentioned that you had been
5   deposed before you worked for Zimmer as well as
6   after.
7   When you were working as an associate
8   professor, or in various capacities at the
9   University of Iowa, were you deposed regarding a
10   Zimmer product?
11 A. Yes, I was.
12 Q. Before you joined Zimmer, had you served as an
13   expert witness for Zimmer?
14 A. Yes, I have. Yes, I did, excuse me.
15 Q. So during the period from, looks like, about 1975
16   until 1983 when you were at the University of
17   Iowa, you at various times were called upon to
18   serve as an expert witness and testified on behalf
19   of Zimmer in lawsuits, is that correct?
20 A. Yes.
21 Q. Is that how you came to know the people at Zimmer?
22 A. No, I had previous association and knowledge of
23   Zimmer and Zimmer's knowledge of some of the work
24   that I had performed in research at the University
25   of Iowa.

13

1 Q. Before you joined Zimmer in 1983, had you ever
2   testified as an expert witness in any cases
3   against Zimmer?
4 A. No.
5 Q. So would it be fair for me to say that on every
6   occasion that you've testified, whether it be
7   before or after you joined Zimmer in 1983, you
8   testified on behalf of a Zimmer product?
9 A. No, it would not be fair.
10 Q. What other areas have you testified in besides
11   Zimmer products, what other products have you
12   testified regarding?
13 A. I've had depositions, as I recall, related to hip
14   products made by other companies.
15 Q. What other companies?
16 A. The Richards Manufacturing Company at the time,
17   now the Smith and Nephew (phonetic) Orthopedic
18   Company. I was involved in some consultation and
19   expert advice and witnessing with them.
20 Q. And with respect to all of your testimony at
21   depositions, would it be fair for me to say that
22   you've always testified on behalf of a
23   manufacturer of an orthopedic product that is
24   being sued, in other words, that is the defendant?
25 A. Yes, I think my experience has all been that

14

1  associated with an orthopedic manufacturer.
2 Q.  When they've been sued by a plaintiff?
3 A.  Yes, for --
4 Q.  In other words, folks like me?  I don't mean to
5     interrupt, folks like me.  Plaintiffs lawyers have
6     not ever hired you to serve as an expert, is that
7     correct?
8 A.  That is correct.
9        MR. DAHM:  You don't want us to characterize
10     folks like you, Bob.
11        MR. REARDON:  Well, other people characterize
12     us as people like us, us and them.  I don't
13     necessarily but other people do.  I just wanted to
14     make it easier for the doctor.
15 BY MR. REARDON:
16 Q.  Now, Dr. Crowninshield, you went to University of
17     Vermont and you went through all your program
18     there from Bachelor right through your Ph.D.,
19     according to your CV.
20        Were you raised in Vermont?
21 A.  No, I was not.
22 Q.  What area were you raised in?
23 A.  I grew up in Massachusetts, Boston area
24     Massachusetts.
25 Q.  So you're related to Ben Bradley then?

15

1 A.  No.
2 Q.  You're not?
3 A.  I don't know.
4 Q.  You don't know, really?  Ben Bradley's mother is a
5     Crowninshield.
6 A.  It's a name that finds its way around the Boston
7     area Massachusetts.
8 Q.  Ever been to Boca Raton in Florida?
9 A.  No.
10 Q.  There's a Crowninshield Community Center there,
11     you should go down and visit it, that would be
12     Ben Bradley's mother.
13        You're not related to Louise Crowninshield
14     who is the benefactor of the Crowninshield
15     Community Center at Boca Raton in Florida?
16 A.  Not that I'm aware of.
17 Q.  Might get in for free if you go there.
18        You're from the Boston Crowninshield family?
19        MR. DAHM:  Form.
20 BY MR. REARDON:
21 Q.  You were raised there?
22 A.  I was raised around Boston.
23 Q.  Okay, and what high school did you go to?
24 A.  Harvard High School in the town of Harvard,
25     Massachusetts.

16

1 Q.  Okay.  Is that whe   you were raised, the Harvard
2     area?
3 A.  Yes.
4 Q.  Let me take a quick look at your resume, maybe I
5     can save time by skimming it before I ask you any
6     questions.  (Short pause.)
7        Okay.  Dr. Crowninshield, you got out of the
8     University of Vermont in 1975 with a Ph.D.  Can
9     you tell me who was the individual or individuals
10     who served to review your dissertation when you
11     got your Ph.D.?
12 A.  I certainly remember some of them.
13        My thesis advisor was Malcolm Pope; a
14     Dr. Robert Johnson, who's an orthopedic surgeon.
15     If I recall correctly, he was on the committee.
16     Dr. McClay, who was an engineering professor, was
17     on the committee.
18 Q.  Is he M-c-C-l-a-y?
19 A.  Boy, it's been a long time.  I don't recall how to
20     spell his name.
21        And I believe the department chairman was on
22     the committee, and his name was Vaughn Turkovitch,
23     and I could not spell that for you.  It's been a
24     long time since I thought about that; that was 30
25     years ago.

17

1 Q.  Any of these four people still around, as far as
2     you know?
3 A.  Malcolm Pope is.  I believe McClay is, Bob Johnson
4     is, Vaughn Turkovitch I don't know.
5 Q.  Any of them still at University of Vermont?
6 A.  The last I knew Dr. Johnson and Dr. McClay were
7     both in Burlington, Vermont.
8        Dr. Johnson I think is still a practicing
9     orthopedic surgeon and I believe still at the
10     university.
11        Dr. McClay I don't believe is affiliated with
12     the university.
13 Q.  How about Malcolm Pope, where is he now?
14 A.  Last I knew he was in the U. K.
15 Q.  Does he work for a manufacturer now?
16 A.  No, I believe he works for a university in the
17     U. K.
18 Q.  Okay.  All right.  I understand you were in Europe
19     over the last week?
20 A.  Yes, I was.
21 Q.  I hope it was enjoyable.
22        Was it business or pleasure?
23 A.  It was business.
24 Q.  Regarding Zimmer?
25 A.  Yes.

18

1  Q.  And its international operations.

2  A.  Yes.

3  Q.  Have anything to do with the Centralign implant?

4  A.  No.

5  Q.  Okay.  According to your C.V., you were made a

6      senior vice president and chief scientific officer

7      in May of last year.

8          Can you tell me how that distinguished itself

9      from the -- right, 5-2000?

10         MR. DAHM:  You said he was made that in May

11     of last year.

12         MR. REARDON:  Well, that's when he was

13     appointed.

14         MR. DAHM:  You might want to ask the

15     question.

16         MR. REARDON:  Sure.

17         Were you appointed senior vice president

18     chief scientific officer in May of 2000?

19         I'm going to have to move you over because

20     you keep shaking your head.

21         MR. DAHM:  Sorry, Bob, I was trying to have a

22     clean record.

23         THE WITNESS:  Actually that doesn't seem to

24     be correct —

25         MR. REARDON:  Okay.

---

19

1          THE WITNESS:  — to me.

2          Excuse me, you're right.  I couldn't

3      tell if it was May.  But a year and a half, two

4      years ago, yes.

5  BY MR. REARDON:

6  Q.  Okay.  So my next question was going to be, and I

7      guess it will still be, we're uncertain on the

8      date on that appointment, but my question —

9  A.  May sounds correct.

10 Q.  All right.  My question would be what is the

11     distinction in terms of responsibilities between

12     your job as the senior vice president in research

13     and development and your job as senior

14     vice president chief scientific officer?

15 A.  The, and part of the reason for my hesitation, is

16     that the titles reflect different organizational

17     designs of the company; that in 1997, when I was

18     vice president in research and development, there

19     was an organizational element of research and

20     development.

21         In May of 2000, the organization which

22     changed such that the development functions became

23     part of what became to be called the

24     commercialization function combining

25     development engineering with product management,

---

20

1      and the responsibi    es associated with that then

2      no longer reported to me.  But I kept the

3      responsibility of research for the company and

4      served and continued to serve as its chief

5      technical representative.

6          And I previously had, if you back up a few

7      years, chief scientific officer title previously

8      in 1995, again, in a different organizational

9      arrangement as we've moved between

10     commercialization functions and research and

11     development functions.

12 Q.  Okay.  To make it simple for me, tell me a little

13     bit about the corporate structure.

14         Is Mr. Elliott still the president of the

15     company?

16 A.  Mr. Elliott is president of the company, and I

17     work for Mr. Elliott.

18 Q.  You report directly to the president and CEO?

19 A.  Yes, I do.

20 Q.  And how many people are at that level of the

21     corporate structure that report directly to the

22     president and CEO?

23         MR. DAHM:  Bob, that's not a subject that's

24     been noticed for this deposition.  Now, you can

25     reserve that and if you have other things that are

---

21

1      noticed, I suggest you get in that, but that's not

2      been noticed.

3          MR. REARDON:  Well, I just want to understand

4      his level of responsibility for purposes of his

5      bias.  I'm certainly entitled to ask.

6          MR. DAHM:  You can ask that question.

7          MR. REARDON:  Okay.  Tell me how many

8      people —

9          MR. DAHM:  No, that's a different question.

10     That has not been noticed.  You can ask him what

11     his level of responsibility is.

12         MR. REARDON:  You know, I don't want to

13     terminate the deposition at this early stage, —

14         MR. DAHM:  It's your call, Bob.

15         MR. REARDON:  — but I'm not going to be

16     limited, after I've gone to all of this trouble to

17     get this deposition and traveled all the way to

18     Fort Wayne, Indiana, I'm not going to be limited

19     on basic questions regarding how he falls into the

20     corporate structure.  I mean, if that's where

21     we're going with this deposition, I think we ought

22     to go back to court and get a better understanding

23     as to what —

24         MR. DAHM:  Bob, show me where in your notice,

25     your notice, that area appears, your 30(B)(6)

22

1  notice, show me where that appear...
2      MR. REARDON:  He was noticed, sir, as an
3  individual deponent as well as a 30(B)(6)
4  deponent.
5      MR. DAHM:  You withdrew that individual
6  notice.
7      MR. REARDON:  No, I did not.
8      MR. DAHM:  The only one we have --
9      MR. REARDON:  No, I did not, sir.
10     MR. DAHM:  Let's go back to Exhibit 1, for
11  the record.  And as you said earlier, you are
12  being produced today pursuant to 30(B)(6), that's
13  it.  There is no category that talks about the
14  corporate structure.
15         Now, Bob, if you want to ask him what
16  his responsibilities are, I told you you can do
17  that.  But the corporate structure has not been
18  properly noticed for today.
19     MR. REARDON:  I'm not asking -- I'm going to
20  pursue this, and we're going to either pursue it
21  or end the deposition --
22     MR. DAHM:  It's your call.
23     MR. REARDON:  -- because I'm going to ask a
24  very limited question, but I will not allow
25  somebody ten minutes into the deposition to draw

23

1  lines in the sand, I mean about basic questions,
2  otherwise we're going to have no progress made
3  here.
4         I mean I'm not going to go through this
5  entire day having you circumvent and circumscribe
6  everything I say in claiming that this is not
7  permissible and that is not permissible.  You're
8  not a judge.  You can reserve for the time of
9  trial as the rules allow; but if you think that
10  something is not permissible, if you instruct him
11  not to answer, I'm going to go to a judge, I'm not
12  going to have it, I'm not going to have it.
13         And believe me, we tried to keep a
14  cordial relationship; but after what I went
15  through, and I'm going to put this on the record,
16  after I went through to get to Salt Lake City to
17  hiring lawyers, after what I went through to get
18  the deposition of Dr. Harris, I am going to get
19  the answers to my questions.
20         You have a different type of personality
21  than the last 15 or so cases you've settled
22  regarding the Centralgin implant.  I'm going to
23  get the information no matter how much it costs,
24  sir, okay?
25         Now if it requires an appeal to the

24

1  Second Circuit, so be it.  But I will get the
2  information that I'm entitled to in this case.  I
3  understand what's discoverable and what's not,
4  I've been practicing law for 31 years.
5         I would like to ask him how many people
6  in addition to himself report to the president of
7  the company.  Beyond that, I doubt I would go any
8  further.  But I need to know where he falls into
9  the corporate structure in terms of level of
10  responsibility, level of authority, if he's the
11  only person.  That certainly changes my perception
12  of him if there's 50 people.  I know the company
13  has roughly 3500 employees, it's going to change
14  my perception.
15     MR. DAHM:  Bob, are you asking him now what
16  the corporate structure is?
17     MR. REARDON:  I'm asking him it today, he's
18  being deposed today, as to how many people --
19     MR. DAHM:  What possible relevance that has
20  with respect to a product that was manufactured
21  way back when is beyond me, number one.
22         Number two, you haven't noticed that
23  area.
24     MR. REARDON:  Bias.  You want an answer to
25  your question?  Bias.

25

1      MR. DAHM:  Bias?
2      MR. REARDON:  And I'm going to ask him, since
3  he's been with the company for a number of years,
4  is he eligible for retirement, I assume he is at
5  some point, if there's a pension plan and so on.
6  All of that is relevant.  I'm not going to ask him
7  dollars, how much money he's going to get.  But
8  I'm allowed to establish that this witness has a
9  very significant vested interest in this company,
10  that's all.
11     MR. DAHM:  If you want to ask him do others
12  currently report to the president directly, you
13  can ask him that question.
14     MR. REARDON:  And how many people.
15     MR. DAHM:  What's the possible relevance of
16  that latter point?
17     MR. REARDON:  Because if there are -- I just
18  said so.  And I've asked this question
19  innumerable times and never had an objection by
20  corporate executives.
21     MR. DAHM:  You haven't noticed it, Bob.  I
22  mean, Bob, if you'd follow the rules.
23     MR. REARDON:  Every witness is subject to
24  being deposed on his or her bias, regardless of
25  the reasoning.

**Page 26**

1  MR. DAHM: All right, if you represent that
2  is the limited nature of this inquiry, I will let
3  you proceed. Is that your representation?
4  MR. REARDON: That is the limited nature, and
5  I have no intention of going into great detail.
6  MR. DAHM: Fine.
7  MR. REARDON: Let's just move on. I mean,
8  really, I know where I'm supposed to go and where
9  I'm not, don't worry. I'm not trying to get any
10  information out of him that will create problems
11  for you, for him, or for me; I just want to move
12  on. It's a cloudy day in Fort Wayne, I'd rather
13  be somewhere else.
14  Dr. Crowninshield, how many people
15  besides yourself report directly to Mr. Elliott?
16  MR. DAHM: Objection, form, vague.
17  THE WITNESS: There's about eight or ten.
18  BY MR. REARDON:
19 Q.  Okay. Are you on the Board of the Zimmer, Inc.?
20 A.  No, I'm not.
21 Q.  And I take it, sir, that since you've worked for
22  the company for, let's see, about 17 years, 18
23  years?
24 A.  19 years.
25 Q.  19 years, you were at some point going to be

**Page 27**

1  eligible for pension benefits and so on, as any
2  corporate executive would?
3 A.  I would expect so.
4 Q.  And you have things like -- do you have stock
5  options you're allowed?
6 A.  Yes, I have stock options.
7 Q.  And I assume you own stock in the company as well?
8 A.  I own stock in the company.
9 Q.  The company went public I believe this year, early
10  part of this year, correct?
11 A.  In August of this year.
12 Q.  And did you acquire additional stock at that time?
13 A.  The only stock that I hold in Zimmer I acquired at
14  that time.
15 Q.  Okay, I see.
16  Did you own stock in Bristol-Myers Squibb
17  before that day?
18 A.  I own stock in Bristol-Myers Squibb, and it's as a
19  result of owning that stock that I own Zimmer
20  stock.
21 Q.  I understand.
22  That wasn't that painful, was it?
23 A.  As all shareholders of Bristol-Myers receive
24  Zimmer stock.
25 Q.  Yes, I would assume that there'd be some sort of

**Page 28**

1  stock plan, employ stock plan, that you
2  participate in, along with other employees,
3  correct?
4 A.  Stock plan? What do you mean?
5 Q.  That allows you to acquire stock or be given
6  stock.
7 A.  There's a stock option plan that you asked about
8  that I participate in.
9 Q.  All right. Am I correct that there are roughly
10  3500 Zimmer employees?
11 A.  Yes.
12 Q.  And Zimmer's main offices are located in Warsaw,
13  Indiana?
14 A.  Yes.
15 Q.  You also have another facility, a manufacturing
16  facility, in North Carolina, is that correct?
17 A.  Yes.
18 Q.  Have any other facilities in the United States
19  other than in I believe it's Statesville,
20  North Carolina and Warsaw, Indiana?
21 A.  Yes.
22 Q.  Where else?
23 A.  Dover, Ohio. Or New Philadelphia, Ohio.
24 Q.  What kind of facility is that?
25 A.  It manufactures product, largely electronic

**Page 29**

1  devices and disposable medical products.
2 Q.  Okay.
3 A.  And there's a facility in Palmse, Puerto Rico.
4 Q.  How do you spell Palmse, do you know?
5 A.  I don't know.
6 Q.  It's P-a-l-m-s-e maybe?
7 A.  Perhaps.
8 Q.  Okay. And the facility in Puerto Rico, what does
9  that manufacture? I assume it's a manufacturing
10  facility?
11 A.  It's a manufacturing facility, makes implant
12  devices.
13 Q.  Okay. Have any of the components of the
14  Zimmer Centralign ever been manufactured at the
15  Puerto Rico facility?
16 A.  Yes, in part.
17 Q.  Okay. How about the New Philadelphia, Ohio
18  facility?
19 A.  No.
20 Q.  Is it Ohio, was I wrong on something?
21 A.  It's New Philadelphia/Dover, sort of two twin
22  cities side by side. I do not recall which.
23 Q.  And it is Ohio?
24 A.  Yes, Ohio.
25 Q.  Okay. And how about the Statesville,

30

1   North Carolina facility?
2 A. No.
3 Q. And in Warsaw, are there manufacturing facilities
4    in Warsaw as well?
5 A. Yes.
6 Q. Have we covered all of the locations that
7    Zimmer, Inc. has facilities, manufacturing
8    facilities? We'll exclude sales from this.
9 A. Yes.
10 Q. And design facilities as well?
11 A. Yes, with a possible exception that there may be a
12    very modest design facility still operating in
13    Japan.
14 Q. Did the Japan facility have anything to do with
15    the design of the Zimmer Centralign?
16 A. No.
17 Q. So I think what I can conclude from all of this is
18    that the only facilities that had anything to do
19    with the manufacture or design of the
20    Zimmer Centralign are the Warsaw, Indiana
21    facilities and the Puerto Rican facilities, is
22    that right?
23 A. That's correct.
24 Q. Thank you.
25        In Warsaw, Indiana, can you describe to me

31

1    what manufacturing facilities you have that were
2    involved in any way in the manufacture of the
3    Zimmer Centralign prosthesis?
4 A. The facility for precoating the implants is in
5    Warsaw, the facility for cement centralizer
6    attachment is in Warsaw, the final
7    packaging/labeling is in Warsaw.
8 Q. Shipping as well, I assume?
9 A. The sterilization process is arranged out of
10    Warsaw and plants leave Warsaw and then return to
11    Warsaw where they're warehoused in Warsaw and then
12    shipped to the customer from Warsaw.
13 Q. And how about the Puerto Rican facility, what
14    manufacturing responsibilities were performed in
15    Puerto Rico?
16 A. The Puerto Rico facility performed some machining
17    operations on Centralign implants, performed some
18    polishing operations. Both facilities, Warsaw and
19    Puerto Rico, would have performed appropriate
20    inspection, quality assurance operations on
21    various steps in the manufacture.
22 Q. Were the casting, and I'm not sure if I'm using
23    the correct word, but the actual manufacture of
24    the implant itself, was that done in Puerto Rico
25    or was it done in Warsaw, or by a subcontractor?

32

1 A. The implant is not casting, it is a forging.
2    And it was not performed in either Warsaw or in
3    Puerto Rico; it would have been performed by a
4    vendor.
5 Q. And who was the vendor? Or if there's more than
6    one, if you could list them for me.
7 A. I don't recall what vendor or vendors, if there
8    were more than one, supplied the forgings for the
9    Centralign.
10 Q. I assume the first step in the process would be
11    the forging; and then after it's forged, it would
12    be then sent to various locations for machining,
13    polishing, precoating, and so on, is that fair to
14    say? You have to have an implant in its forged
15    form before you can go about doing any of the
16    other steps of finishing the product and
17    distributing it, correct?
18 A. The manufacturing process starts with a purchased
19    item, which is a forging, yes.
20 Q. And you can't, as you sit here today, tell me the
21    names of any of the vendors that forged the
22    Centralign implant?
23 A. I'm familiar with the names of vendors of forgings
24    that we have used over the years. I don't recall
25    which ones may have been involved in the

33

1    Centralign implant.
2 Q. Can you tell me the forgers, I guess if that's a
3    correct term, who were involved with the forging
4    of any of the implants that were manufactured by
5    Zimmer from 1992 through 1998?
6        MR. DAHM: Bob, I think that, just to save
7    some time, the documents that we're going to get
8    for you, the manufacturing, I think will show that
9    on there.
10        MR. REARDON: Okay.
11        MR. DAHM: So if you want to reserve that.
12        MR. REARDON: Well, if he doesn't know, he
13    can say he doesn't know and we can save that for
14    later on.
15 BY MR. REARDON:
16 Q. Do you remember the names of any of the vendors
17    that manufactured or forged implants in the period
18    from '92 to '98?
19 A. Yes, one called Thorton, I believe we used during
20    that period. There's one in Worcester,
21    Massachusetts, the name escapes me, I'll think of
22    it in a minute probably, that we used during that
23    period of time. There may have been a vendor
24    known as Jet that we used.
25 Q. Okay. Dr. Crowninshield, when I speak of

**34**

1  Centralign implants, I think you understand I'm
2  speaking of the Centralign Precoat as well as the
3  Centralign Option, the non-precoat of Centraligns,
4  just for future reference, is that okay? And if
5  you want to make a distinction or I want to make a
6  distinction between the two, I'll make it in my
7  question or you'll make it in your answer. But
8  the term Centralign encompasses both the
9  non-precoated and the precoated, that is the
10 option, and the Centralign Precoat also known, at
11 times, as the Centralign Premium.
12        MR. DAHM:. Is there a question there?
13        MR. REARDON: Just do you understand that?
14        MR. DAHM: Which? Now what you were asking
15 the witness to do is draw a distinction now --
16        MR. REARDON: No, I'm not.
17        MR. DAHM: -- and then you threw something
18 else in there. So why don't you rephrase the
19 question.
20        MR. REARDON: All right.
21 BY MR. REARDON:
22 Q.  Have you ever heard the Centralign Precoat
23      referred to as the Centralign Premium?
24 A.  Not until this morning. That wasn't part of my
25      terminology.

**35**

1  Q.  How did you refer to the Centralign Precoat in
2      distinguishing it from the Centralign Option?
3  A.  In my terminology and reference, I think it would
4      generally have been the Centralign, for one, and
5      the Centralign Option for the other.
6  Q.  So that we can get a time frame here, would you
7      agree that the Centralign Precoat, or Centralign
8      as you call it, was marketed in the United States
9      from 1992 to 1998?
10 A.  During about that period, yeah, that sounds right.
11 Q.  Okay. Do you know when the first Centralign
12      precoated implant was sold or distributed to the
13      general orthopedic community, not including
14      clinical trials?
15 A.  I do not recall.
16 Q.  Was it some time in 1992?
17 A.  It's my understanding that it was 1992 some time.
18 Q.  And do you know when the last time one was sold or
19      distributed to the general orthopedic community?
20 A.  As you refer to previously, I think in 1998, some
21      time in 1998 they ceased being distributed in the
22      United States.
23 Q.  Was there a specific date, and you can look at
24      your materials since I couldn't find one in the
25      materials provided to me, maybe you could help me,

**36**

1  that the last one  distributed and was there a
2  formal step that was taken in order to end the
3  distribution?
4  A.  I'm not aware of any action taken to end the
5      distribution. And to your question of was there a
6      date that the last one was distributed, the answer
7      would be, yes, obviously. What that date was, I
8      do not know.
9  Q.  You don't know?
10 A.  No.
11 Q.  But you believe it'd be some time in 1998?
12 A.  That's my understanding.
13 Q.  I take it, Dr. Crowinshield, that at some point
14      there must have been a decision to stop
15      manufacturing, stop buying it from vendors and so
16      on.
17          Do you have that date, do you have any idea
18      what that date is?
19 A.  No, I don't.
20 Q.  Would you agree that there was such a date,
21      though?
22 A.  There was a date that we distributed our last
23      product, and I don't know what that date is.
24 Q.  With respect to the Centralign implant, I know I
25      wrote counsel and asked if there would be produced

**37**

1  today the Exemplar implant, and I was going to ask
2  some questions about that specific implant.
3      Will it be produced today?
4          MR. DAHM: Yeah, Bob, on the record, your
5  voice mail message I got Saturday morning,
6  because our voice mail machine wasn't working; I
7  did see your letter.
8          I'm not aware of any order that talks
9  about the production of our Exemplar. If you have
10 an order, I'd be pleased to look at it. Are you
11 aware of an order?
12          MR. REARDON: Well, the interrogatory answer
13 says that you will produce it, you provided us
14 with.
15          MR. DAHM: Right, but that's not an order.
16          MR. REARDON: My understanding, unfortunately
17 with the federal judge before, he very often does
18 not make a record, as we both know, of what goes
19 on in chambers and then provides a subsequent with
20 sort of a summary form order.
21          MR. DAHM: I do have that summary form order,
22 and it talks about the production of your
23 components.
24          MR. REARDON: Right.
25          MR. DAHM: It does not mention in any way the

38

1  production of our components. But leaving that
2  aside, so the record is clear, we --
3  MR. REARDON: My understanding is that you
4  did indicate to him that you provide us with one
5  Exemplar, it's a size number 2, I think it's a
6  9825 that you have in inventory.
7  MR. DAHM: Yeah, what we said in our answer
8  to interrogatory, which we served on you as
9  subject to and without waiving our objection,
10  Zimmer will produce at a time and place mutually
11  agreeable to the parties an Exemplar of the
12  Centralign Precoat femoral stem, catalog number
13  9825-002, for inspection on the following
14  conditions which must be agreed to by the
15  plaintiffs in a letter of understanding: A, you've
16  got to pay for it; B, that it'll only be used,
17  this Exemplar, in this litigation and may not be
18  used for any other purpose; C, that you do not
19  conduct any destructive examination or testing on
20  the Exemplar.
21  MR. REARDON: What number are you on, by the
22  way?
23  MR. DAHM: Zimmer's response to plaintiff's
24  supplemental request for production request, it
25  was served August 29th.

39

1  MR. REARDON: Okay. Just give me a moment,
2  I'll get it; I've got everything with me.
3  MR. DAHM: Okay.
4  MR. REARDON: What number?
5  MR. DAHM: I don't believe there was a
6  number. You just served a stand alone request for
7  production.
8  MR. REARDON: Okay, I have it.
9  MR. DAHM: And you served it on July 27th of
10  2001. And I'm looking at page 2 of our response,
11  see it?
12  MR. REARDON: Yeah, I see it. And it says
13  pay all the costs associated with removing it from
14  the inventory. I assume that means bringing it
15  from Warsaw to here?
16  MR. DAHM: Well, actually the cost of it.
17  MR. REARDON: It doesn't say that, that's why
18  I wanted to look. It wasn't my recollection, and
19  that's not what it says.
20  What it says is what it says: the
21  plaintiff will pay all the costs associated with
22  removing the Exemplar from Zimmer's inventory.
23  If you want me to drive to Warsaw this
24  afternoon, I'll terminate the deposition at four
25  and I'll go there, if it's expensive for you to

40

1  bring it -- how far is Warsaw from here, Doctor?
2  MR. DAHM: 45 minutes to an hour.
3  MR. REARDON: Okay. I take it that somebody
4  can bring it here or I can take a cab out there?
5  MR. DAHM: Bob, do you want to do this the
6  easy way or the hard way?
7  MR. REARDON: Yeah, why don't you just
8  produce it? I asked for it.
9  MR. DAHM: We objected. The time for you to
10  challenge our objection has come and gone.
11  MR. REARDON: You agreed. You didn't object,
12  you agreed, the word is agreed, sir.
13  MR. DAHM: Subject to without waiving, we
14  will do this provided you do the following things.
15  If you have any problems with any of these things,
16  now's the time to talk about it.
17  MR. REARDON: No, I don't have any problem or
18  I wouldn't have asked for production.
19  I will pay the cost of bringing it from
20  Warsaw to here, to Fort Wayne, approximately 45
21  minutes. I assume that requires some sort of
22  courier to bring it.
23  MR. DAHM: See, Bob, --
24  MR. REARDON: Let me finish, okay, so we can
25  put it on the record.

41

1  I will, number 1, I will pay the cost
2  associated with bringing it to the deposition.
3  Number 2, that it is to be used for the
4  present litigation and not for any other purpose.
5  Number 3, I will not conduct any
6  destructive examination or testing on it.
7  And number 4, the plaintiff and the
8  plaintiff's experts will maintain exclusive
9  possession and control of the Exemplar, it will
10  not relinquish possession and control to
11  nonparties.
12  And number 5, the Exemplar will be
13  returned in an unaltered state once the
14  inspection of testing is completed or within 30
15  days of receipt, whichever is shorter. All of
16  that is agreed, sir.
17  Now what you want to do now, would you
18  produce the Exemplar?
19  MR. DAHM: Well, Bob, this is the first time
20  you've said that, so we will try to make it
21  available for you today and I will come back and
22  revisit the cost issue; I don't have it here in my
23  possession, this is the first time you tell me
24  that, Bob.
25  MR. REARDON: I sent you a letter.

42

1    MR. DAHM:  Friday afternoon, I got a letter
2 dealing with the response that we sent you
3 August 29.
4    MR. REARDON:  Let's see if you can produce it
5 by tomorrow then and bring it 45 minutes from
6 Warsaw to here.
7    I will return it to you at the end of
8 the deposition; I would like to use the Exemplar
9 for purposes of questioning the witnesses, and
10 without waiving my right to request that it be
11 produced for purposes of expert examination at a
12 subsequent date.
13    But I intend to use it today.  It'll be
14 during the time that -- excuse me, during the time
15 that it will be used today it will be in your
16 possession and control at all times, it'll be here
17 in the deposition room, that's my only purpose in
18 having it here.
19    MR. DAHM:  You said today and then you just
20 said tomorrow.  Which is it?  Do you want it today
21 or tomorrow, Bob?
22    MR. REARDON:  Hell, I'm going to be here
23 tomorrow.  I prefer today, I have a series of
24 questions I wanted to ask about it.  But I'll wait
25 until tomorrow to ask them.

43

1    MR. DAHM:  Not withstanding your request,
2 Friday afternoon, we'll see what we can do for
3 you, Bob.
4    MR. REARDON:  Thank you.
5 BY MR. REARDON:
6 Q.  Dr. Crowninshield, when you were hired in 1983 as
7 the director of research of Zimmer, had you ever
8 served as a corporate employee before that, or
9 were you an academia?
10 A.  The previous seven or eight years I was at a
11 university on a faculty.
12 Q.  I understand.
13    Had you worked for any corporations?  I don't
14 think universities are corporations, maybe they
15 are, I'm not a corporate expert, but.  You know
16 the distinction between academia and business, I
17 assume?
18    Had you ever worked in business before you
19 came to Zimmer?
20 A.  Not on a full-time basis.
21 Q.  Okay.  How about on a part-time basis, that's what
22 I was leading to, had you worked for Zimmer or any
23 other corporations on a part-time basis?
24 A.  Yes, as a student.
25 Q.  How about as a consultant, had you served as a

44

1 consultant to Zimmer or Bristol-Myers Squibb,
2 before 1983?
3 A.  As I previously described, I consulted with Zimmer
4 in matters of some litigation and served as an
5 expert witness in some matters prior to being an
6 employee of the company.
7 Q.  And you were paid for that service, I take it?
8 A.  Yes.
9 Q.  Your subpoena duces tecum calls for you to bring
10 any minutes, notes, correspondence, or other
11 records of the Centralign Precoat hip prothesis
12 development team, that's number 2.
13    In reviewing the materials that have been
14 provided to me that are all bate stamped, the
15 development team minutes, which have been
16 provided, seemed to end in around 1996.
17    Has there been any meetings of the
18 Zimmer Centralign development team since 1996 to
19 your knowledge?
20 A.  Not to my knowledge.
21    MR. DAHM:  Bob, just for the record, you
22 referred to a subpoena duces tecum.  There is none
23 with respect to this fifth renotice.
24    MR. REARDON:  I'm not going to necessarily
25 engage in a dialogue throughout the whole

45

1 deposition.  If you want to make statements about
2 what you think is the case, I'm not necessarily
3 going to argue with you, I'm just going to
4 disregard them.  That doesn't mean I agree with
5 them, that just means I'm disregarding them.
6    Just for the record, I won't respond
7 again.  I was tempted not to respond this time,
8 but I will respond to the extent of stating that
9 by my silence, that does not mean I agree with
10 your comments, okay?  And that's true for the
11 future.
12 BY MR. REARDON:
13 Q.  Doctor, you are familiar with the development
14 committee or development team for the
15 Zimmer Centralign, are you not?
16 A.  Yes, I believe I am.
17 Q.  And at various times it appears that it was called
18 the Next Generation Harris Cemented Stem
19 Committee, and the Development Committee, and had
20 other names, but the purpose of this committee was
21 to develop what ultimately was called the
22 Zimmer Centralign, is that fair to say?
23 A.  I believe that's fair to say.
24 Q.  Okay.  According to the materials that I was
25 provided with, this committee had its first

46

```
 1   meeting, that I received a copy of the minutes
 2   of, on April 21st, 1989.  And the attendees were a
 3   Mr. Dock -- well, I shouldn't say Mr., I don't
 4   know if they're male or female.  Someone named
 5   Dock, someone named Fitzpatrick, someone named
 6   Geremakis, is that the correct pronunciation?
 7 A.   Geremakis.
 8 Q.   Geremakis.  Dr. William Harris; Leda Hewka; and
 9      D., and I think it's David, Weidenbenner, is that
10      how you pronounce his name, Weidenbenner?
11 A.   Yes.
12 Q.   Did that list of names that I just gave you
13      encompass all of the members of the team that was
14      assembled to develop the, what was then called,
15      the Next Generation Harris cemented stem implant?
16 A.   I believe that list reflects correctly the team of
17      people who started that discussion at that date.
18 Q.   And was there any discussion of developing the
19      implant, cemented stem implant, which ultimately
20      resulted in the production of the
21      Zimmer Centralign before April 21st, 1989?
22 A.   Not to my knowledge.
23 Q.   You were not, according to the minutes, at that
24      meeting.
25           What was your capacity or relationship to
```

47

```
 1   this committee?
 2 A.   In 1988 I believe --
 3 Q.   This says April 21st, 1989.
 4 A.   Oh, '89, okay.
 5        In 1989 I was responsible for research and
 6      development within Zimmer.
 7 Q.   Were you overseeing this particular committee's
 8      actions?
 9 A.   Excuse me, I misspoke; let me look in my resume'.
10        1989 I was responsible for research.  In 1990
11      I became responsible for research and development,
12      so.
13        MR. DAHM:  Bob, what's the bate label on that
14      document down at the bottom?
15        MR. REARDON:  This would be R2-1.  It's
16      actually the first document.
17        MR. DAHM:  Whatever it is?
18        MR. REARDON:  Yeah.  By the way, I believe
19      you bRought in your copy.  If you want to see
20      one -- I only have my loose-leaf, and I informed
21      Mr. Dahm beforehand that because of the traveling
22      here I wasn't able to put together two
23      loose-leafs, it would be too cumbersome.  This
24      occupied one whole suitcase as it was and it was
25      over 60 pounds, so that was extra.  It would have
```

48

```
 1   been 120 pounds i   did it twice.
 2        Mr. Dahm was kind enough to bring in his
 3      copy.  If you need to see R2-1, which is the
 4      minutes of the April 21st, 1989 meeting, I'm sure
 5      Mr. Dahm can get it for you.
 6 BY MR. REARDON:
 7 Q.   The committee that I listed, would that be a
 8      committee that reported directly to you?
 9 A.   No, it would not be.
10 Q.   Who did that committee report to in April of 1989?
11 A.   That committee has a number of names, as you've
12      read them there, that reported to various
13      individuals within the company.  They're assembled
14      as an operating team, if you would, not as a
15      reporting organization.  So I think you'll find
16      that there were several superiors and reporting
17      line chains of commands of those individuals.
18 Q.   Could you tell me who the reporting lines were in
19      1989 when the development process started?
20 A.   We could go name by name, if you like.
21 Q.   Sure.
22 A.   They're all different.
23 Q.   They're all different?
24        Let's take T. Dock.  Do you have the same
25      document in front of you?
```

49

```
 1 A.   I have a document here, yes.
 2 Q.   Okay.
 3 A.   That is, I believe, Ted Dock, I believe that's the
 4      individual.  And I believe at that time he
 5      reported to the manufacturing operation.
 6 Q.   So he was responsible or had some knowledge of the
 7      manufacturing aspects, that's why he was there?
 8 A.   Yes.
 9 Q.   What about T. Fitzpatrick?
10 A.   That would be Tom Fitzpatrick.  Tom was a
11      marketing person, I believe, working in the hip
12      area at that time.
13 Q.   How about, and I'm going to try again, Geremakis?
14 A.   Perry Geremakis.  Perry was a development engineer
15      and reported to the development engineering
16      function.
17 Q.   So he was an engineer, the other two were not, is
18      that correct?
19 A.   I don't recall whether Dock has an engineering
20      degree.  He perhaps did.
21 Q.   Okay.  How about Dr. Harris, we all know what his
22      involvement was, he was serving as a consultant,
23      is that fair to say?
24 A.   Dr. Harris is an orthopedic surgeon in
25      Massachusetts General Hospital at the time.
```

50

1 Q. And he served as a consultant to Zimmer in the
2   development of the Zimmer Centralign implant,
3   correct?
4 A. Yes.
5 Q. Leda Hewka, is that the pronunciation?
6 A. I believe it's Hewka.
7 Q. Hewka?
8 A. I'm not sure.
9      Leda is an engineer, I believe at that time
10   worked for Perry Geremakis who reported to the
11   development engineering function.
12 Q. And the last person, Weidenbenner?
13 A. That's David Weidenbenner.
14      David is an engineer, but at that time he was
15   working in marketing.  It's possible that
16   Tom Fitzpatrick worked for him at that time, I'm
17   not sure.  But Tom Fitzpatrick and
18   Dave Weidenbenner were in the marketing area, I
19   believe.
20 Q. All right.  To the best of your knowledge, did
21   that group encompass the team that was organized
22   to develop what eventually led to the
23   Zimmer Centralign implant?
24 A. As I previously said, I think that was the team
25   that started the project, yes.

51

1 Q. Okay.  Were others added to the team later?
2 A. The development of an implant requires a great
3   deal more participation than six individuals.  I
4   mean, there's a large number of people who are
5   involved in it as the project progresses.
6 Q. Okay.  Where is Mr. Dock now?
7 A. Mr. Dock, Ted Dock, retired from Zimmer quite a
8   number of years ago, he's elderly.  I've not heard
9   from him in 10 years probably.
10 Q. How about Mr. Fitzpatrick, where is he now?
11 A. He works for Zimmer.
12 Q. Is he still in marketing?
13 A. No.
14 Q. What is he doing now?
15 A. He works in external development.
16 Q. What is external development?
17 A. He's involved in the activities of licensing and
18   acquisitions.
19 Q. Acquisitions of other companies and that?
20 A. Yes.
21 Q. I see, okay.
22      And is Geremakis --
23 A. Geremakis.
24 Q. Geremakis, I'll get it eventually.  Geremakis,
25   where is he now?

52

1 A. He does not work at Zimmer.  I do not know where
2   he's at.
3 Q. When did he leave Zimmer?
4 A. Several years ago.
5 Q. And do you know if he's still working in the field
6   of development or engineering of biomedical
7   implants?
8 A. No, I do not.
9 Q. Do you know under what circumstances he left
10   Zimmer?
11 A. Yes.
12 Q. Could you tell me?
13 A. He left Zimmer to work for a company that was in
14   New Jersey that was in the trauma products area.
15 Q. And that's the last you heard of him?
16 A. Yes.
17 Q. And what company is that?
18 A. A company called Osteotech.
19 Q. Where are they located in New Jersey?
20 A. I don't know.
21 Q. Leda Hewka?  I'm trying.
22      MR. DAHM:  What's the question?
23 BY MR. REARDON:
24 Q. The question is am I correctly pronouncing her
25   name?  I don't want to incorrectly pronounce

53

1   names.  I'm learning these, the correct
2   pronunciation of these names, for the first time
3   this morning.
4 A. I pronounce it as Hewka, but I could be all wrong.
5   It looks more like Hewka than Hewka, so I don't
6   know.
7 Q. She's in Canada now, did you know that?
8 A. That's my understanding.
9 Q. Do you know what she's doing in Canada?
10 A. No, I do not.
11 Q. When did she leave -- I assume she's not working
12   for Zimmer any longer?
13 A. No, she's not.
14 Q. And when did she leave Zimmer?
15 A. Several years ago, many years ago.
16 Q. And do you know what the circumstances were by
17   which she left Zimmer?
18 A. I believe I recall that she left to work for a
19   company in Pennsylvania that made trauma products.
20 Q. Do you know the name of that company?
21 A. That would be Synthes.
22 Q. And the last person on the list, Weidenbenner, I
23   hope I'm doing that one right, he's still with
24   Zimmer?
25 A. Yes, he is.

54

1 Q.   And I think he's supposed to be deposed tomorrow.
2      Isn't he the individual that's been provided?
3           MR. DAHM:   (Nodding head.)
4 BY MR. REARDON:
5 Q.   He's still in marketing, I take it?
6 A.   Yes, but he has more responsibility than is in the
7      commercialization function so he's responsible for
8      marketing, brand management, and development of
9      hip products.
10 Q.  Okay.  All right.  How long have you known
11     Dr. Harris?
12 A.  Longer than I've been at Zimmer.
13 Q.  You met him when you were in Iowa?
14 A.  I believe I met him when I was a student.
15 Q.  In Vermont?
16 A.  Yeah.
17 Q.  And you consider him a friend, I take it?
18 A.  Yes, he's a friend.
19 Q.  Do you know Richard Santore?
20 A.  Yes, I do.
21 Q.  Mark Sylvain?
22 A.  I beg your pardon?
23 Q.  Mark Sylvain, who is co-author with Dr. Santore?
24 A.  I don't know him.
25 Q.  How about Kent Backus, who's a Ph.D. in

55

1      Salt Lake City?
2 A.   I know of him; I don't know that I've met him.
3 Q.   Do you know Richard Coutts, Dr. Richard Coutts?
4 A.   Yes, I do.
5 Q.   How about Dr. Grady-Benson?
6 A.   I certainly know of him.  I may have met him.
7 Q.   You're not sure?
8 A.   Well, yeah.  If I met him, it was probably once.
9      He's not a friend, not one that I have very much
10     contact with.
11 Q.  Dr. Steven Schutzer?
12 A.  Yes, I do know him.
13 Q.  And you know him as an associate of
14     Dr. Grady Benson in Hartford?
15 A.  That's my understanding.
16 Q.  How long how known Dr. Schutzer?
17 A.  Probably more than 10 years, 15 years probably
18     perhaps.
19 Q.  I see from your CV that you are a -- I think I saw
20     some reference to the American Association of
21     Orthopaedic Surgeons somewhere, AAOS.
22          What's your relationship to that
23     organization?
24 A.  If you're referring to the AAOS?
25 Q.  Yes, AAOS.

56

1 A.   That's American Ac...my --
2 Q.   -- Academy of Orthopaedic Surgeons.  You said
3      you're --
4           MR. DAHM:   Bob, Bob, I can see the court
5      reporter's face.  One of you ought to be talking.
6      And when you ask a question, let him --
7           MR. REARDON:   Thank you, thank you.
8           MR. DAHM:   Don't interrupt me.  We will
9      terminate this deposition if your attitude
10     continues.
11          The witness --
12          MR. REARDON:   Go ahead, but don't threaten
13     me.
14          MR. DAHM:   I'm not a threat, Bob.
15          MR. REARDON:   Then don't wave your finger in
16     my face, sir, or I'm going to do the same thing
17     back to you.  That's not going to accomplish
18     anything.
19          I think that the court reporter is more
20     than capable of letting me know if she's having
21     some difficulty, she doesn't need your help, okay?
22          MR. DAHM:   Let the record reflect that the
23     counselor is sitting some four feet apart; my
24     finger is not in counsel's face.  He has
25     repeatedly interrupted the witness.  I am asking

57

1      him not to do that again.
2           Now have you finished your answer,
3      Dr. Crowninshield?  Do you even recall the
4      question?
5           THE WITNESS:   Perhaps you could —
6           MR. REARDON:   Let me withdraw the question
7      and ask it again, Doctor, to save time.
8 BY MR. REARDON:
9 Q.   The American Academy of Orthopaedic Surgeons is an
10     organization that, according to Exhibit 1, you
11     have a professional affiliation with.
12          Now what is your professional affiliation
13     with the American Academy of Orthopaedic
14     Surgeons?
15 A.   I have a membership status with them, I believe
16     it's called an associate member.  And so I'm a
17     member of that organization.
18 Q.   And how long have you had an associate membership
19     with that organization?
20 A.   About 20 years.
21 Q.   So I take it the association with that
22     organization came while you were in Iowa, rather
23     than after you joined Zimmer?
24 A.   The process started when I was in Iowa, and I
25     think it finished shortly after I came to Zimmer.

58

1  I recall being interviewed by an orthopedic
2  surgeon who is here in Indiana as part of one of
3  the last steps of joining that organization.
4  Q.  And as an associate member of that organization,
5  have you attended the annual meetings?
6  A.  Yes.
7  Q.  All of them since you joined?
8  A.  I have probably been to twenty-five, twenty-seven
9  or eight annual meetings of that association.
10 Q.  Let me change the question: virtually all of
11 them?
12 A.  Yes.
13 Q.  Okay.  You might have missed one or two, is that
14 what you're saying?
15 A.  Since being a member, no, I have not missed any.
16 Q.  I see, okay.
17 A.  But I attended meetings prior to being a member.
18 Q.  Have you also attended any quarterly meetings or
19 regional meetings of that organization besides the
20 annual meetings?
21 A.  I have served on committees in that organization.
22 To my knowledge, they don't have quarterly
23 meetings but they have committees and other
24 functions, and I've attended quite a number of
25 other functions and meetings of that association.

59

1  Q.  And as an associate member attending those
2  meetings — I'll withdraw that.
3      During the time that you've worked for
4  Zimmer, has Zimmer had a vendor display at the
5  annual meetings of the AAOS?  You know what a
6  vendor display is, right?
7  A.  Yes, I do.
8      As a component of their annual meeting, there
9  are commercial exhibits.  And Zimmer has, for the
10 period of time that I've been with Zimmer, been a
11 member of the organization, had a commercial
12 exhibit.
13 Q.  And has the commercial exhibit included displaying
14 the available line of hip implants?
15 A.  Yes.
16 Q.  And during the time that you've been an employee
17 of Zimmer, have you participated at all in the
18 marketing aspect by being in the vicinity of these
19 displays explaining the products from a scientific
20 point of view to the participants in the
21 convention?
22     MR. DAHM:  Form.
23     THE WITNESS:  I have participated in
24 technical communications related to the product,
25 to support an understanding of the technical

60

1  aspects of design        materials of the implants.
2  BY MR. REARDON:
3  Q.  And if I understand it, this organization is an
4  organization that's a national organization of
5  orthopedic surgeons, correct?
6  A.  That is correct.
7  Q.  And your membership is not a full membership
8  because you're not an orthopedic surgeon, is that
9  correct?
10 A.  That is correct.
11 Q.  And your participation is because, I assume, of
12 your interest in the field of orthopedic surgery,
13 in particular implants, and your scientific
14 interest, as well as your responsibility as an
15 officer of Zimmer to present their products to the
16 orthopedic community, right?
17     MR. DAHM:  Form.
18     THE WITNESS:  I participate in the meeting in
19 a dual capacity perhaps.
20     As a member of the organization, I've
21 spoken, I've been on their agenda, spoken at their
22 meeting.  I also am an employee of a company that
23 has a technical exhibit at their meeting so I
24 participate as a member of the industry as well as
25 a member of the organization.

61

1  BY MR. REARDON:
2  Q.  Now during these annual meetings of the AAOS, does
3  Zimmer have any private rooms where they entertain
4  parties, cocktail parties, where they offer
5  beverages to orthopedic surgeons to allow them to
6  socialize with Zimmer employees?
7  A.  Not typically.  There is in some years on some
8  occasions perhaps a social aspect or opportunity
9  for some surgeons, but not, you know, broadly
10 based and not every year.
11 Q.  Well, when you go to these meetings, I take it
12 Zimmer, since you've been an employee of Zimmer,
13 Zimmer pays for your expenses in attending these
14 meetings, correct?
15 A.  Yes, they do.
16 Q.  And including any of the expenses relating to
17 entertaining any particular orthopedic surgeons?
18 A.  Yes.
19 Q.  And I assume that from time to time you might have
20 dinner or lunch with an orthopedic surgeon to
21 discuss with him Zimmer products?
22 A.  I may, and I do.
23 Q.  And you have, I assume?
24 A.  Yes.
25 Q.  That's part of your responsibility as an officer

62

```
 1     of Zimmer, correct?
 2 A.  That's not my responsibility to have dinner and
 3     lunch but it is to talk to surgeons, answer
 4     questions.
 5 Q.  So there is a marketing aspect to your
 6     responsibilities when attending these meetings?
 7 A.  As a technical representative answering questions
 8     about technology and design, that's been typically
 9     my participation.
10 Q.  Do you recall when you first attended a meeting of
11     the American Association -- or American Academy of
12     Orthopaedic Surgeons and discussed the
13     Zimmer Centralign implant?
14 A.  No, I do not.
15 Q.  We can return to that after we go through the
16     materials here.
17         Was it before 1992 that you discussed the
18     implant for the first time at a meeting of the
19     AAOC or after it was already on the market?
20         MR. DAHM:  Form.
21 BY MR. REARDON:
22 Q.  Do you understand my question?
23 A.  No, I don't.
24 Q.  Was it pre-market?  There are things that are done
25     pre-market, are there not, before it actually goes
```

63

```
 1     on the market to let the orthopedic community know
 2     that a particular product will be coming out, and
 3     then there's marketing that occurs after a
 4     product is already available to orthopedists, you
 5     understand the distinction pre-market and post, do
 6     you not?
 7 A.  I understand from your question now, yes.
 8 Q.  Okay.  Did Zimmer, in fact, do any pre-marketing
 9     sales promotion of the Zimmer Centralign before it
10     was available to the orthopedic community in 1992?
11         MR. DAHM:  Form.
12         THE WITNESS:  I don't recall whether any
13     substantial or substantially before product
14     release marketing programs were engaged in by the
15     company.
16 BY MR. REARDON:
17 Q.  Do you subscribe to the Journal of Arthroplasty?
18 A.  I certainly see it.  I don't know that -- I
19     subscribe to a few journals, but I read lots of
20     journals through our library.  The company
21     subscribes to it.
22 Q.  And do you read it, the periodical Journal of
23     Arthroplasty, each time it comes out?
24 A.  I think I very seldom have missed one.  I
25     certainly try to read it.
```

64

```
 1 Q.  Do you consider the Journal of Arthroplasty to be
 2     authoritative in the field of orthopedic surgery?
 3         DAHM:  Form.
 4         THE WITNESS:  I think many of the articles
 5     published in it or authoritative.  It's, today, a
 6     reasonably well-recognized journal in that field.
 7 BY MR. REARDON:
 8 Q.  Who publishes it, do you know?
 9 A.  I do not know.
10 Q.  And you understand it to be a peer reviewed
11     publication?
12 A.  A peer reviewed publication is my understanding.
13 Q.  Let's go through, if we could, I'm going to take
14     you through -- I'll withdraw that.
15         Before I go into the development of this, I
16     do want to ask you a little bit about your
17     meetings with Dr. Santore that he discussed in his
18     deposition.
19         Have you had an opportunity to read
20     Dr. Santore's deposition?
21 A.  Yes, I did.
22 Q.  And you may recall in his deposition that he made
23     reference to having some meetings with you and
24     Dr. Rohr, I believe that's the correct
25     pronunciation, isn't it?
```

65

```
 1 A.  I recall that was in his deposition.
 2 Q.  My first question is I want to get is it Dr. Rohr,
 3     R-o-h-r, is that the correct pronunciation of his
 4     name?
 5 A.  Yes.
 6 Q.  And do you agree that you met with Dr. Santore
 7     first of all at an AAOS meeting in 1996 to discuss
 8     the Zimmer Centralign?
 9 A.  I don't recall that.
10 Q.  What month are the AAOS annual meetings typically
11     held?
12 A.  They're early in the year, typically February or
13     March.
14 Q.  According to Dr. Santore's deposition, I believe
15     it was on page 33, he testified -- I'll withdraw
16     that, you're quite right, he didn't.  I'm just
17     looking at my notes.
18         He did testify that he met with Dr. Harris in
19     February or March of 1996 regarding the Zimmer
20     Centralign and his concerns, do you recall that
21     testimony?
22         MR. DAHM:  Bob, you know, if you have a piece
23     of testimony, it's fair to show it to the witness.
24         MR. REARDON:  I don't have the transcript
25     with me, but if you have it.
```

66

1    MR. DAHM: (Shaking head).

2    MR. REARDON: I'm asking if he recalls it.

3 If he doesn't, that's fine.

4    MR. DAHM: Well, also, just understand, as

5 your earlier point about silence, that I have no

6 idea whether that's an accurate rendition of that

7 transcript.

8    MR. REARDON: You're in a much better

9 position than I am --

10    MR. DAHM: Bob, let me just finish.

11    MR. REARDON: -- to get a copy of the

12 transcript.

13    MR. DAHM: Bob, let me finish my sentence or

14 two before you interrupt me, please.

15    So if you want to inquire about specific

16 testimony, you ought to show it to the witness.

17 If you want to ask him generally, that's a

18 different issue.

19    MR. REARDON: Do you recall -- I'm asking if

20 he recalls, thank you, sir.

21    Do you recall, Doctor, the testimony of

22 Dr. Santore at his deposition that he spoke with

23 Dr. Harris about his concerns regarding the

24 Zimmer Centralign at the 1996 annual meeting of

25 the American Academy of Orthopaedic Surgeons?

67

1    MR. DAHM: As counsel, a few questions ago,

2 noted, his recollection of what Dr. Santore said

3 was a bit garbled.

4    The witness ought to understand that

5 that may or may not be the testimony, but he can

6 ask generally whether that's his understanding of

7 those events.

8    THE WITNESS: I don't recall that from his

9 testimony, and I don't have any recollection

10 otherwise of the meeting.

11    MR. REARDON: Well, maybe I do have it, come

12 to think of it. I didn't look at all the

13 loose-leafs that were prepared for me. Give me a

14 moment and I'll see.

15    If you aren't willing to provide me with

16 a transcript of Dr. Santore's deposition, I'll see

17 if I have one here.

18    MR. DAHM: This is not my deposition, Bob.

19           - - -

20    Crowninshield Deposition Exhibit 3 marked for

21    identification.

22           - - -

23 BY MR. REARDON:

24 Q. Let me show you what's been marked as Exhibit 3

25    which maybe will refresh your recollection.

68

1    this is a cop    f Dr. Santore's deposition

2 transcript, and I've highlighted the section that

3 I refer to in my earlier question.

4    Does that refresh your recollection with

5 respect to your review of the transcript?

6 A. I see that it's in this transcript. I didn't make

7 note of it at the time, but it appears to be here

8 that Dr. Santore has a recollection of having a

9 meeting with Dr. Harris in March of 1996.

10 Q. Okay. Thank you.

11    If you need to refer to Dr. Santore's

12 transcripts, since counsel's not willing to

13 provide you with a copy, I'll be glad to provide

14 you with a copy, okay? It was in my suitcase.

15    Do you recall that Dr. Santore testified that

16 you and Dr. Rohr went to San Diego in the early

17 spring of 1996 after that meeting at the American

18 Academy of Orthopaedic Surgeons?

19 A. I believe I recall that was his testimony.

20 Q. Okay. Do you recall meeting with Dr. Santore in

21 the early spring of 1996 regarding the

22 Zimmer Centralign and the concerns that he

23 expressed about that particular product to

24 Dr. Harris?

25    MR. DAHM: Form.

69

1    THE WITNESS: I recall a meeting that I had

2 with Dr. Santore. I do not recall a meeting with

3 Dr. Rohr. I had a meeting by myself with

4 Dr. Santore; a little different recollection of it

5 than perhaps he did.

6 BY MR. REARDON:

7 Q. Were you alone for that meeting, sir?

8 A. Yes, my recollection was I traveled to San Diego

9 by myself and I met with Dr. Santore in his

10 office. I, today, don't recall what the date of

11 that meeting was.

12 Q. Was it in the early spring of 1996?

13 A. I don't recall the date of it. I recall that it

14 was I believe after the -- I believe it was after

15 the Clinical Orthopedics -- excuse me, the

16 Orthopedics Today article talking about his

17 presentation at a meeting.

18 Q. The Orthopedics Today article did not appear until

19 1997, is that your recollection?

20 A. Well, I don't really have a recollection.

21    My recollection of events at that time was

22 that he made a presentation in a meeting that was

23 later publicized in Orthopedics Today, and I

24 thought it was after the publication but perhaps

25 it was between his presentation and the time of

70

1   the publication that I went to San Diego and met
2   with Dr. Santore in his office.
3 Q. So your best recollection is that this meeting
4   that -- well, let me take it one step at a time.
5       How many times have you been in
6   Dr. Santore's office?
7 A. One, that I recall.
8 Q. And you were alone, is that correct?
9 A. That's my remembrance of it, memory of it.
10 Q. And the purpose of that meeting was to discuss the
11   Zimmer Centralign, is that correct, sir?
12 A. The purpose of that meeting was to discuss the
13   clinical experience that he had had with the
14   Zimmer Centralign implant as was reported in a
15   presentation that he had made and then was later
16   reported on by Orthopedics Today.
17 Q. When you met with him, had the Orthopedics Today
18   article been published?
19 A. As I previously said, I thought it had been, but
20   it may have occurred before then and I just had
21   knowledge of his presentation at a meeting.
22       He might be able to figure that out by
23   looking at calendars and seeing if I can figure
24   out when I was in San Diego at about that time.  I
25   think it was the only occasion that I would have

71

1   gone to San Diego in that time frame.
2 Q. Did you make a trip to San Diego specifically to
3   meet with Dr. Santore?
4 A. That's my recollection.  I recall calling him on
5   the phone, talking to him, asking for an
6   opportunity to meet with him, and then traveling
7   out to San Diego and meeting at his clinical
8   office.
9 Q. And so I take it you flew from Indiana to
10   San Diego and returned to Indiana?
11 A. I don't recall if I had any side trips or not but
12   I certainly got to San Diego and got home.
13 Q. Okay.
14       MR. DAHM: Bob, why don't we take a five
15   minute break to go to the restroom.
16       MR. REARDON: Sure.
17       MR. DAHM: Thank you.
18           - - -
19   A brief recess was taken from 11:10 to 11:14.
20           - - -
21   Crowninshield Deposition Exhibits 4 - 6 marked
22       for identification.
23           - - -
24       MR. REARDON:  I'm going to show you
25   Exhibit 4, which on page 37 of Dr. Santore's

72

1   deposition discuss   his meeting with you and
2   Dr. Rohr.
3       If you could just take a look.  I've given
4   you page 36, 37, and 38, which was before and
5   after the discussion of the meeting to encompass
6   the entire transcript with respect to that
7   meeting.
8       MR. DAHM: Yeah, again, Bob, this is not an
9   accurate -- I just don't know one way or the
10   other, so.
11 BY MR. REARDON:
12 Q. Have you had a chance to read it, Doctor?
13 A. Yes.
14 Q. Do you think that the transcript accurately states
15   a meeting that you had with Dr. Santore?
16       MR. DAHM: Form.
17       Bob, I think what you're -- he doesn't
18   know whether the court reporter took down the
19   testimony accurately.
20       I think what you're asking is does that
21   version coincide with his memory?
22       MR. REARDON: You object to the form of the
23   question?
24       MR. DAHM: Yeah.
25       MR. REARDON: Okay, thanks.

73

1       MR. DAHM: And I'm telling you what's wrong
2   with the form so you can correct it.
3       MR. REARDON: I don't want to.  Go ahead and
4   answer the question, Doctor.
5       MR. DAHM: Same objection.
6       THE WITNESS:  Excuse me, when you refer to
7   the transcript, are you referring to this
8   transcript or today's transcript?
9 BY MR. REARDON:
10 Q. The transcript that is marked as Exhibit 4, the
11   Santore transcript.
12 A. And your question is?
13 Q. Does your recollection of the meeting, is it the
14   same as the recollection that was described by
15   Dr. Santore at his deposition, which has been
16   marked as Exhibit 4?
17       Simply put, when you read that, is your
18   recollection of the meeting between you and
19   Dr. Santore consistent with the recollection of
20   Dr. Santore as he testified to in his deposition?
21 A. My recollection is meeting with Dr. Santore by
22   myself, it was he and I in his office, and talking
23   about his clinical experience.
24       This transcript would seem to suggest that
25   Dr. Rohr was present at that meeting, and that is

