74

1   not my recollection.

2 Q. After you read that transcript for the first time,
3   did you ever speak with Dr. Rohr about whether or
4   not he accompanied you to Dr. Santore's office in
5   San Diego?

6 A. No.

7 Q. Have you ever gone about attempting to confirm in
8   some way whether or not Dr. Rohr was with you in
9   San Diego?

10 A. No.

11 Q. I'm sorry, I didn't want to interrupt.

12     MR. DAHM:  He said no.

13     THE WITNESS:  No.

14 BY MR. REARDON:

15 Q. Your recollection is that was you and you alone?

16 A. Yes.

17 Q. And, Dr. Crowninshield, you did mention before the
18   recess that you thought you might be able to
19   confirm the date by looking at some calendar.

20     There is some method, I take it, that you
21   could use to figure out when you flew to San Diego
22   to meet with Dr. Santore, is that right?

23 A. Possibly.  This was a period of time before we had
24   electronic calendars.  I don't know if I have my
25   old calendars from then or not; it's possible.

75

1 Q. Would you agree that you met with Dr. Santore in
2   1996 at his office in San Diego?

3 A. As we previously discussed, I am not clear on my
4   recollection as to whether I met with him before
5   or after the publication by Orthopedics Today.
6   And I believe you reported that the
7   Orthopedics Today article was published in '97.

8 Q. Let me show you Exhibit 5.

9     Is that the Orthopedics Today article that
10   you're making reference to?

11 A. No, this looks like an electronic recovery of one.
12   But the Orthopedics Today article that I'm
13   referring to is something that would have had the
14   appearance of a newspaper.

15 Q. Read the content, Doctor.

16     Is that the article in content, whether it be
17   retrieved by electronic means or photostated from
18   a newspaper?

19 A. It would appear to be.

20 Q. Okay.  According to the retrieval from electronic
21   means, it was published in November of 1997, is
22   that correct, Doctor, if you look up in the upper
23   left-hand corner?

24 A. The date 11/97 is handwritten in the corner.

25 Q. I think it's printed below that, but perhaps the

76

1   N-o of the November is not visible on the copy, do
2   you see that?  If you can return it to me, I can
3   point it out to you.

4 A. I see, there in the corner.

5 Q. Yeah.  See, the month obviously is November, since
6   the only month that would have a V in it is
7   November, of the 12 months, that I'm aware of.

8     So it appears that it's printed, at least, as
9   well as written in someone's handwriting at the
10   top, 11/97, or November '97, as the publication
11   date of that article.  In fact, there might be
12   other places that it's indicated as well.

13     Is it your recollection, Doctor, so we're
14   clear on this -- I'll withdraw that.

15     Do you have a recollection, with any degree
16   of certainty, as to whether or not your meeting
17   with Dr. Santore took place before or after the
18   November 1997 Orthopedics Today article?

19 A. As I now said, that I don't recall whether it was
20   before or after the publication of the article.

21 Q. Okay.  As we've indicated before the deposition
22   started last week some time, Mr. Dahm and I spoke
23   of continuing your deposition to tomorrow morning
24   if it isn't finished by 5:00 today.

25     Could you attempt to make a determination as

77

1   to when you went to San Diego between this
2   afternoon and tomorrow morning?

3     MR. DAHM:  You don't need to answer that,
4   that's not a proper question.

5     What this witness does or doesn't do is
6   between counsel.

7     MR. REARDON:  Okay.  Well, I'm requesting
8   counsel to make that determination since that's a
9   critical date here as to when he met with
10   Dr. Santore.

11 BY MR. REARDON:

12 Q. Did you ever attend the Western Orthopaedic
13   Association meetings?

14 A. I attended one this year.

15 Q. Was that the first one you've ever attended?

16 A. Yes, I believe it is.  I'm not a member of the --
17   in fact, I am now a member of the Western
18   Orthopaedic Association because they made me an
19   honorary member.  But it's a meeting that, my
20   understanding, is open only to the members; and
21   until this year, I was not a member so I wouldn't
22   have been invited to attend.

23 Q. And were you aware of the presentation of
24   Dr. Sylvain, Dr. Kassab, Santore, and Coutts at
25   the 1998 Western Orthopaedic Association meeting



78

1 that reviewed Dr. Santore and others'
2 retrospective study of the Centralign implant?
3 A. I'm not aware of a presentation in 1998 at that
4 meeting; I wasn't at the meeting. I don't know
5 that I've ever seen a program of the meeting.
6 Q. Let me show you Exhibit 6 I've marked.
7 Have you seen that abstract before?
8 A. No, not that I recall.
9 Q. According to the abstract presented at the
10 September -- I believe it's September 8th, 1998
11 Western Orthopaedics Association meeting, do you
12 see that on the exhibit?
13 A. Yes, I do.
14 Q. Were you aware of the presentation that
15 Dr. Santore, Sylvain, and others made at that
16 meeting regarding the Centralign implant and their
17 retrospective study?
18 A. I don't recall being aware of it.
19 Q. Even today you were not aware until I showed it to
20 you?
21 MR. DAHM: It's been asked and answered.
22 MR. REARDON: Well, I think I want to
23 understand his answer, if I could.
24 BY MR. REARDON:
25 Q. Until I showed you that today, were you aware of

79

1 that presentation?
2 A. My only reference to a Western Orthopaedic
3 Association presentation was one that I recently
4 read in this transcript, which is Dr. Santore's
5 transcript of his deposition, which I think refers
6 to a presentation that he made. It could be this
7 one, I don't recall, I wasn't there. I never saw
8 any documents.
9 Q. Thank you.
10 Maybe I could have that transcript back,
11 Doctor, so we can keep it with the other exhibits.
12 When did you first become aware of
13 Dr. Santore's concerns about the
14 Zimmer Centralign?
15 A. I was aware of Dr. Santore's experience with the
16 Centralign when the Orthopedics Today article was
17 published. And I believe that I had heard of the
18 presentation that he made that became reported on
19 by the Orthopedics Today article. So some time in
20 that period of time from when he made that
21 presentation to when the report of that
22 presentation occurred would have been the
23 approximate time frame.
24 Q. Could I have that answer read back, is that a
25 problem? Either that or I can ask a further

80

1 question, whichever your preference, I don't
2 want to inconvenience anyone. I'm having a little
3 trouble understanding; forgive me. To save time
4 let me ask again.
5 Correct me if I'm wrong here: your testimony
6 is that some time between when the article in
7 Orthopedics Today was published and when he made
8 his presentation, or vice versa, between when he
9 made his presentation and when the article was
10 published, you believe you became aware of
11 Dr. Santore's concerns regarding the Centralign
12 implant, is that what you're saying?
13 A. Yes, I became aware of his clinical experience and
14 he apparently reported, presented, at a meeting
15 that was then later published upon by the
16 Orthopedics Today describing his report at that
17 meeting. And it was in that time frame that I
18 became aware of his clinical experience with the
19 implant.
20 Q. What presentation are you speaking of that you
21 indicate he made before the Orthopedics Today
22 article? If you want to look at the article or
23 look at anything else that we've marked, feel
24 free.
25 A. I could be wrong of my recollection, but I thought

81

1 the Orthopedics Today article was a report of a
2 presentation of some nature that he had made.
3 The Orthopedics Today journal typically
4 covers meetings and produces accounts of things
5 that were presented at meetings. In fact, this
6 article refers to the 10th annual meeting of the
7 International Society For Technology In
8 Arthroplasty.
9 Q. Were you in attendance at that meeting?
10 A. I attended that meeting, the last day of that
11 meeting, because I was invited to speak at it.
12 And I remember coming to that meeting. I was not
13 there during his presentation.
14 Q. Is that the presentation you're referring to?
15 A. That's the presentation this refers to. You know,
16 as I now recall at that time of having gone to
17 San Diego for that meeting, I had been aware of
18 his experience. And it may well be that I had
19 previously met with him, so maybe that meeting was
20 before November of '97.
21 Q. Okay, so -- you've confused me now, Doctor,
22 forgive me.
23 The meeting that you are referring to, and
24 I'm trying to identify the dates that things
25 occurred here as best we can, and I know that you

82

```
 1   don't have a calendar in front of you, but you've
 2   indicated that the International Society For
 3   Technology In Arthroplasty's 10th annual meeting
 4   in San Diego was a meeting that you attended,
 5   correct?
 6 A. I attended the last day of that meeting.
 7 Q. Why did you attend the last day of that meeting?
 8 A. Because I was invited to speak at that meeting at
 9   a session that was towards the end of the meeting.
10 Q. And what was the topic of your discussion, or
11   speech?
12 A. I was in a panel discussion with other
13   representatives of industry about the application
14   of technology in arthroplasty.
15 Q. Did it have anything to do with the Centralign
16   implant and its failure rate?
17 A. No, it did not.
18 Q. Okay.  At that time at that meeting, the 10th
19   annual meeting of the International Society For
20   Technology In Arthroplasty in San Diego, did you
21   become aware -- I'll withdraw that.
22       Were you, by the time you got to that
23   meeting, aware already of Dr. Santore's concerns
24   concerning the failure rate of the Centralign
25   implant?
```

83

```
 1       MR. DAHM:  Form.
 2       THE WITNESS:  I believe I was aware prior to
 3   that meeting; and as I'm now trying to recall, I
 4   believe I met with Dr. Santore prior to that
 5   meeting.
 6 BY MR. REARDON:
 7 Q. Okay, so now at least we've identified that some
 8   time before the 10th annual meeting of the
 9   International Society For Technology In
10   Arthroplasty, which appears from the article it
11   occurred right around the time of the article,
12   because it says held here in the article, so I
13   assume that the article was published at the time,
14   some time before that you did go to San Diego and
15   meet with Dr. Santore, is that right?
16 A. I believe that's the case.  I wish I could be more
17   precise for you, but I just don't recall when I
18   met with him.
19 Q. You can see from the transcript that there's a
20   difference of over a year between when Dr. Santore
21   says you came to meet with him in his office and
22   the 10th annual meeting in 1997, so I'm trying to
23   determine whether or not you met with Dr. Santore
24   one year before, or approximately one year before,
25   or more than one year before the 10th annual
```

84

```
 1   meeting of the International Society For
 2   Technology In Arthroplasty or was it close in time
 3   to that meeting?
 4       MR. DAHM:  Form.
 5 BY MR. REARDON:
 6 Q. And if you don't know, you don't know.
 7 A. I don't recall the dates of the meeting.
 8 Q. Okay.  Could it have been a year before?
 9 A. Could have, I can't say that it was.
10 Q. Okay.  Is Dr. Rohr employed by Zimmer?
11 A. No, he's not.
12 Q. Has he ever been employed by Zimmer?
13 A. Yes.
14 Q. When did he leave Zimmer?
15 A. Probably five years ago.
16 Q. That'd be about 1996?
17 A. Could have been.
18 Q. What is Dr. Rohr's first name?
19 A. William.
20 Q. And what was his position at Zimmer when he left?
21 A. He was responsible for research at Zimmer.
22 Q. Did he report to you?
23 A. Not at the time that he left.
24 Q. Who did he report to?
25 A. Excuse me.  He did, I think, report to me at the
```

85

```
 1   time that he left.  And it was shortly before he
 2   left that he started reporting to me directly.
 3   Prior to that he reported to another individual.
 4 Q. According to your CV you were the chief scientific
 5   officer from '95 to '97.
 6       Was it during that time that he left before
 7   you became in charge of advanced technology and
 8   business development?
 9 A. I believe it was in that time.
10 Q. Okay.  So it would have been between January of
11   '95 and January of '97 that he left, to the best
12   of your knowledge, that's using your CV?
13       MR. DAHM:  Form.
14       THE WITNESS:  I'm having trouble remembering.
15   I think it may have been four years ago that he
16   left, four to five.
17 BY MR. REARDON:
18 Q. Well, what was your position when he left?  And
19   you can look at your CV to refresh your
20   recollection if that will help you.
21 A. I believe I was responsible for what's described
22   as advanced technology and business development at
23   the time, at or about 1997 when Bill Rohr left
24   Zimmer.
25 Q. Are you certain?
```

86

1  A.  I am not certain, but that's my recollection.

2  Q.  Is Dr. Rohr a physician?

3  A.  Yes.

4  Q.  And is he an orthopedic surgeon?

5  A.  Yes.

6  Q.  Where is he now?

7  A.  I believe he works for Johnson and Johnson.

8  Q.  In New Jersey?

9  A.  I don't think so; I don't know where he resides.

10 Q.  And what were the circumstances under which he

11     left Zimmer?

12         MR. DAHM:  Form.

13         THE WITNESS:  He left Zimmer and took a job,

14     and I don't recall the nature of the job, with

15     Johnson and Johnson's Ethicon Division that was

16     located in Ohio, I believe.

17 BY MR. REARDON:

18 Q.  So the last you knew of him -- have you been in

19     touch with him recently at all?

20 A.  I have seen him occasionally.

21 Q.  You understand that he's living in Ohio now?

22 A.  No, I don't understand that.

23         The last I knew of where he lived I believe

24     it was in Massachusetts.  I don't know if he's

25     still in Massachusetts.

87

1  Q.  Do you know if he's working with Dr. Harris now at

2     Mass. General Hospital?

3  A.  I don't know of any association.

4  Q.  Do you remember ever traveling to San Diego with

5     Dr. Rohr?

6  A.  No, I don't.

7  Q.  Tell me what you remember of the meeting that you

8     had in San Diego with Dr. Santore.

9  A.  I remember meeting in his office; and the meeting

10     was probably an hour, maybe a little more longer;

11     and we talked about his clinical experience with

12     the implant.  I believe he may have shown me some

13     x-rays from some of his patients.  He talked about

14     some continued data collection and analysis that

15     he was performing, or had intended to perform.

16 Q.  Anything else?

17 A.  I remember, you know, discussing with him his

18     indication for cemented hip surgery, talking a

19     little bit about the demographics, nature of his

20     patients, their age, and activity, and those kinds

21     of things.

22 Q.  Anything else that you can think of?

23 A.  No.

24 Q.  When you went to see Dr. Santore about his

25     clinical experience with the Zimmer Centralign,

88

1     were you concerned about his findings that you had

2     been made aware of?

3  A.  I was aware that he had a clinical experience and

4     that he had concerns, and that I went out to meet

5     with him and understand more about his clinical

6     experience.  And we discussed it.

7  Q.  Had you ever met with any other physicians

8     regarding their concerns about the

9     Zimmer Centralign before you met with Dr. Santore

10     in San Diego?

11         MR. DAHM:  Form.

12         THE WITNESS:  Not that I recall.

13 BY MR. REARDON:

14 Q.  Had you ever received any information from any

15     surgeons that they had had a higher failure rate

16     than expected with the Zimmer Centralign before

17     you met with Dr. Santore in San Diego?

18 A.  Not that I recall.

19 Q.  Had you received any complaints from any implant

20     patients that their Zimmer Centralign had failed

21     prematurely before you met with Dr. Santore in

22     San Diego?

23 A.  I had not.

24 Q.  When you say you had not, were you aware as to

25     whether or not Zimmer had?

89

1  A.  I'm not aware of the complaint history prior to my

2     meeting with Dr. Santore.

3  Q.  Did you tell Dr. Santore that Zimmer had not had

4     any complaints of premature failure of the

5     Centralign femoral component at the time you met

6     with him in San Diego?

7  A.  I don't recall telling him that, no.

8  Q.  Let's go to specifics about this meeting.

9         You said you talked about clinical

10     experience.  What did he tell you about his

11     clinical experience, as best you can recall?

12 A.  That he had a series of patients that he had

13     followed and had reported on and discussed that

14     had received Centralign implants.  I recall him

15     explaining that his surgical practice at the time

16     was that he was doing femoral cemented hip

17     reconstructions in all patients; that we talked

18     about some of the age and activity expectations of

19     some of his patients.

20         I recall at the time that --

21 Q.  I don't mean to interrupt you, sir.  I'll be

22     asking you about what you said to him in just a

23     moment, but I'm interested in what he reported

24     to you about his clinical experience rather than

25     what you might have said to him.



90

1 A.  Okay.

2 Q.  Just to make it simpler for the record.

3        If you could just tell me everything you

4    recall him reporting to you about his clinical

5    experience.

6 A.  I recall that he had a number of cases, I do not

7    remember the number that we discussed or looked

8    at.  I remember some x-rays that he used as

9    illustrative examples of patients who had received

10   Centralign implants.  As I said, I recall him

11   describing doing cemented implants in all his

12   patients at that time.

13 Q.  Let me ask you some specifics, to help you.

14        Did he indicate to you that he believed that

15   the Zimmer Centralign had a higher failure rate

16   prematurely than the other cemented implants that

17   he had been using in his professional practice?

18 A.  Well, he described, as I recall, that he had

19   switched from a practice that utilized both

20   cemented and cementless implants to a practice

21   that used cemented implants only; and that that

22   switch, as I recall, was about commensurate with

23   his utilizing the Centralign implant so that he

24   had a broader indication for patient use of the

25   Centralign in that experience than he previously

91

1    had.  And I recall him describing to me that his

2    then current practice, by the time that we had

3    met, was that he was once again utilizing both

4    cemented and cementless femoral components in

5    patients.  So that left me with the understanding

6    that his use of the Centralign implant was in a

7    period of time of which he was doing exclusively

8    cemented implants.  And prior to that time and

9    after that time, he used both cemented and

10   cementless implants, not including the Centralign.

11 Q.  Okay.  Let's go back to the question.

12        The question was did he tell you that the

13   Centralign implant had a higher failure rate, in

14   his view, than other implants that he was using?

15        MR. DAHM:  Form.

16        THE WITNESS:  I recall our discussing the

17   failure rate in comparison to the patient

18   populations, and that's why I was making a point

19   about cemented and cementless; because as I

20   recall, his personal experience in previous

21   cemented implants was in a different population of

22   patients.  And we talked about age of patients and

23   indication for other implant types, and we

24   discussed average age, weight, activities of

25   patients and, as I recall, discussing further

92

1    analyses of the patient demographics that he

2    wished to perform in that patient group.

3 BY MR. REARDON:

4 Q.  Okay.  So I think what you're trying to tell me,

5    correct me if I'm wrong, is that you and he

6    discussed whether or not his patients that he was

7    using the Centralign cemented implant were younger

8    and more active patients than the average patient

9    population, is that what you're trying to say?

10 A.  They were perhaps younger and more active than his

11   previous patient groups that utilized other

12   cemented implants.

13 Q.  Okay, now you read his transcript, you've

14   indicated that already, right?

15 A.  Yes.

16 Q.  And do you recall him saying, when questioned

17   about that, that he did not feel that the patient

18   population that he looked at for purposes of

19   determining whether or not there was an early

20   aseptic loosening of the Centralign implant was

21   any different from his general patient population,

22   do you recall him saying that?  And I'll show him

23   if he doesn't recall, I happen to have a

24   transcript here.  Do you recall?

25 A.  I don't recall that in the transcript.

93

1 Q.  Did you tell him that you thought that his patient

2    population that he was looking at, for purposes of

3    determining that there was an early aseptic

4    loosening of the Centralign implant, was a

5    different patient population than the general

6    population, or did he tell you that?

7        MR. DAHM:  Form.

8        THE WITNESS:  The discussion we had was not

9    that it was different than the general or his

10   general patient population, but we had a

11   discussion of whether it was different than his

12   previous cemented patient population; because

13   prior to using the Centralign, he was using

14   cementless implants with a principal indication of

15   they're being used in younger patients, a practice

16   that I think he changed at about the time that he

17   began using the Centralign implant.

18 BY MR. REARDON:

19 Q.  Now I take it you've had an opportunity to also

20   review his article that was published in February

21   of 2001 in the Journal of Arthroplasty along with

22   Dr. Sylvain, Dr. Coutts, and another doctor with

23   the name K that I'm unfamiliar with, you know the

24   article I'm speaking of?

25 A.  Yes, I know the article.

94

```
1 Q.  And in that article was the patient population
2      that he studied retrospectively one that was
3      weighted more heavily towards younger and more
4      active patients?
5           MR. DAHM:  Why don't you show the witness the
6      article so he can refresh his memory?  Bob, you're
7      asking him to speculate on an article; it came out
8      months ago, I mean that's not fair, come on.  Just
9      mark it, let him look at it, and then ask your
10     questions.
11          MR. REARDON:  We may not get done in two
12     days.
13          MR. DAHM:  Whatever.
14                        - - -
15     Crowninshield Deposition Exhibit 7 marked for
16                    identification.
17                        - - -
18          THE WITNESS:  I now see the article.  Could
19     you rephrase your question?
20 BY MR. REARDON:
21 Q.  My question was, sir, did that article, which is
22     now marked as Exhibit 7, is a peer reviewed
23     retrospective study which resulted from the
24     preliminary findings that Dr. Santore presented
25     previously and discussed with you in San Diego,
```

95

```
1      correct?
2 A.   Yes.
3 Q.   And in this article could you tell me, sir, if the
4      patient population that he has retrospectively
5      studied is weighted towards younger and more
6      active patients?
7 A.   As reported in the abstract, the patient
8      population that is described as being the failed
9      group had 48.2 years of age compared to 63.4 years
10     of age for those of the asymptomatic group.  So it
11     describes the patients experiencing loosening as a
12     group of typically younger aged than the patients
13     who did not experience loosening, and that was the
14     nature of the kind of discussion that we had when
15     we met in San Diego.
16 Q.  I don't think I'm interrupting, but forgive me.
17          MR. DAHM:  I want to make sure.  Are you
18     finished, Roy?
19          THE WITNESS:  Yeah.  The other point I was
20     going to make is you referred to the studied
21     group.
22          I don't know that his patients overall
23     had a younger or older profile than patients in
24     general for total hip replacement; but compared to
25     patients who in many practices received cemented
```

96

```
1      total joints, they -- they included more
2      younger patients because of his indication at the
3      time of doing only cemented implants on the
4      femoral component in essentially all the patients
5      that were indicative for total joints.
6 BY MR. REARDON:
7 Q.   Are you saying that he was doing cemented implants
8      for his younger patients or in general cemented
9      implants were being used more frequently for
10     younger patients?  Are you referring to his
11     practice or in general in the orthopedic
12     community?
13 A.  He indicated to me that at the time that he
14     adopted the utilization of this implant and for
15     this group of patients that he subsequently
16     reported on, that he was doing cemented femoral
17     reconstructions in all patients, that he did not
18     have an indication, typically did not do
19     cementless reconstructions with a femoral
20     component in any patient group.
21 Q.  Okay.  So whatever his patient population was,
22     whether it be younger or older, all of the patient
23     population during this time period that he's
24     reported in this retrospective study was receiving
25     cemented implants, that's what you're saying,
```

97

```
1      correct?
2           MR. DAHM:  Form.
3           THE WITNESS:  My understanding is all his
4      patients received cemented implants.
5 BY MR. REARDON:
6 Q.   Okay.  Now you've commented on the head note of
7      the article and the fact that there is a
8      distinction that was drawn between the patients
9      which had aseptic loosening in terms of age and
10     those that did not, is it your testimony that the
11     general patient population that he studied was
12     older or younger than the general patient
13     population nationally that is receiving hip
14     implants?  Or if you don't know, you don't know.
15 A.  I don't know that his patient population was older
16     or younger than national standards.
17 Q.  Okay.  Would it be fair for me to say, Doctor,
18     that a failure rate of 11.4% is in the general
19     population include -- which, of course, would
20     include everyone, younger to older, is an
21     unacceptable failure rate for a hip implant?
22          MR. DAHM:  Form.
23          THE WITNESS:  In what period of time?
24          MR. REARDON:  In 1992 to 1998.
25          THE WITNESS:  You mean --
```

**98**

```
 1        MR. DAHM:  Form.
 2        THE WITNESS:  You asked the question 11% over
 3   what period of time?
 4        MR. REARDON:  Over a period of 33 months,
 5   which is I think 32.8 months he said, 33 months;
 6   less than three years.
 7        THE WITNESS:  I think that incidents of
 8   aseptic loosening is a disappointing result, if it
 9   was broadly the experience of total joint
10   replacement in the patient population.
11 BY MR. REARDON:
12 Q.  Has Zimmer, Inc. ever done a study, to date, of
13   the failure rate, a national study of the failure
14   rate of the Zimmer Centralign due to aseptic
15   loosening?
16 A.  We've not done a national study, no.
17 Q.  In other words, you had roughly, I estimated
18   through the discovery materials, something in the
19   order of 60,000 of these Centralign implants sold
20   over a period of '92 to '98.
21        Have you ever attempted to retrieve
22   information from the orthopedic surgeons to whom
23   you have sold these implants to determine what
24   their failure rate has been?
25 A.  We're aware, as in this case, of individual
```

**99**

```
 1   experience reports.  But of 60,000 that you quote,
 2   that could be the number, I don't know, we don't
 3   have database on the broad population.  We do and
 4   are aware of reports of reported series of
 5   implants.
 6 Q.  I know that.  You mean individual doctors who
 7   have, like Dr. Santore, written concerning their
 8   experiences, correct?
 9 A.  Yes.
10 Q.  What I'm trying to get at is I take it that Zimmer
11   keeps a record of every orthopedic surgeon to whom
12   they sell an implant, right?
13        MR. DAHM:  Form.
14        THE WITNESS:  No, we don't sell implants to
15   orthopedic surgeons.  We sell implants to
16   hospitals, they are our customers.  So we do not
17   have record that we retain as to the implanting
18   surgeon or the patient that receives the implant
19   after our customer buys the implant; and the
20   customer is the hospital.
21        MR. REARDON:  Has Zimmer ever made any effort
22   to retrieve this information by any national
23   survey, the information that is on early aseptic
24   loosening, to see whether or not the experience of
25   Dr. Santore is consistent with that of other
```

**100**

```
 1   orthopedic surgeon    the United States?
 2        MR. DAHM:  That's been asked and answered.
 3        THE WITNESS:  We have not conducted a
 4   national survey.
 5        MR. DAHM:  With that, why don't we break for
 6   lunch, be back in an hour.
 7        MR. REARDON:  Okay.
 8                  - - -
 9   (A lunch recess was taken from 12:00 to 1:00)
10        (Back on the record at 1:00 p.m.)
11                  - - -
12        MR. REARDON:  Doctor, I think before lunch
13   you indicated that you didn't recall any
14   complaints about the Centralign before you met
15   with Dr. Santore.  But let me show you a few
16   things and perhaps that might refresh your
17   recollection.
18        First of all, according to the interrogatory
19   answers provided to us by Zimmer in this lawsuit,
20   there was a complaint made concerning the
21   Zimmer Centralign in March of 1996.
22        Do you recall whether or not that complaint
23   was called to your attention in March of 1996?
24        MR. DAHM:  First of all, Bob, just for the
25   record, I know you're looking for it, but that's
```

**101**

```
 1   not reflected on the record; so if we can find the
 2   document and show it to the witness, then we have
 3   a clear record.
 4        MR. REARDON:  Absolutely.  I took it out and
 5   some reason flipped to something else and now I
 6   don't have it in front of me.
 7 BY MR. REARDON:
 8 Q.  It would be the interrogatory answers that were
 9   certified to us on April 20th, 2001; it would be
10   answer number 16 on page 13.
11        The question was: State whether the
12   defendant received prior to December 1996 any
13   complaints, correspondence, or other
14   communications, whether written, telephonic, or
15   oral, concerning instances of debonding,
16   loosening, or other failure of the cement-metal
17   interface or otherwise failing to perform as
18   designed and marketed with respect to the
19   Centralign Precoat hip prothesis.
20        And the answer was: Date complaint
21   reported 3/8/96, patient male, age unknown,
22   product Centralign, 9800-002-00, person reporting
23   complaint surgeon, type of complaint oral,
24   description of event stem prematurely loosened.
25        Do you see that, Dr. Crowninshield?
```

102

1 A. Yes, I do.

2 Q. Do you recall that complaint being called to your

3 attention in March of 1996?

4 A. No.

5 Q. And is it your testimony that it was not called to

6 your attention?

7 A. I don't recall knowing of this.

8 Q. And do you know who the surgeon was who complained

9 in March of 1996 that a Centralign stem

10 prematurely loosened?

11 A. No.

12 Q. Do you know if it was Dr. Santore?

13 A. No.

14 Q. Do you know if that date reflects the time that

15 Dr. Santore met with Dr. Harris concerning the

16 premature loosening that he described in his

17 deposition?

18 MR. DAHM: Form.

19 THE WITNESS: I have no knowledge of the

20 meeting between he and Dr. Harris.

21 MR. REARDON: Okay. Had Dr. Harris ever

22 contacted you as a result of his discussions

23 with Dr. Santore about premature loosening of the

24 Centralign Precoat hip prosthesis?

25 MR. DAHM: Form.

103

1 THE WITNESS: Not that I recall.

2 MR. REARDON: So it's your testimony that you

3 never had any contact with Dr. Harris about

4 Dr. Santore's concerns regarding the Centralign?

5 MR. DAHM: Same objection: form.

6 THE WITNESS: No, that's not what I said.

7 BY MR. REARDON:

8 Q. Okay. Tell me when you first had any

9 communication with Dr. Harris about Dr. Santore's

10 concerns.

11 A. I don't have a precise recollection of when that

12 was.

13 Q. Was it -- I'm sorry?

14 A. I don't recall that it was following a specific

15 meeting that they had together; I have no

16 recollection.

17 Q. Can you tell me what you recall about the first

18 contact you had from Dr. Harris regarding the

19 premature loosening of the Centralign prothesis?

20 MR. DAHM: Same objection.

21 THE WITNESS: I recall talking to Dr. Harris

22 about the Centralign report that Dr. Santore made

23 at or about the time it became reported in

24 Orthopedics Today. I don't have recollection

25 other than that.

104

1 MR. REARDON: you have no recollection of

2 Dr. Harris contacting you by telephone and telling

3 you of Dr. Santore's concerns regarding aseptic

4 loosening of the Centralign Precoated hip

5 prothesis, is that correct?

6 MR. DAHM: Form.

7 THE WITNESS: I don't have recollection of

8 that.

9 MR. REARDON: Okay. And you don't have any

10 knowledge of the March 8th, 1996 complaint?

11 MR. DAHM: Same objection.

12 THE WITNESS: No, I was unaware of it other

13 than as reported here.

14 MR. REARDON: When there is a complaint made

15 concerning a prosthetic device to Zimmer, is there

16 a procedure whereby that complaint is entered into

17 a computer?

18 MR. DAHM: Form.

19 THE WITNESS: I don't know about computer

20 records.

21 BY MR. REARDON:

22 Q. All right, let me ask you another way.

23 Is there some method of keeping a record of

24 complaints that are made to Zimmer regarding hip

25 prostheses?

105

1 A. We have records of device experience reports that

2 come to the company.

3 Q. And who is the individual who receives the

4 complaints when they're first made to the

5 company?

6 A. I believe that individual's name is Connie Morgan.

7 Q. And she's done that for a number of years, has she

8 not?

9 A. Yes.

10 Q. She deals at the first level initially with

11 surgeons and patients who communicate complaints

12 to Zimmer concerning their Zimmer products, right?

13 MR. DAHM: Form.

14 THE WITNESS: I don't know what her contact

15 with patients are, per se.

16 She is the person who coordinates the

17 Zimmer complaint history, and it may come in from

18 a variety of sources.

19 BY MR. REARDON:

20 Q. As Director of Research, when there is a complaint

21 about a device such as the Centralign, is that

22 complaint communicated to you?

23 A. In the capacity of Director of Research, it may

24 not have been. A complaint may be reported to me,

25 it may not be reported to me.

106

1 Q.  Can you tell me under what circumstances a
2      complaint is reported to you and when it is not?
3          MR. DAHM:  Form.
4          THE WITNESS:  The complaints come in and are
5      organized, and processed, and brought to,
6      depending upon the nature of the complaint or the
7      device experience, people who could help
8      understand the cause of it.
9          If it was one that was viewed to be
10     something that required my attention, it may be
11     brought to my attention.  I do not routinely see
12     all complaints
13         MR. REARDON:  Okay.  So am I correct that you
14     do not have a procedure whereby complaints
15     concerning the failure of hip implants are
16     necessarily communicated to you as Director of
17     Research?
18         MR. DAHM:  Form.
19         THE WITNESS:  They are not routinely reported
20     to me, responsible for research.
21 BY MR. REARDON:
22 Q.  Let's say, Doctor, that there is a lawsuit brought
23     in 1996 regarding the aseptic loosening of a
24     Zimmer Centralign implant, is that communicated to
25     you as Director of Research?

107

1 A.  It may be.  There isn't a process procedure that
2      says that it needs to be brought to my attention.
3 Q.  Okay.  Were you aware of the Sandstrom versus
4      Zimmer, Inc. lawsuit brought in 1996 for the
5      aseptic loosening of a Zimmer Centralign implant?
6          MR. DAHM:  Form.
7          THE WITNESS:  I don't recall knowledge to
8      that.
9 BY MR. REARDON:
10 Q.  According to the interrogatory answers, that I
11     believe are before you, there was a lawsuit
12     brought in 1996.  And I'll call your attention to
13     the answer to question 21.  And the lawsuit was
14     brought in the Sacramento County Superior Court in
15     Sacramento, California.  And the patient, or
16     plaintiff, was Mark Sandstrom.
17         Was that lawsuit brought to your attention?
18 A.  I haven't found it on this piece of paper here.
19 Q.  Take your time, Doctor.  It's right at the top of
20     the page in front of you.
21         MR. DAHM:  Which page, Bob?
22         MR. REARDON:  This would be page 22.
23         THE WITNESS:  Oh, there.
24         As I said, I did not have knowledge of
25     that, that I recall.

108

1 BY MR. REARDON:
2 Q.  Okay.  When you met with Dr. Santore, did you
3      discuss with him whether or not other complaints
4      and a lawsuit had been filed already and was
5      pending regarding the aseptic loosening of a
6      Centralign implant?
7 A.  I did not discuss any matter of litigation with
8      Dr. Santore.
9 Q.  Okay.  Did you tell him that he was the only one
10     that had had these kinds of problems with the
11     implant?
12         MR. DAHM:  Asked and answered.
13         THE WITNESS:  I'm not sure I understand your
14     question.  Are you talking about litigation still?
15 BY MR. REARDON:
16 Q.  No, I'm talking about aseptic loosening.
17         Did you tell him that he was the only one
18     that's ever had a problem with aseptic loosening
19     of the Centralign implant?
20 A.  No.
21 Q.  Did you, in fact, know that when you met with him,
22     that there were other people that had complained
23     and, in fact, at least one lawsuit had been filed
24     regarding the aseptic loosening of the Centralign
25     implant?

109

1          MR. DAHM:  Form.
2          THE WITNESS:  As I said, I was not aware of
3      litigation, that I recall, and did not discuss
4      litigation with Dr. Santore.
5 BY MR. REARDON:
6 Q.  Okay.  Did you discuss complaints with
7      Dr. Santore, in other words, people complaining,
8      surgeons complaining, lawyers bringing lawsuits,
9      which is evidence that a person or a surgeon
10     complained?
11 A.  No, I discussed his clinical experience.
12 Q.  Okay.
13 A.  That was the purpose of my visit.
14 Q.  Have you visited with any other doctors other than
15     Dr. Santore regarding their clinical experience
16     with the Centralign implant, in their offices?
17 A.  I don't recall when it was, but I remember
18     visiting with Steve Schutzer.  And I think that
19     may be the only visit to an office, that I recall,
20     other than Dr. Santore.
21 Q.  You said you don't recall when it was.  Let's try
22     to be at least general about that.
23         Was it before or after the Dunn lawsuit was
24     brought?
25         MR. DAHM:  Well, wait.  I'm not sure if he

110

1   knows when that is. Can you give him a date?
2         MR. REARDON:  Well, that shouldn't be too
3   difficult.
4         I don't know that the date is critical so
5   much as it is becoming aware of the Dunn lawsuit.
6   Let me withdraw it.  Because whether it was filed
7   or not, he's already indicated he wasn't aware of
8   the Sandstrom lawsuit.  So let me ask you about
9   the Dunn lawsuit.
10  BY MR. REARDON:
11  Q.  Do you recall becoming aware of a lawsuit brought
12      by Dolores and Donald Dunn against Zimmer at some
13      point in time?
14  A.  I became aware of it at some point in time, yes.
15  Q.  Sure.  Now let's figure out what point in time.
16        Were you aware of the Dunn lawsuit at the
17      point in time that you visited, whenever it was,
18      that you visited with Dr. Schutzer in Hartford?
19  A.  I don't recall being aware of it.
20  Q.  Okay.  And why is it that you visited with
21      Dr. Schutzer?
22  A.  I was in New England, I was visiting with some
23      surgeons in the New England area, and it was a
24      trip that I visited several surgeons, some people
25      that I knew, and one of which was Dr. Schutzer.

111

1   Q.  Did you discuss Dr. Grady-Benson's experience with
2       the Centralign implant when you met with
3       Dr. Schutzer?
4   A.  Dr. Schutzer was the person, as I previously
5       explained, I've known for quite some time.  And we
6       talked about Dr. Schutzer's experience and the
7       experience of his group in the hospital.  I'm not
8       sure I recall today a distinction as to whose
9       patients were whose.  But I met with Dr. Schutzer
10      and talked about their clinical experience.
11  Q.  Was this visit close in time to the visit to
12      Dr. Santore that you made when you went to
13      San Diego to see him?
14  A.  As I recall, it was after that; it was after
15      visiting Dr. Santore.
16  Q.  How long after?
17  A.  A year, within a year.
18  Q.  Okay.  Do you know if the visit to Dr. Schutzer,
19      actually I think it's pronounced Schutzer, do you
20      know if the visit to Dr. Schutzer was in 1998,
21      1997, can you give me a year?
22  A.  I don't suspect it was '97.  It was quite possibly
23      '98.
24  Q.  Do you know whether it was before or after the
25      Orthopedics Today article appeared?

112

1   A.  I'm thinking it was later.  Because as I
2       previously explained, that my visit to Dr. Santore
3       was about the time of that article, and I think it
4       was after my visit with Dr. Santore.
5   Q.  How about before or after the Western Orthopaedics
6       Association presentation of Dr. Santore that was
7       the abstract of which was marked as an exhibit
8       earlier today?
9         MR. DAHM:  5?
10        MR. REARDON:  Yeah, 5, it's September of '98.
11      If you know?
12        THE WITNESS:  I don't know.
13  BY MR. REARDON:
14  Q.  Okay.  Again, as I asked you earlier with respect
15      to the visit you made to San Diego, is it possible
16      for you to, in some manner, go to your calendar or
17      your records to determine when you traveled to
18      Hartford to see Dr. Schutzer?
19  A.  It's possible.
20        MR. REARDON:  And I'll make the same request
21      I made so that perhaps yesterday we'll have those
22      dates.  Not yesterday, tomorrow, excuse me.
23        MR. DAHM:  I'll try.
24        MR. REARDON:  We should have had them
25      yesterday.  Sorry.

113

1         Okay, Doctor, what did you talk to
2   Dr. Schutzer about when you were there?
3         MR. DAHM:  In addition to what he said?  He's
4   already told you.
5         MR. REARDON:  I don't think he told me much,
6   but go ahead.
7   BY MR. REARDON:
8   Q.  If you feel that you've told me, Doctor, I'll ask
9       some specific questions.
10        I like to give the witness an opportunity to
11      describe what they say before I get into
12      specifics.  But if you think you've covered it
13      already, I'll ask specifics.
14  A.  As I said, I recall discussing with him their use
15      of the Centralign implant.
16  Q.  Did he tell you the failure rate of his group with
17      respect to the Centralign implant?
18  A.  I don't recall that.
19  Q.  Did he tell you how many failures that he or the
20      members of his group had had since they began
21      using the cemented Centralign implant?
22  A.  I don't recall hearing about the number of
23      revisions or looking at clinical series.  I recall
24      talking about some specific cases.  And I think I
25      recall him showing some x-rays of a specific case

114

1    or two.
2 Q.  Were these specific cases that were failures?
3 A.  We looked at some x-rays of patients, as I recall,
4    that had had revisions.
5 Q.  So they had had premature failures, right?
6        MR. DAHM:  Objection, form.
7        THE WITNESS:  I don't recall today the
8    circumstances of those cases.
9 BY MR. REARDON:
10 Q.  So these were people that had their implants for
11   how long a period before -- well, let me withdraw
12   that and go back a step, Doctor.
13        The x-rays that you looked at with
14   Dr. Schutzer were x-rays of people that had had a
15   revision surgery, they had an implant removed and
16   another implant placed, is that right?
17 A.  As I recall, we talked about some of that.
18 Q.  Okay.  Were any of these that he showed you people
19   that had implants for more than three years?
20 A.  I don't recall the period of implantation.
21 Q.  Okay, were any of them more than ten years?
22        MR. DAHM:  Objection, form.
23        THE WITNESS:  At that point in time if they
24   were Centralign implants, they could not have been
25   more than ten years.

115

1 BY MR. REARDON:
2 Q.  Right, because they only went on the market in
3    '92, right, and the meeting was in, you think,
4    around '98, right?
5 A.  Yes.
6 Q.  So the most they could be is six years, right?
7 A.  Yes.
8 Q.  Okay.  And how many cases were discussed?
9 A.  I don't recall.
10 Q.  Did you discuss with Dr. Schutzer whether or not
11   his patient population was younger and more active
12   than the average patient population that receives
13   a Centralign implant?
14        MR. DAHM:  Form.
15        THE WITNESS:  I don't recall.
16 BY MR. REARDON:
17 Q.  Did he express to you concerns about the design of
18   the Centralign implant?
19 A.  I don't recall him doing that.
20 Q.  Did he tell you that he thought that the
21   Centralign implant was failing prematurely?
22 A.  I don't recall that.
23 Q.  Okay.  Well, tell me why you went to Hartford to
24   meet with him.
25        MR. DAHM:  Objection, asked and answered.

116

1        MR. REARDON:    ean there is I think in the
2    order of 50,000 orthopedic surgeons in the
3    United States, why'd you pick him?
4        MR. DAHM:  That's argumentative.  That's been
5    asked and answered.
6        MR. REARDON:  That's not argumentative, it's
7    a fact.
8        You sold 60,000 implants in five, six
9    years.  Why did you pick Dr. Schutzer to go to
10   Hartford and talk to?
11        MR. DAHM:  Same objections.
12        THE WITNESS:  As I explained earlier, I was
13   in Connecticut, I was visiting and visited, as I
14   recall, three or four surgeons in the area in
15   Connecticut, one of which was Dr. Schutzer, and
16   visited him in his office.
17        My purpose in going to Connecticut was
18   not to visit with Dr. Schutzer.  My purpose in
19   Connecticut was to visit surgeons.  And I
20   routinely go out and visit surgeons, go to a city
21   or an area and go in and talk to people.
22 BY MR. REARDON:
23 Q.  When you went to Connecticut, were there -- were
24   you finished, I'm sorry, I think you were; but if
25   you weren't, continue, Doctor.

117

1 A.  I'm finished.
2 Q.  Thanks.
3        When you went to Connecticut, what other
4    surgeons did you visit besides Dr. Schutzer?
5 A.  I remember visiting with at least one surgeon, I
6    think two surgeons, talking about knee implants.
7    And as I recall, I had previously been in
8    Massachusetts the day before that and had some
9    other meeting or discussion in Massachusetts, so.
10 Q.  About knee implants?
11 A.  I don't recall what I did in Massachusetts.  But I
12   was in New England and made several stops, and he
13   was one of them.
14 Q.  And so is your testimony that the reason you went
15   to Dr. Schutzer was routine, just to talk with him
16   as you may have talked to other orthopedic
17   surgeons in Connecticut during that trip?
18        MR. DAHM:  Asked and answered.
19        THE WITNESS:  Yes.
20        MR. REARDON:  Had nothing to do with the
21   Centralign?
22        MR. DAHM:  Same.
23        THE WITNESS:  It was a trip to visit
24   surgeons, learn about their practice and talking
25   to them.

118

1   MR. REARDON: Was this vis... ...efore or after
2   the letter went out under your signature to
3   distributors regarding the Centralign implant?
4       MR. DAHM: Can you show him the letter,
5   please?
6 BY MR. REARDON:
7 Q. You're familiar with the letter, aren't you,
8   Doctor?
9 A. Yes, I recall a letter.
10 Q. Okay, was it before or after the letter? And I'll
11   be glad to show you the letter as soon as I can
12   locate it.
13                  - - -
14   Crowninshield Deposition Exhibit 8 marked for
15                  identification.
16                  - - -
17 BY MR. REARDON:
18 Q. Let me show you Exhibit Number 8.
19       Do you recognize that as the Dear Distributor
20   letter?
21 A. Yes, I recognize this letter.
22 Q. Is that the only letter that went out to anyone
23   regarding concerns about the Centralign implant or
24   were there others?
25       MR. DAHM: I thought, Bob, you asked him

119

1   about the letter he sent to doctors. That's what
2   you were going to show him and you gave him a
3   different letter.
4 BY MR. REARDON:
5 Q. Well, let me ask you, who are your distributors?
6 A. Our distributors in the United States are
7   independent companies who represent us in defined
8   territories and sell our products.
9 Q. Did you send a letter to doctors that are similar
10   in content to the letter that's marked as
11   Exhibit 8?
12 A. My recollection was shortly prior to this letter,
13   there was a letter that went to doctors. And then
14   this was a letter to distributors that followed
15   that letter.
16 Q. Okay. Let me show you what we'll mark as
17   Exhibit 9.
18                  - - -
19   Crowninshield Deposition Exhibit 9 marked for
20                  identification.
21                  - - -
22 BY MR. REARDON:
23 Q. Is that the doctors' letter?
24 A. This is a form letter, but it appears to be the
25   one that was addressed to doctors.

120

1 Q. Okay. That was th... ...y it was provided to us
2   through discovery. I assume that the word field
3   in there is for purposes of the form, where it
4   says Dear Field, correct? And that's a letter
5   that you would insert into the computer the name
6   of the doctor where the word field appears, is
7   that correct?
8 A. Yes.
9 Q. Now, according to the dates that are found on
10   Exhibit 7 and Exhibit 8, the Dear Distributor
11   letter went out before the Dear Doctor letter, is
12   that correct?
13 A. That could be. I mean, these were contemporary
14   documents. One was communication to the customer,
15   the other was communication to the distributor
16   about the communication to the customer, so they
17   were contemporary.
18       This is a form letter that has a date of
19   January 23rd, which I don't know that that was the
20   letter that went to the doctor or whether that was
21   the date that this form letter was printed for
22   whatever purposes that you find in here.
23 Q. Okay. You can't tell me, as you sit here today,
24   one way or the other on that, right, whether the
25   distributor letter went out before or after the

121

1   doctor letter?
2 A. No, I think what I can tell you is on or about
3   January of '98, you know, both communications went
4   out. Which one preceded which one, I don't know.
5 Q. Now, how many doctors, roughly, did the doctor
6   letter, which is Exhibit 8, go to?
7 A. I don't recall.
8 Q. Was it thousands?
9 A. It may have been, but it's probably more likely
10   hundreds.
11 Q. And how was the mailing list arrived at in order
12   to mail Exhibit 8 to doctors?
13 A. I don't know how that was done. I don't recall
14   how that was done.
15 Q. Okay. Remember I asked you before lunch whether
16   or not you maintained a list of the doctors that
17   were using the Centralign implants. And I think
18   your answer was you did not think that because
19   your patients, or rather your customers, were
20   hospitals, not doctors.
21       Looking at that letter, which is Exhibit 8,
22   would you agree with that somewhere in the
23   Zimmer records is a list of the doctors that at
24   least you believed had used Centralign implants
25   and that's why you sent them Exhibit 8?

122

1      MR. DAHM:  Form.
2      THE WITNESS:  It may be a list of doctors
3  that could have used by virtue of the fact that
4  they were known to be in practice at hospitals
5  that were our customers.
6      MR. REARDON:  Okay.
7      THE WITNESS:  So I don't know how the list
8  was prepared, I don't recall today how it was
9  prepared.
10 BY MR. REARDON:
11 Q.  But in any case, there was a list of doctors that
12  could have used Centralign implants that Exhibit 8
13  was sent to, correct?
14 A.  Yes.
15 Q.  Now you recall sending a follow-up letter?  We'll
16  mark this as Exhibit 9.
17     MR. DAHM:  It's actually 10.
18              - - -
19  Crowninshield Deposition Exhibit 10 marked for
20              identification.
21              - - -
22 BY MR. REARDON:
23 Q.  Let me put this on the record.
24     When I made reference to the doctors' letter,
25  since the only copy that I have is in front of

123

1  Dr. Crowninshield, I see now that the doctors'
2  letter is Exhibit 9 and the distributor letter is
3  Exhibit 8.
4      Now Exhibit 10 is a letter dated, I believe,
5  February 19th, 1998, Doctor?
6 A.  Yes.
7 Q.  And that was a follow-up letter to Exhibit 9, is
8  that correct?
9 A.  Yes.
10 Q.  And how is it that Exhibit 10 was sent, why did
11  you choose to follow up?
12 A.  As I recall having sent out this letter
13  (pointing), I received some --
14 Q.  This letter meaning Exhibit 9?
15 A.  Exhibit 9.  That I received some communication
16  from doctors concerning Exhibit 9 communication,
17  telephone calls or some other communication, and
18  that this letter addressed some of the questions,
19  discussions I had with those people.  So we went
20  and offered further clarity on this communication.
21 Q.  Okay.  So you wanted to clarify Exhibit 9 and
22  that's why you wrote Exhibit 10, is that right?
23 A.  It clarifies and expands a little bit upon
24  Number 9.
25 Q.  Okay.  May I have Exhibit 10, please.  (Retrieving

124

1  exhibit back).  T...  you.
2      Did you draft these letters yourself?
3 A.  Yes, I did.
4 Q.  And who are the doctors that contacted you between
5  January 23rd and February 19th that caused you to
6  write Exhibit 10?
7 A.  I don't recall specifically who they were.
8 Q.  Was Dr. Santore one of those doctors?
9 A.  No, he wasn't.  And as you lay out these letters,
10  and going to the conversation we had before lunch
11  about dates, this letter, Exhibit 9 of January,
12  was following the meeting that I had with
13  Dr. Santore, which I believe, now looking at these
14  dates, caused me to believe that that was 1997.
15     In fact, I think it was the latter half of
16  the year of 1997, a visit to Dr. Santore, this
17  letter was prepared in part because of the meeting
18  I had with him.  I recall sending him a draft of
19  that letter and then, you know, on or about
20  January of '98 the letter went out and then it was
21  followed by clarification of that letter.
22 Q.  So it's your testimony now that you met with
23  Dr. Santore in late 1997 in San Diego for the
24  first and only time regarding his experience with
25  early failure of the Centralign implant; and that

125

1  as a result of that late 1997 meeting, you
2  generated Exhibit 9, the doctors' letter?
3      MR. DAHM:  Form.
4      MR. REARDON:  Is that correct?
5      THE WITNESS:  I don't know what you mean by
6  late, but it was in 1997.  I suspect it was mid
7  year to fall of '97.  It was before this letter
8  went out, which went out early in January.  As I
9  recall, it was drafted in December of '97.
10     MR. REARDON:  And, again, you're going to try
11  to get me those dates that you traveled to San
12  Diego, so maybe that'll put this whole issue to
13  rest.
14 BY MR. REARDON:
15 Q.  Do you recall who the doctors were, doctor or
16  doctors were, that contacted you after your
17  January 23rd letter, Exhibit 9, that caused you to
18  write another letter on February 19th, 1998?
19 A.  I don't recall who they were.
20 Q.  Okay.  And what you're discussing in the
21  February 19th letter, as I'm sure you know, is
22  that your comment in the earlier letter to use the
23  largest femoral component size reasonably possible
24  for young, active, and/or heavy patients with
25  small intramedullary femoral anatomy, that was the

126

1   comment you made in January, and why did you
2   revise that comment somewhat in your February
3   letter?
4 A.   It was because of the sentence that follows what
5   you read that says: It is important to understand
6   that this is neither the recommendation to size
7   the implant to result in excessively thin bone
8   cement mantle nor the recommendation to
9   extensively ream the endosteal femoral cavity.
10 Q.   So were doctors contacting you and saying if we
11   put in a larger femoral component and we ream out
12   a medullary canal, we might have too thin a
13   femoral at some point, we have to be careful of
14   that, is that the concern they were expressing?
15 A.   Part of the discussion that I had with surgeons
16   was the extent of reaming and/or the consequence
17   of thin bone cement. And we thought it was
18   important to clarify that we were not recommending
19   extensive reaming nor were we recommending
20   particularly thin bone cement.
21 Q.   Okay. So obviously the larger, more reaming
22   that's done, the less bone that's left, correct?
23 A.   Yes, but that wasn't typically the concern. And
24   the patients who, one, might run into this
25   difficulty of particularly small endosteal femoral

127

1   cavities, those patients typically have lots of
2   bone, that they have thin cortical walls and,
3   thus, thin intramedullary cavities. And so I
4   don't recall a surgeon expressing concern about
5   the residual bone that was left after the
6   operation.
7 Q.   Did they express concern about the possibility of
8   bone fracture?
9 A.   No, the concern was not the bone. There's
10   generally, in these patients, lots of bone to work
11   with.
12 Q.   Having looked at Exhibits 8, 9, and 10, and the
13   dates that are on each, do you have any
14   explanation as to why the distributor letter would
15   have gone out, at least according to the dates,
16   before the doctor letter?
17   MR. DAHM:   Form.
18   THE WITNESS:   The distributor letter may have
19   gone out before the doctor letter. As I said,
20   they're largely contemporary documents, within a
21   few days of each other perhaps. And the
22   distributor, is in many cases and in almost all
23   cases, the person representing Zimmer that has
24   very frequent contact with the surgeons. And if
25   we're sending communication to the surgeons,

128

1   the distributor should be aware of that
2   communication so that they don't learn about it
3   from the surgeon but rather from us and can be
4   knowledgeable on the subject of the communication.
5 BY MR. REARDON:
6 Q.   When you talk of distributor, are you talking
7   about employees of Zimmer or are these outside
8   contractors?
9 A.   They're not employees through Zimmer.
10 Q.   Now Zimmer does have a sales force that covers the
11   various areas of the United States, is that
12   correct, employees?
13 A.   No, we do not.
14 Q.   Okay. So all of your sales are by an
15   independent -- are independent distributors?
16 A.   Yes, they are.
17 Q.   The people that visit the --
18 A.   Within the United States they are.
19 Q.   So the people that visit the doctors' offices to
20   discuss Zimmer products are not Zimmer employees,
21   they're distributors, they're independent from the
22   company, is that correct?
23 A.   They are, today, independent with the company.
24   And back at the date of these documents they were
25   largely independent of the company,

129

1 Q.   Okay, there are a few employees, you're saying?
2 A.   There were a few employees, I believe, back in
3   1998.
4 Q.   I know that Dr. Santore mentioned in his
5   deposition, out in San Diego there was a Zimmer
6   representative who visited his office, a woman,
7   and I think he mentioned her name, we could look
8   it up if that's necessary.
9   Would she have been an independent
10   distributor or an employee of the company?
11   MR. DAHM:   Without knowing the name and the
12   time frame, Bob, that's an unfair question.
13   MR. REARDON:   Well, we can look it up, that's
14   easy enough.
15 BY MR. REARDON:
16 Q.   Trudy Jackson, do you know her?
17 A.   Yes, I do.
18 Q.   Is she an employee of Zimmer?
19 A.   No, she is not.
20 Q.   How about the people that cover Hartford,
21   Connecticut, are they employees of Zimmer?
22   MR. DAHM:   Vague as to time.
23 BY MR. REARDON:
24 Q.   From 1997 to 1998?
25 A.   I don't believe they were.

130

1 Q.  Are these individuals that are marketing Zimmer,
2     and this may go to the other deposition so I won't
3     spend a lot of time on this, are these people
4     working for the same company or do they have
5     independent companies around the country,
6     independent distributorships around the country,
7     if you know?
8 A.  There are independent distributors with defined
9     territories around the country that are
10    independent of each other and independent of us,
11    Zimmer.
12 Q.  And are they permitted to market other orthopedic
13    products that are not manufactured by
14    Bristol-Myers Squibb, or Zimmer, or any of the
15    other related companies to Bristol-Myers Squibb
16    and Zimmer?
17         MR. DAHM:  Form.
18         MR. REARDON:  Sometimes the phrase used is
19    captive; I don't know if you've heard that
20    expression.
21         THE WITNESS:  No, not in this context, but
22    they are exclusive distributors of Zimmer.
23         MR. REARDON:  Okay, exclusive.
24 BY MR. REARDON:
25 Q.  Roughly how many of those are there around the

131

1     country, do you have any idea?
2 A.  Today there are about 25.
3 Q.  When you went to Dr. Schutzer's office, we'll
4     return to that now for the moment, had these
5     letters gone out already: that is Exhibits 8, 9,
6     and 10?
7 A.  I don't recall.
8 Q.  Okay.  Do you know if Dr. Schutzer was implanting
9     Zimmer Centralign implants when you met with him
10    in his office or had he stopped?
11 A.  I don't recall.
12 Q.  Did he discuss with you Dr. Grady-Benson, did he
13    mention his name as one of his colleagues in his
14    group?
15         MR. DAHM:  Form.
16         THE WITNESS:  I don't recall the name at that
17    time.
18 BY MR. REARDON:
19 Q.  In the discovery materials that I received, there
20    were brochures where the 9800 Centralign, you
21    understand what I mean by 9800, correct, as a
22    model number?
23 A.  I believe so, yes.
24 Q.  There was also a 9825 that came out in 1995, am I
25    correct on that?

132

1 A.  There's a 9825.  I don't recall when it came out,
2     but probably about '95.
3 Q.  And the principal distinction, and there are
4     others, but the principal distinction between the
5     9800 and the 9825 is the difference in the size of
6     the teardrop centralizer, correct?
7 A.  Yes.
8 Q.  The 9800 has a 1.5 millimeter teardrop centralizer
9     and the 9825 has a 2.5 millimeter size
10    centralizer, in terms of height, correct?
11 A.  Yes.
12 Q.  And, thus, the 25 for 2.5, correct?  That's where
13    the number comes from?
14 A.  I don't know that that's where the number comes
15    from.
16 Q.  You weren't involved in picking the number?
17 A.  I did not pick the number.
18 Q.  Do you know if there were brochures generated for
19    the 9825 Centralign implant similar to the
20    brochures for the 9800 Centralign implant?
21 A.  I do not know.
22         MR. REARDON:  And all of the materials that
23    we have received have been sample brochures from
24    the 9800, I just mentioned that for the record.
25    Although you've taken the position, counsel, that

133

1     the 9825 is the only relevant size, too, is only
2     relevant here.  So if you have brochures for the
3     9825, I'd like to have production of them since
4     this is a 9825, you've only produced a 9825.
5         MR. DAHM:  We've only produced a 9825, is
6     that what you just said?
7         MR. REARDON:  That's right, an Exemplar.  You
8     objected to the production of any of the others
9     other than the 9825.
10        MR. DAHM:  Just to make sure I understand,
11    Bob, you're saying as part of our production we
12    have not produced a brochure for a 9825, is that
13    what you're saying?
14        MR. REARDON:  That's what I'm saying.
15        MR. DAHM:  I don't know, I have to check.
16        MR. REARDON:  Well, if you look in the
17    materials you have there, I think you'll see that
18    the brochure that you attached is a 9800 brochure.
19    I don't think it's necessary to disagree on that
20    issue; you can take a look for yourself.
21        MR. DAHM:  I'm not disagreeing with you; I'm
22    telling you I don't know as I sit here.
23        MR. REARDON:  Well, it would be helpful if I
24    could have a brochure for the 9825.  There may be
25    one readily available to Dr. Crowninshield before

134

1 the deposition's over tomorrow.
2     Doctor, there is also another change that
3 occurred about the same time as the -- and by the
4 way, this is a 9825, and I'm going to mark it, put
5 a little sticker on the plastic bag, I don't think
6 I need to put it on the instrument itself.
7     MR. DAHM: Well, I don't want that part of
8 the record. I mean, you can identify it for what
9 it is, but I don't want it as an exhibit.
10     MR. REARDON: That's fine, it doesn't matter
11 to me.
12         This is a prothesis that has been
13 produced today and it's got a number on it, it has
14 come in the box. I'm not going to --
15     MR. DAHM: I'll tell you what we'll do, Bob,
16 we'll have the court reporter photocopy the label
17 on the outer and the inner box.
18     MR. REARDON: I can read the numbers into the
19 record. It's 9825-02-01, and it's a size 2.
20 BY MR. REARDON:
21 Q. Now, you're familiar with the significance of
22 9825, correct?
23 A. As we just discussed, yes.
24 Q. That means it's a 2.5 millimeter teardrop
25 centralizer on it, right?

135

1 A. Yes.
2 Q. Which is higher than the centralizers that were on
3 the 9800's?
4 A. Thicker.
5 Q. Thicker, right, which is the same as higher.
6     In other words, if you were to look at it
7 laterally, it would create more space between the
8 bone and the metal implant, correct?
9     MR. DAHM: Form.
10 BY MR. REARDON:
11 Q. I'll withdraw that, that's poorly worded, I agree,
12 that's poorly worded.
13     The purpose is to allow more cement mantle
14 between the bone and the metal implant, correct?
15 A. It would presumably cause the implant to remain
16 one millimeter further away from a bony structure
17 than the one with the 1.5 millimeter.
18 Q. Hence, the height difference, right?
19     MR. DAHM: Form.
20     THE WITNESS: Height, if that's your word,
21 yes.
22 BY MR. REARDON:
23 Q. Okay. I don't want to take the time out but that
24 was the word that was in the minutes when they
25 discussed it, and we'll find it later. They

136

1 wanted to change the right, you can look through
2 the minutes yourself and find it, I don't think we
3 need to do that now.
4     There was also another change that occurred
5 at about the same time which was the centralizer
6 that is lateral and proximal, the one I'm pointing
7 to right now, was moved, was it not?
8 A. If I recall correctly, it was moved more distally.
9 Q. Right. In the other model, in the other 9800's,
10 it was on the same plane, if you will, with the
11 other three proximal centralizers, right?
12 A. It could well have been.
13 Q. And on this particular model, which we're going to
14 mark, which has been produced today, this is the
15 model that has the teardrop moved distally, which
16 means moved closer to the tip, the narrower tip,
17 right?
18 A. Yes.
19 Q. So it was moved around the shoulder, right?
20 A. Yes.
21 Q. Why was it moved?
22 A. I believe it was moved to help assure its function
23 in centralizing the implant and keeping the
24 lateral portion of the implant away from bony
25 structures and more into the cement mantle.

137

1 Q. May I have the letters that you have there,
2 Doctor, please? (Retrieving letters.) Thank you.
3         - - -
4     Crowninshield Deposition Exhibit 11 marked for
5             identification.
6         - - -
7 BY MR. REARDON:
8 Q. Would you agree with me, Doctor, that Exhibit 11
9 depicts the Centralign implant that has the
10 teardrops as they were before they were moved to a
11 more distal -- the lateral proximal teardrop was
12 moved to a more distal location?
13 A. This is a Xerox of an x-ray template that shows
14 the proximal lateral teardrop as being more
15 superior of the one that you have in your hand.
16 Q. To put it in layman's terms, it would be closer to
17 the pelvis when it's inserted?
18 A. The pelvis wouldn't be the reference, but it's
19 closer to the upper end of the femur.
20 Q. Closer to the upper end of the femur.
21     And do you know when that decision was made
22 to move the teardrop centralizer to a more distal
23 location?
24 A. No, I do not.
25 Q. Do you know who made that decision?

138

1 A.  No, I do not.

2 Q.  Do you know who proposed that the decision be
3     made?

4 A.  No, I do not.

5 Q.  Isn't it true that it was proposed by marketing?

6 A.  I do not know who proposed it.

7 Q.  Okay, did you have anything to do with the
8     decision to move the distal -- the proximal
9     lateral centralizer to a more distal location?

10 A. I don't recall.

11 Q. And that was done because it would allow better
12    spacing, Doctor?

13 A. If you're asking for my opinion, it's a
14    functionality of the proximal versus the distal
15    centralizer.  The femur at that point, the bone
16    that that sits opposite to is the
17    intratrochanteric cancellous bone, a very soft
18    bone that I'm not sure that either of these, or
19    some position in between those two, would make
20    much functional difference in the centralization
21    of these.  There isn't a well-defined bony
22    structure in that area.  It is a soft trebecular
23    (phonetic) bone that's typically impregnated with
24    bone cement.

25 Q. If there's no defined bone in that area, what's

139

1     the purpose in putting the spacer there?

2 A.  All the spaces are to facilitate centralization.
3         If you look in terms of their relative
4     importance of the eight spaces on this implant,
5     it's probably the one that is the least important
6     in terms of its function because it's the one that
7     sits opposite the most poorly defined bony
8     structure.

9 Q.  Do you know what testing was done with respect to
10    the location of the proximal lateral spacer before
11    the decision was made to move it to a more distal
12    location?

13 A. No, I do not.

14 Q. Were you involved in the review of any testing of
15    the implant before the decision was made to move
16    the proximal lateral spacer to that more distal
17    location as is shown on the exhibit?  And I'd like
18    to refer to this as an exhibit, that's the
19    problem.

20       MR. DAHM:  It's just the stem, I mean, we
21    don't have to refer to it.  We're going to
22    photocopy the markings.

23       MR. REARDON:  I don't see any harm in putting
24    a sticker on the plastic.

25       MR. DAHM:  Bob, it's not going to be part of

140

1     the record.  We're going to photocopy the box and
2     the peeling stickers, which tells us which stem
3     this is.  We have the stem that that came from.

4        MR. REARDON:  I'd like a photograph of the
5     stem, that's more important.

6        MR. DAHM:  We can do that.

7        MR. REARDON:  Why don't we do that and then
8     we'll mark it as the next exhibit, which would be
9     Exhibit Number 12.

10       MR. DAHM:  Do you have a camera?

11       MR. REARDON:  I can buy a camera in a drug
12    store and take a photograph, if that's what you
13    want.

14       MR. DAHM:  You said you just wanted a
15    photograph of the stem, I thought that's what you
16    said.

17       MR. REARDON:  Yeah, that's all.  You asked,
18    do you have a camera?  And I said, I don't have a
19    camera I brought from Connecticut.  If you want
20    me to go buy one, I'll buy one.

21       MR. DAHM:  Well, how do you want us to get a
22    photograph, Bob?

23       MR. REARDON:  You don't have a camera?

24       MR. DAHM:  Do I?  No, I don't have a camera.

25       MR. REARDON:  All right, well, then tonight

141

1     I'll buy a camera and tomorrow morning I'll
2     photograph it.

3        MR. DAHM:  I can try and put it on a Xerox
4     machine, if you'd like.

5        MR. REARDON:  Well, I'd like a photograph of
6     it, and I'll arrange to buy a drug store camera
7     and then I can take my photograph, okay?

8        MR. DAHM:  How are you going to mark the
9     film?  Are you going to have it processed?

10       MR. REARDON:  If you don't have a camera in
11    Baker and Daniels since 1893 or 1863, whatever it
12    is, if you don't have a camera here, I'll buy a
13    camera, okay?  We'll figure it out after that.

14       MR. DAHM:  Good.

15       MR. REARDON:  Okay, would you agree with me
16    that this Exhibit, which we'll identify by
17    photograph as Exhibit Number 12, this prothesis,
18    has 2.5 millimeter centralizers on it and has the
19    centralizer that is proximal and lateral moved to
20    a more distal location than the 9500 and also,
21    then, the early 9825's?

22       MR. DAHM:  Wait a minute: vague, form.

23       MR. REARDON:  You understand the question
24    don't you, Doctor?

25       THE WITNESS:  I understand the description of

that being different as you've described to this x-ray template of a 9800 stem. You asked me previously did I know when that was moved and you then referred to an earlier version of 9825's, I don't know in that regard. Compared to this description here in front of me, it is different as you describe it. This is a 9800, that's a 9825.

MR. REARDON: In all other respects, is the 9800 the same as the 9825 except for the 2.5 millimeter centralizers?

MR. DAHM: Form.

THE WITNESS: It is different in the thickness height of the centralizers and these two are different in the placement of that lateral centralizer.

BY MR. REARDON:

Q. Both of the differences that you directed me to were differences in the centralizers, correct?

A. Yes.

Q. If you were to not consider the centralizers, my question is, in all other respects, other than the centralizers, is the 9825 the same as Exhibit 11?

A. Yes, I think they're functionally the same. The metal component, I believe, is the same component.

Q. More than functionally the same, also they have the roughened surface in the same place, correct?

MR. DAHM: Vague.

THE WITNESS: I think they do. I mean, we could check the prints and the dimensions of the implants, but I don't know that they're different other than the centralizers.

BY MR. REARDON:

Q. This is a 20% enlarged depiction of the 9800 correct, Doctor, on Exhibit 11?

A. The original was, and that's the photocopy of something, so I presume it's about a 20%.

Q. It might not be perfectly accurate because of the photostating, you mean?

A. Yes.

Q. But it's roughly accurate if assuming it was photostated on an 8 and a half by 11 sheet of paper, right, you just don't know?

A. I just don't know.

Q. Okay. So if you did a 20% reduction, would you agree with me that this implant, which is in my hands, Exhibit 12 and Exhibit 11, they are of the same design, except for the centralizers?

A. I believe that to be the case. The position of the centralizers and the height or thickness of

the centralizers.

Q. Right. Other than the centralizers, again, they are of the same shape, the same length, they're both size 2's, the one in the picture is a size 2, in Exhibit 11, and the one that's in my hand is a size 2, they have the same length, they have the same offset, they have the same roughened surface, the same precoat, the difference is the centralizers, correct?

A. That's my understanding.

Q. Okay, thank you.

Before we go any further, Doctor, let me ask you, you mentioned that you reviewed Dr. Santore's deposition before today.

Have you reviewed any other depositions in this case?

A. I saw Dr. Santore's and I believe I saw Dr. Harris'. I don't recall that I read either of them completely, but I had them in front of me.

Q. Okay, how about any of the patients, Mrs. Dunn, Mr. Vino, Miss Lopez?

A. I don't recall that I have read any depositions by them.

Q. In the discovery materials that have been provided to us have included certain agreements between

Dr. Harris and Zimmer, Inc. known as licensing agreements, I believe.

The first of those agreements is --

MR. DAHM: Bob, that's not the subject of this notice.

MR. REARDON: Well, we'll ask him in relationship with his dealings with Dr. Harris. I'm not going to go into the content of the agreements, just the dating of the agreements.

MR. DAHM: Thank you.

MR. REARDON: And I think if you let me ask the question, you'll understand.

MR. DAHM: I just wanted to give you a heads up.

MR. REARDON: No, no, this is pretty straightforward.

BY MR. REARDON:

Q. But the first of the agreements is dated November 9th, 1983. And in looking at your CV it appears that you became associated with Zimmer at about the same time?

A. March of '83.

Q. Right. And you indicated early in your deposition that you were acquainted with Dr. Harris before you came to Zimmer, right?

146

1 A.   That is correct.

2 Q.   Were you at all instrumental in arranging for

3      Dr. Harris to enter into the licensing agreement

4      of November 9th, 1983?

5 A.   I had no discussion with him on that agreement.

6 Q.   So you weren't involved at all in inviting him to

7      join into some sort of agreement with Zimmer on a

8      more permanent basis?

9 A.   I did not initiate contact with Dr. Harris.

10 Q.  Okay.  Did you have anything to do with

11     negotiating the agreement?

12 A.  No.

13 Q.  That was easy, see.

14         Have you ever been to Dr. Harris' home?

15 A.  To his home did you say?

16 Q.  Yes.

17 A.  Yes, I've been to his home.

18 Q.  And so I take it you were socially friendly with

19     him as well as being professionally friendly with

20     him?

21 A.  Yes, he is a friend.

22 Q.  And you know his family?

23 A.  I know some of his family.

24 Q.  Did you ever have any discussions with Dr. Harris

25     about Dr. Grady-Benson, Dr. Schutzer, and

147

1      Dr. Santore regarding their concerns about the

2      Zimmer implant?

3         MR. DAHM:  Form.

4         THE WITNESS:  As I recall, I don't recall

5      discussing Dr. Schutzer or Dr. Grady-Benson with

6      Dr. Harris on any occasion.  And as I recall, I

7      have had discussions with Dr. Harris on

8      Dr. Santore's reported clinical experience as it

9      was published.

10 BY MR. REARDON:

11 Q.  What were your discussions with Dr. Harris

12     regarding Dr. Santore's clinical experience?

13 A.  We discussed the nature of his patient population,

14     kinds of implants that were used in the patients,

15     the age, activity, and clinical profile of the

16     patients.

17 Q.  And what was your understanding from that

18     discussion of Dr. Santore's patient profile?

19 A.  Well, I didn't gain any insight from Dr. Harris on

20     that, but I talked to Dr. Santore about it.

21 Q.  Do you think that after that discussion with

22     Dr. Santore, that his patient profile had any

23     significant differences from the patient profile

24     of, say, Dr. Schutzer; Dr. Grady-Benson;

25     Dr. Moeckel, another orthopedist in Connecticut;

148

1      or any other orth      ist that you're aware of?

2         MR. DAHM:  Form.

3         THE WITNESS:  As I previously described, I

4      don't know that Dr. Santore's indications for

5      total hip replacement, per se, and the profile of

6      his patients and aggregate are different than any

7      other representative experience in the country.

8      But because at the time he was doing only cemented

9      implants, I think his profile in the utilization

10     of cemented implants in patients was different

11     than many of the practices in the country.

12 BY MR. REARDON:

13 Q.  Well, if he were only doing cemented implants, so

14     I understand what you're saying, would it be fair

15     to say that his total patient population at that

16     time, that is a certain given time from 1992 until

17     1995 when I believe he stopped using the

18     Centralign -- for March of 1992 until December of

19     1995 when he stopped using the Centralign and he

20     had implanted 98 primary hip arthroplasties

21     between that time, during that time frame, and I'm

22     referring to Exhibit 7, his article, during that

23     time frame if he only was cementing implants and

24     only using the Centralign for cemented implants

25     and other cemented implants, in other words, no

149

1      cementless, wouldn't his patient population be --

2      I'll withdraw that.

3         Why would you feel that there was a selective

4      patient population of some kind favoring younger

5      people or people that are more active?

6 A.   I didn't say that there was a selective

7      population.

8         His population included patients that were

9      younger and more active compared to other clinical

10     experiences who, in a parallel fashion, utilized

11     both cementless implants as well as cemented

12     implants with the general decision making being

13     the age and activity of the patients.  Being older

14     and more sedentary, patients are more likely to

15     receive the cemented implants, where the younger

16     more active patients would receive the cementless

17     implants.

18        So if you were to take a clinical practice

19     group and look at that group of cemented implants

20     and compare it to Dr. Santore's group of cemented

21     implants, Dr. Santore's is more inclusive of the

22     general population of total hip patients than

23     somebody who had an indication for two different

24     types of prostheses.

25 Q.  Now you had an opportunity to look at

150

1   Dr. Santore's x-rays, as I understand it, when you
2   were in San Diego?
3 A.   We looked at some.
4 Q.   Some.  And you've also looked at Dr. Schutzer's
5   x-rays.
6 A.   Again, looked at some, I believe.
7 Q.   Have you discussed those results and those x-rays
8   with Dr. Harris?
9 A.   I don't recall that I discussed Dr. Schutzer's
10   experience or my discussion with him at all with
11   Dr. Harris.
12 Q.   Okay.
13 A.   My discussions with Dr. Harris, I have talked to
14   about Santore's experience and the nature of this
15   publication (pointing) with Dr. Harris.
16 Q.   Okay.  And as I understand what you're saying, the
17   recommendation that you would make would be that
18   for a younger, more active implant recipient, you
19   should use a cementless implant, you may consider
20   using a cementless implant?
21       MR. DAHM:  Would you give me the question
22   again, please?
23           - - -
24       Whereupon the record was read back by the
25   reporter.

151

1       MR. REARDON:  In other words, I'm not saying
2   you must or you shall, but that should be
3   considered by the physician, a cementless implant,
4   because older patients are better recipients of
5   cemented implants, is that what you're saying?
6       MR. DAHM:  Form.
7       THE WITNESS:  The letter, which I believe is
8   Exhibit 9, expresses, I think appropriately, I
9   thought it was appropriate at the time, it's
10   probably still appropriate, that once you consider
11   the use of cementless implants in patients who are
12   younger, active, put greater mechanical demands on
13   an implant.
14 BY MR. REARDON:
15 Q.   Now before the Centralign came out in '92, there
16   were a number of cemented implants on the market,
17   right?
18 A.   Yes.
19 Q.   And, in fact, the Harris Precoat offered a
20   cemented implant to orthopedic surgeons, right?
21 A.   Harris Precoat was a cemented implant.
22 Q.   Right.  And --
23 A.   And, excuse me, it wasn't called a Harris Precoat.
24   The Zimmer Precoat prosthesis was a cemented
25   implant.

152

1 Q.   Okay.  Dr. Harris had the same problem with that
2   in his deposition.
3       Let me show you your brochure because I don't
4   want to mischaracterize anything.  I don't think
5   this has ever been marked, so let's put a sticker
6   on it.
7           - - -
8       Crowninshield Deposition Exhibit 13 marked for
9   identification.
10          - - -
11 BY MR. REARDON:
12 Q.   You recognize Exhibit 13 as the brochure put out
13   by Zimmer Company regarding the Centralign
14   implant?
15 A.   Yes.
16 Q.   And if you flip to the back, I think you'll see
17   that that's a 9800, brochure for the 9800 implant.
18   I think it gives the specs on the 9800.
19 A.   Refers to a 9801 item number, which I presume is
20   an item number of the brochure.  And it refers to
21   9801 implants and 9800 implants in the brochure.
22 Q.   Okay, so that would be before the 9825 came out,
23   is that right?
24 A.   Well, I don't know the date.  Well, this says '91.
25   So, yes, I think this is dated before my

153

1   understanding of when the 9825 implants came out.
2 Q.   That brochure is dated 1991?
3 A.   Says copywritten '91.
4 Q.   Right.  And I believe you testified earlier that
5   the marketing, that you didn't know when the
6   marketing started for the Centralign implant which
7   was sold to hospitals in '92.  Would you agree
8   that at least a brochure was copyrighted and
9   finalized in 1991?
10 A.   This looks like it was finalized and copywritten
11   in '91.
12 Q.   Okay.  Let me go to the inside of the front cover
13   of Exhibit 13 and I'll read to you what it says,
14   and you can take look at it yourself.
15       First paragraph says: The Zimmer Centralign
16   Precoat Hip Prosthesis is designed to achieve
17   unparalleled cemented hip implant stability.
18   Starting with the time-tested design of the Harris
19   Precoat Plus Hip Prosthesis, and then it goes on.
20       Is the Harris Precoat hip prosthesis that is
21   referred to in the Zimmer brochure the same as
22   what you have just described as the
23   Zimmer Precoat?
24 A.   Yeah, I'm not aware, for example, of a trademark
25   of a Harris Precoat.  The product names that I was