**234**

1     MR. DAHM: So we're off these documents now?
2     MR. REARDON: Yeah.
3            That's the first sentence of the minutes
4     of the meeting of March 13th, 1990. Do you see
5     that, Doctor?
6     MR. DAHM: Just take a minute and look at the
7     entire document.
8     THE WITNESS: (Witness doing so).
9  BY MR. REARDON:
10 Q.  You also were cc'd on this particular set of
11    minutes, right?
12 A.  Yes.
13 Q.  And so at this point the stem design was decided,
14    is that right?
15 A.  First sentence is: The stem design is frozen.
16 Q.  And I'm trying to interpret that. In layman's
17    terms that means that the design was finally
18    decided and that's the design that is before us
19    today?
20    MR. DAHM: It's been asked and answered.
21    THE WITNESS: Yeah, I can't tell you from
22    this document that there hasn't been any fine
23    tuning or changes in design, but the author of
24    this document conceptually expressed they had
25    arrived at a geometry of the stem.

**235**

1  BY MR. REARDON:
2  Q.  Okay. And that geometry of the stem was,
3      according to the letter of March 1st, within the
4      period of 13 days, shortened? In other words,
5      Dr. Harris was asked to review a shortened stem,
6      proposed shortened stem, on March 1st by letter;
7      and on March 13th, 13 days later, the stem length
8      and design was frozen, is that correct?
9  A.  This letter describes having arrived at a geometry
10     and talks about forging tooling.
11 Q.  So the answer is yes, right?
12     MR. DAHM: Objection, form.
13     MR. REARDON: Is the answer yes or no?
14     MR. DAHM: Same.
15     THE WITNESS: My only concern is I don't know
16     whether, in fact, that any other change occurred
17     after this point in time. But it was the
18     assumption at the time I think of the author that
19     they had arrived at a stem geometry and that there
20     was, quotation, frozen.
21 BY MR. REARDON:
22 Q.  Okay. And would you agree at the same time, if
23     you go to page 2 of those minutes, that the PMMA
24     centralizers were not designed yet in their final
25     form?

**236**

1  A.  Yes, and that's consistent with what I previously
2      described as my interpretation of design freeze,
3      which is geometry of the implant which allows
4      tooling to be made, the spacers are a separate
5      issue.
6  Q.  So that the actual implant, metal implant was
7      designed, but there has not at that point been any
8      determination made even as to the final shape or
9      size of the centralizers or spacers that were
10     permanently affixed or bonded to that implant, is
11     that correct?
12 A.  I think the documents we've walked through
13     demonstrated that there was considerable amount of
14     work done on centralizers, and materials, and
15     sizes, and shapes. It was not, in the vernacular
16     of this letter, not frozen from that design point
17     of view.
18 Q.  Okay. And if you look at the last paragraph of
19     that set of minutes, the attachment process for
20     the centralizer was still unknown at the time the
21     design was frozen, is that correct?
22 A.  That's what it says.
23 Q.  Now, Doctor, that having been said, in the next
24     set of minutes, which are I think we have them
25     on -- I can't read the number offhand, but looks

**237**

1      like they're dated March 22nd, 1990 at the top,
2      they're minutes of a March 19th, meeting.
3      MR. DAHM: Let me see your copy, Bob.
4      MR. REARDON: Just a short sheet. It looks
5      like you have the right one there.
6  BY MR. REARDON:
7  Q.  At that point there is still some discussion
8      regarding the stem and the tolerance profile of
9      the stem, right?
10 A.  First sentence refers to the tolerance scheme for
11     the stem.
12 Q.  Okay, and then the last paragraph as well has more
13     detail regarding that, is that correct?
14 A.  Yes.
15 Q.  And so after, according to the minutes of some
16     five days earlier that the stem design was frozen,
17     there's still some discussion of the profile
18     tolerance. And the last sentence is:
19     manufacturing will develop a process that will
20     control as overall dimension. So that wasn't
21     finalized, was it?
22 A.  No, this would indicate that the tolerance around
23     the nominal dimension was still being discussed
24     and evaluated.
25 Q.  How can you have a frozen stem design if you don't



Page 238

1  have a determination of the profile of tolerance,
2  can you explain that to me?
3 A. I believe that the freeze of design referred
4  to nominal dimensions of the stem, and the
5  tolerance then represents manufacturing range
6  around the nominal dimension. You have to come up
7  with the nominal dimensions before you can then
8  commit to the tooling to make the implant.
9  Committing to the tooling has to have some
10  assumption about tolerances to be incorporated
11  within the tooling so that necessarily and
12  logically follows having determined the nominal
13  dimensions that then get into tolerances.
14 Q. Okay. So the tolerances were yet to be
15  determined. And the dimensions that we talk
16  about, when we talk about a freeze on design, are
17  only nominal dimensions, right, that's what we're
18  at in March of 1990?
19 A. Yes.
20 Q. Okay. Then we go to May of 1990, jump ahead a
21  little bit to 2-51 and 52.
22    Now by now, as I understand your earlier
23  testimony, --
24    MR. DAHM: Are you going to ask him about
25  this?

Page 239

1    MR. REARDON: Not right at the moment,
2  preliminary to that.
3 BY MR. REARDON:
4 Q. Your earlier testimony was that you believe in
5  April of 1990 you took a position that caused you
6  to be responsible for the oversight of this
7  project, right?
8 A. For the development function to include this
9  project.
10 Q. And I see that, again, with respect to this
11  distribution, your name is listed as it was with
12  those in February and March?
13    MR. DAHM: And this, for the record, is 2-51.
14    MR. REARDON: Yeah, this is a May 22nd, 1990
15  project meeting.
16    Now if you could go to page -- well, let me
17  just use the summary, the second sentence of the
18  summary: delays in finalizing the forging
19  specifications will not be permitted to affect
20  shelf date.
21    MR. DAHM: That's not what it says; you
22  misspoke.
23    MR. REARDON: Delays in finalizing the
24  forging specifications must not, must not be
25  permitted to affect shelf date.

Page 240

1    Then on the second page it says, at the top
2  of the page: Delays in establishing these
3  specifications must not, and the word not is
4  underlined, be permitted to affect shelf date. It
5  is strongly suggested that the lost time should be
6  made up during pre-production activities such as
7  private runs on sizes 1 and 6.
8    Do you remember at this point some concern
9  being expressed as to whether or not the shelf
10  date which was originally intended to be March of
11  1991 --
12    MR. DAHM: For the record, are you going to
13  refer back, Bob, to the documents that you just
14  looked at?
15    MR. REARDON: Yeah, R2-3, we just discussed
16  it. That's how we got to the defined shelf date.
17 BY MR. REARDON:
18 Q. Do you remember some concern being expressed in
19  May of 1990 that the shelf date may be affected
20  and it was determined that the shelf date would
21  not be -- or must not be affected?
22 A. No, I do not
23 Q. Okay. Since you were responsible for this project
24  in May of 1990, according to your earlier
25  testimony, were you the person who advised the

Page 241

1  team that the specifications must not be permitted
2  to affect the shelf date?
3.    MR. DAHM: Form.
4    THE WITNESS: No.
5 BY MR. REARDON:
6 Q. Do you know who did advise the team of that?
7 A. No.
8 Q. Do you know why the delays in establishing the
9  specifications were not to affect the shelf date,
10  according to the minutes?
11 A. I think the statements reflect a commitment of the
12  team to try to live with the product that was
13  scheduled that the company had an expectation
14  for. I can't tell you, as of the date of this
15  memo, whether, in fact, the shelf date at the time
16  that this was written was still the shelf date
17  that was described more than a year earlier when
18  the project started. But they were trying to do
19  the right thing in terms of moving the project
20  forward to a schedule that the company had an
21  expectation for.
22 Q. All right. But you don't know whether or not the
23  shelf date was changed at this point from that
24  original March of 1991 shelf date?
25 A. No, I do not.

242

1 Q. Okay. Do you remember any discussions at all
2   about this project being delayed, taking longer
3   than expected, in the development process?
4 A. No, I do not.
5 Q. Let's go to May 23rd, 1990, it's 2-53.
6   Before we leave, I apologize, 2-51, the one
7   we were just at, the very last paragraph is: The
8   project team meetings are now held weekly. Up to
9   that point I think that the meetings were held
10  bi-weekly, according to the minutes that you've
11  seen earlier.
12  Did you have any part in arranging, or
13  suggesting, or directing that the project team
14  start meeting on a weekly basis rather than on a
15  bi-weekly basis?
16  MR. DAHM: Form.
17  THE WITNESS: No.
18 BY MR. REARDON:
19 Q. Do you think that had anything to do with the fact
20  that they were 14 months into the project and 10
21  months from the anticipated shelf date as
22  originally planned and they still had not yet
23  decided on the shape of the centralizers or the
24  vendor for the forging and only had reached, at
25  that point, the freezing of the design?

243

1   MR. DAHM: Form.
2   THE WITNESS: No, I do not.
3   MR. REARDON: Okay.
4   THE WITNESS: It would not be unusual for a
5   project team to meet weekly or even more
6   frequently than weekly, depending upon the nature
7   of the work that needed to be done.
8 BY MR. REARDON:
9 Q. Okay. May 18th, 1990 I think is the next one, I
10  think you have that in front of you.
11  At this point it was determined, according to
12  paragraph two, that the PMMA spacers are
13  teardropped, there will be eight of them, and
14  there are four in the proximal and four in the
15  distal location.
16  That's ultimately the way, according to
17  Exhibit A, the final product came out, right?
18 A. Yes.
19 Q. And that they were going to be pre-bonded to the
20  stem surface, that is, in fact, the way it came
21  out, right?
22 A. That is correct.
23 Q. And that the material that was to be used for the
24  teardrops would include barium sulfate, correct?
25 A. That is correct.

244

1 Q. For radioprocity (phonetic), as is indicated, as
2   you previously said, right?
3 A. Yes.
4 Q. So all of that was finalized in May of 1990,
5   correct?
6 A. Yes.
7 Q. Okay. If you look at the bottom of that page I
8   think it'll address the issue that you brought up
9   a moment ago, that is the shelf date. Do you see
10  that?
11 A. Yes.
12 Q. Would you agree with me that as of May 23rd, 1990
13  when this memo was written, this meeting minutes
14  memo, that the shelf date was still March of 1991,
15  which was the 1991 AAOS meeting?
16 A. I would interpret that, yes.
17 Q. Okay, the shelf date had not changed at that
18  point, correct?
19 A. It appears that it did not.
20 Q. Okay. Page 2 of that same set of minutes.
21  Do you remember there being a concern about
22  locating a vendor who would add the barium sulfate
23  to the PMMA because of -- well, do you remember
24  there being concern about it?
25  MR. DAHM: Form.

245

1   THE WITNESS: I don't remember a concern
2   about a vendor, no.
3   MR. REARDON: A problem, a possible problem,
4   that's the word used in the minutes?
5   MR. DAHM: What's the question?
6 BY MR. REARDON:
7 Q. The question is, and I'll quote, you can read it
8   yourself: The addition of barium sulfate may pose
9   a problem in locating a vendor willing to inject
10  mold this material and a vendor or resource
11  capable of repalletizing barium sulfate powder
12  with injection mold grade PMMA pellets.
13  Do you remember this being a possible problem
14  that may be posed?
15 A. I can remember discussions around finding vendors
16  to do this, and I think the way this is phrased
17  is, you know, the problem was finding a vendor.
18  That wasn't to suggest that it was necessarily a
19  problem in doing it. I mean, we had to find a
20  vendor to perform the functions as required.
21 Q. Do you know why vendors were hesitant to do it?
22 A. I don't know that any vendor was hesitant to do
23  it.
24 Q. Do you know if, in fact, putting barium sulfate
25  into their molding equipment would cause the

Page 246

```
 1   equipment to become dirty and problematic?
 2        MR. DAHM:  Form.
 3        THE WITNESS:  I do not know.
 4  BY MR. REARDON:
 5  Q.  All right, let's go on.
 6        Could you explain why it was not clear
 7   whether the process of making these teardrop
 8   spacers with barium sulfate in them required a
 9   clean room operation?
10  A.  This was written by Leda Hewka, and I would
11   interpret this that she wasn't clear as to whether
12   it required it, and maybe others also.  But a
13   level of cleanliness of material is a
14   consideration.
15  Q.  Do you know whether or not injection molding the
16   PMMA teardrop spacers does, in fact, require a
17   clean room operation?
18  A.  I do not know whether it's done in a clean room,
19   no.
20  Q.  Do you know whether or not a clean room is
21   required?  I'm not asking whether or not it's done
22   in a clean room, I'm asking whether or not it's
23   required to be done in a clean room.
24  A.  If it was required to be done in a clean room, it
25   would be done in a clean room.
```

Page 247

```
 1  Q.  Let's talk about, while we're on this subject, a
 2   little bit about the actual molding of these
 3   teardrops.
 4        There's discussion here of locating a vendor
 5   with an injection molder to make these teardrops.
 6        Have these teardrops from 1992 through 1998,
 7   in fact, been molded by outside vendors or were
 8   they done in-house?
 9  A.  I believe they were done by outside vendors.
10  Q.  Was the affixing of them to the metal
11   prosthesis or bonding of them done in-house or by
12   a vendor?
13  A.  That is performed in-house.
14  Q.  Okay.  So the actual, to the best of your
15   understanding, the actual teardrops are made
16   outside of your company and then purchased from a
17   vendor, an outside contractor, and then they're
18   adhered to or bonded to the metal prosthesis by
19   Zimmer?
20        MR. DAHM:  Form.
21        THE WITNESS:  That is my understanding.  You
22   know, we do have injection molding capabilities in
23   Ohio, but I don't know that that operation was
24   performed on these.  I believe they were purchased
25   from a vendor.
```

Page 248

```
 1  BY MR. REARDON:
 2  Q.  What is a clean room operation?
 3  A.  Clean room refers to an environmentally controlled
 4   room that has an established particulate count in
 5   the air, an air quality controlled room.
 6  Q.  And why is it necessary in some instances to have
 7   a clean room operation for certain manufacturing
 8   processes in the biomedical field?
 9  A.  Because the clean room environment can control
10   the -- can influence the bio-burden of an implant,
11   and it's an issue concerning sterilization to
12   ensure that the bio-burden and sterilization
13   processes are compatible with each other.
14  Q.  Okay.
15  A.  And all clean operations are not done in clean
16   rooms, there are clean other environments.
17  Q.  All right, okay, I understand that.
18        Let me ask you, though, about whether or not
19   the process, the next paragraph, whether or not
20   the process or material will require a validation,
21   what does that mean?  I don't know what validation
22   means, if you can help me with that.
23  A.  Where are you in the letter?
24  Q.  On the very next sentence where it says, quote, it
25   is not clear whether the process or material will
```

Page 249

```
 1   require a validation.
 2        And I'm assuming that refers to the
 3   process of injection molding the teardrop
 4   centralizers.
 5        MR. DAHM:  Form.
 6  BY MR. REARDON:
 7  Q.  Is that correct?
 8  A.  I would assume that this is referring to the
 9   centralizers that's in the same paragraph as the
10   other discussion of centralizers.  And material
11   and process validation is performed to
12   characterize the output of a process to assure its
13   maintenance specifications of a product.
14  Q.  In other words, to determine if the specifications
15   had been met?
16  A.  Yes.
17  Q.  The design specifications, correct?
18  A.  Yes.
19  Q.  Do you know whether or not the process did, in
20   fact, the process of making these teardrops, did,
21   in fact, require a validation?
22  A.  I do not know.
23  Q.  Who would know the answer to those questions as to
24   whether or not the process required a clean room
25   operation and whether or not the process required
```

250

1  validation?
2      MR. DAHM: You mean other than what the
3  documents may reveal later?
4 BY MR. REARDON:
5 Q. Yeah, I mean, who in the company would know?
6 A. Mike Hawkins would know.
7 Q. How about Leda Hewka, would she know?
8 A. She may.
9 Q. Do you remember the discussion of using
10    ultrasonic welding to attach the spacers?
11 A. Yes.
12 Q. And what was the process that was finally decided
13    upon to attach the spacers?
14 A. Ultrasonic welding.
15 Q. Ultrasonic welding was the final decision, is that
16    right?
17 A. Yes.
18 Q. So all of the spacers that were attached were
19    attached, as I understand your testimony, by
20    ultrasonic, through the 9800 series and the
21    9825's, through ultrasonic welding and they were
22    done in-house by Zimmer, is that right?
23 A. That is my understanding.
24 Q. Okay. Do you remember some difficulty in getting
25    the welding equipment that was necessary to do the

251

1  bonding of these PMMA spacers during the
2  development process?
3 A. I don't know that there was a difficulty. There
4    was a process which one had to obtain welding
5    equipment, demonstrate that it performed the
6    intended function, and get it on site and make it
7    operational.
8 Q. You do recall that Zimmer acquired the ultrasonic
9    welding equipment specifically to do the bonding
10    of the PMMA spacers?
11 A. We bought specialized equipment.
12 Q. And am I correct, sir, that Zimmer never owned
13    and never used any ultrasonic equipment for
14    bonding of PMMA spacers before it acquired that
15    equipment for use to manufacture the Centralign
16    implant?
17 A. That is correct.
18 Q. We'll go to 5259. I'm going to quit in two
19    minutes, at 5:00. I'm just going to finish up
20    with this one more exhibit, and then we'll call it
21    quits.
22      5259 through to 5261.
23      MR. DAHM: 5261? There is no 5261.
24      MR. REARDON: I'm sorry, R2-61. R2-59
25    through R2-61.

252

1 BY MR. REARDON:
2 Q. First of all, Dr. Pand, of Ednap Medical
3    (phonetic), are you familiar with that gentlemen?
4 A. No, I'm not.
5 Q. And did you have any interaction or dealings with
6    this gentleman with respect to the centralizers
7    and the PMMA with the barium sulfate?
8 A. No, not that I recall.
9 Q. Okay. Did you have anything to do with
10    determination of how much barium sulfate was put
11    into the PMMA in the manufacturing process of the
12    teardrops?
13 A. No.
14 Q. Can you tell me how much -- what percentage of
15    barium sulfate is, in fact, in the teardrops when
16    they were finally produced?
17 A. No.
18 Q. Now 2-61, I'm going to finish this one sheet
19    because I think he has it, if you handed it to
20    him, so we don't have to get it out tomorrow.
21      261, do you have that one, that's a diagram
22    of the PMMA's bone cement? See it?
23 A. Yes, I do.
24 Q. I was giving you an opportunity to look at it.
25    Is that intended to depict the design of the

253

1  PMMA spacers at least as it was on the date of
2  this diagram: May 30th, 1990?
3 A. Yes, it would seem to. As of that date, it was a
4    design of a spacer.
5 Q. And am I correct that the design, the ultimate
6    design that was manufactured in 1992, is
7    different?
8 A. I could not verify that for you.
9 Q. Okay, the shape is not different, you can't tell?
10 A. It looks substantially the same to me.
11 Q. Okay.
12      MR. DAHM: The prints will show that, Bob.
13      MR. REARDON: Yeah, we'll get there, we'll
14    recess today.
15      MR. DAHM: Thank you. We'll start at 9:00
16    in the morning.
17           - - -
18      Off-the-record discussion.
19           - - -
20      MR. DAHM: Bob, earlier you made a comment
21    that we did not produce to you the Centralign
22    marketing brochure for the 9825. That's, like a
23    lot of your statements, is in error, we have
24    produced it. I don't know where your copy is,
25    but --

254

1   MR. REARDON: What's the numbers?
2   MR. DAHM: It starts at I25-143.
3   MR. REARDON: I have the numbers that you're
4 giving me with me, I'm looking at them right now.
5 And the number you said was I25-143, correct?
6   MR. DAHM: Correct. Let me come over and
7 show you.
8   MR. REARDON: I understand that it has
9 depicted in there some of these. But if you
10 look --
11  MR. DAHM: I am looking, catalog 9825, 9825,
12 9825, 9825, specifically document I125-156.
13  MR. REARDON: That is a brochure that has
14 ordering information on it.
15      What I am looking for is the comparable
16 brochure to the one that was marked as Exhibit
17 Number -- and I don't see it on the table anymore.
18  MR. DAHM: Bob, I don't know if there is a,
19 quote unquote, comparable.
20      We produced the marketing documents for
21 the 9825 and you just reflected that you have
22 marketing documents for 9825 and you said earlier
23 we didn't produce any marketing documents for
24 9825; that statement was inaccurate.
25  MR. REARDON: Okay, well, what I would like,

255

1 if it exists, is the marketing brochure for the
2 9825, if it exists, which is comparable to
3 Exhibit 13. And I don't see that in the
4 materials. I apologize if I'm -- if there is
5 none, then obviously there's nothing to produce.
6 It would seem to me that if you were marketing a
7 product, you would put together a brochure similar
8 to the one that's Exhibit 13.
9   MR. DAHM: Well, I don't know if you do or
10 you don't. You have the marketing brochures for
11 the 9825.
12  MR. REARDON: I'll accept your
13 representation. If that's all there is, then
14 there is no more.
15  MR. DAHM: You can ask the witness tomorrow.
16      - - -
17      Whereupon the deposition was adjourned at
18 5:04 p.m.
19      - - -

25             ROY CROWNINSHIELD

256

1       E R R A T A   S H E E T
2
3 Date:       November 19, 2001
4 Case:       Dunn v Zimmer
5 Deponent:   ROY CROWNINSHIELD
6
7 PAGE    LINE    CORRECTION           REASON
8 ----------------------------------------------
9 ----------------------------------------------
10 ---------------------------------------------
11 ---------------------------------------------
12 ---------------------------------------------
13 ---------------------------------------------
14 ---------------------------------------------
15 ---------------------------------------------
16 ---------------------------------------------
17 ---------------------------------------------
18 ---------------------------------------------
19      I HEREBY CERTIFY under the penalties of
   perjury that I have read the above and foregoing
20 deposition, and that the testimony contained therein,
   together with any corrections in form or substance as
21 above set out, is a true, correct and complete record
   of my testimony given at said deposition on the
22 above-shown date.
23
24      _____
25 DATED: _____

257

       CERTIFICATE OF THE REPORTER

3     I, Toni L. VanSyckle, a Certified Reporter
4 and Notary Public, hereby certify there appeared
5 before me on November 19, 2001, ROY CROWNINSHIELD, who
6 was duly sworn to testify the truth, the whole truth,
7 and nothing but the truth to questions propounded at
8 the taking of the foregoing deposition in a cause now
9 pending and undetermined in said court.
10     I further certify that I then and there
11 reported in machine shorthand the proceedings at the
12 said time and place; that the proceedings were then
13 transcribed from my original shorthand notes; and that
14 the foregoing transcript is a true and correct record
15 thereof.
16     IN WITNESS WHEREOF, I have hereunto set my
17 hand and affixed this seal this _____ day of
18 _____, 2001.
19
20      _____
21      Toni L. VanSyckle
22      My Commission Expires:
23      December 16, 2003

```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
                   CONDENSED TRANSCRIPT
DOLORES DUNN;                    )   CONFIDENTIAL
DONALD DUNN,                     )   VOLUME II
                                 )
          Plaintiff(s),           )
                                 )
          -vs-                    )   CIVIL ACTION NO:
                                 )   3:00CV1306 (DJS)
ZIMMER, INC.,                    )
                                 )
          Defendant(s).           )
-----------------------------------
```

The Continuing Deposition of ROY CROWNINSHIELD

DATE:   Tuesday, November 20, 2001

TIME:   9:00 a.m.

PLACE:  Offices of Baker & Daniels
        111 East Wayne Street
        Fort Wayne, Indiana

Called as a Witness herein, in
Accordance with the Rules of Civil
Procedure.

Before Toni L. VanSyckle
Certified Shorthand Reporter,
Notary Public

SUMMIT CITY REPORTING
Certified Shorthand Reporters
3518 Stellhorn Road
Fort Wayne, Indiana 46815
(219) 486-3954

APPEARANCES:

    ROBERT I. REARDON, JR., ESQ.
    The Reardon Law Firm
    160 Hempstead Street
    New London, Connecticut 06320
    (860) 442-0444

    On behalf of the Plaintiffs.

    ALBERT J. DAHM, ESQ.
    MICHAEL S. ELVIN, ESQ.
    Baker & Daniels
    111 East Wayne Street, Suite 800
    Fort Wayne, Indiana 46802
    (219) 424-8000

    On behalf of the Defendant.

ALSO PRESENT:  David N. Royster,
                 Assistant Counsel,
                 Zimmer, Inc.

---

260

INDEX

THE CONTINUING DEPOSITION OF
R O Y   C R O W N I N S H I E L D

CONTINUING DIRECT EXAMINATION
  by Mr. Reardon......................... Page 261

EXHIBITS

CROWNINSHIELD:

Exhibit 12............................. Page 261
  (Label from a Centralign Precoat
  Hip Prothesis)

Exhibit 12-A & 12-B.................... Page 261
  (Labels from a Femoral Stem,
  2 Size, Catalog #9825-02-01)

Exhibits 12-C through 12-J............. Page 261
  (Photographs of a Femoral Stem)

Exhibit 16............................. Page 346
  (United States Patent: 5,116,380)

Exhibit 17............................. Page 346
  (United States Patent: 5,163,963)

---

261

1             - - -
2      Crowninshield Deposition Exhibits 12 and 12-A
3        through 12-J marked for identification.
4             - - -
5         CONTINUING DIRECT EXAMINATION
6  BY MR. REARDON:
7  Q.  Now you understand you're still under oath,
8      Dr. Crowninshield?
9  A.  Yes, I do.
10  Q.  Dr. Crowninshield, when we left off yesterday, we
11     were discussing, as I recall, the development
12     process. And I think we have just finished
13     talking -- or begun to talk about the centralizer
14     ribs.
15         Let me ask you a specific question about
16     whether or not that you were made aware at any
17     time after April of 1990 when you assumed
18     responsibility for this project, overseeing
19     responsibility for this project, that there was
20     some problem with locating injection molders who
21     would use barium sulfate with a PMMA because of a
22     cleanup problem with the equipment?
23         MR. DAHM: Form.
24         THE WITNESS: I don't recall being
25     knowledgeable of the process of securing a vendor.

---

262

1  I know a vendor was chosen and ribs were obtained.
2  I'm not conversant with the dialogue that occurred
3  with them at the process.
4       MR. REARDON: What I'm asking you is were you
5  aware that when you mixed barium sulfate with the
6  PMMA compound, that the injection molders tend to
7  get dirty?
8       MR. DAHM: Form.
9       THE WITNESS: I would be aware that putting a
10  particulate material in a resin for injection
11  molding would, you know, require special setup and
12  cleanup afterwards. I mean our products, medical
13  products, are typically not made for the general
14  use environments, you know, specific for medical
15  devices that they require cleanup, made for
16  medical implant kinds of conditions; and, you
17  know, our vendors would need to respond to that.
18      MR. REARDON: All right. So you're aware,
19  then, that mixing a particulate, such as barium
20  sulfate with the PMMA acrylic, would cause the
21  injection molders to become dirty?
22      MR. DAHM: Form.
23      THE WITNESS: I'm not sure what you mean by
24  dirty, but, you know, putting particulate in a
25  resin produces a different molding environment

263

1  than what's called a need resin, which would be
2  the resin without any particular filler within it.
3      MR. REARDON:  What tests were done by Zimmer
4  in order to determine whether the barium sulfate
5  mixture with PMMA would have any affect upon the
6  adhesion of the PMMA --
7      MR. DAHM:  Form.
8      MR. REARDON:  -- to the femoral component?
9      MR. DAHM:  Same.
10     THE WITNESS:  We clearly did adhesion testing
11 of the PMMA spacers to the femoral components that
12 we documented.  Their adhesion came up with
13 criteria for adhesion.
14     MR. REARDON:  Were those criteria changed --
15     MR. DAHM:  I don't think he's finished.
16     THE WITNESS:  Yeah, and that those spacers
17 included the barium sulfate which was the
18 intention of having radio pacified spacers on the
19 device.
20 BY MR. REARDON:
21 Q. Doctor, you mentioned the criteria.
22    Were the criteria changed, do you know, in
23 1992?
24 A. I'm not -- I don't know what changes in criteria
25 may have occurred.  I don't know if any criteria

264

1  did change.
2  Q. Okay.  R2-75 is a letter, which you can show, if
3  you'd be so kind, to Dr. Crowninshield, a letter
4  to Dr. Harris --
5      MR. DAHM:  What's the number, Bob?
6      MR. REARDON:  -- from Mike Hawkins.  It's
7  2-75.
8      Were you aware --
9      MR. DAHM:  Wait, wait.  Let him read the
10 letter, Bob, gees.
11     MR. REARDON:  He doesn't have to read the
12 whole letter; I'm going to ask him about one
13 sentence of the first paragraph of the letter.
14 But if you want him to read the whole letter, let
15 him read the whole letter.  It means I'll have to
16 come back because I'm not going to finish with --
17 if we have him read every document in its entirety
18 when I'm asking a question about one particular
19 paragraph of that document, it looks like I'm
20 going to have to come back again to do a
21 deposition of the individual you've designated.
22     I want to get through this as quickly as
23 I can, but it's very time consuming when he reads
24 the entire document and I want to call his
25 attention to one paragraph.  The other paragraphs

265

1  are clearly unrelated.
2      If you'll let me ask the question first,
3  I think you'd appreciate what I'm asking about and
4  he won't have the need to read the entire document
5  and study it.
6      MR. DAHM:  Are you finished?
7      MR. REARDON:  Yeah.
8      MR. DAHM:  You're taking up time, Bob.  I
9  think he's done.
10     MR. REARDON:  Are you finished reading?
11     THE WITNESS:  Yes.
12 BY MR. REARDON:
13 Q. Okay.  In the letter it mentions in the first
14 paragraph that there was a process used to
15 roughen the surfaces of the femoral component by
16 an etch in hot sulfuric acid, do you see that?
17 A. Yes, I do.
18 Q. Is that the process that was ultimately used to
19 roughen the surface of the 9800 and 9825?
20 A. This sentence refers to several candidate
21 processes that were used in the laboratory.  And
22 the hot sulfuric acid was not a process that was
23 used commercially in the production of this
24 product.
25 Q. What process was, in fact, used and was it changed

266

1  at all after production began?
2  A. The precoated regions of these implants, I
3  believe, are roughened by blasting with aluminum
4  oxide, and I'm not aware of any change in that.
5  Q. And so as of July 9th, 1990, it was determined
6  that there would be another process developed and
7  that it would likely be an oxide blast, according
8  to paragraph two of the letter, do you see that?
9      MR. DAHM:  Form.
10     THE WITNESS:  Excuse me, could you repeat the
11 question?
12 BY MR. REARDON:
13 Q. As of July 9th, 1990, according to the letter, the
14 method found most practical was an oxide blast, do
15 you see that?
16 A. It's my understanding that an oxide blast was used
17 prior to 1990 and afterwards; I'm not aware of any
18 change.
19 Q. Okay.  I'm just reading from the letter, and I
20 understand that it says in the next paragraph, in
21 1984 there was this type of finish started for
22 another product.
23     What product was that?
24 A. The oxide blast was used on the Zimmer Precoat
25 prosthesis, I believe so, and that would have been

Page 267

```
 1     in production starting about 1(?)
 2 Q.  Okay.
 3 A.  And there are other precoated prostheses. The
 4     oxide blast has been used commonly and I believe
 5     exclusively on the preparation of the precoat
 6     surfaces for an extended period of time.
 7 Q.  Could you tell me why there was consideration
 8     given to roughening the surface by an etch in hot
 9     sulfuric acid as indicated in the July 9th letter?
10 A.  I was aware that hot sulfuric acid was considered
11     very early on, back in the early eighties. I was
12     not aware of any work or consideration of it in
13     1990.
14 Q.  Can you tell me what the letter means, then, when
15     it says in the first sentence of paragraph two,
16     the scale of this process was not successful?
17 A.  I have not found that sentence in the first
18     paragraph.
19 Q.  First sentence, second paragraph.
20 A.  Oh, second paragraph.
21         I believe it's referring to the hot sulfuric
22     acid etch, that that was a process that was
23     considered early in the eighties. And the scale
24     up of that was not performed, as the next
25     sentence, it presented some safety and logistic
```

Page 268

```
 1     issues that had not been adequately addressed, and
 2     the preferred method of aluminum oxide blast was
 3     then opted.
 4 Q.  Okay, so it's your understanding that the
 5     roughening process from the beginning of the
 6     development of this prosthesis in 1989, right
 7     through to when it was produced in its final
 8     state, always intended to use a method of
 9     roughening the surface by oxide blasting?
10 A.  Yes, that's my understanding.
11 Q.  Okay. Why was there, and I'll go to paragraph
12     four, why was there consideration given, or some
13     questions, about using a less aggressive grid to
14     roughen the surface, do you know?
15 A.  I'm not sure what that's referring to. I do not
16     know what that is referring to.
17 Q.  Do you know whether or not it had anything to do
18     with adhesion of the PMMA precoat on the roughened
19     surface?
20 A.  The characterization of PMMA precoating to the
21     surface is done consistent with a developed
22     process. And I believe this paragraph suggests
23     that if another process was to be used, then it
24     would require development and testing for the
25     purposes of making sure of adhesion of precoating.
```

Page 269

```
 1 Q.  Thank you, I'm finished with that document.
 2         R2-130. Sir, do you recall in February of
 3     1991 the critical paths activities for the
 4     implant, as indicated in these meeting minutes,
 5     being adjusted because of delays in development of
 6     the implant?
 7 A.  Excuse me, I've had a chance to read it. Now,
 8     what is your question?
 9 Q.  My question was, sir, do you recall that the
10     critical path dates for the implant were adjusted
11     from the original dates, which if you recall
12     yesterday was that it would be on the shelf by
13     March of 1991, in February of 1991 because of
14     delays in development?
15 A.  This memo discusses shelf release of August of
16     1991, which is later than the date previously
17     discussed.
18 Q.  My question was do you recall, I'll ask it a third
19     time, sir, do you recall, I'm speaking of you, do
20     you recall? Do you understand the question?
21 A.  Yes.
22         MR. DAHM: Mr. Reardon, I'm going to
23     interrupt. This deposition will terminate if you
24     continue -- let the record reflect that he's
25     arguing with the witness, he's --
```

Page 270

```
 1         MR. REARDON: I'm not arguing with the
 2     witness.
 3         MR. DAHM: Let me finish my objection. You
 4     raised your voice --
 5         MR. REARDON: I did not. That is absolutely
 6     nonsense. I will now raise my voice, when you
 7     accuse me of raising my voice and it's untrue. I
 8     resent people not telling the truth, sir. I did
 9     not raise my voice to this gentleman.
10         MR. DAHM: Bob, if you have a question,
11     answer it civilly -- ask it civilly.
12 BY MR. REARDON:
13 Q.  Do you recall, sir, any discussion of delaying the
14     critical path deadlines for reaching the shelf or
15     putting this product out into the marketplace
16     that occurred in February of 1991 that caused the
17     delay to August of 1991 from March of 1991?
18 A.  I have no recollection other than the document
19     that you put in front of me.
20 Q.  Thank you. Would you go to R2-164.
21         Do you recall, Doctor, the filming of the
22     first surgical technique video in July of 1991 by
23     Dr. Harris in Boston at Mass. General Hospital?
24 A.  Just for clarity, and I don't want to be
25     argumentative, the last question you put a
```

271

1 document in front of me and I referred to it in
2 trying to answer your question.
3     You've put another document in front of me.
4 Is it relevant to answering whether I recall?
5 Because I don't recall, apart from any document
6 that you're going to put in front of me, about the
7 filming of the video that was ten years ago.
8 Q. Okay, let me explain why I put the document in
9 front of you.
10     If you don't recall, you can take a look at
11 the document and perhaps that might refresh your
12 recollection. In the interest of time, I'm
13 getting the documents now and having them handed
14 to you.
15     I'd like to know whether or not you have any
16 personal recollections, since you've been
17 designated as the person most knowledgeable in the
18 development and design of this particular product.
19 And so if you don't have a recollection of it, I'd
20 like to know. If you're simply relying upon
21 documents that will have already been produced,
22 that is quite different, from my perspective.
23     And so forgive me for confusing you, I don't
24 mean to do that. I would like to know what your
25 specific recollections are; and then if you don't

272

1 have a recollection, you can look at the document.
2 If that document doesn't refresh your
3 recollection, then we'll move on, okay?
4     MR. DAHM: And, again, as to this deposition
5 and the rule to which it is being taken is very
6 clear.
7     So the question, again, Mr. Reardon of
8 the witness is what?
9 BY MR. REARDON:
10 Q. The question is, do you recall the filming of the
11 surgical technique video, that is the operation
12 performed by Dr. Harris in July of 1991 at
13 Mass. General Hospital?
14 A. No, I do not.
15 Q. Okay. Do you recall that a surgical technique
16 video, that is a filming, took place of an
17 operation by which the Zimmer Centralign was
18 placed in a patient in July of 1991?
19 A. It is our standard practice on products that have
20 surgical technique videos. I'd be surprise if we
21 did not have one, but I don't recall when one was
22 made.
23 Q. Okay. And do you recall any discussion whatsoever
24 in July of 1991 at the end of the month of whether
25 or not reaching the shelf, to use the expression

273

1 we've been using, was possible by August of 1991
2 which was the revised date from March of 1991?
3     MR. DAHM: Form.
4     THE WITNESS: I do not recall.
5 BY MR. REARDON:
6 Q. Okay. Do you recall that the plan, and you may
7 look to refresh your recollection at any time as I
8 explained if it will help you, the documents I've
9 offered to you 2-164, do you recall the plan for
10 Dr. Harris to do a live presentation at the annual
11 Harvard hip course in September of 1991 that was
12 planned in July?
13 A. I do not have recollection of that.
14 Q. Am I correct, sir, that this product did not reach
15 the shelf until 1992?
16     MR. DAHM: Form.
17     THE WITNESS: My understanding was that sales
18 of the product began in 1992.
19 BY MR. REARDON:
20 Q. And that means that it reached the shelf, correct?
21 A. Yes.
22 Q. Now I'd like you to go to R2-166. And I think it
23 goes over through 169, it's a four page
24 memorandum.
25     Now this is a memo from Roy, is it pronounced

274

1 Horre (phonetic)?
2 A. Horre.
3 Q. Horre. To you, correct, sir?
4 A. Yes.
5 Q. Do you recall the content of that memo?
6 A. Not apart from seeing it here this morning, no.
7 Q. Okay. Is it signed by Mr. Horre, is that his
8 signature?
9 A. Yes, it is.
10 Q. And the subject was July issues report, correct?
11 A. Yes.
12 Q. Do you know what the issues were that were
13 reported on?
14 A. I know one issue that's depicted here. This is
15 a standard, you know, monthly sort of status
16 report.
17 Q. Well, the one issue you know is the one that's
18 visible, correct?
19 A. Yes, I don't know what the other issues were.
20 Q. All right. Who is Mr. Horre and what was his
21 position at Zimmer?
22     MR. DAHM: Form.
23     THE WITNESS: Roy Horre is an engineer at the
24 time I believe responsible for hip development.
25     MR. REARDON: And was he over the people that



**Page 275**

1  were on this development commit. that we've been
2  talking about through the deposition?
3      MR. DAHM: Form.
4      THE WITNESS: Yes.
5  BY MR. REARDON:
6  Q. There have been, in the four pages of this
7     document, redactions of entire pages.
8         Can you tell me, sir, whether or not any of
9     those -- any of the content of that issues report
10    discussed the delays in the production -- final
11    development and production of the Centralign
12    implant?
13 A. You're asking me to tell you what is in the
14    redacted?
15 Q. Yes, if you recall.
16 A. I do not recall what's in the redacted sections.
17 Q. Okay. When there were delays in the research and
18    development of a product under development such as
19    the Centralign implant, were the delays to be
20    reported to you as the Director of Research?
21    MR. DAHM: Form.
22    THE WITNESS: The scheduled project would be
23    brought to my attention.
24 BY MR. REARDON:
25 Q. Is there anything in this memorandum that refers

**Page 276**

1  to the delays in the project, this July 31st, 1991
2  memorandum? When I say in it, I mean in it that
3  has not been redacted.
4  A. I do not see reference to schedule the implant
5     development. The only points described here is a
6     surgery.
7  Q. On the last page, which is page 169, there's a
8     discussion of Tim Doolin and Jim Crumley literally
9     spending about three days and nights manually
10    setting up the ultrasonic welder to attach the
11    centralizing buttons on the stems.
12        Do you recall Mr. Doolin and Mr. Crumley
13    working days and nights to set up the ultrasonic
14    welder?
15 A. I do not recall that.
16 Q. Do you recall some urgency in late July of 1991 in
17    getting the Centralign on the shelf?
18    MR. DAHM: Form.
19    THE WITNESS: I don't recall the schedule
20    issues in the development of this apart from
21    documents that you're putting in front of me.
22    MR. REARDON: So you don't have any
23    recollection of changing in the scheduling date,
24    delaying, any of that?
25    MR. DAHM: Form.

**Page 277**

1  BY MR. REARDON:
2  Q. Is that right?
3  A. I don't have specific recollection of the schedule
4     and the changes of it.
5  Q. Okay. If you could go to the next page, which is
6     170, bottom of the page.
7     MR. DAHM: And, again, like the witness said,
8     do you have a question apart from the document or
9     do you want him to look at the document first?
10    MR. REARDON: Well, if he wishes to look at
11    the document. The only information that I have at
12    this point is from the document.
13       If he doesn't have any knowledge of it
14    beyond what's in the document, then, you know,
15    obviously there's no point in me questioning him
16    further, we'll move on.
17    MR. DAHM: You misunderstand, Bob.
18    MR. REARDON: Well, I'm not the smartest guy
19    but I try. Thank you for telling me that I
20    misunderstand, it's very kind of you.
21    MR. DAHM: You're welcome.
22 BY MR. REARDON:
23 Q. The last paragraph on page 170 talks about a
24    production delay due to tooling delays with
25    reference to the ultrasonic welder.

**Page 278**

1      Now, I know you mentioned yesterday that you
2  were aware that Zimmer bought an ultrasonic welder
3  in order to attach the spacers, correct?
4  A. Yes.
5  Q. Prior to that, had Zimmer, to the best of your
6     knowledge, ever owned an ultrasonic welder?
7  A. We talked about that yesterday. No, this is, to
8     my knowledge, the first time we've done ultrasonic
9     welding of PMMA spacers on an implant.
10 Q. Who did the ultrasonic welding?
11 A. Zimmer did.
12 Q. Who at Zimmer?
13    MR. DAHM: When?
14 BY MR. REARDON:
15 Q. When this thing was set up in late 1991, who did
16    it?
17 A. It would have been done in --
18    MR. DAHM: Excuse me, form.
19    THE WITNESS: Ultrasonic welding was done in
20    the production department in Warsaw.
21 BY MR. REARDON:
22 Q. Okay. Was it ever subcontracted out?
23 A. Not to my knowledge.
24 Q. Okay. So let's talk about the different
25    production facilities that you have.

279

1    You mentioned one in Puerto Rico and there's
2    one in Warsaw, correct?
3 A.  There are facilities in those two locations.
4 Q.  Okay. Where were the spacers attached?
5        MR. DAHM: In which of the facilities?
6        MR. REARDON: In which of the facilities, or
7    by a contractor, an outside vendor?
8        MR. DAHM: Form.
9        THE WITNESS: Well, my previous answer: they
10   were done in Warsaw.
11       MR. REARDON: Okay.
12       THE WITNESS: In our facility.
13       MR. REARDON: Who provided training to the
14   people in Warsaw who operated the ultrasonic
15   welders to attach the PMMA spacers?
16       MR. DAHM: Form.
17       THE WITNESS: I don't recall the names of the
18   people, but what you see is a series of documents
19   that talk about the development of the process,
20   the procuring of equipment, the development of the
21   process, and then the installation of it in a
22   manufacturing environment. There were development
23   engineers, process engineers, manufacturing people
24   working together, and then finally operators who
25   operate the equipment, which was installed in

280

1    Warsaw. I recall seeing it operate in the very
2    early days of its use in our facility at the west
3    end of the building.
4        MR. REARDON: All right. At the west end of
5    the building where you saw it being operated, who
6    was operating it?
7        MR. DAHM: Form. When? I mean March?
8        MR. REARDON: In the early stages.
9        MR. DAHM: But what's that mean, Bob?
10       MR. REARDON: Well, --
11       MR. DAHM: Form.
12 BY MR. REARDON:
13 Q. You started to sell this product on the shelf in
14   about January or February of 1992, correct?
15 A. Yes.
16 Q. Okay. Now we're in August of 1991, according to
17   the document that I've just shown to you.
18       Between August of 1991 and January of 1992
19   when this was put on the shelf, a period of about
20   four to five months, who was attaching the spacers
21   by ultrasonic welding at the west end of the
22   building?
23       MR. DAHM: Form.
24       THE WITNESS: I do not know the names of the
25   individual or individuals who were doing it.

281

1 BY MR. REARDON:
2 Q. Okay. Now from the beginning am I correct, sir,
3    that these femoral components were forged by
4    outside vendors, correct?
5 A. Yes.
6 Q. Okay. Who did the forging?
7        MR. DAHM: We've been through that yesterday,
8    Bob.
9        MR. REARDON: No, we didn't, we never did
10   identify who did it; I didn't even have the
11   documents until last night.
12       MR. DAHM: He said he didn't know. The
13   documents may reveal that. If you want to ask him
14   about a document.
15       You say you have time constraints, don't go
16   over ground repeatedly. Do you want the same
17   question and same answer?
18 BY MR. REARDON:
19 Q. Would you answer the question?
20 A. I do not know who the chosen vendor was.
21 Q. Was the polishing process done in Puerto Rico?
22 A. I don't recall whether the -- the answer to that
23   may depend on what point in time you're speaking
24   of.
25       I don't recall whether the earliest

282

1    production of the stems was performed in
2    Puerto Rico or Warsaw. Later in the product life
3    they were polished in Puerto Rico and machining
4    was done in Puerto Rico.
5 Q. Would you agree that page 170, that you have
6    before you, on its last line at the bottom of the
7    page indicates that the project due date has
8    slipped to November of 1991 from August?
9 A. That's what this memo says.
10 Q. Okay. The due date, the language due date, does
11   that mean the shelf date, is that synonomous with
12   shelf date as you understand it?
13 A. That would be my assumption.
14 Q. And actually it was not placed on the shelf until
15   1992, is that correct?
16       MR. DAHM: Bob, we've been over this.
17       THE WITNESS: My understanding is we began to
18   sell them; they were on the shelf in 1992.
19       MR. REARDON: Okay. 190 through 193.
20       MR. DAHM: Through 193?
21       MR. REARDON: Yeah.
22       MR. DAHM: Two documents, is that what you
23   want?
24       MR. REARDON: Yes.
25       Remember any problems at all with the

283

1  delivery of equipment, the ultrasonic welding
2  equipment, in October as indicated, --
3       MR. DAHM: Wait.
4       MR. REARDON: -- as indicated, excuse me, I'm
5  not finished with my question, as indicated in the
6  memorandum of October 21st, 1991?
7       MR. DAHM: Well, that's not a question.
8  BY MR. REARDON:
9  Q. Do you remember it, that's the question.
10 A. I remember the process of our getting the
11    ultrasonic welder delivered from the vendors and
12    having been successfully tested at their site and
13    then brought to our site and installed. I don't
14    recall the dates of those occurrences, but I
15    recall it being one of the important
16    accomplishments of getting this implant
17    manufactured.
18 Q. Would you be so kind as to refer to 193, the last
19    of the three pages.
20        Do you see that timetable, the release
21    timetable?
22       MR. DAHM: That's actually the fourth page of
23  the two documents you gave.
24 BY MR. REARDON:
25 Q. Do you see the release timetable?

284

1  A. I see a release timetable memo.
2  Q. And that's to Don Patmore. Who's Don Patmore?
3  A. Don Patmore was an individual who was I believe at
4     that time responsible for manufacturing operations
5     that covered hip implants.
6  Q. Is he still with the company?
7  A. Yes, he is.
8  Q. How about Andy Anderson and Jim Crumley, who sent
9     the memo?
10      MR. DAHM: What about them?
11      MR. REARDON: Who are they, where do they
12  work?
13      MR. DAHM: Those are two questions.
14      MR. REARDON: That's right.
15      MR. DAHM: Form.
16      THE WITNESS: Andy Anderson, I believe, and
17  Jim Crumley, I believe also, were process
18  engineers working in manufacturing. I believe at
19  the time they worked for Don Patmore.
20 BY MR. REARDON:
21 Q. And would you agree that at this point,
22    October 29th, the welding equipment or attachment
23    of the PMMA spacers had not even been shipped to
24    Zimmer?
25 A. This memo talks about shipment in the future, so

285

1  it appears that October 29th that it had not
2  been shipped to Zimmer.
3  Q. Am I correct that when you looked at the brochure
4     that is Exhibit 11, that is the Zimmer Centralign
5     brochure, that that was copyrighted in 1991,
6     correct?
7  A. It appeared to be, yes.
8  Q. Okay. Would you agree that as of October 29th,
9     1991 that Zimmer had not yet successfully bonded
10    the teardrop centralizers to the femoral component
11    in their factory in Warsaw?
12      MR. DAHM: Form.
13      THE WITNESS: My understanding, as I can get
14  from this memo, is that on October 29th we did not
15  have the ultrasonic welding equipment in Warsaw.
16      MR. REARDON: You mentioned -- go ahead I'm
17  sorry, is there more?
18      THE WITNESS: So I would assume at this point
19  in time we were not welding implants in Warsaw.
20 BY MR. REARDON:
21 Q. You mentioned that there were criteria for bonding
22    that were determined and I asked you if they had
23    been changed.
24        Are those the push-off strength requirements
25    that you refer to, is that the criteria?

286

1  A. Yes.
2  Q. And the push-off strength requirements do you
3     recall were changed from 29 pounds to 8 pounds
4     because they would not adhere to 29 pounds, do you
5     recall that, sir?
6  A. No, I don't.
7  Q. Okay. I'm finished with those documents, thank
8     you.
9         Could you tell me who John Bonitati is?
10    B-o-n-i-t-a-t-i. Bonitati I believe is the
11    pronunciation.
12 A. John Bonitati. He was a product manager/marketing
13    person, I believe.
14 Q. Is he with the company at this time?
15 A. I do not know.
16 Q. Do you know whether the ultrasonic welding
17    equipment, as you described to be in the west end
18    of the Warsaw building, was in a clean room
19    environment?
20 A. It was in a clean environment. And it had a
21    protective hood around it, protective walls, and
22    it was a maintained clean environment. A semantic
23    argument whether you call it a room, but it was
24    enclosed and maintained to a microbiological
25    standard of clean air.

287

1 Q. Do you recall it being relocated in February of
2 1992, after the product was on the shelf, to a
3 clean room?
4 A. No, I do not recall.
5 Q. R2-208, please.
6     Would you agree that the minutes of the
7 meeting of February 17th, 1992 --
8     MR. DAHM: What document number, Bob?
9     MR. REARDON: 208. Says relocation of
10 ultrasonic equipment to the modular clean room has
11 been delayed until mid March pending completion of
12 clean air testing.
13 BY MR. REARDON:
14 Q. Does that refresh your recollection that the
15 ultrasonic welding equipment was relocated in
16 March to a modular clean room?
17 A. I have no recollection of moving of the machine.
18 Q. Do you know whether or not it was necessary for
19 the welding to take place of the PMMA spacers to
20 the femoral component in a clean room?
21 A. No, I do not.
22 Q. And according to documents that have been
23 provided, the pre-release meeting occurred on
24 January 17th, 1992.
25     Was that your understanding of the

288

1 approximate time that this product was released to
2 the shelf, in January of 1992?
3 A. My recollection was it was early '92. I don't
4 have a recollection it was January.
5 Q. Okay. Do you have any reason to disagree with a
6 memorandum that gives a release of January 17th,
7 1992?
8 A. No.
9 Q. So we're clear, sir, with respect to the VerSys as
10 compared to the Centralign, would you agree with
11 me that the VerSys cemented implant has no
12 centralizers attached to it?
13     MR. DAHM: Form.
14     MR. REARDON: I'll withdraw that.
15 BY MR. REARDON:
16 Q. Has no teardrop centralizers bonded to it?
17 A. It has no teardrop centralizers bonded to it.
18 Q. Would you agree that it's longer, as depicted in
19 your memorandum, the Dear Distributor memorandum,
20 than the Centralign?
21     MR. DAHM: Form.
22     THE WITNESS: We discussed yesterday the
23 comparison of implants on, I think it was,
24 Exhibit 8, and the comparison there of two stems
25 showed the VerSys one being longer.

289

1     MR. REARDON: Would you agree that it's not
2 as large in anterior-posterior dimension as the
3 Centralign is?
4     MR. DAHM: Form.
5     MR. REARDON: For the same size for the same
6 person?
7     MR. DAHM: Form.
8     THE WITNESS: I do not have recollection of
9 those dimensions.
10     MR. REARDON: Would you agree that the
11 Centralign has a greater offset than the VerSys?
12     MR. DAHM: Form.
13     THE WITNESS: I don't have recollection of
14 that.
15     MR. REARDON: Would you agree that the
16 Centralign has a larger collar than the VerSys?
17     MR. DAHM: Form.
18     THE WITNESS: I've not sat down and made
19 those detailed comparisons to implants.
20 BY MR. REARDON:
21 Q. All right. Let me show you the Dear Distributor
22 letter, which was marked yesterday, ask you some
23 questions about that, if I could, in a little bit
24 more detail. I'll give you Exhibits 8, 9, and 10,
25 which are the letters that were sent to the

290

1 distributors and to the physicians. Do you have
2 those?
3     Could you ensure that the numbers that I'm
4 going to be referring to match the numbers -- if
5 you could hand that back to me, so that we don't
6 have any misunderstanding.
7 A. (Witness doing so).
8 Q. Yes, they do. I have the same copies as you.
9     With respect to the Dear Distributor letter,
10 as I understand it from yesterday, this went out
11 to the people that are in the sales force,
12 correct?
13 A. This went to our distributors in the
14 United States.
15 Q. And I think you described those people yesterday
16 as the sales people, the independent reps that
17 were selling your product?
18 A. Yes, these are the people who own the businesses;
19 that independent reps, if you would, work for a
20 hierarchy.
21 Q. And they have an exclusive contract with Zimmer,
22 correct?
23     MR. DAHM: Form.
24     THE WITNESS: They exclusively distribute
25 our products.

291

BY MR. REARDON:
Q. Does that include Bristol-Myers Squibb products?
A. No, it does not.
Q. And if you go to 120-2, at the top of the page, that's page 2 of the distributor letter, in a box is a portion of a letter which starts Dear Zimmer Customer.
   Could you tell me who the customer is that you were referring to when you wrote your letter?
A. This letter and this box I believe abstracts sections from the Dear Customer letter, which is a different document.
Q. I understand that.
A. It's orthopedic surgeons.
Q. Okay. You wrote the Dear Customer letter, correct?
A. Yes.
Q. And this letter is explaining to distributors, as it says in its very first sentence, a letter that was authored by you, that was being sent to all previous Centralign users, right, the very first sentence?
A. Yes.
Q. Okay. Who are the customers here, are they physicians or are they patients?

292

   MR. DAHM: That's been asked and answered, Bob.
   MR. REARDON: I'm not sure it has been, I'm trying to understand.
   THE WITNESS: The Dear Customer letter went to orthopedic surgeons.
   MR. REARDON: Okay. You mentioned yesterday that your customers were hospitals, not surgeons.
      Are they surgeons or are they hospitals?
   MR. DAHM: Argumentative.
   THE WITNESS: The entity that purchases the item is a hospital. The person who implants the item is a surgeon.
BY MR. REARDON:
Q. When you wrote the letter to Dear Customers, you were writing to surgeons, is that right, not hospitals?
A. Well, the letter went out not -- I don't believe went out Dear Customer, it went Dear Doctor somebody, it was addressed to an individual. So this refers to a letter that was sent to individual surgeons.
Q. Did you ever send a letter to individual patients who were recipients of Zimmer Centralign prosthesis at any time to present?

293

A. No.
Q. On page 3 of the Dear Distributor letter there's reference made to a portion of your letter, again, in the box, in the middle of the page, it deals with the clinical experiences from two other centers demonstrate a 1.3 to 1.7% revision of the Precoat and Precoat Plus systems at a seven to ten year follow up. And then it goes on to say a third preliminary study reports a point 4% revision rate for Centralign hips followed up to five years. Let me ask you about these studies.
   First of all, with respect to the Precoat and Precoat Plus system study, that did not encompass, as you understand it, Dr. Crowninshield, any Centralign implants, correct?
A. The Precoat/Precoat Plus's studies were not.
Q. Did not include any Centraligns?
A. That is correct.
Q. With respect to the third study that you made reference to that reported a point 4% revision rate, who conducted that study?
A. That, I believe, is Dr. Richard White.
Q. Is that the study that you make reference to on the next page, 120-4?
A. Yes.

294

Q. And do you know if Dr. White's study, which is described on the next page, has ever been published in a peer review journal?
A. I don't recall if it's been published yet.
Q. Do you know if Dr. White has sought a publication in a peer review journal such as the Journal of Arthroplasty?
A. I do not know.
Q. According to your letter to the customers, in 1998 Dr. White in his preliminary report demonstrated good results with the Centralign hip.
   Have you received any further information from Dr. White since January of 1998 with respect to his results with the Centralign hip?
A. I'm not in receipt of any report, that I recall. I have talked to Dr. White about his results with the Centralign hip since then.
Q. Okay. And what has Dr. White told you?
A. That he continues to have good results with the device.
Q. Do you know if Dr. White implanted other hip prosthesis during the same period of time that he was implanting the Centraligns?
A. I don't believe he was exclusively implanting Centraligns. So, yes, I think he was implanting

Continuous Dep of Roy Crowninshield

                                                                295
1   other hip prostheses at the time.
2 Q. Do you know if he was using hip prosthesis that
3   were manufactured by other companies than Zimmer?
4 A. I do not know what his utilization of all hip
5   prosthesis are.
6 Q. In the next paragraph on page 4 of the Dear
7   Distributor letter the first sentence says: Many
8   surgeons have experienced success with the
9   Centralign system but have not seen a published
10  paper in an orthopedic journal.
11      This is not correct at this time, is it, sir?
12  There is now a published paper in an orthopedic
13  journal?
14 A. Yes.
15 Q. And that is the paper written by Dr. Sylvain,
16  Santore, and others?
17 A. That is not published.
18 Q. Are there any other papers that you are aware of
19  that have been published that are retrospective
20  studies of the success of the Centralign system?
21 A. No.
22 Q. Page 6 of the same letter, if I could ask you to
23  flip to it, sir.
24      The bottom of the page in the, again, in the
25  box, which would mean, as I understand it, that

                                                                296
1   that's part of the Dear Customer letter, correct?
2 A. Yes.
3 Q. That you wrote, right, you wrote the Dear Customer
4   letter?
5       MR. DAHM: Bob, we've been over this.
6       THE WITNESS: Yes.
7       MR. DAHM: Do you want to get out of here?
8       MR. REARDON: Thank you.
9 BY MR. REARDON:
10 Q. Number 3 indicates if cement fixation is chosen,
11  use the VerSys hip system cemented designs,
12  Heritage hip system, and CPT hip system may be
13  more suitable for a particular patient. These
14  three implant designs are larger than the
15  Centralign Precoat hip relative to their
16  respective rasps and may permit implantation of
17  a larger prosthesis. The size 1 or 2 Centralign
18  implant should only be utilized in patients with a
19  very small femoral anatomy and low body weight.
20      Could you tell me, sir, whether these larger
21  designs that you've discussed, these three larger
22  Centraligns which then are demonstrated by a
23  diagram that was included, whether or not those
24  larger designs that you mentioned also -- I'll
25  withdraw that, let me reword it, I apologize.

                                                                297
1       Could you tell me, sir, whether or not the
2   Harris Precoat had a larger design with a greater
3   metal cement interface area as did the VerSys,
4   Heritage, and CPT systems?
5       MR. DAHM: Form.
6       THE WITNESS: Yes, today in some documents I
7   think we reviewed an overlay that showed that the
8   Precoat prostheses was a longer stem. I've not
9   done a surface area calculation on it, but I
10  would presume that it had a larger surface area
11  of contact with bone cement, if that's your
12  question.
13      MR. REARDON: Yes.
14 BY MR. REARDON:
15 Q. If you go to 120-11, I think that that study was
16  done by you, or someone, and it's attached to the
17  Dear Distributor letter. Take a look at that.
18      Am I correct that the Precoat you referred to
19  on page 120-11 is the Zimmer Precoat which was on
20  the market in the 1980's before the Zimmer
21  Centralign was on the shelf available for use?
22 A. Yes, that is the prosthesis.
23 Q. And according to this material that was attached
24  to the Dear Distributor letter, there's a 38.6
25  greater surface area on the Precoat than there is

                                                                298
1   on the Centralign, correct?
2 A. For a small size -- a size small Precoat compared
3   to a size 1 Centralign.
4 Q. The smallest size in each, right?
5 A. I believe that is the smallest size in the
6   Precoat. Size 1 Centralign is the small size,
7   yes.
8 Q. So am I correct, sir, that the cemented implants,
9   both before and after the Centralign, had a
10  greater percentage surface area for a cement-metal
11  bonding than the Centralign?
12      MR. DAHM: Form.
13      THE WITNESS: The ones discussed in this
14  communication do.
15      MR. REARDON: Thank you.
16      Now, sir, with respect to the weight
17  restrictions that are mentioned, could you tell me
18  if whether the weight restrictions were always the
19  same during the time that this product was on the
20  market?
21      MR. DAHM: Form.
22      MR. REARDON: For the different sizes of the
23  Centralign?
24      MR. DAHM: Form.
25      THE WITNESS: When you say the weight

299

1    restrictions, are you referring a document?
2 BY MR. REARDON:
3 Q.  Yes, I will refer you a document if that'll help
4    you.
5        Let me ask you specifically whether you
6    recall in June of 1994 some changes in the
7    brochure with respect to weight restrictions for
8    various stem sizes?
9 A.  I don't recall that change.
10 Q. Okay. Do you recall any discussion of changing
11    the brochure with respect to maximum body weights
12    that occurred in 1994?
13 A. No, I do not.
14 Q. Let me call your attention to I19-32.
15        MR. DAHM: I don't have those handy, Bob.
16        MR. REARDON: I can show you.
17        I'll first of all show you R2-77, which
18    gives the design criteria for the Harris Ultra.
19    And I think from yesterday you'll agree that the
20    Harris Ultra was a name that was originally used
21    for what was finally decided to be the Centralign,
22    correct?
23        MR. DAHM: Form.
24        THE WITNESS: We saw previous communication
25    with the word Ultra on it.

300

1 BY MR. REARDON:
2 Q.  And would you agree with me that there were six
3    stem sizes in the original design criteria and
4    that the six stem sizes were determined to have
5    body weights of 170 for the number 1, or smallest
6    stem size, that's pounds; 194, the number 2 stem
7    size; 205 for the number 3 stem size, and so on?
8 A.  This document, which is a handwritten document, is
9    not dated, but talks about a design criteria which
10    I suspect is early on in the process in part
11    because of the early nomenclature on the name of
12    this device being the Ultra and talks about a
13    design criteria apparently as proposed or
14    discussed by somebody including those numbers.
15 Q. Okay. And let me show you R2-219.
16        Does that also talk of the same body weights
17    for the same sizes in the design of this now
18    called Next Generation Harris Cemented Implant?
19 A. This makes reference now to a mini and a small
20    size with 170, 190 pound body weight in a design
21    specification memo.
22 Q. All right. And then the number 2, let's take the
23    number 2 on the first document I showed you, 77,
24    and the small on the second document I showed you,
25    they have the same body weight, correct?

301

1 A.  Yes.
2 Q.  That's 190 pounds, right?
3 A.  Yes.
4 Q.  And in one case that's called a number 2 and
5    another case it's called a small, correct?
6 A.  Yes. And both of these documents are discussing
7    this body weight for the purposes of determining a
8    fatigue requirement for the mid stem fatigue test
9    with a particular orientation of applied load and
10    with requirement of ten million cycles of fatigue
11    testing, so it's a hip stem strength criteria for
12    the device.
13 Q. And do you know of any other testing with respect
14    to the maximum body weight that was done, other
15    than for fatigue testing?
16 A. Excuse me?
17 Q. Let me ask it a different way.
18        The people that have brought the lawsuits
19    here all are alleging, as you know, aseptic
20    loosening, correct, you understand that, right?
21 A. That's my understanding.
22 Q. Do you know what testing was done to discern what
23    body weight was appropriate to avoid aseptic
24    loosening? In other words -- if you don't
25    understand my question, I'll word it. Do you

302

1    understand it?
2 A.  Yes.
3 Q.  Okay, why don't you see if you can answer it,
4    then, please.
5        MR. DAHM: Form.
6        THE WITNESS: The laboratory testing of
7    aseptic loosening of a hip stem is a very
8    difficult area to investigate and I know of no
9    models that -- methodologies that predict aseptic
10    loosening. That is a clinical occurrence; that
11    the laboratory tests, you know, are not in any
12    absolute way predictable. There isn't testing
13    described here of aseptic loosening, this is
14    testing describing strength of a hip stem, not
15    aseptic loosening.
16 BY MR. REARDON:
17 Q. So the criteria for maximum body weight with
18    respect to a particular stem size, in this case
19    number 2, or a small, of 190 pounds as depicted on
20    the two memorandums that are before you, has been
21    determined for purposes of determining the
22    strength of the femoral component to avoid
23    fracture, right?
24 A. That's what these documents discuss.
25 Q. And that's what, when you undertook this testing,

```
                                              303
 1   the purpose of telling physicians that you should
 2   use a particular stem size for a particular
 3   maximum body weight was to avoid a fracture of the
 4   stem after it was inserted, right?
 5        MR. DAHM:  Form.
 6        THE WITNESS:  That would certainly be one of
 7   the implications of body weight.  I mean it, I
 8   think, is well established in orthopedic
 9   literature that, you know, body weight, and
10   activity, and age, and a number of other factors
11   do influence aseptic loosening of the hip stem, so
12   body weight is a factor in it.  Body weight is
13   clearly also a factor in potential fatigue and
14   fracture of the device itself.
15        MR. REARDON:  The standards, however, that
16   you reached with respect to the stem length and
17   the maximum body weight to be used for each stem
18   length that you then imparted to your customers,
19   the surgeons, was based upon the possibility of a
20   fracture, right?
21        MR. DAHM:  Form.
22        THE WITNESS:  It included the possibility of
23   fracture.
24        MR. REARDON:  Was there any other testing
25   that was done other than testing to determine
```

```
                                              304
 1   fatigue stress, that is fracture, the risk of
 2   fracture?
 3        MR. DAHM:  Form.
 4        THE WITNESS:  The testing that was done was
 5   for fatigue testing.
 6        Testing of aseptic loosening, you know,
 7   was not performed in a laboratory setting.  That
 8   is something which we rely upon clinical history
 9   with implants and the understanding that body
10   weight is, amongst other factors, an influence in
11   aseptic loosening.
12        MR. REARDON:  How would you be able to
13   determine, if the product had never been on the
14   shelf in 1991 or 1992 before it was placed into
15   human beings, what the standard would be for a
16   maximum body weight to avoid aseptic loosening?
17        MR. DAHM:  Form.
18        THE WITNESS:  The process of aseptic
19   loosening is a multi-factorial issue.  It involves
20   body weight, it isn't simply a standard of body
21   weight, but that is a consideration.
22   BY MR. REARDON:
23 Q.  Okay.  Let me show you 2-308, do you see that?
24     Would you agree with me that that also makes
25     reference to six stem sizes; and that in the case
```

```
                                              305
 1   of the second size, the second smallest size, the
 2   maximum body weight is 190 pounds, again?
 3 A.  Yes.
 4 Q.  Okay.  Now, that also carries that out and makes a
 5     determination of six times body weight, correct?
 6 A.  Yes.
 7 Q.  And tell me what your understanding is of the
 8     significance of using the six times body weight
 9     measure in order to determine the stem size.
10        MR. DAHM:  Form.
11        THE WITNESS:  Again, this refers to a fatigue
12   endurance test of ten million cycles that the mid
13   stem of this device was designed to withstand.
14 BY MR. REARDON:
15 Q.  All right.  And that six times body weight, where
16     does that criteria come from, if you know?
17 A.  That was a criteria that -- we have developed
18     criteria for strengths of hip stems at various
19     positions of the hip stem at the end of the --
20     ultimately it's an internal criteria but it's
21     based on a long history of development testing of
22     implants, review of the literature, and an
23     engineering standard that we've utilized within
24     the department for hip stems.
25 Q.  Have you heard of Dr. Noble's six times body
```

```
                                              306
 1     weight standard?
 2        MR. DAHM:  Form.
 3        THE WITNESS:  No.
 4 BY MR. REARDON:
 5 Q.  Okay.  Let me show you -- to save time I'll just
 6     hand him I19-32, which is dated June 14th, 1994.
 7        Are you familiar with that memorandum, have
 8     you seen that before today?
 9 A.  I don't recall that I've seen this before.
10 Q.  Okay.  And for stem sizes 1 and 2, could you tell
11     me what it indicates as the maximum body weight to
12     be used?
13 A.  This says 170 pounds.
14 Q.  Okay.  Do you know, and I believe that memorandum
15     indicates, does it not, that the brochure, that is
16     to a proposed change in the brochure, that would
17     go with the product?
18        MR. DAHM:  It says package insert, Bob.
19 BY MR. REARDON:
20 Q.  The package insert, I'm sorry, terminology,
21     package insert to go with the product, right?
22 A.  This memo addresses the design of the package
23     insert.
24 Q.  And do you know why the package insert in 1994,
25     which came out in August, added the language that
```

307

1  is proposed in the June 14th, '    memorandum?
2 A.  I don't have a specific recollection as to why it
3     was added.
4 Q.  Do you know whether it had anything to do with
5     aseptic loosening?
6 A.  I suspect, as this reads, that the proper function
7     of the hip stem can be compromised if a patient
8     exceeds the recommended body weight and engages in
9     high levels of physical activity or does not
10    comply with the post-operative restrictions that
11    that function of the hip would include aseptic
12    loosening.
13 Q. Would it include fracture, or aseptic loosening,
14    or both?
15 A.  It potentially includes both.
16 Q. Would it include anything else that you can think
17    of?
18 A.  It could affect articular surface wear, function
19    of the acetabular reconstruction, other aspects of
20    the total hip reconstruction.
21 Q. Would you agree that for a stem size number 2 that
22    the maximum body weight restriction was reduced,
23    in 1994, from 190 pounds to 170 pounds?
24       MR. DAHM:  Form.
25       MR. REARDON:  I'll allow you to answer.

308

1        MR. DAHM:  Thank you.
2        MR. REARDON:  No, I don't understand what's
3     wrong with the form, but.
4        THE WITNESS:  This memo suggests that it be
5     170 pounds in the package insert.
6 BY MR. REARDON:
7 Q.  Well, I've given you three or four documents,
8     though, already that have showed a stem size 2
9     having a maximum body weight of 190 pounds, you've
10    seen those, right?
11 A.  Yes, and none of those were no package inserts.
12 Q.  Do you know whether or not there was ever any
13    maximum body weight included in any package
14    inserts before August of 1994?
15 A.  I don't recall the package insert part of 1994.
16 Q.  All right.  Let me show you R12-17.
17       Do you recognize that as the package insert
18    that was put out in September of 1993?
19 A.  Yes.
20 Q.  And does that have any warnings in it regarding
21    the weight restrictions for a certain stem size?
22       MR. DAHM:  Form.
23       THE WITNESS:  This document refers to --
24    makes reference to the smallest -- the smallest
25    sizes in heavy or physically active patients that

309

1     are particularly at risk.  It does not refer to a
2     particular body weight.
3 BY MR. REARDON:
4 Q.  Let me show you what's R12-25, which is an
5     August 1994 package insert.  I'll call your
6     attention to the warning section of that package
7     insert.
8        Is it the same as the July 14th, 1994
9     memorandum that I've previously shown to you which
10    proposed the package insert change?
11 A.  In the first package insert --
12       MR. DAHM:  Bob, what's the question again,
13    I'm sorry?
14 BY MR. REARDON:
15 Q.  The question is I showed you earlier a July 14th,
16    1994 memorandum.  If you look underneath the
17    papers that you have there, you looked at it, it
18    has a table, it indicates maximum body weights on
19    it and it indicates for stem size 1 and 2, 170
20    pounds.
21       I'm asking you if that's now
22    incorporated in the August of 1994 package insert?
23 A.  That body weight table's incorporated in the 1994.
24 Q.  Would you agree with me that before that package
25    insert was -- that particular warning was

310

1     incorporated in the package insert, there was no
2     specific discussion of what stem size was
3     appropriate for a maximum body weight, such as the
4     June of '94 memorandum proposed?
5 A.  The previous document refers to, in fact, on the
6     first page, talks about heavy patients and makes
7     reference to 125 pounds, which is -- 225 pounds
8     which is in the table of the later document for
9     the larger sizes.  And then the earlier document
10    doesn't make reference to specific body weights
11    by size but does contain a statement that
12    suggests that, you know, heavy and physically
13    active patients are particularly at risk with the
14    use of smaller implant sizes, so.
15 Q.  So the table wasn't in --
16 A.  The table was not in the previous document.
17 Q.  Okay.  Now, that having been said, why was it
18    decided to put the table in that came out with the
19    package insert of August of 1994?
20       MR. DAHM:  Form.
21       THE WITNESS:  The revised package insert
22    brings greater specificity to issues that are
23    raised in the earlier one, so it makes it more
24    specific in terms of recommendations.  And I
25    believe it was revised to make it more specific.