311

1  BY MR. REARDON:
2  Q. What caused Zimmer to revise its package insert to
3     add the language that is proposed in the
4     July 14th, 1994 memorandum?
5  A. As I previously said, I don't recall being
6     involved in the discussion, I was not copied on
7     the memo, the revision of it, so I was not
8     directly involved in the discussion that led to
9     the package insert change, that I recall.
10 Q. Do you know whether or not it had to do with
11    fatigue testing that occurred in a fracture that
12    occurred in the laboratory setting?
13 A. No, I do not.
14 Q. Do you know whether it had anything at all to do
15    with aseptic loosening?
16       MR. DAHM: Asked and answered.
17 BY MR. REARDON:
18 Q. Well, you weren't involved in it, right?
19 A. I was not involved in the discussion that led to
20    the revision of the package insert.
21 Q. So you can't provide me any information as to why
22    the revision took place, is that fair to say?
23 A. Yeah, I do not have specific information as to why
24    it occurred.
25 Q. Thank you.

312

1        At about the same time as the July 14th, 1994
2     memorandum, do you recall discussion of increasing
3     the height of the centralizers from 1.5
4     millimeters to 2.5 millimeters?
5  A. I recall a discussion of doing that; I don't
6     recall the dates of them.
7  Q. Let me show you this document, which is I7-1294.
8        MR. DAHM: Bob, are we finished with these?
9        MR. REARDON: Yeah, if you could return them
10    to me, those are my copies.
11       MR. DAHM: Yeah, I know.
12       MR. REARDON: Thank you.
13       MR. DAHM: You're welcome.
14 BY MR. REARDON:
15 Q. Have you had a chance to look at the memorandum?
16 A. Yes, I have.
17 Q. And does that refresh your recollection with
18    respect to the date, or approximate date, that the
19    centralizers were changed from a 1.5 millimeter
20    height to a 2.5 millimeter height?
21 A. This is June of 1994 and this memo discussing the
22    evaluation of prototypes with a change in the
23    centralizers, so it would imply to me that some
24    time after this point in time the centralizers
25    were changed.

313

1  Q. Can you tell me whether or not the change in the
2     height of the centralizers that was being
3     considered in June of 1994, according to that
4     memorandum, had anything to do with the change in
5     the package insert in June of 1994 to provide
6     surgeons with a warning regarding weight
7     restrictions?
8        MR. DAHM: Well, form, as to that last part,
9     Bob.
10       THE WITNESS: The changes in the centralizers
11    were performed to help in the centralization
12    process of the implant. I don't know of any
13    association between that and the weight
14    restriction discussion we just had.
15 BY MR. REARDON:
16 Q. With respect to the centralizers, they're in the
17    brochure and you can look at Exhibit 11, the
18    brochure, perhaps the easiest way to call your
19    attention to the representations, there is a
20    diagram on the fourth page, the bottom of the
21    page, which compares round positioners to the
22    so-called arrow dynamic shape of the Centralign
23    centralizers.
24       Do you know what testing, can you tell me
25    what testing was done to determine that, in fact,

314

1     the arrow dynamic shape of the Centralign
2     centralizers facilitates cement flow and reduces
3     the possibility of bubbles in the cement mantle?
4        MR. DAHM: Form.
5        THE WITNESS: I don't recall what testing was
6     performed.
7  BY MR. REARDON:
8  Q. Do you know if any was performed?
9  A. I don't recall the testing.
10 Q. Well, is your testimony that there was none or
11    that you don't know whether there was or not?
12 A. I don't recall testing of that, so I can't say
13    that there was none.
14 Q. Okay. I've looked through the materials that have
15    been provided to us regarding testing, and the
16    only testing I'm finding that is documented in the
17    materials with respect to the femoral component is
18    fatigue testing.
19       Do you have any other testing you recall that
20    was done on this femoral component with respect to
21    the centralizer spacers, other than -- I'll
22    withdraw that.
23       I'll just make it simple: do you have any
24    recollection whatsoever of any testing that was
25    done on the centralizer spacers when bonded to the

Page 315

1 Centralign femoral component to determine whether
2 or not, in fact, the spacers reduced bubbles in
3 the cement mantle, as compared to a round spacer?
4 A. I don't recall any testing.
5 Q. Okay. On what basis was that representation then
6 made in the brochure which is before you?
7     MR. DAHM: Form.
8     THE WITNESS: I didn't write the brochure;
9 I'm not knowledgeable of its origin.
10 BY MR. REARDON:
11 Q. Who wrote the brochure?
12 A. This is a product brochure that would have come
13 from the marketing area.
14 Q. Okay. So that representation that is contained
15 in the brochure which describes smooth, even
16 cement flow, uniform cement mantle with increased
17 thickness and so on, that entire page that is
18 before you which starts out simplified, accurate
19 alignment improves stress distribution, that was
20 written by marketing people, it was not written by
21 engineering people, is that correct?
22     MR. DAHM: Form.
23     THE WITNESS: That part of the brochure is
24 the responsibility of the product management
25 marketing people, they're origin of the material.

Page 316

1 BY MR. REARDON:
2 Q. Okay. Well, then I'll ask the marketing man about
3 it then, thank you.
4     Do you know of any retrospective studies that
5 are currently under way of the aseptic loosening
6 rate of the Centralign femoral component?
7 A. I have heard a presentation of a retrospective
8 study of the Centralign, by Dr. Lakavitch
9 (phonetic).
10 Q. How do you spell his name?
11 A. I don't know.
12 Q. Where is he located?
13 A. South Carolina. No, excuse me, Chapel Hill, is
14 that North Carolina or South Carolina?
15 Q. That's University of North Carolina. I seem to
16 find my way to my daughters. One is at the
17 University of North Carolina Medical Center or the
18 other is in Burlington, Vermont.
19     I assume that Dr. Lakavitch, is the
20 pronunciation, is at the University of
21 North Carolina Medical Center?
22 A. I believe so, it's in that area. He may be in
23 private practice, but I believe he's at the
24 university.
25 Q. And he's an orthopedist?

Page 317

1 A. Yes, he is.
2 Q. Tell me what you've heard from Dr. Lakavitch about
3 his retrospective study of the Centralign.
4 A. That he had, I don't recall the numbers, but it
5 was a very positive report, rather low incidence
6 of aseptic loosening. It was a significantly long
7 period of time, I think he was a fairly early user
8 of the Centralign so it was a significant
9 follow-up period and a positive report upon the
10 performance of that in his practice.
11 Q. When was this report -- when did you hear this
12 report?
13 A. I've heard an oral presentation of it a year ago.
14 Q. Where?
15 A. At a hip society meeting.
16 Q. Do you remember where the hip society meeting was?
17 A. San Diego. No, excuse me, I didn't hear him. I
18 heard him -- excuse me, I heard him get up and
19 cite his data in response in the discussion to
20 somebody else's discussion of hip stems. So I
21 heard -- that was not, excuse me, that was not a
22 presentation he made but it was part of a lengthy
23 discussion.
24 Q. So he stood up in response to someone who was
25 reporting some adverse results?

Page 318

1     MR. DAHM: Form.
2 BY MR. REARDON:
3 Q. Is that correct?
4 A. He got up and it was part of a discussion on
5 cemented hip stems, and he offered data in his
6 discussion.
7 Q. Okay. Tell me who was making the presentation
8 that resulted in Dr. Lakavitch standing up and
9 reporting orally on his experience.
10 A. I believe that was Dr. Santore.
11 Q. And that was last year?
12 A. I think it was a year ago.
13 Q. Do you know if Dr. Lakavitch's data has been
14 published anywhere?
15 A. No, I do not.
16 Q. Do you know if an abstract of his data was ever
17 presented at any professional meetings?
18 A. I believe an abstract was published. And now that
19 I recall this is where I think I did hear him
20 speak, at the Eastern Orthopaedic Association
21 meeting, which would have been this year. And I
22 think there was an abstract of that meeting
23 published.
24 Q. So that would have been in 2001?
25 A. Yes.

### Page 319

1 Q. And you don't know what month?
2 A. It was earlier this year, first half of the year:
3    my recollection.
4 Q. Okay. Do you have a copy of that abstract?
5 A. I might; I don't know.
6 Q. Where was the meeting, do you remember?
7 A. Idaho.
8 Q. Any other retrospective studies you're aware of
9    that are presently underway?
10 A. We previously spoke of Rick White's experience.
11 Q. Do you know if that's presently underway, that's
12    what I'm asking?
13 A. Rick White is a very active investigator. He
14    follows his patients quite broadly, so I think
15    it's fair to assume that Rick continues to follow
16    his patients as such as an active study underway.
17 Q. Any others that you're aware of?
18 A. No.
19 Q. Are you aware of a study that's being undertaken
20    by the Mayo Clinic?
21    MR. DAHM: Form.
22    THE WITNESS: I'm not aware of a study, no.
23    MR. REARDON: Dr. Santore mentioned the
24 Mayo Clinic undertaking a study, in his
25 deposition, do you recall that?

### Page 320

1    MR. DAHM: What, do you recall the testimony,
2 is that what you're asking, Bob?
3    MR. REARDON: I'm asking him if he read the
4 deposition, does he remember -- I'm trying to
5 refresh his recollection with respect to the
6 Mayo Clinic.
7    Do you remember Dr. Santore mentioning
8 that there was some adverse experiences at the
9 Mayo Clinic that were being documented?
10    MR. DAHM: Form.
11    THE WITNESS: I don't know if I recall it
12    from his deposition.
13 BY MR. REARDON:
14 Q. Do you know Dr. Berry?
15 A. Yes, I do know Dr. Berry.
16 Q. And have you discussed the Centralign with
17    Dr. Berry?
18    MR. DAHM: Form.
19    THE WITNESS: I may have discussed the
20    Centralign with Dr. Berry. I've certainly
21    discussed many things with Dr. Berry.
22    MR. REARDON: Has Dr. Berry ever discussed
23    with you a high failure rate due to aseptic
24    loosening that he's found in his patients at the
25    Mayo Clinic?

### Page 321

1    MR. DAHM: Form.
2    THE WITNESS: He may have. I'm trying to
3    recall whether we specifically talked about
4    Centralign implants with Dr. Berry. I may have.
5    I don't recall ever seeing any data. I've not
6    seen any presentation, I don't know of any
7    abstracts. Not that I recall, no.
8 BY MR. REARDON:
9 Q. You know Dr. Schmalzried, right? I think that's
10    the correct pronunciation, that's an
11    extraordinarily difficult name to pronounce.
12 A. Schmalzried.
13 Q. Schmalzried. Do you know him?
14 A. Yes, I do.
15 Q. And you're familiar with his peer review article
16    regarding debonding?
17 A. Yes.
18 Q. And do you agree that debonding carries a poor
19    prognosis with a rough stem surface because of
20    abrasive wear?
21    MR. DAHM: Hold on a second, Bob.
22    If you're going to get -- as we told you
23    before the deposition some weeks ago, this is not
24    the time to get into expert opinions.
25    Dr. Crowninshield may or may not be one of our

### Page 322

1    experts. If he is, you can inquire about general
2    expert opinions.
3    This is the time to talk to him as a
4    30(B)(6) witness. So if you want to get that
5    material, --
6    MR. REARDON: Let's approach the same thing
7    from a different direction.
8    Do you believe that the cement mantle
9    with a roughened surface, based upon the
10    development of the Centralign, has an increased
11    risk of the abrasiveness of the roughened surface
12    causing particulates to develop?
13    MR. DAHM: Hold up.
14    Bob, you're asking opinion testimony of
15    this witness apart from -- if you want to talk
16    about documents, we have documents here, you said
17    you got manufacturing records.
18    MR. REARDON: I'll get the documents if that
19    saves time.
20 BY MR. REARDON:
21 Q. Do you recall that being discussed during the
22    development of the Centralign, the problem with
23    the roughened surface and the particulates that
24    developed from the roughened surface?
25 A. I don't recall it being discussed in the

323
1  development of the Centralign.
2 Q. At the time the Centralign was developed, were you
3    aware that that was a recognized affect of the
4    roughened surface?
5       MR. DAHM: Form.
6       THE WITNESS: I don't recall recognition or
7    discussion of that at that time.
8 BY MR. REARDON:
9 Q. Well, the Harris or the Zimmer Precoat had a
10    roughened surface, correct?
11 A. As we previously discussed, the surfaces are
12    prepared by grid blasting for the purposes of
13    attaching -- enhancing the attachment of the bone
14    cement precoat layer to the prosthesis.
15 Q. And the roughened surface on the Zimmer Precoat
16    was roughened in the same manner as the roughened
17    surface on the Centralign, correct?
18 A. Yes.
19 Q. The roughened surface on the VerSys, if it's
20    called a roughened surface, the surface of the
21    Centralign is different from the surface of the
22    VerSys in terms of the roughening process,
23    correct?
24       MR. DAHM: Form.
25       THE WITNESS: There are, you know, some

324
1  aspects of the VerSys surface finish that have
2    similarities and perhaps are the same as the
3    Centralign, and there are some aspects of the
4    VerSys that are not the same, and --
5       MR. REARDON: Well, let me show you Exhibit
6    14 and Exhibit 11.
7       I think you and I can agree that the
8    proximal surface of the VerSys, which is on
9    Exhibit 14, has a different type of roughened
10    surface than the proximal surface of the
11    Centralign, which is Exhibit 11, right?
12       MR. DAHM: Form.
13       THE WITNESS: We have a semantic
14    misunderstanding.
15       Roughening I would choose to use as a
16    microscopic sort of roughening, irregular sort of
17    roughening. And there's a large variation of
18    conditions and intense of roughening on implants
19    from extremely rough implants to extremely smooth
20    implants.
21       What you're referring to is called a
22    texturing. So it's a microscopic texturing of the
23    prostheses, and there's the difference in
24    texturing of these two prostheses. The underlying
25    roughening of the precoat is very similar.

325
1       MR. REARDON: All right. I'm sorry for the
2    mistaken nomenclature here.
3       The texturing of the VerSys is not as intense
4    or not as aggressive, so to speak, as the
5    texturing of the Centralign, correct?
6       MR. DAHM: Form.
7       THE WITNESS: It is different. I don't know
8    what intensive or aggressive means. There are
9    different geometry macrotextures of the surfaces.
10       MR. REARDON: I think the pictures speaks for
11    themselves as to the differences. I don't think
12    you need to be a scientist.
13       MR. DAHM: Is that an argument or do you want
14    to continue with a legitimate question, Bob?
15 BY MR. REARDON:
16 Q. Let me ask you why the texturing of the VerSys is
17    different from the texturing of the Centralign.
18 A. It is intended to perform a similar function, that
19    is to provide interdigitation of bone cement into
20    the surface relief of the implant. There are
21    quite a variety of surface texturing methodologies
22    that have been used on implants by Zimmer and by
23    other people that are produced by different
24    methods they have different manufacturing
25    proficiencies. It was chosen to go to a more

326
1  dimpled appearance on the Centralign -- excuse me,
2    on the VerSys implant than compared to the
3    Centralign, it utilizes different manufacturing
4    methodology.
5 Q. Why was it chosen to go to a dimpled appearance?
6       MR. DAHM: Bob, --
7       MR. REARDON: What's the different scientific
8    benefit of the dimpled appearance versus the
9    appearance of the texturing on the Centralign?
10       MR. DAHM: Would you show me in your notice
11    where it's noticing the VerSys system? I've
12    allowed a little bit of latitude.
13       MR. REARDON: I'm sorry, I didn't hear you.
14       MR. DAHM: Will you show me in your notice
15    for this 30(B)(6) deposition for the questions
16    about the VerSys system, which item is that in
17    here?
18       It's not in here. I've given you quite
19    a bit of latitude.
20       MR. REARDON: I don't know --
21       MR. DAHM: I didn't interrupt you, don't do
22    it to me.
23       I've given you quite a bit of latitude.
24    You keep saying over and over again how you want
25    to get through. Ask him why this particular



327

1  design was chosen for the Centralign. That's
2  legitimate inquiry per this notice, the VerSys
3  system is not. If you want to ask him about the
4  Centralign, let's get at it.
5       MR. REARDON: Are you finished?
6       MR. DAHM: Yeah, I stopped.
7       MR. REARDON: Okay, now it's my turn.
8       I intend to ask him about the VerSys
9  system because the VerSys system, according to all
10 of the materials that I've been provided with,
11 written as well as the testimony of this witness,
12 replaced the Centralign system in 1998. And if
13 the VerSys system replaced the Centralign system,
14 it is appropriate for me to ask questions about
15 why the Centralign system was a failure in my view
16 and the view of my experts and why it became
17 necessary in 1998, ultimately after years of
18 recognizing the failure, or failing to acknowledge
19 the recognized failure before it finally was
20 acknowledged, and the VerSys system, which was
21 under development, was in place. In other words,
22 to put it —
23      MR. DAHM: Well, —
24      MR. REARDON: Let me finish, okay, you had
25 your turn.

328

1       In other words, to put it in very direct
2  terms, the VerSys system replaced the Centralign
3  system. The VerSys system was in development in
4  1996, 1997, and in 1998. By 1996 and 1995, and
5  perhaps maybe in 1994, memorandums were being sent
6  out to modify the package insert and add a
7  centralizer, it was already recognized that this
8  particular product was a failure. However, the
9  company failed to replace the product or pull it
10 off the market until 1998 because the VerSys
11 system wasn't in place.
12      And that's fair game with respect to why
13 I am inquiring about this particular failed
14 product.
15      MR. DAHM: No, it's not. And leave your
16 adhominem aside for a second. If you have
17 questions about the Centralign, we'll continue.
18 If your questions are remaining on the
19 VerSys, —
20      MR. REARDON: Let's continue. I have several
21 more questions, so let's finish.
22          - - -
23 A brief recess was taken from 10:39 to 10:41.
24          - - -
25      MR. REARDON: Doctor, would you agree that

329

1  the debonding of the cement mantle from these
2  metal interface was something that was a concern
3  during the development of the Centralign?
4       MR. DAHM: Form.
5       THE WITNESS: The process and concept of
6  precoating of prostheses is to enhance that
7  bonding. So in the development of the Centralign
8  implant, we were interested in enhancing the bond
9  of bone cement attachment to the surface of the
10 prostheses compared to a device that was not
11 precoated.
12 BY MR. REARDON:
13 Q. And with respect to the roughened surface, sir,
14    was the roughened surface, the microscopic
15    roughened surface and the texturing, were both of
16    those aspects of the femoral component designed to
17    enhance the cement-metal interface bond?
18 A. Yes.
19 Q. And would you agree with me that in retrospect the
20    combination of the cement, the roughened surface
21    with loosening, some loosening — I'll withdraw
22    that and reword it.
23       Would you agree with me that Dr. Schmalzried,
24    I believe is the pronunciation, forgive me if
25    I've pronounced it wrong, has found that the

330

1  roughened surface on the Centralign causes an
2  increased or advancement of the loosening, the
3  aseptic loosening once it starts because of the
4  particulates that are caused by the roughened
5  surface?
6       MR. DAHM: This witness today is not going to
7  comment about other papers to give opinions, Bob.
8       MR. REARDON: I'll withdraw the other paper.
9       Would you agree, sir, in retrospect that
10 the roughened surface on the Centralign causes an
11 increased or advancement of the loosening once it
12 commences?
13      MR. DAHM: Form.
14      THE WITNESS: I don't know that it causes
15 advancement of the loosening of the prostheses.
16 It is there to enhance the attachment consistent
17 with the surgical philosophy to achieve bonding of
18 the bone cement to a femoral component.
19      MR. REARDON: Would you agree that in
20 retrospect that the roughened surface on the
21 Centralign femoral stem causes particulates to
22 develop when the stem is loosening?
23      MR. DAHM: Form. And, Bob, you're getting
24 into opinion testimony. We're not going to do
25 that today.

331

1  MR. REARDON: No, I'm not.
2  MR. DAHM: If you want to ask him about
3  Centralign development design, per the notice, ask
4  him, this the last question on that.
5  MR. REARDON: Go ahead and answer the
6  question please, Doctor.
7  THE WITNESS: Please restate it.
8  MR. REARDON: Why don't you read it back,
9  please.
10     - - -
11  Whereupon the record was read back by the
12  reporter.
13     - - -
14  MR. DAHM: Form.
15  THE WITNESS: When a roughened femoral
16  component is loosened and is moving relative to
17  bone cement, there can be a tendency to produce
18  particulate bone cement at that interface.
19  MR. REARDON: Thank you.
20      In November of 1993, according to the
21  materials I've provided, the distal hole was added
22  on the Centralign.
23      Do you recall the distal hole being
24  added to the tip of the Centralign?
25  MR. DAHM: Form.

332

1  THE WITNESS: We talked about that yesterday,
2  I don't recall a distal hole being added. We had
3  an example that has a distal hole. When it
4  occurred, I do not recall.
5  MR. REARDON: Do you recall that it was
6  added?
7  MR. DAHM: Bob, he just answered that
8  question.
9  BY MR. REARDON:
10 Q. Let me show you I7-1228.
11      Does that refresh your recollection?
12 A. This is a memo from November of '93 that talks
13     about adding a distal hole to size 2 through 6 of
14     the Centralign.
15 Q. Could you tell me why the distal hole was added,
16     for what purpose?
17 A. As we discussed yesterday, to receive a different
18     style centralizer that utilizes the distal hole
19     for fixation to the stem.
20 Q. So having looked at I7-1228, would you agree that
21     before November of 1993 the Centralign implants,
22     sizes 1 through 6, were being produced and sold
23     without a distal hole?
24  MR. DAHM: Form.
25  THE WITNESS: It would appear that if it was

333

1  added as a change, then prior to that there was no
2  distal hole.
3  MR. REARDON: Do you know what testing was
4  done in November of 1993, or for that matter at
5  any time, by Zimmer, regarding the affect that the
6  distal hole had on the cement mantle in the
7  development of air bubbles?
8  MR. DAHM: Form.
9  THE WITNESS: We had, at that time, a ten
10  year clinical history of implants with, I believe
11  it was ten years, thereabouts, distal holes on the
12  devices. And we had that clinical experience and
13  knowledge behind us at the time that we put the
14  hole in this device apparently.
15  MR. REARDON: When you put the hole in this
16  device, could you tell me if you were aware of any
17  testing that occurred to determine whether or not
18  the addition of the distal hole would create air
19  bubbles?
20  MR. DAHM: Form.
21  MR. REARDON: In the cement mantle?
22  MR. DAHM: Same.
23  THE WITNESS: I think the clinical experience
24  documented the performance of distal holes in
25  prostheses.

334

1 BY MR. REARDON:
2 Q. Would you agree that, from your clinical
3    experience that you've described, over ten years,
4    that the introduction of a distal hole into the
5    femoral stem increases the risk of air bubbles?
6 A. It has been reported that an air bubble may form
7    at the distal tip of the prostheses associated
8    with a hole that is not occupied by a centralizer
9    or not occupied by bone cement.
10 Q. And would you agree with me that in development of
11    the Centralign prosthesis right through to the
12    time that it was taken off the market in 1998,
13    that a very important aspect of the engineering of
14    that prosthesis formal stem was to ensure that the
15    cement-metal interface bonding was secure without
16    air bubbles?
17  MR. DAHM: Form.
18  MR. REARDON: To the greatest extent
19  possible?
20  MR. DAHM: Form.
21  THE WITNESS: As I previously described, we
22  were interested in bone cement attachment adhesion
23  to the surface of the implant. The air bubble,
24  typically the singular air bubble on some
25  occasions, has been reported to occur at the

335

1  distal tip of the prostheses. We were familiar
2  with it at the time, and it didn't change the
3  design objectives of this implant.
4      MR. REARDON: Okay. In retrospect do you
5  believe that it's more difficult to obtain a
6  Harris A grade cement mantle with centralizers in
7  a roughened surface as was designed on the Zimmer
8  Centralign?
9      MR. DAHM: Bob, he's not answering opinion
10 testimony today.
11     If you have questions about the stack of
12 documents in front of you, get at it. If you
13 don't, then we're done.
14     MR. REARDON: From your statement am I
15 correct that he will not be an expert witness
16 then?
17     MR. DAHM: Bob, how many times do we have to
18 go over ground with you?
19     MR. REARDON: I just —
20     MR. DAHM: Let me finish, let me finish.
21     I wrote you a letter —
22     MR. REARDON: Don't lecture me, just talk,
23 but you don't have to lecture me, sir.
24     MR. DAHM: Bob, I wrote you a letter. I made
25 it very clear that this is not the time for Zimmer

336

1  to designate experts.
2      MR. REARDON: Please don't point your finger
3  in my face.
4      MR. DAHM: I'm not pointing my finger at
5  your face.
6      MR. REARDON: Put your hands down, sir.
7      MR. DAHM: Bob, if you want to leave, you can
8  leave. I will make the record.
9      I wrote you a letter. I said this is
10 not the time to ask opinions of Dr. Crowninshield.
11 If and when it comes to our time for designation
12 of experts and if we decide to designate
13 Dr. Crowninshield as an expert, then and only then
14 is it your opportunity to ask him these kinds of
15 questions.
16     Do you remember that letter I sent you?
17     MR. REARDON: No. But whether I remember it
18 or not, I'll have my chance now to respond to you
19 if you're finished. Are you finished?
20     MR. DAHM: Yeah.
21     MR. REARDON: Okay, thank you.
22     I designated Dr. Crowninshield as an
23 individual deponent as well as a 30(B)(6)
24 deponent. There have been any number of
25 deposition notices that would have been issued.

337

1  There have been any number of discussions about
2  the fact that I expected him to produce documents
3  as an individual as well as the documents that
4  were produced under 30(B)(6). And you mustn't
5  remember those either. So I don't remember your
6  letter and you mustn't remember what I told you,
7  but that's my recollection, sir. And I'm here to
8  depose Dr. Crowninshield as an individual as well
9  as pursuant to Rule 30(B)(6). And I think the
10 earlier notices of deposition will so indicate.
11     MR. DAHM: Will you hand me Exhibit 1,
12 please.
13     MR. REARDON: I know what Exhibit 1 says, you
14 don't have to read it to me, I wrote it.
15     MR. DAHM: This deposition, pursuant to
16 Exhibit 1, or as noticed by the fifth re-notice,
17 please take notice that pursuant to Rule 30(B)(6)
18 of the Federal Rules of Civil Procedure, —
19     MR. REARDON: Thank you, sir, you don't have
20 to read the exhibit to me, it's in evidence.
21     MR. DAHM: Bob, —
22     MR. REARDON: What I suggest, sir, I'm
23 finished with this, I want to question the
24 witness, I don't want to get a lecture.
25     What I suggest is that if you would be

338

1  so kind as to provide me with dates for
2  Dr. Crowninshield's individual deposition, I
3  intend to take it if you're going to limit my
4  testimony today in that regard.
5      MR. DAHM: The plaintiffs in the above matter
6  will take the deposition upon oral examination
7  pursuant to Rule 30(B)(6).
8      MR. REARDON: If your position, sir, is that
9  this is a 30(B)(6) deposition only, I'm requesting
10 at this time another date to continue the
11 deposition of Dr. Crowninshield as an individual
12 witness. And I would ask him at that time to
13 produce any documents he has in his personal file
14 regarding the Centralign hip implant.
15     And let's continue with the 30(B)(6)
16 deposition because that's your position and I
17 don't mind coming back, sir. As I explained to
18 you yesterday, I'll be back again, and again, and
19 again. You don't understand: I'm not going to go
20 away, I'm going to get the information that I'm
21 entitled to.
22     Let's continue with the deposition.
23     Could you describe to me all of the
24 testing procedures that were undertaken in the
25 development of the Centralign femoral component to

Page 339

1  determine the quality of adherence of the PMMA
2  clear coat to the metal interface?
3      MR. DAHM:  Form.
4      THE WITNESS:  As we've previously discussed,
5  the PMMA precoating and its application to this
6  hip stem in the preparation of the surface to
7  which it is applied and the material of the stem
8  is all consistent at that point in time ten years
9  or so of previous product development, process
10 development, and clinical use.
11     We've characterized the PMMA precoating
12 in a variety of mechanical tests and biological
13 tests demonstrating an adhesion property of the
14 PMMA precoating to metal prostheses.  And that
15 history of technology, development, and
16 utilization was incorporated and useful in the
17 basis of the Centralign implant.
18 BY MR. REARDON:
19 Q. All right.  You mentioned ten years and I assume
20    what you're referring to is the Zimmer Precoat
21    during that ten years, correct?
22 A. That would be one of the devices.
23 Q. Okay.  Was the Zimmer Precoat the first hip
24    implant femoral component that was ever
25    manufactured by Zimmer that had a PMMA precoat on

Page 340

1     the stem?
2  A. No.
3  Q. What other hip femoral stems, before the so-called
4     Harris or Zimmer Precoat, had a PMMA clear coat on
5     the stem?
6  A. There was a device called an Iowa prostheses.
7  Q. Is that in the ten year study that you've
8     described, the Iowa prosthesis?
9  A. It was in that ten year time period.
10 Q. And was that the first that had a PMMA clear
11    precoat?
12 A. I believe so.
13 Q. Did you develop that, sir?
14 A. I was involved in the development of it.
15 Q. Since you're from the University of Iowa, did the
16    name have anything to do with that?
17 A. I was at the University of Iowa, and the
18    surgeon who was involved in developing it was from
19    Iowa.
20 Q. So it was developed at the University of Iowa?
21 A. I was at the University of Iowa, the surgeon was
22    not.
23 Q. Where was it developed, was it developed at Zimmer
24    or was it developed elsewhere?
25 A. It was a Zimmer device, and I and a surgeon was

Page 341

1     involved with Zimmer in the development of it.
2     But it was developed by Zimmer.
3  Q. Excluding the Iowa process, or the Iowa femoral
4     component, and the Harris Precoat, and I think
5     those are the ones that you've mentioned in that
6     ten year period, I'm asking you specifically, sir,
7     as to the Centralign, what testing, specifically
8     as to the Centralign femoral stem, was done to
9     determine the quality of adherence of the PMMA
10    precoat to the metal interface?
11        MR. DAHM:  Form.
12        THE WITNESS:  The quality of it is evaluated
13    in the manufacturing process.  There is testing
14    implicit in the PMMA precoating process.
15    Evaluation of the precoating as attached to the
16    stem in a constructed laboratory experiment I'm
17    not familiar with.  But there were a substantial
18    history of constructed laboratory experiments of
19    precoating technology applied to femoral component
20    stems of the same surface preparation, the same
21    material as this device.
22        MR. REARDON:  Can you tell me what testing
23    was done in the development process, not quality
24    control, I understand the distinction between
25    quality control and testing and development, to

Page 342

1     determine that, in fact, the PMMA clear coat that
2     was applied on the roughened surfaces of the
3     Centralign implant proximally and distally
4     actually did, in fact, enhance the bonding at the
5     cement-metal interface?
6         MR. DAHM:  That's a different question.
7         THE WITNESS:  I don't recall testing of the
8     device configuration of the Centralign for
9     enhancement of bone cement to that surface, but
10    that is a device that was consistent with a wide
11    number of other devices that the company has
12    experience with, were in concurrent manufacture
13    with this device in both the hip area and the knee
14    area, and we had substantial database of bone
15    cement attachment experience to precoated
16    surfaces.
17 BY MR. REARDON:
18 Q. According to Exhibit Number 13, the brochure on
19    the Centralign, it indicates on the 8th page,
20    counting the cover, that the combination of
21    precoating and texturing can nearly triple the
22    fatigue strength of the cement/metal interface.
23    And that's footnoted to Davies and Harris Fatigue
24    strength of cement-metal interface: Comparison of
25    metal, metal with precoating, and metal with

**343**

1. roughened surface and precoating. And it says
2. Trans 16th Society for Biomaterials 1990, page 35.
3.    Would you agree with me, sir, that that study
4. was a study of the Zimmer Precoat, not of the
5. Centralign?
6. A. I don't recall the nature of that study, I'd have
7. to go look at it.
8. Q. Would you agree with me that in 1990 you hadn't
9. even had a meeting that had finalized the design
10. of the Centralign, the design wasn't frozen at
11. that point?
12. A. The design was -- I'm trying to recall, but that
13. was in the design period of the implant.
14. Q. Wouldn't it be fair to say, sir, that in 1990 if a
15. study was published, it couldn't have dealt with
16. the Centralign?
17. A. I don't recall if it dealt with the Centralign, or
18. whether it dealt with prototypes of the
19. Centralign, or with other prostheses or standard
20. specimens, I've not looked at that study in years.
21. Q. Okay. Can you tell me whether or not the
22. representation made in Exhibit 13 that the
23. combination of precoating and texturing can nearly
24. triple the fatigue strength of the cement-metal
25. interface was based upon testing of the Centralign

**344**

1. implant?
2.    MR. DAHM: Form.
3.    THE WITNESS: As I previously said, I don't
4. recall testing of the Centralign implant, per se,
5. but rather of the methodologies that were
6. applied to it. And in many cases the adhesion
7. testing to surfaces is done in standardized
8. specimens to permit characterization of tensile
9. strength, or sheer strength, or engineering
10. analyses that are not performable on an implant
11. configuration.
12.    MR. REARDON: So the answer to the question
13. is you can't tell me whether or not that tripling
14. statement that's in the brochure was based upon a
15. study of the Centralign implant?
16.    MR. DAHM: Argumentative of the answer that
17. he just gave you.
18.    MR. REARDON: It was a very long answer, and
19. I'm trying to see whether or not we can simplify
20. it.
21.    MR. DAHM: Do not tell him to simply his
22. answer.
23.    MR. REARDON: Did the statement that was made
24. in the brochure, or was the statement that was
25. made in the brochure that the combination of

**345**

1. precoating and texturing can nearly triple the
2. fatigue strength of the cement-metal interface,
3. was that statement based upon any testing
4. whatsoever of the Centralign implant?
5.    MR. DAHM: Objection to form.
6.    THE WITNESS: As we previously described,
7. that refers to a published article that I am --
8. today, I do not recall the details of that
9. testing. I do not know if it involved the
10. Centralign implant or whether it involved surface
11. preparations, standardized specimens, or other
12. devices.
13.    MR. REARDON: All right. Doctor, do you know
14. who holds the patent for the Centralign PMMA
15. spacers?
16.    MR. DAHM: Form.
17.    THE WITNESS: I don't recall.
18. BY MR. REARDON:
19. Q. Would Zimmer hold the patent at this time?
20. A. If you want to refer to a particular patent, I'm
21. not sure which patent you're referring to.
22. Q. All right, let me locate that for you. Actually,
23. I had it out here in some of this material
24. somewhere.
25.    We can mark this as the next exhibit.

**346**

   - - -
   Crowninshield Deposition Exhibits 16 & 17
   marked for identification.
   - - -

5.    THE WITNESS: This patent that you've shown
6. me indicated here is assigned to Zimmer.
7. BY MR. REARDON:
8. Q. And the inventors were Leda Hewka and others?
9. A. Yes.
10. Q. All of those individuals were employees of Zimmer
11. at the time they invented this particular
12. prosthetic implant with spacers, having tapered
13. trailing edges, that's the description given in
14. the patent?
15.    MR. DAHM: Form.
16. BY MR. REARDON:
17. Q. Is that correct?
18. A. I believe they were employees of Zimmer.
19. Q. And I haven't asked you, I don't believe, about
20. Jack E. Parr, is he still with Zimmer?
21. A. No, he's not.
22. Q. Where is he now?
23. A. I believe he works -- lives in Memphis, Tennessee.
24. Q. Do you know where he works?
25. A. At Wright Medical Products.

347
1 Q. How about Lester, Mark B. Lester.
2 A. I do not know where he is.
3 Q. Okay. Would you agree that those four were the
4    inventors that ultimately assigned this particular
5    prosthetic implant, which is the Centralign, to
6    Zimmer?
7       MR. DAHM: Form.
8       THE WITNESS: These people applied for a
9    patent assigned to Zimmer, Zimmer apparently had
10   issued, describing an implant with spacers.
11      You characterize that as the patent on
12   the Centralign. I don't know that this makes
13   specific reference to the Centralign; I've not
14   read this patent recently.
15 BY MR. REARDON:
16 Q. Why don't you read page 2 where it describes the
17    invention.
18      Would you agree with me that it's describing
19    an invention that includes centralizers that are
20    teardrop shaped?
21 A. It describes centralizers which I think may be
22    applicable to the Centralign prosthesis.
23 Q. Let me show you Exhibit 17, which is a subsequent
24    patent application that was assigned to Zimmer by
25    the same four individuals, four inventors.

348
1    Can you tell me what the differences are, are
2    you familiar with what the differences are between
3    the product that was patented that is described in
4    Exhibit 16 and the product that was patented that
5    is described in Exhibit 17?
6       MR. DAHM: Form. Are you asking the witness
7    to compare these two documents and tell you the
8    differences?
9       MR. REARDON: He's supposed to know about --
10   yes, I will represent that this is the patent
11   which describes the Centralign implant. There are
12   two patents. And obviously if he is the Director
13   of Research, he ought to be aware of the patenting
14   of the particular product that is the subject of
15   this litigation and the differences between the
16   first patent and the second patent, both of which
17   occurred in 1992, filed in 1992.
18      MR. DAHM: If you want him to read these two
19   documents and describe what document A says versus
20   what document B says, ask him to do that.
21      MR. REARDON: I'm asking him if he's
22   familiar, I'm not asking him -- I've given them to
23   him to refresh his recollection as I have with all
24   of the documents. I could have very well asked
25   him the questions without giving him the

349
1    documents.
2       MR. DAHM: So what's the question, Bob?
3       MR. REARDON: So in the interest of time I've
4    provided him with the documents to help to
5    familiarize him and orient him to the documents.
6       MR. DAHM: So what's your question?
7 BY MR. REARDON:
8 Q. My question is are you familiar with the patenting
9    of the Zimmer Centralign, sir?
10 A. I'm familiar, you refreshed my memory with these
11   two patents, they appear to be issued U.S. patents
12   on aspect of implant design that is applicable to
13   the Centralign by four Zimmer employees.
14 Q. And are you familiar with the distinctions between
15   the first patent and the second patent?
16 A. No, I'm not familiar with the distinctions.
17 Q. Okay. Thank you.
18      MR. REARDON: Again, so the record is clear,
19   we do intend to take Leda Hewka's deposition as
20   soon as possible. I've asked Mr. Camassar to
21   contact your office today regarding choosing a
22   date for the deposition.
23      MR. DAHM: You told that to me yesterday
24   afternoon, Bob, I haven't forgotten.
25      MR. REARDON: Thank you.

350
1      Dr. Growninshields, I'd like to --
2       MR. DAHM: Crowninshield.
3       MR. REARDON: I'm sorry?
4       MR. DAHM: You keep adding an s.
5       MR. REARDON: Crowninshields?
6       MR. DAHM: It's Crowninshield.
7       MR. REARDON: I'm sorry.
8       MR. DAHM: That's all right.
9       MR. REARDON: I'd like to ask you some
10   questions about the -- let me just get some of
11   these materials organized, if I could.
12      About the manufacturing of the
13   Centralign implant, I was provided with some
14   documents yesterday regarding manufacturing and I
15   reviewed them last night and I don't know if you
16   have -- do you have a copy of these made available
17   to the doctor?
18      MR. DAHM: I do.
19 BY MR. REARDON:
20 Q. Have you seen any of these documents before,
21   Doctor?
22 A. I think I've seen at least some of them before.
23 Q. Okay. They appear to be divided into four sets of
24   documents: one for Dunn, one for Vino, one for
25   Lopes, and one for Fuentes-Weed, and so we'll

Page 351

1  address them in that order.
2      MR. DAHM: In what order?
3      MR. REARDON: Dunn first.
4      MR. DAHM: Okay.
5      MR. REARDON: As I understand it, and correct
6  me if I'm wrong, counsel, these are the
7  manufacturing documents that are specific to the
8  four implants that were implanted into these four
9  individuals?
10     MR. DAHM: Right, and just so there is no
11 misunderstanding of the record, Bob, you make
12 these comments on the record so sometimes I'll let
13 them go, sometimes I feel compelled to respond.
14         It's our position that you just asked --
15 you've never asked for manufacturing records
16 specific to devices. Notwithstanding that, we
17 agreed to make these available so we wouldn't have
18 to come back and do the 30(B)(6) deposition
19 before. We jumped through a lot of hoops to get
20 these for you. So when you say, I was just given
21 these last night, that part of your statement is
22 true but it's completely out of context, so I want
23 to make sure there's no ambiguity in the record
24 about this.
25     MR. REARDON: I thank you for the

Page 352

1  manufacturing documents that are specific to these
2  four individuals. However, I designated this -- I
3  designated -- you designated an individual, who as
4  I understand it to be Dr. Crowninshield, to deal
5  with the process of the design and development of
6  this product. That would include the quality
7  control procedures for the product.
8          While you provided me with information
9  which will assist me in understanding the quality
10 control procedure, since I'm able to discern from
11 these documents what quality control procedures
12 were used with respect to these four implants,
13 that doesn't necessarily tell me everything I need
14 to know about quality control of the product. And
15 the processes that were in place in the
16 development of a product in order to ensure that
17 the product was produced in a safe manner in
18 accordance with appropriate engineering standards.
19         Thus, I believe, as I indicated to you
20 on the telephone, sir, that the information that
21 you've given me is not adequate for that purpose,
22 but I thank you for what you've given me, it's
23 something.
24         And as I mentioned to you yesterday, and
25 last night again, every interrogatory that was

Page 353

1  posed to you and every request of production was
2  objected to but then answered over objection. We
3  intend to resolve that issue. I wanted to do it
4  last night, you were not interested; and we intend
5  to get answers without having an objection
6  interposed every question we've asked.
7      MR. DAHM: Is it your position, Bob, that we
8  have not produced quality control documents to
9  you?
10     MR. REARDON: It's my position that you've
11 produced quality control documents that are
12 related specifically to each of the four implants.
13 I don't know if they're all of them. I don't know
14 if they're all -- that they are the quality
15 control documents that were used in the
16 development of this product. But they are
17 specific to the four implants, yes, appears that
18 they are, from my review, that they're specific.
19     MR. DAHM: So it's your understanding of our
20 production that we've only produced quality
21 control documents specific to these four implants,
22 is that your understanding?
23     MR. REARDON: Yes, when they were -- at the
24 given times when they were manufactured, that's
25 what I apparently have here, --

Page 354

1      MR. DAHM: Okay.
2      MR. REARDON: -- in the manufacturing
3  documents that were given to me yesterday. But in
4  any event, whatever they are, they are, and I'd
5  like to ask you some questions about them, Doctor,
6  we have limited time.
7  BY MR. REARDON:
8  Q. With respect to the Dunn documents, you have them
9     in front of you, are you generally familiar with
10    these types of documents so that you can interpret
11    them for me, Doctor?
12 A. Yes.
13 Q. Okay.
14     MR. DAHM: And, Bob, just for the record,
15 it's Zimm Dunn M dash 1, et cetera.
16     MR. REARDON: Yeah, M dash 1 through M dash
17 102, I believe.
18     MR. DAHM: Thank you.
19 BY MR. REARDON:
20 Q. Now if you could explain to me what M dash 1 and 2
21    are, what that computer generated -- it appears to
22    be computer generated, two sheets of paper, are,
23    what they represent?
24 A. This is a production router for a particular order
25    of implants that describes the steps that were

355

1   performed on this router in terms of manufacture
2   of the implant.
3 Q. Okay. And so this would be, according to the
4   date, the issue date, September 16th, 1996, would
5   this be at the time that the implant is in Warsaw,
6   Indiana?
7 A. Yes, this is a Warsaw production router.
8 Q. Okay. There were certain steps that were taken in
9   the production of this particular implant that was
10  implanted in Mrs. Dunn before then, September
11  16th, 1996, is that correct?
12 A. Yes.
13 Q. This would be the final series of steps before
14  shipping, is that fair to say?
15     MR. DAHM: When you say final series, I mean,
16  maybe he can tell you what it says, then we can
17  decide --
18 BY MR. REARDON:
19 Q. What occurred in Warsaw, Indiana starting on
20  September 16th, 1996?
21 A. The first step on this router is an etching step,
22  which is applying an etch, a label, to the
23  implant. And the final step is inspection as it
24  goes into inventory.
25 Q. Okay. Am I correct, sir, you can look through the

356

1   documents yourself again, that the implant itself
2   was forged by a vendor?
3 A. Yes, we previously talked about these implants,
4   started with a purchased forging from a vendor.
5 Q. And was this one forged by Komtex in Worcester,
6   Massachusetts? K-o-m-t-e-x.
7     MR. DAHM: Komtek. I think it's K-o-m-t-e-k.
8   But, I mean, it's whatever it is.
9     MR. REARDON: Okay, I'm sorry, the photostat
10  almost looked like an x.
11    MR. DAHM: What page are you looking at?
12    MR. REARDON: M-69 for one has Komtek's name
13  on it, it's a k apparently. And actually M-71 has
14  its address, 40 Rockdale Street, Worcester, Mass.
15 BY MR. REARDON:
16 Q. Is that where the forging occurred for this
17  implant?
18 A. For this production order it appeared to have come
19  from Komtek.
20 Q. Okay. So would Komtek, then, actually make the
21  metal femoral component before it's polished
22  or any of the finished work is done, would they
23  actually forge it?
24 A. They transform it from a bar, typically a straight
25  round cylindrical bar into an implant that --

357

1   into a shape that more like the finished shape
2   of the implant. The following steps of the
3   polishing and machining bring it to the final
4   dimension of the implant.
5 Q. And the machining and the final steps to bring it
6   to the final dimensions occurred at Zimmer Caribe
7   in Puerto Rico, correct?
8 A. I believe that's the case.
9 Q. And that's a separate corporation from Zimmer, is
10  it not?
11    MR. DAHM: Form.
12    THE WITNESS: In terms of corporation I'm not
13  sure what you mean. It is part of our
14  organization, it's a Zimmer organization.
15 BY MR. REARDON:
16 Q. Well, I noticed in the materials that were
17  provided that it was called Zimmer Caribe, Inc.,
18  are you familiar with that at all?
19 A. I'm not familiar with the corporate structure of
20  it.
21 Q. Now, the inspection documents for the measurement
22  instruction worksheet are extensive and included
23  in the materials, runs from page M-20 through page
24  M-65, do you see those?
25 A. Yes.

358

1 Q. Now they were, according to all of those sheets of
2   paper, 45 sheets of paper, they were prepared by a
3   Jose Bagu, B-a-g-u, and approved by a
4   Ricardo Burgos, B-u-r-g-o-s, Pabon, P-a-b-o-n.
5   Do you know either of those gentlemen?
6 A. I know Ricardo Burgos.
7 Q. And what is -- Mr. Ricardo Burgos Pabon you do
8   know?
9 A. Yes, I do.
10 Q. And what is Mr. Pabon's credentials to approve the
11  measurements in final form of the femoral stem?
12    MR. DAHM: Form.
13    THE WITNESS: At the time of this production,
14  Mr. Burgos, I believe, was the person responsible
15  for quality assurance within the Zimmer Caribe
16  manufacturing operation.
17    MR. REARDON: What are his credentials to be
18  responsible for the determination of the
19  measurements of the final femoral stem?
20    MR. DAHM: Bob, when you say credentials,
21  what are you asking him for?
22    MR. REARDON: What's his background, what's
23  his education, how much experience did he have,
24  those are credentials.
25    MR. DAHM: Well, I don't know. Form.

**Page 359**

1  MR. REARDON: I don't know either, that's
2  why I'm asking him. Maybe he doesn't know either.
3  MR. DAHM: I don't know if he does as he sits
4  here. Come on, Bob, let's be fair.
5  MR. REARDON: I am being fair.
6  MR. DAHM: Well, you're not, so I object to
7  the form of the question.
8  MR. REARDON: Do you know what his
9  credentials are?
10  MR. DAHM: As defined by counsel.
11  THE WITNESS: I'm not familiar with the
12  details of his educational background.
13 BY MR. REARDON:
14 Q. Do you know if he still works for Zimmer?
15 A. He does still work for Zimmer.
16 Q. Do you know if he's still doing quality control
17    for Zimmer?
18 A. Yes, he is.
19 Q. Now, if you go to M-25, for example, and this is
20    just taking one example, which is stem length, to
21    compare each of the four femoral stems that were
22    forged and then finished, am I correct that this
23    page indicates that the stem length was inspected
24    on August 2nd, 1996 for quality control purposes?
25 A. Yes, I think that's August 2nd.

**Page 360**

1 Q. And is that to determine, is that inspection to
2    determine whether or not the stem meets certain
3    parameters of length?
4 A. It's determined whether a dimension on the implant
5    meets a dimension in tolerances required by the
6    design.
7 Q. Where is the roughened surface oxide blasted, is
8    that done in Zimmer Caribe?
9 A. I believe it is.
10 Q. Okay. If you want to look through the materials
11    to confirm that, feel free, sir.
12  MR. DAHM: I mean if you have a specific
13  page, Bob, it'll save us some time.
14  MR. REARDON: No, I don't. I could not find
15  any indication specifically of that.
16  MR. DAHM: Okay.
17  MR. REARDON: I will say that my assumption
18  would be that, but that's only an assumption, I'm
19  looking for confirmation.
20  THE WITNESS: Yes, I believe the oxide blast
21  is done in the Zimmer Caribe facility.
22 BY MR. REARDON:
23 Q. That's part of the finishing process that's done
24    in Puerto Rico, correct?
25 A. Yes.

**Page 361**

1 Q. I couldn't find any indication in the materials of
2    a description of quality control or an inspection
3    that occurred of the oxide blasted surfaces to
4    determine whether or not there was contamination
5    of those surfaces.
6    Could you tell me if there's any documents in
7    there that I'm missing that would deal with that
8    in the quality assurance process that occurred at
9    Zimmer Caribe?
10  MR. DAHM: Form. I'm sorry, I don't know
11  what you're asking him.
12  MR. REARDON: I'm asking him -- I could not
13  find anything, I think you do but I'll ask again.
14  MR. DAHM: And I don't, Bob.
15  MR. REARDON: All right, fair enough, I'll
16  try to explain myself to save time.
17    I have looked through the materials to
18  try to find some indication that there was some
19  quality assurance inspection of the grid blasted
20  surface as there was the stem length, for example.
21  MR. DAHM: So after that process, all right.
22  MR. REARDON: After it was grid blasted,
23  could you find any indication of a quality
24  assurance inspection of the grid blasted surface
25  to determine, among other things, whether or not

**Page 362**

1  the surface was contaminated in any way, whether
2  or not it was grid blasted properly within certain
3  parameters, you know, all of the things that I
4  assume were involved in a quality assurance
5  inspection?
6  MR. DAHM: Form.
7  MR. REARDON: I'm trying to save time. I
8  think they all were involved in any quality
9  assurance inspection.
10  MR. DAHM: Maybe to save time you might say
11  what was done.
12 BY MR. REARDON:
13 Q. What was done?
14 A. Well, I was looking to find the routers that may
15    describe that, but there are a variety of visual
16    inspections.
17    When the part is in Warsaw, it is, for
18    example, pacivated. Pacivation is a cleaning
19    process; it's the second router step in the Warsaw
20    operation. And perhaps I can find the router step
21    documents for Puerto Rico.
22        ---
23        Off-the-record discussion.
24        ---
25  MR. REARDON: Well, I think the question, as

363

1  some time ago was, could you find anything in the
2  documents that indicated that there was any
3  quality assurance inspection of the roughened
4  surface?
5       MR. DAHM:  And he answered that yes.  Now do
6  you have another question?
7  BY MR. REARDON:
8  Q.  Yeah, where is it?
9  A.  The document M-14, which is the Zimmer Caribe
10     production order, also answers the previous
11     question you asked as to where the blast operation
12     is performed.  It's a step on that production
13     order in Puerto Rico.
14          Following the blast operation there's a sonic
15     cleaning operation which is, as the name would
16     imply, is intended to clean the surface of the
17     implant.  The implant is then inspected following
18     that sonic cleaning operation as the last
19     operation on this router in Puerto Rico.
20 Q.  Okay.  The router indicates that that is the
21     steps, that's a pre-printed or router, of the
22     various steps, correct?
23 A.  Yes.
24 Q.  Tells you the operator number, the department, and
25     the description of the standard operations.

364

1       What I asked you is could you locate similar
2  to the stem length inspection that occurred and
3  was done by an individual that's actually
4  designated by number in the inspection sheet, can
5  you locate something similar that tells us
6  actually that there was an inspection that
7  occurred after the blast oxide roughening was
8  done?
9       MR. DAHM:  Asked and answered.
10      THE WITNESS:  On document M-15, last item
11 number, step 1,000, which is final inspection as
12 depicted on the router was performed on August
13 23rd, 1996 by an individual, I apologize I can't
14 remember his signature, but that would be the
15 operator that would perform that step.
16 BY MR. REARDON:
17 Q.  Would you agree with me it's probably W. Martines?
18 A.  I have no idea.
19 Q.  Is that the same person that would be number 5, do
20     you see the stamp on the left side: Z C 5 QA,
21     quality assurance, see that stamp, circular
22     stamp?
23 A.  Here on the left-hand side I see a circle, yes.
24 Q.  That's the same line you're referring to that
25     demonstrates that there was an inspection that

365

1  occurred, right?
2  A.  Yes.
3  Q.  Do you know if -- Z C, I assume, stands for
4     Zimmer Caribe, correct?
5  A.  Yes.
6  Q.  And number 5 QA is the number of the quality
7     assurance inspector, correct?
8  A.  I don't know what that 5 refers to but that could
9     well be the case.
10 Q.  Okay.  And that would be --
11 A.  It refers to an individual because it's in the
12     column of clock number which identifies an
13     individual.
14 Q.  Well, I think if you look at the other numbers,
15     for example, it identifies individuals like 2032
16     is the clock number for the gentleman who signed
17     on the right side.  2110 is somebody that looks
18     like E-r-o something, r-o-s, r-o-z, or something
19     like that, his signature.  20-113 is an individual
20     which has a different signature.
21          Would you agree that the numbers match up
22     with the signatures, the same numbers are found on
23     the left side as there are signatures?
24 A.  The clock number identifies the individual, all
25     employees of Zimmer.  I have a clock number, I

366

1  have a Zimmer number.
2  Q.  Okay.  And number 5 is this gentleman who
3     apparently is Martines, or W. Martines, something
4     like that is his last name?
5  A.  Yes.
6  Q.  Okay.  Do you know what the qualifications are of
7     that individual to do that inspection to determine
8     if the sonic clean was accomplished sufficiently
9     to remove all of the oxide from the roughened
10     surface?
11      MR. DAHM:  Form.
12      THE WITNESS:  I am not familiar with the
13 qualifications and training of that particular
14 individual.
15      MR. REARDON:  Do you know what actually is
16 done to determine if the oxide is fully removed
17 from the roughened surface?
18      MR. DAHM:  During that step?
19      MR. REARDON:  During that step, yeah.
20      THE WITNESS:  No, I do not.
21 BY MR. REARDON:
22 Q.  Do you know if any microscopic analysis is done
23     after the blasting occurred, in this case the
24     blast oxide was done on apparently some time about
25     August 22nd 1996, to determine whether or not all

367

1  of the oxide that was used in the blasting process
2  was removed from the surface?
3  A. The process steps in a production router are well
4     characterized by the company. The sonic clean
5     step, for example, is a process that is tested
6     with laboratory inspection of implants to assure
7     that that operation performs an intended result
8     and so that is a process that is intended to clean
9     the implant and to remove oxide to a satisfactory
10    level.
11 Q. That's the intent of the sonic clean?
12 A. Yes, and as designed by the process and as the
13    process engineers and laboratory people would
14    design that process and then implement it in the
15    manufacturing environment.
16 Q. And the purpose of the inspection by number 5
17    quality assurance inspector would be to determine
18    whether or not that sonic clean, in fact, did what
19    it was supposed to do, correct?
20 A. That inspection step looks -- that's a final
21    inspection of all the steps up to that point. I
22    can't tell you that that inspection step includes,
23    as you describe, a microscopic examination of the
24    implant surface. But --
25 Q. Do you know what -- I'm sorry, I didn't mean to

368

1  interrupt you, I thought you were finished.
2  A. But the process of sonic cleaning was designed and
3     validated for the purposes of cleaning the surface
4     of the implant to a known state of cleanliness.
5  Q. Would you agree with me that if the oxide that is
6     used to blast the roughened surface remained on
7     the surface at the time -- any of the oxide
8     remained on the surface at the time the PMMA
9     precoat was applied, that would be a contaminant
10    to the surface?
11 A. No, I'm not sure.
12    The process of blasting a hip stem, whether
13    it's an oxide or a nonoxide, could result in trace
14    amounts, small amounts, of residual manufacturing
15    material that would be well characterized in the
16    process. And the use of the word contaminant,
17    perhaps contaminant, if the implication is
18    detrimental contaminant, then, no, I would not
19    agree that it was a detrimental contaminant. It
20    could be residual amounts of material that were
21    well characterized and understood and did not
22    affect the efficiency/effectiveness of the
23    implant.
24 Q. Okay. So let's define contaminant then.
25    So that we're clear on what we're talking

369

1  about, since you h...  some concerns about how to
2  define it, in the process of manufacturing this
3  particular implant, is it acceptable for a
4  residual amount of oxide to remain on the metal
5  surface, hardened surface of the implant, at the
6  time that the PMMA coat is applied?
7  A. Yes, I believe that you will find, you know, trace
8     amounts of oxide media, you know, within the
9     surface or on the surface of this implant and
10    virtually any other implant that has gone through
11    a blast operation.
12 Q. And would that trace amount of oxide that remains
13    on the implant affect at all the cement-metal
14    interface bond?
15    MR. DAHM: Objection, form.
16    THE WITNESS: I do not believe it would have
17    an effect upon the quality of the cement-metal
18    interface bond.
19    MR. REARDON: Did Zimmer conduct any tests at
20    any time to determine whether or not any residual
21    oxide that remained on the femoral stem after the
22    blasting process and sonic cleaning is completed,
23    would have any affect upon the cement-metal
24    interface bond?
25    MR. DAHM: Form.

370

1     THE WITNESS: We certainly tested the
2  application of precoating to surfaces that have
3  been produced by abrasive blast preparations. We
4  also, as previously discussed, done some work in
5  terms of nonabrasive blast acid, acid etch kinds
6  of surfaces. And the, you know, characterization
7  of the precoat attachment was that we obtained an
8  enhanced bonding of precoat to the surface of the
9  implant compared to intraoperatively applied bone
10 cement in the blast condition with an
11 understanding that there could be trace amounts of
12 blast media on the surface of the implant.
13    MR. REARDON: How much is an acceptable trace
14 amount of residual oxide on the implant before
15 precoating?
16    MR. DAHM: Form.
17    THE WITNESS: I don't recall, I'm not
18 familiar with the levels of material that may be
19 present after blasting, pacivating, sonic
20 cleaning; I can't specifically answer your
21 question.
22 BY MR. REARDON:
23 Q. Now the oxide that we're speaking of, is this iron
24    oxide?
25 A. This is a material that is aluminum oxide which

371

1     inherently contains some level iron in it but
2     it's principally aluminum oxide.
3 Q. Just so we're clear, it sounded like you said ion
4     but I think you said iron, with an r in it, right?
5 A. Iron, element of iron.
6 Q. Okay. Doctor, in the materials there's a
7     reference to Moore Products Company, and I'm not
8     sure what role they played in the Dunn implant
9     except that their name appears on some documents,
10    M-68, for example.
11         Can you tell me what role Moore Products
12    played in the production of this implant?
13 A. I believe Moore Products was the producer
14    of a gauge, gauge 873.
15 Q. Which is used to determine whether or not the
16    measurements of the finished product are within
17    acceptable ranges?
18 A. Yes, this is a gauge that I believe that is
19    measuring the angle of the taper that's machined
20    on the proximal end of the stem and that the gauge
21    was manufactured or purchased from Moore Products
22    Company.
23 Q. Okay. And am I correct on M-68 that the angle was
24    inspected by use of this, I assume this is a
25    computerized device, is that correct?

372

1     Well, let me begin by asking are you familiar
2     with this device?
3 A. I am familiar with devices that measured angles.
4    The ones I'm familiar with, and I think they were
5    in use back then that were not computerized,
6    they're an air gauge. But it could be a
7    computerized device, I'm not sure.
8 Q. Up at the top of the page, you are on page 68,
9    right? Up at the top of the page it indicates
10    that there's an I.D. of a certain stem taper angle
11    and it's dated 4-23, April 23rd, 1991 at
12    three o-nine, and then there's a number which
13    identifies, I assume, the particular taper that is
14    being used as the standard in the computer. Am I
15    correct on that?
16 A. I'm not following where you are in terms of
17    number.
18 Q. Right at the very top of the page, the very first
19    line.
20 A. I see the I.D. stem taper, taper angle and taper,
21    DIO 4, there's the date and what appears to be a
22    time, three o-nine. Maybe I'm misinterpreting
23    this three o-nine.
24        The tapers on these devices were six degree
25    tapers, nominally six degrees. I suspect that

373

1     three o-nine, but is just as sufficient, refers
2     to half the taper angles. So it's on one side of
3     the tapers, three degrees, nine minutes.
4 Q. Are the parameters that were programmed into the
5    Moore Products computer parameters that were
6    arrived at on April 23rd, 1991?
7        MR. DAHM: Well, again, Bob, we don't know
8    specifically what type of gauge it is, so you
9    build that into your question, so I object to the
10    form.
11       THE WITNESS: I don't know if this is a
12    computerized operation.
13 BY MR. REARDON:
14 Q. So you're not familiar with exactly how this
15    particular measurement device determined the
16    parameters of the angle and taper?
17 A. No, I'm not.
18 Q. All right. After the product was finished in
19    Puerto Rico and approved by Jose Bagu and
20    Ricardo Pabon, it was, as I understand from
21    reviewing the materials, then shipped to another
22    vendor. Can you tell me where it went then?
23       MR. DAHM: Form.
24 BY MR. REARDON:
25 Q. What would be the next step in the manufacturing

374

1     process?
2 A. Excuse me, I lost my train of thought there.
3 Q. Well, I think we've taken it through this product
4    started with a bar; it was a Komtek in Worcester,
5    Massachusetts; then it was shipped to
6    Zimmer Caribe in Puerto Rico where it was finished
7    and the grid blasting occurred.
8        At that point there's no PMMA coating on it,
9    correct?
10 A. That is correct.
11 Q. Then it's shipped elsewhere, am I correct?
12 A. Yes.
13 Q. Where did it go then for the next step in the
14    manufacturing process?
15 A. It is shipped to Warsaw, Indiana and comes in our
16    plant here.
17 Q. Can you tell, from looking at the materials, when
18    it arrived in Warsaw, Indiana?
19 A. Well, the router, which is the first page here,
20    M-1, is dated 9-16, so there was a router issued
21    for operations on this lot as of 9-16. So one
22    indication is that it would seem to have been in
23    Warsaw on or before the 16th of September.
24 Q. 1996?
25 A. 1996.

Page 375

```
 1 Q.  And am I correct that the PMMA spacers were then
 2     manufactured by a vendor, Courtesy Corporation of
 3     Buffalo Grove, Illinois?
 4        MR. DAHM:  Bob, I'm sorry, do you have a
 5     document to refresh his memory with?
 6        MR. REARDON:  Yeah, I can give him a few that
 7     make reference to it.  You can try M-84, M-83,
 8     those two.
 9        THE WITNESS:  M-83 is a receiving report for
10     PMMA spacers received from a vendor: the vendor
11     number and name that's Courtesy Mold.
12 BY MR. REARDON:
13 Q.  Are you familiar with Courtesy Mold?
14 A.  No, I'm not.
15 Q.  And could you tell me anything about the quality
16     assurance process that they carried out in --
17     well, let me take it one step backwards.
18        In looking at the materials, would you agree
19     that an outside vendor, Courtesy Mold or
20     Courtesy Corporation, manufactured the PMMA
21     spacers at 2.5 millimeters in height?
22 A.  Yes.
23 Q.  And could you tell me whether or not Zimmer
24     did -- I'll withdraw that.
25        Could you tell me what the quality assurance
```

Page 376

```
 1     process was at Courtesy Corporation in
 2     Buffalo Grove, Illinois?
 3        MR. DAHM:  Objection, form.
 4        MR. REARDON:  And I'll be more specific to
 5     help you a little bit: with respect to what we
 6     discussed earlier, that is the barium sulfate
 7     percentages that were to be used when mixed with
 8     the PMMA material to form the centralizers.
 9        MR. DAHM:  Same objection.
10        THE WITNESS:  This document doesn't indicate
11     what inspection occurred or what manufacturing
12     controls were in place at Courtesy Mold, and I'm
13     not personally familiar with them.
14        The Purchasing Department would work
15     with the vendor developing specifications and
16     processes for which products would be purchased to
17     meet our specifications and then this document
18     memorializes the receipt of those materials.
19 BY MR. REARDON:
20 Q.  Is there anything in these materials that would
21     tell you whether or not these particular teardrop
22     shaped components that were eventually bonded to
23     the femoral stem were inspected for the amount of
24     barium sulfate or the proper chemical composition
25     of the PMMA?
```

Page 377

```
 1 A.  The next page, which is document M-84, is a
 2     certificate of compliance by Courtesy Corporation
 3     that they are certifying that they are in
 4     compliance with specifications by Zimmer for the
 5     production of these devices; there's that
 6     certification here.  I do not see, and perhaps
 7     there is in this pile of documents, any other
 8     documentation from them, but I'm not familiar with
 9     it.
10 Q.  It makes reference to a specific specification,
11     which is 9800-099-01, correct?
12 A.  Yes.
13 Q.  And that would be the specification that at least
14     the Courtesy Corporation is certifying that they
15     met, correct?
16 A.  For the materials used in this operation.
17 Q.  And the materials means the PMMA and the barium
18     sulfate?
19 A.  I don't know, I'm not familiar with that
20     specification.
21 Q.  Okay.  With respect to the PMMA that was used to
22     make the teardrop spacers, do you know where that
23     came from, looking at the document, by looking at
24     the document?
25 A.  No, I do not.
```

Page 378

```
 1 Q.  Do you know if that's manufactured by Zimmer or an
 2     outside vendor?
 3 A.  We do not do commercial polymer synthesis so we
 4     would not have manufactured the polymer, that
 5     would be a purchased item.
 6 Q.  Let me direct you to number M-88.
 7        Would you agree with me that a company called
 8     Acrylics, Inc. in Memphis, Tennessee manufactured
 9     the polymer, the PMMA?
10 A.  This document indicates that they specified a --
11     certified the analysis of a polymer.
12 Q.  You don't know whether or not they made it but
13     they certified it as meeting certain standards?
14 A.  Yes.
15 Q.  And at this point -- well, before it's made into
16     these teardrop spacers by, in the case of this
17     particular implant, Courtesy Corporation, it's
18     actually in a viscous form, a liquid type form of
19     viscous nature?
20 A.  No, that would not be my understanding.
21 Q.  What's your understanding of the form that it's in
22     when it goes to Courtesy Corporation to be made
23     into PMMA spacers?
24 A.  The PMMA spacers are made by injection molding.
25     Injection molding is typically conducted with
```

379

1  palletized materials. So my best would be that
2  this was a palletized, or fine, or coarse powder
3  or pallet of acrylic.
4 Q. Okay. Do you know whether the barium sulfate, 10%
5     barium sulfate I believe is the specification, do
6     you know whether the barium sulfate is added at
7     Acrylic, Inc. or whether it's added at Courtesy?
8 A. I do not know where the barium sulfate is added to
9     the injection molded resin.
10 Q. Okay. So you don't have any way of knowing, I
11    take it, if you don't know where it was added, you
12    don't have any way of knowing whether or not
13    there was proper quality assurance procedures to
14    ensure that the proper amount was added, is that
15    fair to say?
16    MR. DAHM: Form.
17    THE WITNESS: Our purchased product,
18    purchased materials, and contract manufacturing is
19    done to specifications. An example of which the
20    Courtesy Corporation certified their compliance
21    with specifications that we gave them and our
22    purchasing quality assurance people do vendor
23    audits to certify compliance with the requirements
24    for production.
25              We would have characterized,

380

1  appropriately the raw materials, both the barium
2  sulfate, the acrylic, and the mixture of the
3  barium sulfates and the acrylics, to assure that
4  they met our specifications.
5     MR. REARDON: Well, do you know whether any
6     quality assurance inspections that you've
7     described occurred in the period of, say, three
8     months before June of 1995 when, according to
9     M-84, the PMMA spacer process for the spacers that
10    were used on this implant were manufactured?
11    MR. DAHM: Form.
12    THE WITNESS: In the normal course of our
13    business, we devote a great deal of diligence to
14    managing our vendors and the quality of materials
15    we receive from the vendors. I cannot tell you
16    the inspection frequency or occurrence of any
17    particular inspection or validation of a vendor at
18    this period of time.
19 BY MR. REARDON:
20 Q. Would you agree with me that this particular --
21    in the case of this particular implant,
22    Mrs. Dunn's implant, that the bonding of the PMMA
23    spacer occurred some time after August of 1996,
24    since the Zimmer Caribe inspected and shipped out
25    the metal stem in August of 1996?

381

1 A. Yes, the bonding the spacers to this prostheses
2    would appear to have been performed in August of
3    1996.
4 Q. And would you agree with me that according to
5    M-84 --
6 A. Excuse me, I said August, or is it September? The
7    production router says September.
8 Q. Okay, September of 1996.
9             Would you agree with me that
10   Courtesy Corporation manufactured the PMMA spacers
11   that were used and bonded to the femoral stem
12   between the period of June 19th and June 20th,
13   1995, according to the certificate of compliance
14   at M-84?
15 A. This is June of 1995 is that certificate of
16   compliance.
17 Q. So, therefore, the spacers that were applied to or
18   bonded to Mrs. Dunn's femoral component were a
19   year old when they were bonded?
20   MR. DAHM: Form.
21   THE WITNESS: These appeared to have been
22   purchased and supplied in June of 1995.
23 BY MR. REARDON:
24 Q. Okay. They were more than a year old when bonded,
25   is that correct?

382

1 A. They would appear to be about a year, year and
2    three months.
3 Q. Thank you.
4             Now the distal plug, according to the
5    materials, was manufactured by Peerless Mold, an
6    outside vendor, is that correct? You can look at
7    M-86 if you need to confirm that.
8 A. Yes.
9 Q. And do you know whether or not the distal plug was
10   used by Mrs. Dunn's surgeon when her femoral stem
11   was implanted?
12 A. I do not know the disposition of the distal plug
13   at the time of surgery. This records that a
14   distal plug was made, which would have been
15   inserted into the distal centralizer hole.
16 Q. Now the distal plug, as I understand in the
17   development of this product, we've talked about
18   the distal plug, the distal hole was made as
19   we've seen in our documents on this particular
20   implant after it was already on the shelf as a
21   modification, correct?
22   MR. DAHM: Form.
23   THE WITNESS: No. If you're implying that
24   the implants were finished to the shelf and
25   then modified, I don't know that that was the

383

1  case.
2  BY MR. REARDON:
3  Q. No, what I'm asking you is the distal plug that is
4     being manufactured by Peerless Mold, as
5     demonstrated by M-86, is that a plug that is to be
6     used with the distal hole at the end -- or the tip
7     of the femoral stem?
8  A. I believe that that plug is a plug that's inserted
9     into the distal hole to address the issue of air
10    entrapment in the distal hole and to potentially
11    affect the development of a small air bubble
12    distal to the stem.
13 Q. So that if I understand what you're saying, if the
14    surgeon uses a distal centralizer that is included
15    in the package, then he would remove the distal
16    plug that is already been inserted in the
17    production process?
18 A. I believe that the plug is inserted in the stem;
19    and if you use a distal centralizer, you would not
20    use the distal plug.
21 Q. Okay. With respect to Exhibit 12, I believe is
22    the number, which is the prosthesis that was
23    brought here, is there a distal centralizer
24    enclosed in the package with this particular
25    prosthesis?

384

1  A. I don't know that there is. I believe they're
2     packaged separately.
3  Q. The only thing I've seen in this package, and I
4     didn't know that this is the way they were always
5     packaged, I wanted to ask you that, is the actual
6     femoral stem, are there other components such as
7     the distal centralizer, the distal plug, that are
8     included in the same package when it typically is
9     shipped?
10        MR. DAHM: Form.
11        THE WITNESS: The distal centralizer is a
12    separate item as is the femoral head and other
13    items that are used in conjunction with the
14    stem.
15 BY MR. REARDON:
16 Q. Okay. When we opened this yesterday, we peeled it
17    back and it was sealed, as I assume it would have
18    been sealed once it leaves Zimmer's shelf and goes
19    out to the hospital, correct?
20 A. Yes.
21 Q. And so when we peeled it back, the only thing that
22    we found inside, I think you will agree, is the
23    actual femoral stem, correct?
24        MR. DAHM: As the box says, a femoral stem,
25    right.

385

1        THE WITNESS: Yeah, says a femoral stem was
2  in that box.
3        MR. REARDON: There's no package insert in
4  this package, right?
5        THE WITNESS: There was a package insert.
6        MR. DAHM: Yeah, there was.
7        MR. REARDON: I haven't see one.
8        MR. DAHM: Bob, I opened that box and brought
9  it in the room. I have the package insert for
10 that.
11       MR. REARDON: Okay.
12       MR. DAHM: You're asking about the other
13 things now, now you're asking about the package
14 insert. Was there a package insert with that?
15 Yes, there is, it's downstairs, I have it.
16       MR. REARDON: When I opened the box, I didn't
17 see it, but.
18       MR. DAHM: Because it wasn't there.
19       MR. REARDON: Okay, that's fine.
20       I think possibly before we leave today
21 if you could have the package insert up here,
22 since you apparently took it out of the box before
23 you produced the box, I'd like to mark it.
24       MR. DAHM: Sure. Bob, again, if you're
25 implying anything at all, I am -- well, I'll let

386

1  it go.
2  BY MR. REARDON:
3  Q. Well, is it your understanding, Dr. Crowninshield,
4     that there was anything else besides the package
5     insert that was taken out of the box which is
6     photographed as Exhibit 12?
7  A. I have no understanding if anything was removed
8     from the box other than the package insert.
9        MR. DAHM: Now, Bob, I'm telling you I opened
10    the box and took the package insert out because
11    you wanted to look at the stem, that's what I'm
12    telling you.
13       MR. REARDON: I understand. You need not get
14    upset with me. Obviously it's a legitimate
15    question. When I looked in the box, there was no
16    package insert.
17       MR. DAHM: You didn't ask for a package
18    insert, you asked for the stem.
19       MR. REARDON: Am I correct, sir, that this
20    particular stem started production, to summarize
21    basically the chain of events here, started at a
22    company called Kotek, I believe --
23       MR. DAHM: Komtek.
24       MR. REARDON: Komtek, excuse me, Komtek, in
25    Worcester, Massachusetts where it was forged; then

387

1   it went to Puerto Rico where the metal stem was
2   finished; then it went to Warsaw; and from various
3   locations the PMMA spacer came from Buffalo Grove,
4   Illinois where it was manufactured by
5   Courtesy Corporation; the distal plug was
6   manufactured by Peerless Mold in Toledo, Ohio; and
7   the Acrylics, Inc. in Memphis, Tennessee
8   manufactured the PMMA, is that a fair statement of
9   what occurred, and they came together in Warsaw,
10  Indiana?
11       MR. DAHM:  Again, Bob, you said to the later
12  one, Acrylics, we don't know whether it was
13  manufactured or there's certification, that was
14  the only -- if I understood what the witness said,
15  I wasn't sure about that.
16       THE WITNESS:  You are conceptually correct in
17  that the metal hip stem is made by forging vendor
18  Komtek.  The metal finishing is done in
19  Puerto Rico.  That product then comes to Warsaw
20  where it is combined with acrylic products,
21  spacers, and material used for the PMMA
22  precoating are just performed in Warsaw where the
23  finished implant is then packaged, sent out for
24  sterilization, and ends up in the distribution
25  warehouse.

388

1   BY MR. REARDON:
2   Q. Now on M-93 there is a chemical products
3      laboratory analysis which indicates that there is
4      a Benzoyl Peroxide asa (phonetic) with an average
5      of point 28%.
6           Can you explain why that test was done?
7   A. Approximately, I'm not a chemist, but
8      Benzoyl Peroxide is an element of acrylic bone
9      cement, and this was a measurement of the percent
10     of Benzoyl Peroxide in acrylic.
11  Q. Do you know what the -- can you tell me what the
12     range is of acceptable Benzoyl Peroxide content in
13     the acrylic?
14  A. It says these tests conform to ZES 2R-04.
15  Q. That would be a Zimmer engineering standard?
16  A. Yes.
17  Q. 2R dash 04?
18  A. Yes.
19  Q. You don't know what that standard says?
20  A. I do not recall what that standard says.
21  Q. And that was in-house, that testing, done at
22     Zimmer?
23  A. Yes, it would have been performed in-house.  Much
24     of this form is not legible as well as I'd like in
25     the black box area, but I believe it's performed

389

1      in Warsaw.
2   Q. And ultimately what then happens is all this
3      material and this femoral stem that's finished in
4      Puerto Rico, all comes to Warsaw and then in
5      Warsaw the PMMA spacers are ultrasonically -- or
6      ultrasonic welding attached, correct?
7   A. That is correct.
8   Q. In the manner that we discussed earlier?
9   A. Yes.
10  Q. When is the PMMA clear coat applied to the
11     roughened surfaces, proximally and distally?
12  A. Prior to the PMMA -- prior to the ultrasonic
13     welding of the spacers.
14  Q. Okay.  And that occurs, I assume, in Warsaw?
15  A. Yes, it does.
16  Q. And what quality assurance processes are in place
17     to determine whether or not the PMMA clear coat
18     was applied uniformally and adequately?
19       MR. DAHM:  Form.
20       THE WITNESS:  The metal prostheses goes
21  through a pacivation process, a bio-burden upgrade
22  process to clean the prostheses, it enters into a
23  clean room environment, controlled air quality.
24  The implant is subject to visual inspection,
25  careful handling with gloved hands in a clean room

390

1   environment by operators wearing protective
2   clothing, put into a machine that
3   electrostatically charges the implant, causes the
4   acrylic powder to be attracted in a uniform manner
5   onto the surface of the implant subject to masking
6   to protect portions of the implant that are not
7   intended to be coated from coating.
8        The implants are then removed from that
9   electrostatic coating process.  The powder
10  surface, coated powder surface of the implant, is
11  visually inspected.  They're put into a furnace
12  where the prostheses are annealed.  The acrylic
13  powder is fused into a coating that appears on the
14  finished implant.  There is a measurement of the
15  thickness of the coating utilizing of methodology
16  known as the Eddie current, like the name Eddie.
17  Q. E-d-d-y?
18  A. Maybe it's i-e, Eddie current.
19  Q. Current, c-u-r-r-e-n-t?
20  A. Yes, electric current, that gives an indication of
21     the thickness of the coating.  There is a periodic
22     inspection of tests to specimens that are run
23     through the process for adhesion testing subject
24     to a standard of adhesion testing.  The implants
25     are, after being precoated, are put into carefully