391
1  cleaned containers and sent to packaging for
2  finished packaging and ultimately sterilization.
3 Q.  Now, first of all, you mentioned two types of
4  testing that I understood from your answer. The
5  first is this Eddie current testing.
6     Who actually does the Eddie current testing
7  to determine the thickness of the PMMA clear coat?
8 A.  The operator in the precoat facility.
9 Q.  And so that's done after it comes out of the
10  furnace?
11 A.  Yes.
12 Q.  And after it cools, I assume?
13 A.  Yes, there are moderate temperatures and then cool
14  down to room temperature.
15 Q.  What are the qualifications of the individuals
16  that are doing the operation of the furnace to
17  cause the powder to result in a clear coat?
18     MR. DAHM: Form.
19     THE WITNESS: The individuals are trained to
20  their specific tasks. And I can't tell you the
21  names of individual people and what their
22  histories are, but we have carefully constructed
23  training programs, making sure that everyone
24  understands well the function they are performing
25  and the implications it has on the final quality

392
1  of the implant; well-trained, dedicated people.
2 BY MR. REARDON:
3 Q.  Okay. In the inspection of the stem length that
4  occurs down in Puerto Rico, there's a separate
5  individual who inspects the stem, there's a
6  quality assurance inspector.
7     In the inspection of the roughened surface,
8  number 5 inspector inspected the roughened
9  surface, is a separate quality assurance, Q & A,
10  inspector, is there a separate quality assurance
11  inspector that inspects the thickness of the PMMA
12  clear coat after it's removed from the furnace?
13 A.  My understanding is that the thickness of the
14  precoat is an operator inspection process which is
15  common throughout our manufacturing, medical
16  device manufacturing. We have inspections that
17  are done by quality assurance personnel, we have
18  inspections that are done by operators in both
19  cases to deliver specifications and procedures.
20  We have operator trained inspection as well as
21  quality assurance inspection.
22 Q.  Okay. So there is no quality assurance inspection
23  for the thickness, it's operator inspection, is
24  that correct?
25 A.  The operator performs the quality assurance

393
1  inspection.
2 Q.  The same person that did the procedure, that did
3  the manufacturing process, inspects his own
4  process?
5 A.  That same well-trained individual, yes.
6 Q.  So that's the way that you do quality assurance on
7  the thickness of PMMA precoat is by having the
8  same person who actually applied the precoat
9  through the manufacturing process decide whether
10  or not what applied meets acceptable standards?
11     MR. DAHM: Objection, it's argumentative.
12     THE WITNESS: There are multiple individuals
13  who simultaneously work in that precoat
14  environment, there are multiple steps. There's
15  coating, there's the annealing of the material,
16  and as you described the inspection, they are all
17  operators; that the person who does -- who did the
18  Eddie current may have been the person who applied
19  the powder, it could be a different individual but
20  it would be, I believe, a production employee, a
21  trained production employee as opposed to a
22  separate quality assurance step.
23 BY MR. REARDON:
24 Q.  Would you agree with me that the thickness of the
25  PMMA clear coat on the roughened surface is

394
1  proximally and distally of the implant an
2  important aspect of the production of this
3  implant?
4 A.  We have specifications for the thickness of it
5  that we expect the implant to fulfill.
6 Q.  With respect to the adhesion testing that you
7  mentioned, who does the adhesion testing?
8 A.  That's done within the precoat facility by the
9  operators.
10 Q.  And how does the operator test adhesion?
11 A.  It's done to a standard, published standard,
12  involves providing a scratching, if you would, of
13  the precoat surface in a prescribed manner, the
14  attachment of an adhesive tape of this particular
15  specification and the removal of that tape and
16  inspection of the residual precoat layer after the
17  removal of the adhesive.
18 Q.  Okay. So does a stem actually have some adhesive
19  applied to it and then it's scratched to see
20  whether or not the adhesive -- I'll withdraw that
21  and word it a little differently.
22     Does a stem have a precoat applied to it and
23  then it's scratched to determine whether or not it
24  has proper adhesive qualities, is that the process
25  essentially?

395

1  A.  Yeah, the process involves a f   surface, I
2      believe.  So a flat surface specimen is prepared
3      along with the stems, and the testing is performed
4      on the test coupon.
5  Q.  Is it a flat surface of the same metal?
6  A.  Yes, same surface preparation, same coating
7      methodology.
8  Q.  So it goes through the same process of the furnace
9      and the powder of the furnace and heating up and
10     then cooling down?
11 A.  Yes, sir.
12 Q.  And that is scratched, that's basically to
13     determine whether or not it adhered, the PMMA
14     precoat adhered properly, is that right?
15 A.  Yes, it's a test to determine adherence of a thin
16     coating on a metal surface.
17 Q.  And does this, could we call it a sample, how
18     would you describe this flat piece of metal
19     that's used?
20 A.  It's a test coupon.
21 Q.  Test coupon.
22     Does the test coupon have an oxide blasted
23     roughened surface?
24 A.  Yes, it does.
25 Q.  Is the entire surface oxide blasted or is a

396

1      portion of it as the femoral stem, if you
2      remember?
3  A.  I don't remember.  The part to be tested clearly
4      is prepared in the same manner as is the
5      prostheses.
6  Q.  What type of device is used to scratch this
7      sample?  I'm using the word sample.
8  A.  I don't recall.  As a matter of fact, I don't
9      recall if I've seen the device; but it's
10     conceptually a multi-track stylist that produces
11     parallel tracts.  I've seen the sequence of the
12     scratching.  I don't recall that I have seen the
13     device work.
14 Q.  Let me ask you one more question about Dunn and
15     then I'll take you to the end.
16     The last item I want to call your attention
17     to is page M-7, the sterilization certificate of
18     irradiation by Sterigenics (phonetic), do you have
19     that, Doctor?
20 A.  Yes, I do.
21 Q.  And according to the certificate of irradiation,
22     various medical products were irradiated, some
23     from Warsaw, some from Caribe, which I assume is
24     your Puerto Rican facility, a total of 726
25     cartons.

397

1      First of all   ere is Sterigenics, because I
2      can't read the bottom of the page on the
3      photostat?
4  A.  I can't read it either.
5  Q.  At the top it says irradiation facility
6      Westerville.
7      Does that help you at all?
8  A.  I believe it's Ohio, I think it's Westerville,
9      Ohio.
10 Q.  Okay.
11 A.  It's a company, I think, has multiple business
12     locations.
13 Q.  Have you ever seen the irradiation process that's
14     performed by Sterigenics on these 726 cartons of
15     medical products?
16 A.  No, I have not.
17 Q.  Do you know whether they irradiate every
18     individual item or whether they irradiate while
19     these things are in cartons?
20     MR. DAHM:  Form.
21     THE WITNESS:  I believe that the irradiation
22     process is done of implants on pallets, grouped by
23     product families, with the symmetry placed within
24     the pallets; on the pallets; within the pallets to
25     determine the dose range of radiation that the

398

1      products receive.
2      I know our validation work on the
3      developmental implants, we do extensive
4      irradiation testing with the fine quantities of
5      products by product families.  So whether it's a
6      metal implant, or a plastic implant, or a
7      combination of metal and plastic devices that we
8      know the irradiation profile required for
9      sterilization.
10 BY MR. REARDON:
11 Q.  So I assume from your answer that they are
12     irradiated in the cartons?
13 A.  Oh, they're irradiated in a box, as you see here
14     on the table, of a finished implant with a sterile
15     barrier, a barrier that becomes sterile after the
16     irradiation process.
17 Q.  And besides being irradiated in the cartons, as
18     you see on the table, Exhibit 12, they're in
19     cartons, in other words, those items are in larger
20     cartons that are on pallets?
21     MR. DAHM:  Form.
22     THE WITNESS:  I don't know that they are in
23     other cartons, they may or may not be.  They are
24     in pallets of significant number of individual
25     implant boxes on a design pallet.



399

BY MR. REARDON:
Q. So when Sterigenics certified irradiation of 726 cartons, that would be many more than seven hundred and -- would that be 726 individual femoral stems or that would be other types of devices besides femoral stems, if you can tell me?
A. I can't tell you from this document as to what the devices all were, but they could well be different devices. It would not necessarily be a quantity of identical product.
Q. And would the irradiation of all 726 cartons occur simultaneously in the same irradiation process?
A. Yes.
Q. And is there a quality assurance process that allows Zimmer to determine if the irradiation met certain standards, an independent quality assurance process or is it operator controlled again?
MR. DAHM: Form.
THE WITNESS: There are absolutely certification to determine that they meet certain standards and the standards are quite certain for sterile products. We have a microbiology group within the company that works closely with the vendors, does all the vendor certifications, does

400

all the product certifications, does product release testing when it's appropriate, does all the statistical studies. I'm not a microbiologist, but I can assure you it's a high science and a serious business because these are implantable medical devices.
BY MR. REARDON:
Q. It is a serious business, Doctor, I agree with you on that.
    When the irradiation occurs, in this case on October 16th, 1996, am I correct on that?
A. Yes, October 16th.
Q. So that would be the very last step in the process, is that right, before it's shipped?
A. Well, following this step it would be returned to our distribution warehouse in Warsaw where it would be put into inventory.
Q. Right. So when it's irradiated, the ultrasonic welding of the spacers has been completed, of course, the precoat has been applied, the product is essentially finished in its production, and the last step in the production is to send it off to Sterigenics for irradiation before it's finally put into inventory and made available for sale, is that right?

401

A. Yes.
Q. Okay. Has any studies been done after irradiation of this particular implant to determine what effect, if any, the irradiation may have had on the PMMA process, or the clear coat as well as the spacers that were applied?
MR. DAHM: Objection, form.
THE WITNESS: As we talked yesterday, the PMMA precoating, the centralizers that we use on implants, are utilized in a sterile condition. And we routinely test our implants for a variety of functions in an as finished condition or the materials that are used, elements of the implant in an as finished condition. And that includes sterilization, particularly polymers.
    We know the effect of sterilization on a variety of polymers, including the acrylics that are used in bone cement, PMMA precoating, and the spacers on implants. We have characterized and understand the effect of radiation on those materials.
MR. REARDON: Okay, I asked you, Doctor whether or not there was any -- I'm not going to waste my time with it. He answered the question, that's the answer to the question.

402

No need to start gasping.
MR. DAHM: I wasn't gasping, Robert.
BY MR. REARDON:
Q. Would you agree, Doctor, that the femoral stem that was manufactured for Dolores Dunn was 115 millimeters and was a stem size number 2? You can look at the materials.
A. That's my understanding, yes.
Q. If you want to take a look at M-13, that might help you.
A. It's a size 2 implant.
Q. Right. And that would be 115 millimeters in length?
A. I believe that's the case, yes.
Q. And the item number for the stem, as indicated on M-13, is 9800-102-01, correct?
A. That is a part number. I can't tell if you that refers to the forging or to the stem. That may be a forging part number, raw materials part number.
Q. The part number that's on page 1, M-1, at the top of the page is a 9825-002-01, do you see that?
A. Dash 002 dash 01, yes.
Q. And that would be a Centralign implant with 2.5 millimeter spacers, correct?
A. Yes.

**403**

1 Q. That's what the 9825 represents, correct?
2 A. Yes.
3 Q. The 002 means size 2, which is 115 millimeters in
4    length, correct?
5 A. Yes.
6 Q. And the 01 indicates what, sir, if you know?
7 A. I don't know what the 01 indicates.
8 Q. Okay, they all have a 01 on them. Some day I'll
9    figure that out.
10      Okay, let's go to Fuentes-Weed, which is
11   F-U-E slash M-1 through F-U-E slash M-186.
12      Now by comparison, this implant is an Option,
13   correct, it's a Centralign Option?
14 A. That could be, I'm not familiar with the part
15   numbers, I don't recall the part numbers. It's a
16   9800.
17 Q. Okay, well, to save time, go to M-18.
18      Does it also start with the same item number
19   for the femoral stem, which is 9800-102-01 as the
20   Dunn implant which we just showed you on M-13 of
21   the Dunn documents?
22 A. Yes, and as I said, I believe that's a forging
23   part number.
24 Q. That means that they're the same size, same shape
25   implants?

**404**

1 A. Same raw material.
2 Q. Same raw material? How about the same size and
3    shape?
4 A. Yes.
5 Q. Okay. When the implants are finished, and you can
6    look at the materials, and leave Puerto Rico, are
7    the exact same specifications met for the
8    Fuentes-Weed implant as the Dunn implant? In
9    other words, are they the very same size, 115
10   millimeters, same proximal width, same A.P., same
11   roughened surface, all of the same specifications
12   met for the Fuentes-Weed implant and the Dunn
13   implant when they leave Puerto Rico with the metal
14   stem finished ready for the other steps in the
15   process that we described earlier in this
16   deposition?
17      MR. DAHM: Form.
18      THE WITNESS: I believe they are, as you
19   described, the same nominal dimensions made to the
20   same tolerances, same manufacturing processes as
21   performed in Puerto Rico.
22      MR. REARDON: If you were to take the two
23   implants at the point in which they both leave
24   Puerto Rico, and by the way the Fuentes-Weed was
25   manufactured in Puerto Rico, was it not, the stem?

**405**

1   You can look through the same documents that I
2   showed you in the other one, Dunn, and starting
3   with M-19 through M I believe it's 50.
4      MR. DAHM: Form.
5      MR. REARDON: Excuse me, it's longer than
6   that: M-19 through M --
7      THE WITNESS: To save you time, there is a
8   Zimmer Caribe production order, M-16. So I
9   believe that the hip stem was prepared in a
10  similar fashion in Puerto Rico.
11 BY MR. REARDON:
12 Q. And, in fact -- M-15 you're looking at?
13 A. M-16.
14 Q. Well, if you look at M-15, it's a femoral stem
15   size 2, 115 millimeter stem length, and it has in
16   a box without precoat, correct?
17 A. Yes.
18 Q. So other than the absence of a precoat, since
19   they're both size 2's, since they're both femoral
20   stems, since they're both made at the same
21   location, these stems should be identical --
22      MR. DAHM: Form.
23      MR. REARDON: -- when they leave Puerto Rico?
24      MR. DAHM: Same.
25      THE WITNESS: I'm not aware of any

**406**

1   differences that there should be in the prostheses
2   as they're finished in Puerto Rico.
3      MR. REARDON: Okay. What I'm getting at is
4   whether there's a Centralign Option or a
5   Centralign Precoat, the femoral stem, if it's a
6   size 2, is identical, with the exception of the
7   application of a precoat?
8      MR. DAHM: That's been asked and answered.
9      MR. REARDON: Is that correct?
10     MR. DAHM: Same.
11     THE WITNESS: That's my understanding.
12     MR. REARDON: Thank you.
13        Now, just to kind of summarize that and then
14   we'll go back, I'd like you to go to the Vino
15   documents and see if you can agree with me that
16   that stem was also manufactured in Puerto Rico at
17   the same facilities, and as in the case of
18   Fuentes-Weed and in the case of Dunn, the quality
19   assurance documents were prepared by Jose Bagu and
20   approved by Ricardo Pabon?
21     MR. DAHM: Form.
22 BY MR. REARDON:
23 Q. Do you agree with me that in all three cases
24   that's true?
25 A. I see a Zimmer Caribe production order here for

407

1 this product also.
2 Q. And would you agree that the Vino implant is also
3 a femoral stem size number 2?
4 A. Yes, it is.
5 Q. And would you agree with me that when that left
6 Puerto Rico, that that stem should be virtually
7 identical to the stem that was manufactured and
8 ultimately installed in Mrs. Fuentes-Weed and
9 Mrs. Dunn?
10   MR. DAHM: Form.
11   THE WITNESS: Consistent with tolerances and,
12 you know, specifications, I mean, this is the same
13 product item as the one in Dunn, this one is
14 intended to be precoated.
15   MR. REARDON: And so when this product
16 reached the surgeon, it would be identical, it
17 should be identical, to the Dunn prosthesis,
18 right? The Vino should be identical to the Dunn
19 prosthesis in all respects, correct?
20   MR. DAHM: Same.
21   THE WITNESS: Yes, these are the same product
22 number, same part number, same nominal dimension,
23 same process of production.
24 BY MR. REARDON:
25 Q. Same size?

408

1 A. Same size.
2 Q. Okay. And let's go quickly to then Lopes, which
3 would be Zimm Lopes M-1 through M-90.
4   In the case of Mrs. Lopes' femoral stem,
5 would you agree with me that that was also
6 manufactured in its finished state in Puerto Rico
7 and, again, the quality assurance was prepared by
8 Jose Bagu and approved by Ricardo Burgos? It used
9 to be called Ricardo Burgos Pabon but now he's
10 become -- his name changed apparently, the Pabon
11 came and went.
12   MR. DAHM: Bob, what's the question?
13   MR. REARDON: Excuse me?
14   MR. DAHM: What's the question?
15   MR. REARDON: I'm asking the question, don't
16 interrupt me.
17   I'm sorry, I'll start all over again because
18 I was interrupted.
19   THE WITNESS: I remember the question.
20   MR. REARDON: Okay.
21   THE WITNESS: And the answer is no because
22 you said manufactured in the finished state in
23 Puerto Rico.
24   This was not manufactured in the
25 finished state in Puerto Rico nor were any of the

409

1 other implants. They were manufactured to a state
2 of finish in Puerto Rico. They were then sent to
3 Warsaw where they were finished and made into
4 final product.
5   MR. REARDON: All of the metal work that was
6 done on these implants was done in Puerto Rico, am
7 I correct, sir?
8   MR. DAHM: Form.
9   THE WITNESS: The metal finishing was done in
10 Puerto Rico.
11   MR. REARDON: That's what I was referring to.
12 BY MR. REARDON:
13 Q. Certainly the PMMA coat, so the record is clear,
14 is applied in Warsaw, the spacers are applied in
15 Warsaw, they're manufactured by outside vendors.
16 But with respect to the femoral stem, the metal
17 femoral stem, it was in its finished state when it
18 left Puerto Rico in the case of each of these four
19 stems, right?
20 A. From a metal finishing point of view, apart from
21 pacivation and other cleaning that was performed
22 in Warsaw, the metal was finished.
23 Q. Okay. And in the case of Ms. Lopes' stem, when it
24 left Puerto Rico, was that stem or should that
25 stem have been identical in all respects with

410

1 respect to its size and its shape as the stem that
2 was manufactured and ultimately used for
3 Mrs. Dunn, Mr. Vino, and Mrs. Fuentes-Weed?
4   MR. DAHM: Form.
5   THE WITNESS: These implants, the same part
6 numbers, same dimension, same nominal dimension,
7 same tolerance scheme, same sizing, same stem
8 length.
9 BY MR. REARDON:
10 Q. All four of them?
11 A. Yes.
12 Q. And am I correct that the only difference in the
13 ultimate product between any of these four is that
14 the Fuentes-Weed implant had no precoat? Other
15 than that, they were identical in all respects?
16   MR. DAHM: Form.
17   THE WITNESS: I'm trusting you that it was
18 that one. There was one that was different. It
19 was the Option one, and there were three that were
20 precoated ones. The name of the individual, I
21 presume that's the correct one.
22 BY MR. REARDON:
23 Q. Well, I think I called your attention to it
24 earlier, but I'll call your attention to it again
25 so that you don't have to trust me.

411

1     And that is, if you look u... the
2  Fuentes-Weed documents, I think you'll note that
3  it says without precoat, on page M-15 of
4  Fuentes-Weed, manufacturing documents. Do you
5  have that?
6  A. That one says without precoat.
7  Q. So other than the absence of a precoat on the
8     Fuentes-Weed implant, femoral component of the
9     implant, the femoral stems of all four of these
10    implants were identical?
11        MR. DAHM:  Same objection.
12        THE WITNESS:  The metal components of the
13 devices were identical
14        MR. REARDON:  Okay.  And also the placement
15 of the centralizers were identical, is that
16 correct?
17        MR. DAHM:  Same objection.
18        THE WITNESS:  I believe there's only one
19 specification for a centralizer placement.  Any of
20 the implants at this period would have had the
21 same placement centralizers.
22        MR. REARDON:  And the roughened surfaces were
23 identical on all four?
24        MR. DAHM:  Same.
25        THE WITNESS:  Would have been produced by the

412

1  same process.
2  BY MR. REARDON:
3  Q. In the same location?
4  A. Yes.
5  Q. Same area?
6  A. Yes.
7  Q. Now with respect to the Fuentes-Weed implant, that
8     appears to have been forged in Forge DeBologne,
9     France, are you familiar with that facility at
10    all?
11 A. That is another vendor that we use, which is
12    Forge DeBologne.
13 Q. Why do you see fit to use vendors in Puerto Rico
14    and France rather than the United States to do the
15    forging of the implant?
16        MR. DAHM:  That's a mistake,
17 mischaracterization of the record.
18        MR. REARDON:  Well, I mean, --
19        MR. DAHM:  Contact is in Massachusetts.
20        THE WITNESS:  And Puerto Rico is in the
21 United States.  We use a variety of vendors for
22 production of our implants.  The contact is a
23 domestic vendor, Forge DeBologne is a French
24 vendor, we've also used English vendors.  Our
25 production facility in Puerto Rico is a Zimmer

413

1  facility, not an o...e vendor; and the employees
2  are Americans.
3        MR. REARDON:  When you indicate in your
4  materials that you have a manufacturing center of
5  5,000 square feet, where is that manufacturing
6  center located?
7        MR. DAHM:  Can you show him the document?
8        MR. REARDON:  500,000 square feet.  This was
9  on the Internet.
10       THE WITNESS:  I'm not one familiar with one
11 that's 5,000 square feet.
12 BY MR. REARDON:
13 Q. 500,000, I'm sorry.
14 A. This would be in reference to Warsaw.  In fact,
15    right next to that statement is a picture of a
16    building which is a facility in Warsaw, Indiana.
17 Q. Why don't you make reference to your Puerto Rican
18    facility if you say it's part of the Zimmer
19    manufacturing facilities?
20       MR. DAHM:  Objection.  It's totally
21 without -- are you done with the development?
22       MR. REARDON:  That's part of it, no, I'm not.
23 I'm asking about forging.
24       MR. DAHM:  You're asking about something that
25 appears on the Internet, Bob.  This witness has

414

1  nothing to do with it.
2        MR. REARDON:  I'm asking about the forging of
3  this particular implant of Mrs. Fuentes-Weed which
4  occurred in France and why it occurred in France.
5  It's perfectly permissible questioning with
6  respect to the manufacturing process of this
7  particular implant.
8        MR. DAHM:  You didn't say France, you said
9  Puerto Rico and why isn't there a reference to a
10 Puerto Rico facility --
11       MR. REARDON:  I'm asking about --
12       MR. DAHM:  -- with respect to this, excuse
13 me, Bob, don't interrupt, use your own advice,
14 with respect to this particular document.  We're
15 not here to talk about what's on the Internet.
16       MR. REARDON:  Okay, let's talk about the real
17 world then.
18       MR. DAHM:  Are you finished with the 30(B)(6)
19 notice?
20       MR. REARDON:  No, I'm not.
21            I'm asking you, sir, whether or not you
22 indicate in any of your materials that are
23 available to your customers that some of the
24 process of development of the implants that are in
25 implanted into their patients occurs with outside



                                                                    415
1   vendors in France and in Puerto Rico?
2        MR. DAHM:  Form.
3        MR. REARDON:  I'll withdraw outside vendors:
4   occurs at facilities in France and in Puerto Rico?
5        MR. DAHM:  Form.
6        THE WITNESS:  I'm not sure what material
7   would make reference to that.  Perhaps there is
8   some material, I'm not familiar with it.
9             We've had customers visit our facility
10  in Puerto Rico.  I mean, it's not a secretive
11  facility, it's a Zimmer facility, we're quite
12  proud of it, we have more than ten years of
13  history manufacturing implants there.  And they do
14  a very fine job.
15  BY MR. REARDON:
16  Q.  How have you selected Forge DeBologne in France,
17      how did you choose that particular operation to
18      forge the femoral stems?
19  A.  As we would choose other vendors, other forging
20      vendors and other vendors of other processes, we
21      have a vendor qualification process, we work with
22      them to assure the quality of their production, we
23      use multiple vendors in many cases to get
24      sufficient capacity to make hip stems, to have
25      multiple sources that were not strategically tied

                                                                    416
1       to one source for an operation, that we can go to
2       multiple vendors if we need to, if somebody has a
3       capacity problem.
4   Q.  Does price have anything to do with it?
5   A.  Our purchasing people negotiate price with all our
6       vendors, as do our customers that, you know, we
7       are vendor to them.
8   Q.  Okay, so price does have something to do with it?
9   A.  These vendors are -- part of their qualification
10      and utilization depends upon pricing as well as
11      quality, deliverability, reliability, a variety of
12      factors.
13  Q.  Would you agree with me that, and you can look
14      through all of the documents, that the
15      Fuentes-Weed, the Vino, and the Lopes, and the
16      Dunn femoral stems were all finished metal stems,
17      were all finished at Zimmer Caribe in
18      Puerto Rico?
19       MR. DAHM:  He's already answered that
20  question, Bob.
21       MR. REARDON:  I think he's answered as to
22  some, I'm not sure he's answered to all, I just
23  want to make sure.
24       MR. DAHM:  He did.
25       THE WITNESS:  I believe all four of those

                                                                    417
1   were metal finishing the stem in Puerto Rico at a
2   Zimmer facility by Zimmer employees.
3        MR. REARDON:  And would you agree that in all
4   four cases the inspection process was overseen by
5   Jose Bagu and Ricardo Burgos?
6        MR. DAHM:  And if you have to go back and
7   look at the documents, feel free.
8        THE WITNESS:  We certainly saw that on some
9   of the documents.  I believe through that period
10  of time that Ricardo Burgos was the head of
11  quality assurance in Puerto Rico and would have
12  been responsible for them.
13            I didn't make note of that on each one
14  of those cases, but I believe that's the case.
15  BY MR. REARDON:
16  Q.  According to the records, the quality assurance
17      check for the stems occurred -- was stamped by
18      number 5, was the gentleman I called your
19      attention to earlier, W. Martines, I believe, in
20      all four cases, were you aware of that?
21  A.  I did not see that in the documents in all four
22      cases.
23  Q.  In the Fuentes-Weed documents, could you see if
24      you could find a certificate from Sterigenics?  I
25      could not find a certificate of irradiation --

                                                                    418
1       excuse me, I apologize, I just did find one.  It's
2       on M-10.
3            With respect to the Option model, I would
4       assume that that goes through the very same
5       irradiation procedure as the precoat model, is
6       that correct?
7   A.  I believe it does.
8   Q.  And the standards, in terms of minimum dose and
9       maximum dose, are the same?
10  A.  I believe they are.
11  Q.  And the Option model does not include any precoat
12      and does not include any centralizers, is that
13      right?
14  A.  I don't believe the centralizer's included in the
15      package.
16  Q.  Okay.  Just so we're clear, I know you're shaking
17      your head, the Option does have centralizer
18      spacers mounted on it, is that correct?
19  A.  Mounted, excuse me, I thought you were talking
20      about the removable centralizer.
21  Q.  I was actually; he wasn't, so.
22  A.  In any centralizer that's mounted on the
23      prostheses is in the package at the time of the
24      sterilization.  The maximum and minimal doses on
25      this radiation certification sheet are very

419

1  similar, to my recollection, of maximum and
2  minimums that was on the previous sheet.
3 Q.  So by comparison, if we were to put a Centralign
4     Option next to a Centralign Precoat, the only
5     difference between the two, if they were of the
6     same size as they apparently are and we've agreed
7     upon that, would be a clear coat on the proximal
8     roughened surface and on the distal roughened
9     surface, in all other respects it should be
10    identical, is that correct?
11      MR. DAHM: Form.
12      THE WITNESS: That's my understanding.
13      MR. REARDON: Could you explain in the case
14  of the Lopes implant why the shipping documents
15  indicate that the forged implants were shipped
16  from France to Alcoa Cleveland.
17      MR. DAHM: Do you have a document for him to
18  look at?
19      MR. REARDON: I do, I'll find it for you.
20         I can ask you while we're locating it do
21  you know if Alcoa Cleveland has any relationship
22  to Zimmer at all, any business relationship to
23  Zimmer?
24      MR. DAHM: Business relationship, do they own
25  Zimmer?

420

1       MR. REARDON: Yeah.
2       THE WITNESS: If we're shipping implants
3   through them, we have a business relationship with
4   them.
5       MR. DAHM: But I think the question is does
6   Alcoa own Zimmer. And the answer's no.
7       THE WITNESS: If that's your question, no.
8       MR. REARDON: Well, simply put my question
9   is, and I'll locate the document, do you know why
10  Alcoa of Cleveland actually paid for the shipping,
11  according to the shipping invoice and all from
12  France? And I'll locate the shipping invoice in
13  just a moment.
14        It's M-56 in the Lopes documents.
15              - - -
16        Off-the-record discussion.
17              - - -
18      MR. DAHM: He has that document in front of him;
19  what's the question?
20      MR. REARDON: My question was can you explain
21  why, according to the document, Alcoa paid for the
22  shipping?
23      MR. DAHM: Foundation, form.
24      THE WITNESS: I don't know who Alcoa
25  Cleveland is.

421

1 BY MR. REARDON:
2 Q.  All right. And, finally, let me show you, and
3     we'll be all finished, M-112, and I'll give it to
4     you to save time, Fuentes-Weed, and this is also
5     found in the other documents.
6        Are you familiar with that change order?
7 A.  I don't recall that I've seen it, I'm not familiar
8     with it.
9 Q.  Okay. Can you explain it to me, based upon your
10    understanding of change orders?
11 A. This is an engineering change notice from 1995, I
12    think it's the fifth month of 1995, that changes
13    the tolerancing of the height of the centralizers
14    from a maximum of ninety-six thousandths of an
15    inch to ninety-six thousandths of an inch, plus
16    zero or minus fifteen thousandths of an inch. I
17    don't know why that change was produced.
18 Q. Let me see it. Thank you.
19       Would you agree that it also changes the
20    centralizer height dimensions? And there are
21    actually four changes: A, B, C, D, they're in
22    boxes, do you see those?
23 A. What I just referred to was the centralizer height
24    change.
25      MR. DAHM: So what's the question?

422

1       MR. REARDON: I'm asking if he sees all four
2   changes; he only made reference to one change.
3       MR. DAHM: Foundation, form.
4       THE WITNESS: This is divided into four
5   parts: A, B, C, and D.
6 BY MR. REARDON:
7 Q.  Do you know why those changes were made?
8 A.  I do not know why those changes were made.
9 Q.  And do you know who authorized those changes?
10 A. If I can read the signature, perhaps.
11 Q. I can't, that's why I'm asking.
12 A. I'm sorry, I can't read the authorizing signature.
13 Q. Was there an employee involved in the production,
14    design or production, of the Centralign known as
15    William Smith or W. Smith?
16 A. There is a William Smith that works for Zimmer.
17    And now that you mentioned that, this could be
18    William Smith.
19 Q. What was his position in 1995?
20 A. I do not know.
21 Q. Did he report to you?
22 A. Not that I recall.
23 Q. Okay. I should be finished, just let me take
24    another look at this since we're sharing a copy,
25    make sure I have no other questions. (Short

423

1    pause).
2           Would you agree that this May 10th, 1995
3    change order directed moving the dimple distally,
4    as is depicted in the prosthesis which is
5    Exhibit 12, and also at the same time changing the
6    height of the dimple or spacer from 1.5
7    centimeters to 2.5 centimeters, both at the same
8    time?
9           MR. DAHM:  Form.
10          MR. REARDON:  Excuse me, millimeters, I
11   apologize, not centimeters.  So I'll withdraw the
12   question and reword it so it's clear.
13 BY MR. REARDON:
14 Q.  Would you agree with me that the May 1995 change
15   order that you have before you directs a change in
16   the manufacturing process so that the PMMA spacers
17   are changed from 1.5 millimeters in height to 2.5
18   millimeters in height and at the same time the
19   proximal lateral spacer is moved distally or
20   closer to the distal tip?
21 A.  Not exactly.  I interpret this, and I could be
22   wrong in my interpretation of it, but I interpret
23   this as being applicable to prosthesis that have
24   2.5 millimeter spacers as well as implants that
25   have 1.5 millimeter spacers.  I don't know that

424

1    it's a change notice from one to the other.
2           And it talks about a change in dimple
3    position and makes reference to some print notes
4    that come from a manufacturing print; and from
5    this document alone I can't tell you what that
6    change was but it's from one print note to another
7    print note, apparently a location of the dimples.
8 Q.  Sir, do you remember whether or not after the 2.5
9    millimeter dimples or spacers were introduced,
10   Zimmer continued to market the 1.5 millimeter
11   spacers internationally in other than the
12   United States?
13 A.  In your construction of your question you use
14   dimples and spacers synonymously.  Dimples and
15   spacers, I believe, are different things.
16 Q.  You're quite right, I apologize, let me withdraw
17   the question, to save time.
18          Do you recall that after the 1.5 millimeter
19   spacers, centralizer spacers, were phased out and
20   the 2.5 millimeter spacers were phased in, that
21   Zimmer continued to market 1.5 millimeter spacers
22   overseas?
23          MR. DAHM:  Form.
24          THE WITNESS:  I believe they were continued
25   to be sold.

425

1           MR. REARDON:  Could you explain why they
2    would modify the spacers in the United States but
3    not overseas?
4           MR. DAHM:  Form.
5           THE WITNESS:  I believe it was a surgeon
6    preference item for certain overseas markets;
7    there was a preference for the 1.5 millimeter
8    spacer devices.
9           MR. REARDON:  Did you ultimately sell out of
10   your 1.5 millimeter spacer implants overseas, the
11   ones that were manufactured to be used in the
12   United States originally?
13          MR. DAHM:  What?
14          MR. REARDON:  In other words, did you sell
15   all of the 1.5 millimeter Centralign spacers, that
16   is the Centraligns with the 1.5 millimeter
17   spacers overseas that would have been sold in
18   the United States when you phased in the 2.5
19   millimeter spacers in the United States?
20          MR. DAHM:  Bob, he's not a market guy.
21          MR. REARDON:  If you don't know, you don't
22   know.
23          THE WITNESS:  Yeah, I don't know.
24          MR. REARDON:  Okay.  Thank you, I have no
25   other questions.

426

1           MR. DAHM:  We'll read and sign.
2           MR. REARDON:  No other questions at this
3    time subject to further discovery because there
4    was an objection interposed with all of the
5    discovery questions and I may have to reconvene
6    the deposition if, in fact, other materials are
7    provided.
8           MR. DAHM:  We are concluded, and we will read
9    and sign, thank you.
10                      - - -
11          Whereupon the deposition was concluded at
12   1:10 p.m.
13                      - - -
14
15
16
17
18                      _____
19                          ROY CROWNINSHIELD
20
21
22
23
24
25

1        E R R A T A   S H E E T
2
3 Date:      November 20, 2001
4 Case:      Dunn v Zimmer
5 Deponent:  ROY CROWNINSHIELD
6
7 PAGE    LINE      CORRECTION               REASON
8 ---------------------------------------------------
9 ---------------------------------------------------
10 ---------------------------------------------------
11 ---------------------------------------------------
12 ---------------------------------------------------
13 ---------------------------------------------------
14 ---------------------------------------------------
15 ---------------------------------------------------
16 ---------------------------------------------------
17 ---------------------------------------------------
18 ---------------------------------------------------
19           I HEREBY CERTIFY under the penalties of
   perjury that I have read the above and foregoing
20 deposition, and that the testimony contained therein,
   together with any corrections in form or substance as
21 above set out, is a true, correct and complete record
   of my testimony given at said deposition on the
22 above-shown date.
23
24           _____
25 DATED: _____

428

1              CERTIFICATE OF THE REPORTER
2
3        I, Toni L. VanSyckle, a Certified Reporter
4 and Notary Public, hereby certify there appeared
5 before me on November 20, 2001, ROY CROWNINSHIELD, who
6 was duly sworn to testify the truth, the whole truth,
7 and nothing but the truth to questions propounded at
8 the taking of the foregoing continuing deposition in a
9 cause now pending and undetermined in said court.
10       I further certify that I then and there
11 reported in machine shorthand the proceedings at the
12 said time and place; that the proceedings were then
13 transcribed from my original shorthand notes; and that
14 the foregoing transcript is a true and correct record
15 thereof.
16       IN WITNESS WHEREOF, I have hereunto set my
17 hand and affixed this seal this _____ day of
18 _____, 2001.
19
20       _____
21            Toni L. VanSyckle
22            My Commission Expires:
23               December 16, 2003
24
25

Summit City Reporting                    Pages 427 to 428