# EXHIBIT F

Page 1

1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF CONNECTICUT
2
3
4
5   -----------------------------------x
    DOLORES DUNN and DONALD DUNN        : CIVIL ACTION NO.
6                                       : 3:00CV1306(DJS)
    VS.                                 : "ALL CASES"
7                                       :
    ZIMMER, INC., ET AL.                :
8   -----------------------------------x
9
10
11
12            DEPOSITION OF: BRUCE H. MOECKEL, M.D.
              DATE: OCTOBER 31, 2002
13            HELD AT: OFFICES OF BRUCE MOECKEL, M.D.
                       520 SAYBROOK ROAD
14                     MIDDLETOWN, CONNECTICUT
15
16
17
18
19
20
21
22
23
              Reporter: MARY Z. ARMANDO, LSR # 00222
24                   BRANDON SMITH REPORTING SERVICE
                         11-A Capitol Avenue
25                   Hartford, Connecticut  06106
                           (860) 549-1850

Dunn vs. Zimmer, Inc., et al
10/31/2002                                                                  Bruce H. Moeckel, MD

Page 2

1   APPEARANCES:
2   FOR THE PLAINTIFFS:
3   THE REARDON LAW FIRM, P.C.
    160 HEMPSTEAD STREET
4   NEW LONDON, CONNECTICUT 06320
    By: ROBERT I. REARDON, ESQ.
5
6   FOR THE DEFENDANTS:
7   BAKER & DANIELS
    111 EAST WAYNE STREET
8   SUITE 800
    FORT WAYNE, INDIANA 46802
9   By: MICHAEL S. ELVIN, ESQ.

Page 3

1            INDEX
2
3   WITNESS           DIRECT CROSS REDIRECT RECROSS
4   BRUCE H. MOECKEL, M.D.   5    68    84    94
5
6
7   EXHIBITS                         Page
8   Defendant's Exhibit 1, file,
    marked for identification................    8
9
    Defendant's Exhibit 2, Centralign package
10  insert, marked for identification............  27
11  Defendant's Exhibit 3, affidavit of
    Bruce H. Moeckel, M.D., marked for
12  identification............................  29
13  Defendant's Exhibit 4, Centralign brochure,
    marked for identification................   29
14
15
16
17  (Note: Reporter retained original exhibits 2 - 4,
    copies sent with copies of transcript to Attorney Elvin.
18  Attorney Reardon did not request copies. Dr. Moeckel
    kept Exhibit 1. Copy of Exhibit 1 to be sent to
19  Attorney Elvin by Dr. Moeckel. Original exhibits 2 - 4
    kept with original transcript.)

Page 4

1            STIPULATIONS
2
3       It is stipulated by the attorneys for the
4   Plaintiffs and the Defendants that each party reserves
5   the right to make specific objections in open court to
6   each and every question asked and the answers given
7   thereto by the witness, reserving the right to move to
8   strike out where applicable, except as to such
9   objections as are directed to the form of the question.
10
11      It is stipulated and agreed between counsel for the
12  parties that the proof of the authority of the Notary
13  Public before whom this deposition is taken is waived.
14
15      It is further stipulated that any defects in the
16  Notice are waived.
17
18      It is further stipulated that the reading and
19  signing of the deposition transcript by the witness is
20  not waived.

Page 5

1       (The deposition commenced at 1:49 p.m.)
2
3       BRUCE MOECKEL, M.D., Deponent, having first been
4   duly sworn, deposes and states as follows:
5
6       DIRECT EXAMINATION BY MR. ELVIN:
7
8   Q.  State your name and spell it for the record,
9   please, Doctor.
10  A.  Bruce H. Moeckel, M-o-e-c-k-e-l.
11  Q.  Dr. Moeckel, my name is Michael Elvin. You
12  and I have met before. We have taken your deposition on
13  two prior occasions. Do you understand that you're here
14  today to give your deposition in a matter involving a
15  former patient of yours Stacia Bogdan?
16  A.  Correct.
17  Q.  I won't give any instructions other than just
18  to remind you that if you don't understand any of my
19  questions, feel free to ask me to rephrase them and I
20  will. We'll try to get out of here in good shape today,
21  Doctor, and I'm not going to ask you any questions about
22  your background. We've covered that extensively in the
23  prior depositions.
24          The last time we took your deposition, Doctor,
25  was in April of this year, April of 2002. The one

Page 6

1  question I would like to ask of you is: Have you
2  authored any articles since April of 2002?
3      A.  No.
4      Q.  If we marked your CV in a prior deposition,
5  would it still be accurate today?
6      A.  Yeah. The only difference is I've been
7  recertified. I took my recertification test, I think,
8  and I am recertified for another ten years.
9      Q.  Doctor, when we took your deposition last, you
10 had told me that you had not conducted any type of
11 retrospective review of your Centralign patients; is
12 that true today as well?
13     A.  Yes.
14     Q.  You told me that you had not in a prior
15 deposition undertaken any scientific work to try to
16 study in a biomechanical way the Centralign stem or the
17 design of the stem; is that true today?
18     A.  That is correct.
19     Q.  You had mentioned in one of your prior
20 deposition sessions, Doctor, that you follow
21 Dr. Campbell Jacobs and Dr. Bernstein's Centralign
22 patients in addition to your own; is that still true
23 today?
24     A.  Yes.
25     Q.  And you had mentioned as well in a prior

Page 7

1  deposition session that you were aware of three
2  Centralign loosenings that either you or your colleagues
3  had initially implanted and possibly a fourth; do you
4  recall when we discussed that at your prior deposition?
5      A.  Yes.
6      Q.  Have those numbers changed at all?
7      A.  No.
8      Q.  Still three loosenings and a possible fourth;
9  correct?
10     A.  Correct, yes.
11     Q.  Doctor, we had discussed extensively the
12 multifactorial nature of cemented hip stem loosenings in
13 your prior deposition; do you recall my questions and
14 your answers on that subject?
15     A.  I think, yeah. In general, yes.
16     Q.  And the loosening of the cemented stem is as
17 multifactorial for Mrs. Bogdan as it was for your other
18 patients in that discussion? It applies with equal
19 force to her as well; correct?
20     A.  Yes.
21     Q.  Did you bring your chart for Mrs. Bogdan
22 today, Doctor?
23     A.  Yes, I did (handing).
24         MR. ELVIN: What I would like to do is ask the
25     court reporter to mark this as Exhibit 1.

Page 8

1      You can just put the sticker on the outside
2      of the cover of his chart if you would,
3      please, or if you want to put the subpoena
4      inside everything will be included then.
5
6  (Defendants' Exhibit 1, file, marked for
7  identification.)
8
9  BY MR. ELVIN:
10     Q.  Exhibit 1 is your chart for Mrs. Bogdan;
11 correct?
12     A.  Yes.
13     Q.  To the extent that Exhibit 1 contains notes of
14 office visits or surgical reports that you prepared; do
15 those documents contain a record of events that you made
16 at or near the time that they occurred?
17     A.  Yes.
18     Q.  And were you the person who dictated your
19 notes of your office visits?
20     A.  Yes.
21     Q.  So those were made by you as a person who had
22 knowledge of the events; correct?
23     A.  Yes.
24     Q.  And you were an orthopedic surgeon at the time
25 that you dictated your notes and authored your reports;

Page 9

1  correct?
2      A.  Yes.
3      Q.  And it is your regular practice to maintain a
4  record for patients such as Exhibit 1; correct?
5      A.  Yes.
6      Q.  And to the best of your knowledge, your office
7  notes and operative reports are accurate; correct?
8      A.  Yes.
9      Q.  When did you first see Mrs. Bogdan?
10     A.  I first saw her on May 3rd of 1993.
11     Q.  What symptoms did she present with on
12 May 3, 1993, Doctor?
13     A.  She had pain in her right knee and her right
14 thigh as well as some pain in her right groin.
15     Q.  Did you take x-rays?
16     A.  Yes.
17     Q.  What did the x-rays indicate?
18     A.  The x-rays showed arthritis of her right hip.
19     Q.  Osteoarthritis is what your record says;
20 correct?
21     A.  Osteoarthritis; correct.
22     Q.  And that is a bone on bone condition resulting
23 from the deterioration of the cartilage; correct?
24     A.  Correct.
25     Q.  What did you prescribe for treatment for her,

Dunn vs. Zimmer, Inc., et al

10/31/2002                                                                 Bruce H. Moeckel, MD

Page 10

1   Doctor?
2       A.  We started her on some course of
3   anti-inflammatory medication called Relafen.  We talked
4   about the activities to avoid aggravating her hip as in
5   using a cane, and then we scheduled a follow-up
6   appointment to have her come back in six weeks.
7       Q.  Did you show Mrs. Bogdan the x-rays that you
8   took, Doctor?
9       A.  Yes.  Well, I don't have any independent
10  recollection, but my normal practice is to show the
11  x-rays to the patient.
12      Q.  So if Mrs. Bogdan testifies in her deposition
13  that on certain occasions you showed x-rays to her, in
14  all likelihood she is correct about that?
15      A.  Yes.
16      Q.  What was the next time that you saw
17  Mrs. Bogdan?
18      A.  June 14, 1993.
19      Q.  And what symptoms was she experiencing at that
20  time?
21      A.  She was still having the pain referable to the
22  hip, in her groin, and her right knee.  She had been
23  tolerating the Relafen, but she hasn't had any
24  significant improvement with the Relafen.
25      Q.  What is Relafen?

Page 11

1       A.  Relafen is an anti-inflammatory medication.
2       Q.  So essentially what you were doing with
3   Mrs. Bogdan at this point in time was treating her
4   conservatively, watching how her symptoms progressed,
5   and not recommending any sort of total joint surgery
6   until her symptoms had gotten worse; was that a fair
7   summary on my part?
8       A.  Yes.  And or also to see if we could make her
9   symptoms better.  I mean, her x-rays were bad at the
10  beginning, so it wasn't really a question of waiting for
11  it to get worse.  It was just a question of seeing if we
12  could make it so it was bearable for her.
13      Q.  When you say in your records of June 14,
14  Long-term prognosis was discussed with the patient; to
15  what were you referring in that note, Doctor?
16      A.  I was referring that she most likely was
17  ultimately going to come to a hip replacement.
18      Q.  But you weren't recommending that for her
19  immediately?
20      A.  No.
21      Q.  Explain for me, if you would, please, why you
22  were waiting to see how her symptoms progressed instead
23  of making that recommendation as of June of 1993?
24      A.  I mean, part of it is just, you know, I had
25  only met her on two occasions, to get to know her.  Kind

Page 12

1   of get a sense of how much it was really disabling her
2   and just to see if any of these medications or activity
3   modifications could help her.
4       Q.  And if I'm remembering our prior discussion
5   accurately, part of it also was your practice to push
6   off hip replacement surgery for as long as the patient
7   could tolerate the pain given that a revision surgery
8   was a possibility for all of your patients; correct?
9       A.  Yes.
10      Q.  When did you next see Mrs. Bogdan?
11      A.  August 12, 1993.
12      Q.  It appears that you were following her on two
13  month intervals?
14      A.  Correct.
15      Q.  Is that a relatively short or a relatively
16  long interval for you?
17      A.  Usually once that's, you know, usually I call
18  it relatively short, but kind of when we follow patients
19  at the beginning.  And once they get to a more steady
20  state, we would stretch that out.
21      Q.  What were her symptoms in August of 1993?
22      A.  Also she had hurt her left ankle.  She
23  essentially twisted her ankle.  Her hip was still
24  bothering her.  She had not a whole lot of improvement
25  with her hip.  She had injured her ankle before this

Page 13

1   office visit and that was starting to get better, and so
2   we really just kind of kept doing what we were doing.
3       Q.  When did you next see Mrs. Bogdan?
4       A.  August of 1994.
5       Q.  Your note of August of 1993, Doctor, indicates
6   that she had experienced a rapid improvement; am I
7   understanding correctly that the medication that you had
8   treated her with had helped her arthritis to some extent
9   at least the symptoms?
10      A.  I don't say it, but I think I was referring to
11  the ankle.  Since her ankle was getting better, I didn't
12  get an x-ray.  So I think that's what I was referring to
13  based on a rapid improvement which continued.  I think
14  that's what that refers to.
15      Q.  Her hip arthritis remained in a state where
16  she likely was going to need a total hip replacement at
17  some point?
18      A.  Correct.  And she goes to Florida every year,
19  and I forget when she actually -- September or October
20  she usually leaves, so that was probably she was coming
21  in to see me before she left for Florida.  And so that
22  was, you know, the time frame.
23      Q.  What was the next time that you saw her,
24  Doctor?
25      A.  The following August, August of '94.

4 (Pages 10 to 13)

Page 14

1 Q. You note that her right hip continues to give
2 her a greet deal of trouble and that she is concerned;
3 what can you tell me about Mrs. Bogdan's condition with
4 respect to her hip at this period of time?
5 A. Well, it was limiting her activity. She is an
6 avid walker and she was having trouble doing her walking
7 and she didn't feel she could live with it anymore and
8 so we talked about doing the hip replacement.
9 Q. You took x-rays on August 25, 1994; correct?
10 A. Yes.
11 Q. And to the best of your recollection and
12 general practice, you discussed those with her; correct?
13 A. Yes.
14 Q. Do you see in the pile of x-rays, Doctor, I
15 put in front of you one from August of '94?
16 A. (Witness reviews x-ray.)
17 Q. Doctor, are you now holding your x-ray from
18 August 25, 1994?
19 A. Yes.
20 Q. And what can you tell us about her condition
21 of her hip at that time from the x-ray?
22 A. You know, she has severe arthritis involving
23 her right hip and, you know, essentially the hip's worn
24 out.
25 Q. And she was in pain in August of 1994?

Page 15

1 A. Yes.
2 Q. She was experiencing difficulty in walking and
3 movements associated with ordinary every day living?
4 A. Yes.
5 Q. She had failed conservative treatment by this
6 time?
7 A. Yes.
8 Q. And she wasn't going to get any better absent
9 a total joint replacement; correct?
10 A. Yes.
11 Q. I'll take that back, Doctor.
12 A. (Handing.)
13 Q. You note in your record -- do you have your
14 August 25 record back?
15 A. Yes.
16 Q. You note in your record, Doctor, that you
17 discussed the risks and benefits of total joint surgery
18 with Mrs. Bogdan. Do you have a specific recollection
19 of that conversation with her?
20 A. No.
21 Q. Why don't you tell me what your general
22 practice was in 1994 in terms of the risks and benefits.
23 A. Essentially we talk about the operation in the
24 sense of where the cut is, how many days you'll be in
25 the hospital, what to expect when you're in the

Page 16

1 hospital, what steps we take to help prevent any
2 short-term problems mainly using perioperative
3 antibiotics, placing them on Coumadin for deep vein
4 thrombosis, prophylaxis, the rehabilitation program, and
5 then what kind of precautions to follow after the
6 operation, and then we essentially talk about the
7 benefits being the relief of pain and improved function.
8 And then the risks being essentially two sets of risks,
9 the short-term risks which are grouped in infection,
10 dislocation, perioperative problems like a heart attack
11 or something like that, and then the long-term risk of
12 how long we expect the hip to last, what kind of
13 activities I'm going to encourage her to avoid to try to
14 have her hip last longer, and kind of give them just an
15 overview of what to expect.
16 Q. You tell them that loosening of the prosthesis
17 is a risk; correct?
18 A. Yes. I don't call it loosening, but usually I
19 just refer to it as the bonding between the prosthesis
20 and the bone over time may loosen, so, yeah, I guess I
21 do use the word loosening, may loosen. That varies.
22 That some have lasted as long as, you know, cemented hip
23 replacements have lasted as long as 15 to 20 years. A
24 more common number is 7 to 10 or 7 to 15 years. That is
25 the time frame I give them.

Page 17

1 Q. Do you also tell them some loosening in a
2 number of years less than 7?
3 A. Probably not. I probably don't specifically
4 say that. I might group that though into more of a
5 general thing. I normally say like 98 percent of people
6 who have a hip replacement do well. I don't think I
7 usually say that they're loosening in a short period of
8 time, no.
9 Q. But in 1994 you knew that in some number of
10 patients cemented stems do loosen in a few number of
11 years; correct?
12 A. Yes.
13 Q. And you knew as well that there is no time
14 period in which you could guarantee that a cemented stem
15 wouldn't loosen; correct?
16 A. Correct.
17 Q. And that's the reason that you don't guarantee
18 any number of years to your patients; right?
19 A. Right, no guarantees.
20 Q. And the factors that influence in what period
21 of time a person's stem will loosen can be generally
22 described as patient factors such as activity level and
23 surgical factors such as quality of the cement mantle
24 among others; correct?
25 A. Yes.

5 (Pages 14 to 17)

Case 3:02-cv-00637-JCH    Document 40-16    Filed 05/17/2006    Page 7 of 14

Dunn vs. Zimmer, Inc., et al
10/31/2002                                                              Bruce H. Moeckel, MD

Page 18

1   Q.  You performed Mrs. Bogdan's surgery on
2   October 6, 1994; right?
3   A.  Correct.
4   Q.  And you used a Centralign stem; correct?
5   A.  Yes.
6   Q.  And you made the decision to use a Centralign
7   for Mrs. Bogdan; correct?
8   A.  Yes.
9   Q.  And you exercised your independent medical
10  judgement when you made that decision; correct?
11      MR. REARDON: I'll object to the form of the
12      question. You can answer it, Doctor.
13  A.  Yes.
14  BY MR. ELVIN:
15  Q.  Do you have your operative report in front of
16  you, Doctor?
17  A.  Yes.
18  Q.  You signed your operative report; correct?
19  A.  Yes.
20  Q.  Did you dictate this report; Doctor?
21  A.  Yes.
22  Q.  Do you have any independent recollection of
23  Mrs. Bogdan's operation other than what is set forth in
24  your report?
25  A.  No.

Page 19

1   Q.  Had you templated Mrs. Bogdan prior to the
2   operation, Doctor?
3   A.  Yes. I usually template it that day or that
4   morning.
5   Q.  When you say you impacted a no. 2 trial, does
6   that mean that you had used a size 2 rasp to make the
7   cavity in which you put the no. 2 --
8       MR. REARDON: Where are you and what page are
9       you on?
10      THE WITNESS: He's on the operative
11      report, first page.
12  A.  I think the canal was entered with the canal
13  finder and then reamed. I think normally there is a
14  zero, one, and two rasp, so I rasped a zero, one, and a
15  two, and then the two had good contact so I left that
16  one in place. And then the head neck assembler usually
17  fits right onto that and the trial reduction is carried
18  out. So I think I left out using the, you know, the
19  numbers, a lot of the prosthesis have different numbers,
20  but this most likely was a zero, one, two rasp, and I
21  stopped at the two.
22  BY MR. ELVIN:
23  Q.  You don't start with the biggest size, you
24  start with the smallest size and work your way up;
25  correct?

Page 20

1   A.  Correct.
2   Q.  And surgically what you're trying to
3   accomplish is putting the largest size rasp in while
4   still preserving enough cells found to be good in her
5   digitation; right?
6   A.  Correct.
7   Q.  And the reason that you're trying to get to
8   the largest size possible is that the risk of loosening
9   is minimized with the largest -- as you increase the
10  size of the stem that you use, you're lessening the
11  chance of loosening; correct?
12      MR. REARDON: Object to the form.
13  A.  I don't think you're lessening loosening.
14  You're trying to put the right size in. And a larger
15  prosthesis is stronger. It is bigger. It is more
16  metal. And so in general, I think you want to try to
17  use the largest prosthesis possible while maintaining --
18  we talked a lot about this in the last deposition --
19  while maintaining what at this time was felt to be
20  important is a big cement mantle or a proper cement
21  mantle, so you want to put the largest prosthesis in,
22  the largest rasp, that's my normal routine. I wouldn't
23  necessarily say though it is just to prevent loosening.
24  It is to put the proper size in.
25  BY MR. ELVIN:

Page 21

1   Q.  When you say it is stronger, the larger size
2   is stronger; what do you meant by that?
3   A.  It is bigger, more metal. You know, it is
4   inherently stronger.
5   Q.  In terms of fracture strength?
6   A.  Fracture strength; correct.
7   Q.  And in terms of resistance to torsional
8   forces?
9   A.  Yes.
10  Q.  So even though you are unwilling to say that
11  lessening the risk of loosening was the only reason you
12  tried for the larger size, it is one of the reasons why
13  you tried for the larger size; correct?
14  A.  Yes, I think.
15  Q.  Fair enough?
16  A.  Yes.
17  Q.  You had mentioned, Doctor, when we talked
18  about Mrs. Lopes, another patient in whom you implanted
19  a Centralign that you had -- after you had prepared the
20  canal, you had taken the final implant and put the final
21  implant in Mrs. Lopes's canal; did you follow that
22  practice with respect to Mrs. Bogdan?
23  A.  I don't know.
24  Q.  Is it possible that you did?
25  A.  It is possible. It is possible, yes.

Page 22

1  Q. You had also mentioned in Mrs. Lopes's
2  deposition that after you did that you took the final
3  component and put in a jar of antibiotic solution; is it
4  possible that you followed that practice for Mrs. Bogdan
5  as well?
6  A. It is possible.
7  Q. And your operative report doesn't mention
8  anything about either of those events, does it?
9  A. No. I would be curious. Did I mention it in
10 Lopes? I don't remember.
11 Q. I can't answer that question.
12    So even though your operative report doesn't
13 mention it, it is possible that you followed that
14 practice?
15 A. What I would do at this point just to be
16 perfectly clear is that after the canal is prepared, the
17 cement restrictor is placed to ensure that there is
18 enough room to put the prosthesis in. In other words,
19 we put in a cement restrictor and it is possible that
20 the cement restrictor is not down far enough, so when
21 you go to cement in your prosthesis, you can't actually
22 fit the prosthesis in the canal. So I normally would do
23 that and then I would take it off and essentially clean
24 off the prosthesis if there was any blood or anything on
25 the prosthesis. And normally we have a jar that is

Page 23

1  essentially saline, it is not pure antibiotics, it is
2  saline with some antibiotics in it, so we would use that
3  because we are constantly throughout the operation and
4  throughout a total hip replacement irrigating the wound
5  with antibiotic solution to help prevent infection. So
6  really the antibiotic solution and saline is all over
7  the place, much like there is antibiotics that are in
8  the blood of the patient that we're getting
9  intravenously. So there's antibiotics all over the
10 place essentially. And then I would take it out then
11 and pat it dry or often just leave it on the Mayo stand
12 and let it air dry while we go about mixing the cement
13 and pressurizing the cement. So I can't say that I did
14 it in her case or that I do it in every case, but I
15 certainly have done that to make sure that there is
16 enough room with the cement restrictor.
17 Q. And did I understand correctly that one of
18 your practices was to on occasion you would wipe the
19 stem off after it was in the jar of saline solution?
20 A. I think it would be more common that I would
21 just take it off -- I might wipe it off, but I think it
22 would be more common that I just take it off and leave
23 it on the Mayo stand because it is probably sitting
24 there, you know, for a good five or ten minutes while
25 the cement is mixing and pressuring. So I think

Page 24

1  ultimately when the prosthesis goes back in, it is
2  probably essentially dry. I don't think I would
3  normally wipe it off with a towel, no.
4  Q. But in any particular case, for example,
5  Mrs. Bogdan's case as you sit here today, you don't know
6  whether the stem was dry when you implanted it or not;
7  correct?
8  A. Correct. I don't know if it was dry or if I
9  wetted it. I don't have any independent recollection;
10 correct.
11 Q. For how long -- I see in your operative
12 report, Doctor, that you say cement was mixed and
13 injected into the canal and pressurized. Did you have a
14 general practice in 1994 for how long you pressurized
15 the cement?
16 A. I would essentially fill the canal in a
17 retrograde fashion. I would then use a canal
18 restrictor, it is like a plastic or rubber dam that sits
19 on the end of the cement gun, and I would pressurize it
20 usually on 3 or 4, 5 squeezing of the gun. What I like
21 to do is observe the proximal femur and with a good
22 pressurization you'll actually see fat and blood be
23 pushed out of the proximal femur, so I'll usually do it
24 until I see that, and then I'll remove the gun. At that
25 point there is usually a little gap at the top where the

Page 25

1  pressurizer was, I will refill that with cement, top it
2  off, as I would say, before I would pressurize the
3  component or before I would place the component in
4  place. So actual time, I don't know, the pressurization
5  probably takes, I don't know, 30 seconds, that sort of
6  time frame.
7  Q. It can't take too long because if you wait too
8  long the cement will harden in the canal; correct?
9  A. Correct.
10 Q. You say in a following sentence, Doctor, The
11 component was impacted in place and held and then the
12 sentence continues. What do you mean by impacted in
13 place?
14 A. The prosthesis would be in one hand. The top
15 of the femur it is bigger than the prosthesis, so I
16 would cover the remaining part of the prosthesis,
17 actually a dam, and then push the prosthesis in by hand,
18 as far as I could by hand. And then often with the
19 pressurization, you're not able to push it all the way
20 in by hand, and then if I had to I would impact it into
21 place. Often you can push it in all the way with your
22 hand, but that's what we mean by impacted into place.
23 Q. Going back to the no. 2 rasp for a second,
24 Doctor, you had said words to the effect that it seemed
25 to you that the fit was good when you used that size of

Dunn vs. Zimmer, Inc., et al

10/31/2002                                                                                                      Bruce H. Moeckel, MD

Page 26

1  rasp. Describe for me what you mean or what you're
2  feeling when you say the fit is good; what is the
3  sensation that you're observing?
4      A. You're impacting it. You know, you're using a
5  hammer or a mallet. Essentially when you're impacting
6  it, you're watching it to see that if you have a sense
7  of how hard you're hitting it and you're watching to see
8  if it advances. Now, as it gets tighter, it advances
9  less per impaction. You're also looking -- you can
10 twist it a little when you're putting it in to see if
11 you're getting, you know, if it's getting to be a tight
12 fit. Essentially to kind of go back to what you were
13 saying before, I do try to put in the biggest one
14 possible. So you're essentially trying to impact it in
15 as big as you can without breaking the proximal femur
16 because the prosthesis itself is smaller than the rasp
17 to allow for the cement mantle, but essentially you're
18 impacting it with the mallet and you can have a sense of
19 how that is going in. I like to tap it and wait to
20 allow for the femur to actually absorb some of what they
21 call the hoop stresses when you impact it into place.
22 But it is just something that kind of comes with, you
23 know, putting in hundreds of these.
24     Q. It is what you feel while you're hitting the
25 rasp?

Page 27

1      A. Correct.
2      Q. Is there also a sound that is associated with
3  getting close to having the right size?
4      A. You can hear -- more so in an uncemented
5  prosthesis, putting in an uncemented prosthesis, but you
6  can often hear the sound quality will change indicating
7  that the prosthesis is not moving anymore and, you know,
8  it does make a different sound sometimes. More so in
9  the uncemented prosthesis.
10     Q. Do you recall seeing the package insert for
11 Mrs. Bogdan's Centralign?
12     A. No.
13        MR. ELVIN: Let's go ahead and mark this as
14 the next exhibit.
15
16 (Defendant's Exhibit 2, Centralign package insert,
17 marked for identification.)
18
19 BY MR. ELVIN:
20     Q. Doctor, we've handed you Exhibit 2, which is
21 the package insert for Mrs. Bogdan's Centralign. If you
22 could flip through Exhibit 2. I would like to know
23 whether that refreshes your memory that you saw this
24 package insert?
25     A. I've never seen this package insert.

Page 28

1      Q. Have you ever seen any Centralign package
2  insert?
3      A. No.
4      Q. Do you have an understanding, Doctor, of how
5  -- where it is that the package insert is located at the
6  time that the implant is shipped from the manufacturer?
7      A. I assume it is in the package and I assume it
8  is outside of the operative field out where the nurse is
9  opening up the package, but I'm not positive.
10     Q. You've implanted a number of Centraligns;
11 correct?
12     A. Yes.
13     Q. If your assumption is true that it is located
14 in the box and opened outside of the sterile field, if
15 you had wanted to read this insert, one was available to
16 you; correct?
17     A. I guess you could read it for the next case or
18 I guess open it up. You can't really -- I mean, I guess
19 they could hold it up in the window and read it while
20 you're putting it in, but from a practical standpoint,
21 there are not many surgeons that stop to read a package
22 insert. And I think it is fair to say that if you
23 polled all orthopedic surgeons in the country, the vast
24 majority have never read a package insert.
25        MR. ELVIN: I'll move to strike that last

Page 29

1  part as nonresponsive. I understand what
2  you're saying, Doctor. I think you answered
3  my question.
4  BY MR. ELVIN:
5      Q. That if you had wanted at some point to read a
6  package insert that one would have been available to
7  you; correct?
8      A. Sure.
9         MR. REARDON: I'm going to object. I think
10 his answer stood.
11        MR. ELVIN: Let's mark this.
12
13 (Defendant's Exhibit 3, affidavit of Bruce H. Moeckel,
14 M.D., marked for identification.)
15
16 (Defendant's Exhibit 4, Centralign brochure, marked for
17 identification.)
18
19 BY MR. ELVIN:
20     Q. Doctor, we've handed you what we've marked as
21 Exhibits 3 and 4; what is Exhibit 3?
22     A. Three is an affidavit of me that I think I
23 remember signing last summer.
24     Q. And you signed that with respect to your
25 patient Joann Lopes; correct?

8 (Pages 26 to 29)

Page 30

1    A. Correct.
2    Q. And do you see in paragraph 5 where you
3 referred to an Exhibit A?
4    A. Yes.
5    Q. When your affidavit, Doctor, was tendered to
6 us, it did not have an Exhibit A with it. Probably just
7 a binding oversight. I've marked an Exhibit 4 a
8 brochure. Could you take a look at Exhibit 4 and tell
9 me whether that's what you recall should be attached to
10 the affidavit?
11        MR. REARDON: I'm going to object just for the
12    record on that remark only because no. 1, I
13    don't know if it is true, and no. 2, I don't
14    know if it really even matters. It's not a
15    question of whether one was provided to you.
16    It's a question of whether the Doctor might
17    have had one attached to his, and I'm not
18    going to agree that yours was not provided
19    to you. That is the first I heard of it.
20    A. Yeah, this was what it was.
21 BY MR. ELVIN:
22    Q. That's Exhibit A?
23    A. Yes.
24        MR. REARDON: Could I examine Exhibit 4 for a
25    second because I notice that's a fax copy on

Page 31

1    the top, and I just want to see.
2        MR. ELVIN: We'll go off the record for
3    a second.
4        MR. REARDON: No, we can go on the
5    record. It is a fax copy and the fax on the
6    top says October 31, 2002, 9:18 a.m. from
7    Baker & Daniels and this is page 2 of 19
8    pages, so presumably there was a cover page.
9    So we're clear, it is apparently also a copy
10    of what was Exhibit 4 in a deposition taken
11    on February 8, 2001. I can't without
12    looking back at my records with all of the
13    depositions taken in this case determine
14    which one that was, but in any event, I
15    don't know necessarily that this is exactly
16    the same copy of the brochure that was
17    provided to the Doctor. But for purposes of
18    today's deposition, as long as I've noted my
19    objection, you can certainly show it to him
20    and we can treat it as such. I'm not going
21    to agree to it.
22        MR. ELVIN: With all due respect, Bob,
23    it is not your place to agree with it or
24    not. The Doctor has already identified it
25    as what was Exhibit A to his affidavit. So

Page 32

1    let's move on.
2        MR. REARDON: Well, I don't know that
3    he did, but the record will speak for
4    itself.
5        MR. ELVIN: It sure will, Bob.
6 BY MR. ELVIN:
7    Q. You're taking another look at Exhibit 4,
8 Doctor?
9    A. Sure.
10    Q. That does appear to be Exhibit A to your
11 affidavit; correct?
12    A. Yes.
13    Q. Doctor, let's go to paragraph 7. First, let
14 me ask you this question: Have you had a chance to
15 review the statements that you make in your affidavit?
16    A. Yes.
17    Q. Are the statements that you make with respect
18 to Mrs. Lopes in this affidavit equally applicable to
19 Mrs. Bogdan?
20    A. Yes.
21    Q. In other words, if you're asked to sign by
22 Mrs. Bogdan's lawyer the same affidavit that you were
23 asked to sign for Mrs. Lopes, you would sign the
24 affidavit for Mrs. Bogdan; correct?
25        MR. REARDON: Well, I'll object to that only

Page 33

1    because obviously it has to be tailored. I
2    mean, I understand your question, but, I
3    mean, it has to be tailored to the
4    individual.
5    A. Yeah. I think they're the same. They're
6 similar problems, similar issues.
7 BY MR. ELVIN:
8    Q. And in paragraph 7, Doctor, you say, "If I had
9 known of this increased risk of or susceptibility to
10 early loosening, I would not have considered using the
11 Centralign and would not have implanted the device
12 during Mrs. Lopes' THA procedure."
13        You implanted Mrs. Bogdan's device in 1994;
14 correct?
15    A. Yes.
16    Q. Of what facts are you aware, Doctor, which
17 make you believe that in 1994 the Centralign had an
18 increased risk of or susceptibility to early loosening?
19        MR. REARDON: Just for the record, objection
20    to the form of that question. What facts is
21    he aware of today, you mean. You said what
22    facts are you aware. That was the present
23    tense.
24        MR. ELVIN: Correct.
25        MR. REARDON: Versus being aware of

9 (Pages 30 to 33)

Page 34

1    facts in 1994 or when he implanted in 1996,
2    as of today what is he aware of?
3        MR. ELVIN: Correct.
4    A.   Can you ask me that question again?
5    BY MR. ELVIN:
6    Q.   As you sit here today, Doctor, what are the
7    facts that support your statement that there was an
8    increased risk of or susceptibility to early loosening
9    present in the Centralign when you used it in
10   Mrs. Bogdan?
11   A.   Obviously I didn't know of anything at the
12   time because I used it. I wouldn't have used it if I
13   had known. And it is a funny way that this is worded.
14   To be honest, I didn't pay as much attention to it. But
15   it kind of asks what I know -- did I know it then? No,
16   obviously not or I wouldn't have done it. I think it is
17   implying that if I knew what I know now would I still
18   use the Centralign prosthesis, and the answer is no. I
19   switched -- it wasn't too long after it was either 1995
20   or '96 -- I switched before it was taken from the market
21   because I had those failures and I switched to a
22   Johnson & Johnson. So the factors are what I know now,
23   mainly that several of my patients have failed, that
24   there have been some scientific or peer review journals
25   which have also had similar problems with the

Page 35

1    Centralign, so if I know what I know now I would not
2    have used it then. And that's probably true in a lot of
3    things in life.
4    Q.   So what you're telling us, Doctor, is that as
5    you sit here today you believe the Centralign -- when
6    you used it in 1994 even though you didn't know it, it
7    had an increased risk of or susceptibility of early
8    loosening; that's what you believe today?
9    A.   I believe that that prosthesis attempted to
10   make -- the goal was to make it better. They changed
11   the design a little with the precoating, with the
12   increased cement mantle, the prosthesis being a little
13   smaller, multifactorial, that in turn -- basic science
14   did not translate into clinical success for a lot of
15   reasons. And knowing that now, I would not use it
16   again.
17   Q.   So one fact which leads you to believe that
18   the implant had an increased risk of or susceptibility
19   to early loosening was your own personal experience?
20   A.   Correct.
21   Q.   And the other fact which leads you to that
22   belief is the journal articles?
23   A.   Correct.
24   Q.   What specific journal articles, Doctor?
25   A.   Well, there were two articles. There was an

Page 36

1    article first it was in Orthopedics Today that came out
2    of I think it was out of California. That's what
3    initially got me thinking about it. And then there have
4    subsequently been some articles -- there was actually
5    just a recent article in JBJS about somebody going over
6    the design issues with the Centralign indicating --
7    giving some of the reasons why there were these
8    failures.
9    Q.   Was that Dr. Santore's experience as well, the
10   recent article you're talking about?
11   A.   I don't think this recent one was Santore. I
12   think that was a different one.
13       MR. REARDON: I can't help you now, Doctor. I
14   will later.
15   A.   I don't think it was Santore though. It was
16   right after our deposition that the article came out.
17   It was funny. I think it was a day or two after the
18   deposition I went home and I was reading JBJS because we
19   were talking a lot about the size of the prosthesis and
20   you were pushing me on -- well, you were pushing me on
21   and I didn't know correct or wrong and I kept saying the
22   bigger prosthesis puts less strain into the cement
23   mantle and you kept asking, Why is it? Why is it? And
24   I didn't really have any reason. It was just kind of a
25   gut feeling and I must have picked it up somewhere along

Page 37

1    the way. Well, this article happened to have some basic
2    science information that a larger prosthesis does put
3    less stress and strain into the cement, and so it was
4    just -- that's the only other article I know about.
5    BY MR. ELVIN:
6    Q.   And you don't recall as you sit here today who
7    the authors were of that article?
8    A.   No.
9    Q.   Any other facts which lead you to your present
10   belief that there was an increased risk or
11   susceptibility to loosening?
12   A.   Well, I mean, there was the prosthesis was
13   taken off the market. I know of other orthopedic
14   surgeons who had some other problems with the
15   prosthesis, and I also doing the procedure essentially
16   the exact same way with different prostheses, I'm not
17   having the same loosening problem with the cemented
18   prosthesis. So those things combined help confirm it in
19   my own mind.
20   Q.   Anything else?
21   A.   No.
22   Q.   The last thing you mentioned that you've not
23   had a similar experience with other prostheses. That is
24   your own personal experience that you're talking about;
25   correct?

Page 38

1    A.  Correct.
2    Q.  Have you used any cemented prosthesis that you
3 can say with certainty, Doctor, as you sit here today
4 that you have not experienced any loosenings with?
5    A.  No short-term loosenings, no. We talked a
6 little bit about this in the last deposition. I mean,
7 my indications have changed a little in when I use a
8 cemented or uncemented prothesis partially based on my
9 experience with Centralign. But in a 65-year-old
10 patient, I think she was about 65, I have not had the
11 same catastrophic or early loosening that I've seen in
12 my cemented stems. No, I have not.
13   Q.  Do you have any information as you sit here
14 today about why Zimmer stopped selling the Centralign?
15   A.  No.
16   Q.  As you sit here today, do you know when that
17 occurred?
18   A.  No, just based on what it says in this
19 affidavit, Off the market in 1998. Other than that, I
20 have no information because as I mentioned before it was
21 either 1995 or 1996 I personally stopped using the
22 Centralign. And so I switched on my own and so I didn't
23 really have any further contact with a Zimmer
24 representative.
25   Q.  Who were the other surgeons of whom you're

Page 39

1 aware of who have had a similar experience as yours with
2 the Centralign?
3    A.  Dr. Grady-Benson.
4    Q.  Who else?
5    A.  That's about the only person that I know
6 about.
7    Q.  None of the facts, Doctor, that support your
8 present belief about an increased risk of or
9 susceptibility to early loosening, none of those facts
10 existed in your mind in 1994, did they?
11   A.  No.
12   Q.  Are you aware of any fact which leads you to
13 believe that Zimmer knew that there was an increased
14 risk of a susceptibility to early loosening in the
15 Centralign in 1994?
16   A.  No.
17   Q.  Let's go to paragraph 5, Doctor, of your
18 affidavit. In paragraph 5 you say that you relied on
19 the representations of Zimmer in promotional and
20 marketing materials; correct?
21   A.  Yes.
22   Q.  And you cite as an example the brochure that
23 is attached as Exhibit A; correct?
24   A.  Yes.
25   Q.  And you believe that Exhibit 4 to this

Page 40

1 deposition was the Exhibit A that you were referring to
2 in your affidavit?
3    A.  Yes.
4    Q.  What specific representations, Doctor, did you
5 rely on that are contained in Exhibit 4?
6       MR. REARDON:  You want him to go through it
7    page by page?
8       MR. ELVIN:  Yes, he's already answering
9    the question.
10      MR. REARDON:  I mean, there is a lot of
11   information there. I think he wants you to
12   be specific rather than general. That's why
13   I'm asking.
14   A.  Well, in general, just to review, our
15 department at that time we all agreed on one type of
16 cemented hip replacement. So as a department, we would
17 normally meet. And when I came to Middlesex in '92,
18 they were using the Zimmer. I think at that point it
19 was the precoat or the predecessor to this implant. And
20 so when this implant came out, Tim Walker made a
21 presentation to the department, and this -- for some
22 reason I remember this, and I only remember it because
23 of the cover -- but I remember seeing this and I
24 remember the discussion about this being better and we
25 decided as a group to switch and so we did switch. The

Page 41

1 issues that -- in general, the issues that he was
2 talking about was the precoat, the change in the
3 precoat. The little spacers that were on the proximal
4 aspect of the prosthesis. There were some changes
5 within the design for implanting it, for using, I think,
6 for using the rasp as a trial. And that's the kind of
7 things that he presented and we discussed as a group and
8 then made a decision to switch.
9 BY MR. ELVIN:
10   Q.  You've been general again in your answer,
11 Doctor. Can you point to any specific statements in the
12 brochure that as you sit here today you recall relying
13 upon?
14      MR. REARDON:  Let's take it page by page,
15   Doctor.
16   A.  Okay. I'm looking at the second page. I
17 think the centralizers were an issue, these proximal and
18 distal centralizers that I mentioned before, which I
19 think were PMMA designed to once again optimize the
20 cement mantle and the stem positioning. There was
21 increase precoat coverage that you mentioned in this
22 second page as well.
23 BY MR. ELVIN:
24   Q.  Let's stay with that page, Doctor.
25      MR. REARDON:  Can we all peak because there

Dunn vs. Zimmer, Inc., et al

10/31/2002                                                                                    Bruce H. Moeckel, MD

Page 42

1     was only one provided.
2   BY MR. ELVIN:
3     Q.  Do you have any reason to believe, Doctor, as
4   you sit here today, that any of the statements on page 2
5   about either the precoat coverage or the centralizers
6   are not true?
7     A.  In retrospect or --
8         MR. REARDON: I think that's the question as
9   of today, yes.
10    A.  Today, unfortunately, the theory that led to
11  the change in the prosthesis did not turn out to be
12  correct. The precoating did not improve -- I mean,
13  there is increased precoat coverage. I don't doubt that
14  there was increased precoat coverage, but unfortunately
15  increased precoat coverage did not translate into
16  prolonged stem fixation. And so, I mean, we know now
17  something differently that didn't work out. You know,
18  at the time this was once again a basic science change
19  that was brought about and that we now know that the
20  cement mantle -- we don't have to make the cement mantle
21  as big as maybe it should have been or as it was
22  designed to be with this prothesis. We also know that
23  the prosthesis, you have to be careful with the size of
24  the prosthesis, and that some of these prosthesis to get
25  a big cement mantle were made smaller. We now know that

Page 43

1   that's probably not the best thing for the goal because
2   that didn't lead to longer life of the prothesis.
3   BY MR. ELVIN:
4     Q.  But where on page 2, Doctor, is there a
5   representation that the increased precoat coverage would
6   lead to a longer clinical life --
7     A.  The first sentence says, Added stability
8   designed to improve clinical outcomes. So you're
9   implying that all of these things are designed to
10  improve the clinical outcome. I think it is common
11  sense to say that a new and improved "prosthesis" is
12  going to be better. I don't think they would design a
13  prosthesis or change a prosthesis to make it worse. I
14  think the goal is to make it better and to make it
15  better in the surgeon's hands. I think that's what is
16  implied there.
17    Q.  But the brochure, Doctor, says, "Zimmer's
18  exclusive poly methylmethacrylate (PMMA) precoating is
19  applied to the stem both proximally and distally, the
20  two critical areas where peak stresses occur."
21        Do you have any reason, Doctor, that you
22  believe that that factual statement today is not true?
23    A.  No, I do not have any -- that that statement
24  -- what I object to --
25    Q.  Doctor, that's fine.

Page 44

1     A.  Okay. Sorry.
2         MR. REARDON: Let him answer the question.
3         MR. ELVIN: I move to strike his
4   nonresponsive answer. He answered the
5   question.
6         MR. REARDON: He did not answer the
7   question fully. He tried to answer it
8   further and I'm going to terminate the
9   deposition unless you let him answer the
10  question. You're not going to tell him he
11  can't answer a question.
12        MR. ELVIN: Bob, do you know what, one
13  of these days I would like to take you up on
14  the threat.
15        MR. REARDON: To be very honest with
16  you, I would rather do other things than
17  this today. We arranged -- let's get this
18  done. Let him finish the answer to the
19  question.
20        THE WITNESS: It was really just a
21  continuation of what I said before in that I
22  think this is implying trying to improve
23  clinical outcome.
24  BY MR. ELVIN:
25    Q.  But the factual statement about where the poly

Page 45

1   methylmethacrylate is located that is true as far as
2   you're concerned?
3     A.  I feel that is true, yes.
4     Q.  And the statement about the centralizers, "The
5   Centralign hip implant incorporates both proximal and
6   distal centralizers attached directly onto the stem to
7   simplify and help assure optimum stem positioning within
8   the femoral canal."
9         Do you have any reason, Doctor, as you sit
10  here today to believe that that is not a true statement?
11    A.  No. I feel that is a true statement.
12    Q.  The brochure says, "The Zimmer Centralign
13  Precoat Hip Prosthesis is designed to achieve
14  unparalleled cemented hip implant stability."
15        Would you agree with me, Doctor, that that is
16  a -- strike that.
17        Do I understand you correctly to be saying
18  that as you sit here today you do not believe that to be
19  a true statement?
20    A.  Well, if the cemented hip implant stability
21  means that it is going to last longer and not have early
22  loosening, then, no, I do not believe that is a correct
23  statement as we sit here today. It is kind of funny the
24  way they said it, hip implant stability. Usually we say
25  stability related to dislocation. But I think they're

12 (Pages 42 to 45)

Page 46

1  implying or stating stable so it stays -- it doesn't
2  loosen in the bone.
3     Q.  So you're drawing the conclusion then that
4  stability in this sentence means loosening?
5     A.  It's a funny statement the way they're saying
6  it.  It is to achieve unparalleled cemented hip implant
7  stability.  And then -- well, they go on further.  That
8  may be instability, but then they go on further.
9  "Several important new innovations to help promote
10 long-term implant performance."  Once again, we usually
11 don't call -- the orthopedic surgeons usually don't talk
12 about implant performance.  They talk about implants not
13 loosening or staying in tight to lasting essentially.
14 So they might be referring to hip stability, you know,
15 increased offset.
16    Q.  It is a statement that in your mind is
17 susceptible to more than one meaning?
18    A.  Correct.
19    Q.  So then as you sit here today, Doctor, you
20 really don't have a basis to say that the first two
21 sentences on this page are untrue, do you?
22    A.  These two first sentences?
23    Q.  The two that we just talked about; correct?
24    A.  The only one that, "Engineering has added
25 several important new innovations to help promote

Page 47

1  long-term implant performance."  I don't feel that's
2  true based on what I know now.
3        MR. REARDON:  That would be the second time
4     he's given you that information, Counsel,
5     just so we can -- we have a lot of pages in
6     this.  There is 19 here.
7        MR. ELVIN:  Thank you, Bob.
8        MR. REARDON:  You said you wanted to be
9     out of here at 3:30 and I'm going to go
10    through it as well, so I told you I wanted
11    some time to examine the doctor and you
12    wanted to make a flight tonight, so if you
13    want to go through it page by page, I don't
14    think you need to have him repeat every
15    answer.
16       MR. ELVIN:  You're now taking your own
17    time, Bob.  Let's just move on.
18 BY MR. ELVIN:
19    Q.  And, Doctor, what's the basis for your not
20 believing as you sit here today that the innovations
21 help promote long-term implant performance?
22    A.  Because I had the opposite.  I had early
23 catastrophic loosening both in my patients and in a
24 patient of mine that went and had it done by another
25 surgeon when the normal wasn't for cemented stems to

Page 48

1  loosen in a year or two after implantation.
2     Q.  In some of your patients, however, the
3  Centralign has worked well; correct?
4     A.  Correct.
5     Q.  So in some of your patients, that is a true
6  sentence; correct?
7     A.  Yes.
8     Q.  Do you see any other statements, Doctor, in
9  that brochure that you were referring to in paragraph 5
10 of your affidavit?
11    A.  This sentence, "The simplified and improved
12 alignment provides a uniform cement mantle with
13 increased thickness.  This in turn provides improved
14 stress distribution as a means to enhance long-term
15 implant performance."  What we know now is that does not
16 enhance long-term implant performance in the smaller
17 sizes, so I disagree with that sentence.
18    Q.  So you're reading that sentence as referring
19 to how the implant will perform in the future?
20    A.  I'm interpreting that statement as saying that
21 this modification in rasp allowing a bigger cement
22 mantle or promoting a bigger cement mantle will lead to
23 a longer longevity of the prosthesis.  I'm saying the
24 implant performance means that the implant will perform
25 longer and not lead to catastrophic loosening, correct.

Page 49

1     Q.  And you're saying that you don't believe that
2  to be true today?
3     A.  Correct.
4     Q.  And that is based on your personal experience;
5  correct?
6     A.  Based on my personal experience, based on some
7  of those recent articles we talked about before, yes.
8     Q.  In some of your patients, however, as you said
9  before, the stem has worked well; correct?
10    A.  Yes.
11       MR. REARDON:  That's been asked and answered,
12    Counsel.  I mean, you really should move
13    along.
14       MR. ELVIN:  Bob, please don't lecture
15    me.
16       MR. REARDON:  I'm not going to lecture
17    you.  I want to make a record though that
18    every time from now on that you repeat the
19    same series of three questions to get the
20    same series of three answers, I'm going to
21    object.  It would be a lot more productive
22    if you didn't repeat the same three
23    questions as to every phrase that he points
24    to.
25 BY MR. ELVIN: