Dunn vs. Zimmer, Inc., et al

10/31/2002                                                          Bruce H. Moeckel, MD

Page 50

1    Q. Do you see any other specific statements,
2  Doctor, that you were referring to in paragraph 5 of
3  your affidavit?
4    A. This statement, "The improved bond provided by
5  PMMA precoating combined with the thicker, more uniform
6  cement mantle attacks the most common causes of implant
7  loosening. These innovative advancements help promote
8  superior long-term implant performance."
9        In my hands this did not promote superior
10  long-term implant performance. It did the opposite.
11    Q. Any other statements?
12    A. No.
13    Q. As you sit here today, Doctor, do you have any
14  reason to believe that Zimmer in 1994 did not believe
15  those statements that you've read that you presently
16  disagree with to be untrue?
17    A. No.
18    Q. You say in paragraph 5 of your affidavit,
19  Doctor, that you also relied on the representation of
20  your Zimmer sales associate; do you see that?
21    A. Yes.
22    Q. What specific statements made by Mr. Walker
23  did you rely on?
24    A. I remember him saying that this design
25  modification was felt to make the prosthesis better and

Page 51

1  that Dr. Harris felt that this was a better prosthesis.
2  And based on those recommendations, we decided to switch
3  to this prosthesis.
4    Q. Did Mr. Walker ever guarantee that the implant
5  would last for a certain number of years and that you
6  would achieve certain results with it?
7    A. No.
8    Q. He simply made the subjective statement that
9  it was better?
10    MR. REARDON: I'm going to object to the use
11  of the word subjective.
12    A. I think he probably referenced some of the
13  things we just reviewed in Exhibit A, but, yeah,
14  essentially the overall presentation was that this
15  prosthesis was going to be better and that he didn't
16  guarantee it. I don't think he was guaranteeing that it
17  was going to last longer, but the goal was for it to
18  last longer.
19  BY MR. ELVIN:
20    Q. Do you have any information, Doctor, as you
21  sit here today that Mr. Walker did not believe those
22  statements when he made them?
23    A. No.
24    Q. You can put 3 and 4 away, Doctor, for the time
25  being.

Page 52

1    A. Thank you.
2    Q. You saw Mrs. Bogdan on several occasions
3  immediately after her surgery; correct?
4    A. Yes.
5    Q. And for a time period after her surgery she
6  was doing well; correct?
7    A. Correct.
8    Q. I would like for you to go to your record of a
9  visit on October 18th of 1995.
10    A. Correct.
11    Q. Do you have that in front of you?
12    A. Yes.
13    Q. Tell me about that visit with Mrs. Bogdan,
14  Doctor.
15    A. She was coming in about her back and her hip.
16  She had been taking anti-inflammatories --
17    MR. REARDON: If I could just stop you for a
18  second only because I'm not finding that. I
19  have your notes, but I want to follow you
20  along. I have May 22, '95, October 18, '95;
21  is that the one you're talking about,
22  Doctor?
23    THE WITNESS: Yes.
24    A. She had been taken the Relafen. However, she
25  had to stop the Relafen because she had developed some

Page 53

1  other medical problems and that when she had stopped
2  taking the Relafen she noted that she was developing
3  some increasing thigh pain. She described it hurting
4  when she took her first few steps and then after she
5  walked a while it seemed to get better. When I examined
6  her, she had some pain with range of motion in her right
7  hip and then she had an x-ray which revealed a fracture
8  in the cement column and some early loosening,
9  BY MR. ELVIN:
10    Q. You should on the pile in front of you,
11  Doctor, have an October 18, 1995 x-ray.
12    A. Yes.
13    Q. I think there are two there with that date?
14    A. Yes.
15    Q. Where is the fracture in the cement column,
16  Doctor?
17    A. Right here (handing) about a third of the way
18  down.
19    MR. REARDON: I can't see from over here,
20  Doctor. Would you point to it again.
21  BY MR. ELVIN:
22    Q. It's on the medial side about a little less
23  than halfway down the stem; correct?
24    A. Correct.
25    Q. That is a fracture that is at about a 45

14 (Pages 50 to 53)

8f276995-3a32-434b-929b-4adb068c296b

Dunn vs. Zimmer, Inc., et al

10/31/2002                                                                    Bruce H. Moeckel, MD

Page 54

1   degree angle to the horizontal access, fair enough?
2       A.  Yes.
3       Q.  What are the signs of early loosening that you
4   see in that x-ray, Doctor?
5       A.  I mean, and when I did this I compared it to
6   her initial x-ray, but there is a crack in the cement
7   there plus there is now a radiolucency up the lateral
8   side of the prosthesis as well as -- which wasn't there
9   before -- as well as settling of the prosthesis.  Now
10  the prosthesis is sitting right on the greater
11  trochanter where an x-ray that we had taken several
12  weeks after the operation, approximately a year before
13  this most resent x-ray, didn't have any of those
14  findings.  There was no radiolucency at all.  There was
15  good cement mantle and there was the collar of the
16  prosthesis was above the lesser trochanter.
17      Q.  Don't you also see on that October 18 film,
18  Doctor, a radiolucency between the bone and the cement
19  on the medial side?
20      A.  This October 18, '95?
21      Q.  Correct.
22      A.  Yes.
23      Q.  And what does that indicate, Doctor, that
24  radiolucent line between the bone and the cement on the
25  medial side?

Page 55

1       A.  Radiolucent light indicates that there is some
2   loosening of the cement column and the underlying bone.
3       Q.  Did you show these x-rays to Mrs. Bogdan?
4       A.  Yes.
5       Q.  Did you discuss the findings of loosening that
6   you just told us about?
7       A.  Yes.  I mean, I may have at the time down
8   played it.  I mean, but I did -- normal practice is for
9   me to show the x-ray to her.
10      Q.  And you referred her for a bone scan; correct?
11      A.  Correct.
12      Q.  Did you tell her that she was seeing these
13  symptoms earlier than what you otherwise would have
14  expected from a cemented stem?
15      A.  Yes.
16      Q.  Do you recall her asking you at any point in
17  time, Doctor, I'm not just talking about the October 18
18  visit now, at any point in time why was it that her stem
19  loosened more quickly than she otherwise would have
20  expected?
21      A.  Yes.
22      Q.  And what do you recall telling her about that?
23          MR. REARDON:  Objection.
24      A.  I did not have a good explanation.
25  BY MR. ELVIN:

Page 56

1       Q.  As part of treating Mrs. Bogdan, Doctor, have
2   you undertaken any work to either rule in or rule out
3   the various causes or potential causes of the loosening
4   of her stem?
5       A.  Yes.
6       Q.  And how did you do that?
7       A.  Well, the most common thing we worry about is
8   an infection, so she had a bone scan plus she had an
9   aspiration arthrogram performed of her hip.  Both of
10  those came back negative for infection.  That was the
11  workup plus I think we did some blood work.
12      Q.  So you ruled out infection?
13      A.  Yes.
14      Q.  As between the factors doctor, patient, and
15  surgical that can contribute to aseptic loosening as
16  part of treating Mrs. Bogdan, did you undertake any work
17  to either rule in or rule out those causes of loosening?
18      A.  Yes.  When this first happened, it was either
19  with this case or Mrs. Lopes, I took the x-rays, the
20  initial postoperative x-rays as well as the initial
21  x-rays to our orthopedic section meeting to get my
22  colleagues opinion.
23      Q.  Well, first of all, as you sit here today, can
24  you say specifically that you did that with respect to
25  Mrs. Bogdan?

Page 57

1       A.  I can't say for sure I did it, but I'm pretty
2   sure I did it.  I definitely did it on one of them.
3       Q.  And what do you recall the discussion being
4   when you took the x-rays in front of your colleagues?
5       A.  Well, the question was I said:  Did you see
6   anything on the initial x-rays that would indicate any
7   reason why her prosthesis would have failed so early?
8   And no one had a reason.  And I was also asking to see
9   if anyone else had had a similar experience.
10      Q.  Mrs. Bogdan was an active walker, wasn't she?
11      A.  Yes.
12      Q.  In fact, she was walking three miles a day
13  during the period of time between her surgery and this
14  October 18 time period, wasn't she?
15      A.  Correct.
16      Q.  How did you rule out her activity level as a
17  potential cause of loosening?
18      A.  Well, I mean, that's a normal activity that --
19  we encourage people to walk.  You know, we try to have
20  people not do high load activity, but walking we -- in
21  general the reason we do the hip replacement is so
22  people can walk.  So did walking contribute to it?
23  Possibly.  But the reason we put this prosthesis in is
24  so that people can walk not so that they can sit in a
25  chair.

15 (Pages 54 to 57)

8f276995-3a32-434b-929b-4adb068c296b

Dunn vs. Zimmer, Inc., et al

10/31/2002                                                          Bruce H. Moeckel, MD

**Page 58**

1    Q. But when you say it is possible, so the answer
2 to my question is that you didn't rule out her activity
3 level as a contributing factor; correct?
4    A. I do not feel her activity level was abnormal
5 and would cause her loosening. I'm not -- and I think
6 we talked about this in the first deposition -- I'm not
7 the type of surgeon that tends to blame when something
8 doesn't go right on the patient. So I didn't see
9 anything that she told me that would cause her -- to
10 lead to this early loosening. If she told me that she
11 was skydiving, if she was playing pickup basketball, or
12 if she was jogging, playing singles tennis, then I would
13 say those are activities that I specifically told you
14 not to do and that is probably not a good idea. But
15 walking, I encourage people to walk and I still
16 encourage people today to walk.
17    Q. So you're telling us that you ruled it out as
18 a potential factor for her because people do it?
19    A. No. I'm just not sure what you mean by ruling
20 out. My opinion is that the walking did not cause her
21 loosening, so that's my opinion.
22    Q. And on what do you base that?
23    A. I base that on the reason that orthopedic
24 surgeons in general do hip operations and hip
25 replacements is so people can walk and do their daily

**Page 59**

1 activities. Walking three miles a day is no different
2 than walking around the supermarket or walking around
3 the mall. Walking is walking. It is considered an
4 acceptable activity for people that have had a hip
5 replacement. It is the reason we do the operation.
6    Q. How did you rule out the quality of the cement
7 mantle or anything that occurred during the surgery as a
8 potential cause of the loosening?
9    A. Looking at the original x-rays, I mean, I
10 think they look perfect. I mean, there is a great
11 cement fill. Nice indentation of the cement. You get a
12 nice whiting out of the prosthesis cement bone, and so I
13 look at this x-ray and I look at it still today saying,
14 I think this cement mantle looks good. I don't see any
15 lucent lines. I see good offsets, good kinematics. I
16 think it is a good result. I mean, I think it was a
17 good cement result right here.
18    Q. And what films were you just holding up,
19 Doctor, if you could identify those by date?
20    A. Yes, AP view dated 11/2/94 and a lateral or a
21 frog lateral from 11/2/94, the same date.
22    Q. You saw Mrs. Bogdan again on November 17 of
23 '95; correct?
24    A. Yes.
25    Q. Tell us about that visit.

**Page 60**

1    A. She was followed up on her hip. She noted
2 that she was still having some pain in her thigh but she
3 noted that it had improved. The physical exam she still
4 had some pain with range of motion. Her bone scan -- I
5 reviewed her bone scan result which was consistent with
6 early loosening. At that point we talked about what
7 would happen. I was hoping that the prosthesis would
8 restabilize. Sometimes what we see is when the cement
9 fractures the prosthesis will settle a little in the
10 canal, but if it reaches an area where it becomes
11 stable, it does not cause pain. It does not lead to
12 osteolysis. You can observe it. And so I was being
13 optimistic that maybe this would happen, and so the plan
14 was to follow her closely and have her come back to see
15 me in four weeks.
16    Q. And you showed her the x-rays that you took
17 then, correct -- or let me -- strike that.
18    Did you take any x-rays on November 17?
19    A. No.
20    Q. But you had her bone scan by then?
21    A. Yes.
22    Q. When did you next see Mrs. Bogdan?
23    A. December 15, '95.
24    Q. You took x-rays then; correct?
25    A. Yes.

**Page 61**

1    Q. They showed no further loosening of her total
2 hip replacement?
3    A. Correct.
4    Q. What was the plan -- well, are you looking for
5 the December 15 x-ray, Doctor?
6    A. Yes.
7    Q. You can still see the fracture in the cement
8 mantle; correct?
9    A. Yes.
10    Q. And the lucent line between the bone and the
11 cement on the medial side; correct?
12    A. Yes.
13    Q. And the lucent line between the stem and the
14 cement on the lateral side?
15    A. Yes.
16    Q. And what your note says is that this reflected
17 no further evidence of early loosening; correct?
18    A. Yes. I mean, it looks essentially the same.
19 What I'm really looking for at this point is to see if
20 she's developing any osteolysis and she has not as of
21 this date.
22    Q. Had you told Mrs. Bogdan by now, Doctor, that
23 she is going to need a revision?
24    A. I think I might have told her that she might
25 need a revision. I'm not sure if I definitely told her.

16 (Pages 58 to 61)

Dunn vs. Zimmer, Inc., et al

10/31/2002                                                              Bruce H. Moeckel, MD

Page 62

1    Q.  It was still unclear in your mind as to
2  whether her implant would stabilize in this position?
3    A.  At that time I didn't know the natural history
4  of this cement fracture settling leading to -- to be
5  honest with you, at this time I didn't know what was
6  going to happen.  I was still hopeful that this
7  prosthesis could be salvaged or at least be left in to
8  allow her to function for, you know, several years,
9  hopefully longer.  I wasn't yet willing to commit this
10  person to another operation, no.
11    Q.  When did you next see Mrs. Bogdan?
12    A.  I saw her on April 15th of '96.
13    Q.  Tell us about this visit, Doctor.
14    A.  It was getting worse.  She was limping.  She
15  had just come back from Florida.  Her husband noted she
16  was limping more.  X-rays showed that there was some
17  further loosening of the prosthesis.  There was another
18  cement fracture.  At that point I explained to her that
19  I was concerned about the progressive bone loss.  I
20  recommended that she get another opinion.  At that point
21  she wanted to kind of wait and see if it would kind of
22  get better or stabilize.
23    Q.  Do you have the April 15 film in front of you,
24  Doctor, in the stack of x-rays?
25    A.  Yes, I do.

Page 63

1    Q.  And you say you reviewed those x-rays with
2  Mrs. Bogdan; right?
3    A.  Yes.
4    Q.  Tell us what you observe on those x-rays that
5  you recall pointing out to her?
6    A.  Well, she has another fracture in the cement
7  mantle.  There has been further settling of the
8  prosthesis.  The prosthesis is now beginning to wear
9  into or settle into the lesser trochanter.  The bone on
10  the lateral aspect of the femur is thinning more
11  consistent with osteolysis.  The cup still looks in
12  stable position, but the prosthesis is not getting
13  better and it is not staying the same.  It is
14  unfortunately getting worse.
15    Q.  Further evidence of loosening; correct?
16    A.  Yes.
17    Q.  And the findings that you just described, you
18  discussed those with Mrs. Bogdan?
19    A.  Yes.
20    Q.  And by this point she needed a revision?
21    A.  Yes.
22    Q.  And it was either at this visit or some other
23  that you discussed with her the fact that this was
24  occurring earlier than what you would have expected?
25    A.  Yes.

Page 64

1    Q.  Did you tell her that you had not seen this
2  with any other cemented implant early loosening in this
3  time period?
4    A.  I might have.  I don't know for sure.
5    Q.  Did you tell her during this visit, Doctor,
6  that she needed to have the stem revised?
7    MR. REARDON:  Objection to the form.
8    A.  On April 15, 1996?
9  BY MR. ELVIN:
10    Q.  Yes.
11    A.  I think I did.  I don't say it exactly in my
12  note, but I imply that she is not interested in
13  considering any intervention.  So that usually would
14  mean that I discussed it with her, but she wanted to
15  give it more time.
16    Q.  That leads you to believe that you had
17  discussed revision surgery with her?
18    A.  Yes.  As well as I offered a referral for a
19  second opinion.
20    Q.  What did Mrs. Bogdan decide to do?
21    A.  She came back to see me in two months.
22    Q.  Did you take x-rays on June 17th of 1996?
23    A.  No.
24    Q.  And tell us about that visit.
25    A.  Essentially she was having increasing pain

Page 65

1  with her hip.  She had one episode when it felt better,
2  but then she's noted that the pain is getting worse.
3  She noted that her leg is getting shorter.  At that
4  point she agreed to the revision of her right total hip
5  replacement.
6    Q.  And you went ahead and revised her hip;
7  correct?
8    A.  Yes.
9    Q.  And you elected to do a cemented revision;
10  correct?
11    A.  Correct.
12    Q.  Tell us about the thought process, Doctor,
13  that led you to decide to do a cemented revision.
14    A.  Well, at the time there was -- I don't think
15  it is as clear cut as it is now -- that most of these
16  cemented stems that needed to be revised most people now
17  try to revise them to a cementless system with the
18  theory being that if a cemented stem has failed it is
19  better to kind of change gears and go to an uncemented
20  system.  At the time in of training and residency, we
21  did most of all our revisions with long stem cemented
22  stems and that's why I elected to do that.
23    Q.  That being a cemented revision is a different
24  surgical procedure from a cemented primary; correct?
25    A.  Yes.

17 (Pages 62 to 65)

8f276995-3a32-434b-929b-4adb068c296b

Dunn vs. Zimmer, Inc., et al

10/31/2002                                                    Bruce H. Moeckel, MD

Page 66

1    Q. It has different risks and different
2  prognoses; correct?
3    A. Yes. For the patient it is a similar
4  operation, for the surgeon it is a much harder, more
5  complicated operation.
6    Q. I'm going to jump ahead, Doctor, to a note
7  dated -- if you would go into 1998, the latter part of
8  1998, I will be able to identify specifically the date.
9    A. Sure.
10   Q. She eventually started to have problems with
11 the second operation you did; correct?
12   A. Yes.
13   Q. And you saw her on December 16th of 1998;
14 correct?
15   A. September --
16   Q. December 16, 1998.
17   A. Yes, I did see her.
18   Q. And you note in the last paragraph of that
19 record that Mrs. Bogdan had had a fall; correct?
20   A. Yes.
21   Q. And she had a fracture in her cement column;
22 correct?
23   A. Yes.
24   Q. And you believed at the time that her fall was
25 what caused the fracture in the cement column; right?

Page 67

1    A. It could have. I think that's what I -- I
2  don't think I told her that, but I think that -- oh,
3  yes, I'm sorry. It is likely that the fracture in the
4  cement column came from the recent fall. Yes, I did
5  attribute it to that.
6    Q. Any reason as you sit here today not to
7  believe it was the fall that caused that fracture?
8    A. No, except that what you don't know is whether
9  it was the stem loosening again leading to some -- once
10 the prosthesis loosens within the cement mantle that
11 sometimes when we see the fracture, but, no, I don't
12 have any reason to say that it is not related to the
13 fall.
14   Q. Does Mrs. Bogdan treat with you today, Doctor?
15   A. No. Well, I haven't seen her since '99. I've
16 seen her with -- her husband still treats with me, but I
17 haven't seen her since September 27, 1999.
18   Q. Do you have any information about her current
19 medical condition?
20   A. Not her -- well, she subsequently had her hip
21 revised by Dr. Grady-Benson and he had done that. He
22 sent me notes. Plus her husband has kept me up-to-date
23 when I saw him in the office.
24   Q. And what is your understanding from those
25 sources of her current condition?

Page 68

1    A. That she underwent a revision of her hip
2  replacement and that she was doing fairly well.
3      MR. ELVIN: Bob, you can go ahead while I
4  review my notes.
5      MR. REARDON: Thank you.
6
7      CROSS-EXAMINATION BY MR. REARDON:
8
9    Q. Doctor, there are a few questions that I
10 have.
11   A. Sure.
12   Q. Hopefully we'll be done pretty quick.
13     There was, first of all, I told you during
14 your direct examination I couldn't refresh your
15 recollection. I had to wait for my turn. So is the
16 article that you're speaking of an article that was in
17 the journal -- you call it JBJS, right, for short?
18   A. Journal of Bone and Joint Surgery.
19   Q. And that was written by Drs. Ong, Wong, and
20 Steinberg; is that the one? You're nodding your head in
21 agreement. Does that seem to refresh your recollection?
22   A. Yes.
23   Q. And is that the article that came out sometime
24 after your deposition that caught your attention because
25 it was the subject that -- an area of inquiry in your

Page 69

1  deposition?
2    A. Yes.
3    Q. And did that article confirm your opinions as
4  you rendered in your deposition?
5    A. Yes.
6    Q. And I believe that was in May of 2002, but I'm
7  not sure without checking. I don't have it with me, but
8  it was sometime after your deposition, in any event; is
9  that right, Doctor?
10   A. Correct.
11   Q. Let me go back and talk to you about your
12 surgical procedure with respect to the component and
13 putting it in the canal and then saline and then putting
14 it in antibiotics afterward.
15     You mentioned that you're not sure whether you
16 actually did that. It is not included in your operative
17 report that you did that; is that correct?
18   A. Correct.
19     MR. ELVIN: Objection; asked and answered.
20     MR. REARDON: Lord knows you did enough asking
21 and answering the same questions. I should
22 be allowed one.
23 BY MR. REARDON:
24   Q. Any way, with respect to that process, do you
25 have any reason to believe that -- well, first of all,

18 (Pages 66 to 69)

Dunn vs. Zimmer, Inc., et al

10/31/2002                                                                    Bruce H. Moeckel, MD

Page 70

1  let me understand when you rasp out the canal I take it
2  that there is a lot of blood in the canal that has to be
3  dealt with before you put the component into the canal;
4  right?
5      A.  Correct.
6      Q.  And so is all of that -- I mean, we're laymen.
7  Is all of the blood out of the canal when you finally
8  place the cement in there and implant the component?
9      A.  I think the best is we try to minimize it.
10  The patients obviously are hopefully still alive, so
11  blood is being pumped to the bone.  We take steps to try
12  to minimize it, but there is, I think, there is always
13  some blood around especially between the cement and the
14  bone.  I think you can essentially eliminate any blood
15  between the prosthesis and the cement.
16      Q.  Now, with respect to this process you used, at
17  least you mentioned it in the Lopes case of putting the
18  component into the canal and then taking it out; would
19  you expect that based upon your experience with -- let
20  me withdraw that.
21          Do you do that -- can you tell us whether or
22  not you do this in every instance when you're implanting
23  a femoral component?
24      A.  I would say a lot of times I do it and it came
25  from training, in residency.  You know, we did -- when I

Page 71

1  was in New York, we did this all the time.
2      Q.  And so you mean at the Hospital for Special
3  Surgery in New York City where you trained?
4      A.  Yes.
5      Q.  And why is it that when you were trained at
6  the Hospital for Special Surgery -- and I believe you
7  were trained in the '80s; correct?
8      A.  '88 to '92.
9      Q.  Just before you came here to Middletown then?
10      A.  Yes.
11      Q.  Why is it that you were trained to place the
12  femoral component into the canal and then remove it and
13  place it in a saline and antibiotic solution?
14          MR. ELVIN:  Object to the form.
15      A.  Well, when I was a resident we had a case
16  where the cement -- when the person put the cement
17  restrictor in and it hadn't been placed far enough down,
18  and when they went to put the prosthesis in they
19  couldn't impact it all the way down.  The cement
20  hardened and essentially then you had to do a revision
21  on the table.  Remove the hardened cement and, you know,
22  push the cement restrictor down and do it again, so it
23  became a habit of -- it was kind of a habit that most of
24  the surgeons followed there and it was a habit that I
25  brought here.

Page 72

1  BY MR. REARDON:
2      Q.  And who trained you at the Hospital for
3  Special Surgery in New York Hospital Cornell Medical
4  Center?
5      A.  Mostly for hips it was Dr. Chip Ranawat,
6  R-a-n-a-w-a-t; Eduardo Saliati, Philip Wilson,
7  Paul Pellicci, those were the main people doing hip
8  replacement surgery.
9      Q.  And I recognize that this might be considered
10  a pat on your own back, but is the Hospital for Special
11  Surgery considered to be one of the main medical
12  facilities for hip implant in New York City?
13          MR. ELVIN:  Object to the form.
14      A.  Yes.
15  BY MR. REARDON:
16      Q.  And one of the leading institutions for hip
17  implant surgery in the northeastern United States?
18          MR. ELVIN:  Object to the form.
19      A.  You could argue it is the best in the world.
20  BY MR. REARDON:
21      Q.  Now, do you have an opinion, Doctor, as to
22  whether or not based upon your experience, your training
23  at the Hospital for Special Surgery, and your experience
24  in the practice of orthopedic medicine, whether or not
25  this procedure of placing the implant femoral component

Page 73

1  in the canal and then taking it out and putting it in
2  saline and antibiotics and then letting it dry on the
3  table before implanting it into the cement mantle that
4  that would in any way affect the ability of the cement
5  to adhere to the implant component?
6      A.  I think it has nothing to do with it.
7      Q.  And that is based on your experience and
8  training?
9      A.  Yes.
10      Q.  Now, could you tell me why?
11      A.  Well, I think, first of all, I think in most
12  times the prosthesis is dry when we put it back in, so
13  it's not like I dip it and put it in.  I just think
14  that's -- I think it has nothing to do with it.  And if
15  it did, if it does with the prosthesis, then you might
16  have to redesign the prosthesis, but it is just
17  something that has been done thousands of times and I
18  don't think that's the problem.
19      Q.  Well, you've indicated that you've had
20  problems with the Centralign prosthesis but you've also
21  implanted a number of others before and after.  Did you
22  use the same procedure with the others that you
23  implanted?
24      A.  Yes.
25      Q.  And did you find the same problem with the

19 (Pages 70 to 73)

Dunn vs. Zimmer, Inc., et al

10/31/2002                                                      Bruce H. Moeckel, MD

Page 74

1  others with the early loosening problems that you
2  described in the deposition today?
3         MR. ELVIN: Object to the form.
4      A. No.
5  BY MR. REARDON:
6      Q. Are you continuing to use that procedure when
7  implanting femoral components?
8      A. Yes.
9      Q. Today you are?
10     A. Yes.
11     Q. And you think it is a correct procedure?
12     A. Yes.
13     Q. Were you made aware by me, Doctor, in a
14 telephone conversation that that procedure had been
15 criticized by a Dr. Berger in his deposition?
16     A. Yes.
17     Q. I called you and I told you about that
18 criticism?
19     A. Correct.
20     Q. And did that change your opinion whatsoever as
21 to whether or not you would continue to use the
22 procedure that you've been using with respect to placing
23 the component in the canal and then later on taking it
24 out and putting it in saline and antibiotic and letting
25 it dry on the table before implanting it?

Page 75

1         MR. ELVIN: Object to the form.
2      A. No.
3  BY MR. REARDON:
4      Q. So you're not impressed by that opinion at
5  all, I take it?
6         MR. ELVIN: Object to the form.
7      A. No.
8  BY MR. REARDON:
9      Q. You indicated on direct examination that you
10 have had no short-term loosenings since you changed from
11 the Centralign to Johnson & Johnson; is that correct?
12     A. Yes.
13     Q. And so that would have occurred back in '95 or
14 '96 that you made the change; right?
15        MR. ELVIN: Object to the form.
16     A. Yes.
17 BY MR. REARDON:
18     Q. So we're now 6 or 7 years out from your
19 change?
20     A. Correct.
21     Q. Roughly how many implants would you say, hip
22 implants would you say you've implanted, primary
23 implants you've implanted since 1995, 1996?
24     A. Cemented implants?
25     Q. Cemented implants, yes.

Page 76

1      A. I think I estimated and I probably still
2  estimate cemented implants probably 10 to 20 per year,
3  so probably we're talking about 60.
4      Q. Sixty roughly?
5      A. Yeah.
6      Q. All without problems to date, to the best of
7  your knowledge?
8      A. Correct.
9      Q. Now, Tim Walker, I now you mentioned
10 Tim Walker, but nobody, I don't think, actually
11 specifically described who he was. As I understand it,
12 Tim Walker was the sales representative for Zimmer for
13 this area; correct?
14        MR. ELVIN: Objection.
15     A. Yes.
16 BY MR. REARDON:
17     Q. And he made the presentation back in the early
18 '90s when the Centralign came out to you and others in
19 the Middletown orthopedic community?
20     A. Yes.
21     Q. At Middletown Hospital?
22     A. Yes.
23     Q. And in that presentation, he described among
24 other things the same information that was discussed in
25 Exhibit 4, the brochure?

Page 77

1      A. Correct.
2      Q. You also mentioned that he said that
3  Dr. Harris thought it was a better prosthesis. You were
4  aware that Dr. Harris had been involved -- you were
5  informed by him that Dr. Harris had been involved in the
6  development of this prosthesis?
7         MR. ELVIN: Object to the form.
8      A. Yes.
9  BY MR. REARDON:
10     Q. And did you consider that fact that he
11 represented to you that Dr. Harris thought it was a
12 better prosthesis than others that had been made
13 available before to be a fact that would influence you
14 because of Dr. Harris's reputation as an orthopedic
15 surgeon with special expertise in hip implant surgery?
16        MR. ELVIN: Object to the form.
17     A. He represented that Dr. Harris had felt it was
18 better and that Dr. Harris was using it.
19 BY MR. REARDON:
20     Q. What was your understanding or what do you know
21 of Dr. Harris and his reputation?
22     A. Well, he has a very good reputation. You
23 know, there is a certain bit of, I don't want to say
24 animosity, but a certain bit of difference in opinion
25 between New York and Boston. And so Harris represents

20 (Pages 74 to 77)

Dunn vs. Zimmer, Inc., et al

10/31/2002                                                                Bruce H. Moeckel, MD

Page 78

1   the Boston kind of way people do things and in New York
2   Hospital for Special Surgery represents that. So there
3   is a certain bit of, I'll admit, that throughout this
4   whole experience I was a little leery of Dr. Harris just
5   from my training in New York, so I wasn't -- and that's
6   -- so I looked at things a little differently. And so
7   just by my nature of my training, I may have questioned
8   a little more during this meeting and during subsequent
9   meetings, Was Harris doing this? What was Harris's
10  opinion? Also around the same time I knew one of
11  Harris's fellows from Special Surgery went to do the
12  Harrison Fellowship. But yeah, so there's always a
13  certain New York, Boston tilt among things with
14  orthopedic surgeons.
15      Q.   Well, in any event, after you got through with
16  your questions and you questioned Mr. Walker during
17  these meetings and perhaps more than the others because
18  of your New York tilt; is that correct?
19      A.   Correct.
20      Q.   After you were finished with the meetings,
21  were you satisfied with the presentation and the
22  representations made of the materials that were provided
23  to you and then the presentation of Tim Walker and that
24  the Centralign was, in fact, an improvement over its
25  predecessors and that you were going to use it?

Page 79

1       A.   Yes.
2       Q.   So you relied upon those representations after
3   questioning him with respect to the details of those
4   representations and on the basis of those -- your
5   reliance upon those representations went ahead and used
6   it the same?
7           MR. ELVIN: Object to the form.
8       A.   Yes, because at the time when I left
9   Special Surgery we used the Harris cup but we did not
10  use the Harris stem. We used the Osteonic stem, so I
11  was more comfortable and I actually argued to use the
12  Osteonic stem but people here felt more comfortable with
13  the Harris and the Zimmer, so I went along with that
14  based on to make things simpler for the hospital.
15  BY MR. REARDON:
16      Q.   And was it at all based upon the information
17  that was provided to you as well by Walker and the
18  brochures and other information that was presented to
19  you from the company?
20          MR. ELVIN: Object to the form.
21      A.   Correct.
22  BY MR. REARDON:
23      Q.   Did you know at the time that these
24  presentations were made that Dr. Harris was receiving
25  and had received millions of dollars in royalties from

Page 80

1   Zimmer?
2           MR. ELVIN: Object to the form.
3       A.   No. I didn't know the exact amount, but most
4   of us who are in the profession know that implant
5   designers receive remuneration from the prosthetic
6   companies.
7   BY MR. REARDON:
8       Q.   Did you have any idea how much money he was
9   receiving?
10      A.   No.
11      Q.   Would that have influenced your opinion at all
12  if you knew that he was endorsing this particular
13  prosthesis and that he had received seven million
14  dollars through various entities that he had designated
15  including his children's trust, his family, and his
16  foundation?
17          MR. ELVIN: Object to the form.
18      A.   It probably wouldn't have. You know, seven
19  million -- these guys make a lot of money off these
20  prosthesis. And some of the guys at Special Surgery had
21  similar arrangements. Not with Zimmer but with other
22  companies, so it is, you know, a thing that -- you know,
23  it doesn't go on as much now, but it probably shouldn't
24  go on, but it is a fact of life.
25  BY MR. REARDON:

Page 81

1       Q.   Do you have an opinion looking at the x-ray of
2   October 18, 1995, the one that you noted for the first
3   time the fracture and the loosening; do you have an
4   opinion as to where the loosening was first developed?
5           MR. ELVIN: Object to the form.
6   BY MR. REARDON:
7       Q.   In other words, you noted loosening --
8       A.   Now?
9       Q.   Yeah, now. As of now do you have an opinion?
10  Not as of then.
11      A.   Yes.
12      Q.   And what is your opinion as to where the
13  loosening first developed and how it evolved thereafter?
14      A.   That because of the prosthesis or because of
15  the design of the prosthesis, the cement mantle often
16  fractured, and once the cement mantle fractured the
17  prosthesis became loose and began to generate a lot of
18  wear debris because of the friction between the PMA --
19  the precoating and the cement, and that wear debris led
20  to earlier catastrophic loosening.
21      Q.   And the wear debris is the same as what you
22  described earlier as the osteolysis that you were
23  looking for?
24      A.   The wear debris leads to osteolysis, which is
25  bone loss, correct.

21 (Pages 78 to 81)

8f276995-3a32-434b-929b-4adb068c296b

Dunn vs. Zimmer, Inc., et al

10/31/2002　　　　　　　　　　　　　　　　　　　　Bruce H. Moeckel, MD

Page 82

1　Q. And so at first when you saw her in October of
2　-- you noticed loosening in October of 1995, you did not
3　see any osteolysis; correct? No evidence of wear debris
4　at that point?
5　A. No. And nor did I know what I just said.
6　Q. And nor did you know what you just said. And
7　we'll get to that in a moment.
8　　But then it wasn't until, as I understood your
9　testimony on direct examination, you first noticed
10　osteolysis starting in April of 1996; is that right?
11　A. Correct.
12　Q. Now, when did you -- you indicated that in the
13　1995, 1996 time frame you stopped using it, stopped
14　using the Centralign; correct?
15　A. Correct.
16　Q. And changed to this Johnson & Johnson product?
17　A. Correct.
18　Q. At that time, did you inform Mrs. Bogdan at
19　that time of what you had -- of your decision to change
20　to a Johnson & Johnson from a Zimmer Centralign?
21　A. No.
22　Q. When she came in to see you in April of '96
23　and you noticed the osteolysis was starting, and then
24　again in June of '96 when her leg was short, and then
25　finally there was an agreement that you would go forward

Page 83

1　with the revision; had you at that time informed her of
2　the fact that you either had changed or you were
3　considering changing at that moment to another type of
4　femoral component?
5　A. No. I don't think I ever told her I switched.
6　Q. And finally, Doctor, with respect to the
7　information that has come to your attention since then,
8　and you've already described it, I won't go through it
9　such as the articles in Orthopedics Today, the Santore
10　article that everyone has discussed with you at all of
11　your depositions, and then even more recent articles
12　such as the one Ong & Steinberg article that appeared in
13　2002. With that information, had you known that
14　information in 1992 or 1993 before you implanted
15　Mrs. Bogdan's Centralign, would you have used the
16　Centralign?
17　　　MR. ELVIN: Objection to form.
18　A. No.
19　　　MR. REARDON: I don't have any other
20　questions.
21　　　MR. ELVIN: I'm going to take a minute
22　and look at my notes.
23
24　　(A recess was taken from 3:30 p.m. to 3:31 p.m.)
25

Page 84

1　　REDIRECT EXAMINATION BY MR. ELVIN:
2
3　Q. Doctor, did there come a time when you
4　telephoned Mrs. Bogdan in November of 2001?
5　A. I think I talked to -- yes. I'm not sure if I
6　called her or I talked to her husband when I was seeing
7　the husband in the office.
8　Q. Tell me what led to your telephone call to
9　Mrs. Bogdan.
10　A. Well, you had during the -- I don't know if it
11　was the first or second deposition -- you had kind of
12　pressed me into saying, you know, Have you looked at all
13　your hip implants? Have you followed it? Have you done
14　any scientific study? And so I went home that night and
15　I said I knew there had been some other failures and so
16　I went through some of my -- just thinking about it, I
17　flipped through my surgery book to kind of look through
18　some of my ones I had done and then her name suddenly
19　came back to me that, yes, she had an implant around
20　that time that had failed. Subsequent to that I revised
21　and I wasn't sure what kind of prosthesis it was because
22　the op note as we looked at before doesn't indicate the
23　prosthesis. So I went to the medical records and I
24　pulled out her sheet from her medical records of what
25　type of prosthesis it was and I found out it was the

Page 85

1　Centralign so I called -- and once again, I don't
2　know if it was her or the husband, but I said there have
3　been some other problems with this prosthesis and there
4　is a class action lawsuit and I gave them the name of
5　Attorney Reardon.
6　Q. Had you disclosed Mrs. Bogdan's name to
7　anybody from The Reardon Law Firm before you spoke to
8　her on the telephone?
9　A. No.
10　Q. Did you ask for her permission to disclose her
11　name to The Reardon Law Firm?
12　　　MR. REARDON: It was the other way around. He
13　didn't have to ask my permission to disclose
14　my name to her.
15　　　MR. ELVIN: Should we put you under
16　oath, Bob? Read the question --
17　　　MR. REARDON: But I'll object to the
18　form of the question. There is no testimony
19　that he disclosed her name to our firm. It
20　is the other way around.
21　　　MR. ELVIN: I'll rephrase.
22　BY MR. ELVIN:
23　Q. Did you at any time disclose the name of
24　Mrs. Bogdan to any lawyer or other person from
25　The Reardon Law Firm?

22 (Pages 82 to 85)

8f276995-3a32-434b-929b-4adb068c296b

Dunn vs. Zimmer, Inc., et al

10/31/2002                                                              Bruce H. Moeckel, MD

Page 86

1      A.  No.
2      MR. REARDON:  Why is that so troubling?  She
3  called me.  Why are you perplexed at that?
4  BY MR. ELVIN:
5      Q.  You told me, Doctor, that during the telephone
6  call with Mrs. Bogdan you told her that she would be
7  hearing from somebody from The Reardon Law Firm;
8  correct?
9      A.  I don't think I said that.  My recollection is
10  that I called her -- once again, I thought it was her
11  husband, but the recollection was that I did call
12  somebody.  Actually, I think I called them actually from
13  the medical records department when I had found the
14  medical record that indicated that she did have that
15  same prosthesis, the Centralign, and I think I gave her
16  Attorney Reardon's number.  I think that's my
17  recollection.  I mean, that is my recollection.
18      Q.  If Mrs. Bogdan testified that after the call
19  with you somebody from The Reardon Law Firm called her,
20  do you believe that she is incorrect about that?
21      A.  My recollection is that she is incorrect, yes,
22  but once again it is a recollection.
23      Q.  Could she be correct about that?
24      MR. REARDON:  You know, according to my note
25  from Mr. Camassar that was not her

Page 87

1  testimony.  You don't have a transcript and
2  I don't, but I just want to object to the
3  form.
4      A.  Yeah, I'm under the impression that events are
5  as I indicated.  That I did that little bit of research
6  that I mentioned.  When I determined that it was the
7  Centralign, I called her.  I thought it was her husband
8  that I talked to actually the day I called and gave her
9  the name of The Reardon Law Firm.
10  BY MR. ELVIN:
11      Q.  So as you sit here today, it is your testimony
12  that you did not give her name to anybody from
13  The Reardon Law Firm; is that correct, just so I
14  understand you?
15      A.  Correct.  Now, it is possible that at a later
16  date after they had already talked we may have talked
17  about Bogdan.  I don't know.  I don't even remember that
18  to be honest with you.
19      Q.  Mr. Reardon during his questioning mentioned a
20  telephone conversation with you where he told you about
21  some opinions of Dr. Richard Berger, tell me about that
22  conversation.
23      A.  He told me that Dr. Berger was very critical
24  of my technique, of the way I did the operation.  I
25  guess he reviewed not my op note but reviewed my

Page 88

1  deposition because as we indicated it wasn't in the op
2  note about the prosthesis being cleaned off, putting it
3  in the stem or putting it in the canal, and I indicated
4  what I indicated under cross-examination that I thought
5  that had nothing to do with the early failure and that
6  was about it.
7      Q.  Can you recall anything else that Mr. Reardon
8  told you during that conversation?
9      A.  I think he was critical -- Dr. Berger was
10  critical also of my technique.  He felt the
11  postoperative x-rays indicated that it was a poor cement
12  mantle.  That's about all I remember.
13      Q.  When did that conversation occur?
14      A.  That conversation occurred probably a week
15  ago, a week and ten days ago.
16      Q.  Had you spoken with either Mr. Reardon or
17  Mr. Camassar since your deposition other than that
18  conversation?
19      A.  The only other time was the time I signed the
20  affidavit.
21      Q.  Did the conversation with Mr. Reardon about
22  Dr. Berger's opinions cause you to do anything?
23      A.  No.  Well, I reviewed the op note.  I reviewed
24  the op note and prior to this deposition -- I don't know
25  if it was his conversation -- I reviewed my medical

Page 89

1  record before this deposition and tried to review the
2  x-rays but the x-rays had been signed out.  Other than
3  that, that's all I've done.
4      Q.  Tried to review the Bogdan x-rays?
5      A.  Yeah, to see if I knew what he was talking
6  about.
7      Q.  You said it is your opinion that dipping the
8  final stem or putting the final stem into the solution,
9  the saline or antibiotic solution, didn't have any
10  impact on the bonding of the stem to the cement; do you
11  recall your telling Mr. Reardon that during his
12  questions?
13      A.  Yes.
14      Q.  Have you done any work to support that
15  opinion?
16      A.  I've just from a practical matter it is
17  something that I continue to do and it hasn't been a
18  problem in other cases.  And if when I get the chance, I
19  might ask Dr. Grady-Benson if he did the same thing.  If
20  that, you know, might be further evidence, then maybe
21  there is a problem there with that.  But other than
22  that, no, I haven't done any scientific data.  It has
23  just been a practice that I've done now for over ten
24  years.
25      Q.  The Centralign is the only component you've

23 (Pages 86 to 89)

8f276995-3a32-434b-929b-4adb068c296b

Dunn vs. Zimmer, Inc., et al

10/31/2002                                                     Bruce H. Moeckel, MD

---

Page 90

1  used that's been precoated; correct?
2      A.  Well, the precoat was precoated too.
3      Q.  You used the Harris precoat as well?
4      A.  Yeah.
5      Q.  So those two components are the only two that
6  have been precoated; correct?
7      A.  I think so, yes.
8      Q.  In response to Mr. Reardon's questions, you
9  said that you're unaware of any other cemented stem
10  patients that you've done since you moved away from the
11  Centralign who have experienced loosening in the time
12  frame of your Centralign patients.  Do you still follow
13  all of the patients who you did since your Centralign?
14      A.  I schedule follow-up appointments, so I don't
15  keep a -- I don't call back patients that don't follow
16  up, so there may be patients that have left my practice
17  or gone somewhere else.
18      Q.  That's possible in other words?
19      A.  Correct.
20      Q.  Tell me what the x-rays were, the first set of
21  x-rays that you did before October of 1995?
22      A.  The first?
23      Q.  If you don't understand the question, I can
24  rephrase it.  The ones most immediately in time prior to
25  October of 1995.

---

Page 91

1      A.  Before October 18th of '95?
2      Q.  Right, before October 18.
3      A.  That was that postop x-ray of that three week
4  or three to four week postop, 11/2/94.
5      Q.  So the interval is 11/2/94 and October 18th of
6  1995; correct?
7      A.  Yeah, about eleven months.
8      Q.  And I think you testified on that November of
9  '94 film you don't see the radiolucent lines that you
10  described in the October of '95 x-ray?
11      A.  Correct.
12      Q.  And in the October of '95 x-ray, you saw
13  radiolucent lines between the bone and the cement on the
14  medial side and between the stem and the cement on the
15  lateral side; correct?  Two radiolucent lines, in other
16  words, on the October of '95 film?
17      A.  I see -- I don't see -- I see radiolucent --
18  a fracture in the cement column medially -- yeah,
19  radiolucent line between the cement and the bone and
20  also a radiolucent line between the cement and the bone
21  laterally.
22      Q.  Do you have any way, Doctor, given that
23  neither of those radiolucent lines were present in the
24  prior film; do you have any way to tell which of those
25  lines emerged first?

---

Page 92

1      A.  You mean whether the cement fractured first?
2      Q.  Yes.
3      A.  No, I do not.
4      Q.  And you don't have any way to tell whether the
5  stem came away from the cement first or whether the
6  cement came away from the bone first on the medial side;
7  you can't tell which of those events occurred first?
8      A.  No.
9      Q.  Since your last deposition, Doctor, in April,
10  have you talked with any other physician or employee or
11  representative of Zimmer, anybody about the Centralign?
12      A.  I think I talked once to Dr. Grady-Benson --
13  or are you just talking Zimmer representatives?
14      Q.  Tell me everybody with whom you remember
15  talking about Centralign since your last deposition.
16      A.  I mean, I had contact with Tim Walker but not
17  about the Centralign.  I've talked to Dr. Grady-Benson
18  about the Centralign.
19      Q.  Tell me about your -- was it one or more than
20  one conversation with Dr. Grady-Benson?
21      A.  Just one, I think.  We were actually at a
22  dinner about minimal invasive hip surgery sponsored by
23  Tim Walker, and Dr. Grady-Benson and I ate dinner
24  together and at some point during the dinner we -- I
25  think it was -- it might have been around the time

---

Page 93

1  either he had a deposition or I had a deposition, and we
2  were just talking about having a deposition and the
3  prosthesis and that was about it.
4      Q.  What can you remember him saying to you?
5      A.  That's about it.  I don't really have a lot of
6  independent recollection.  There wasn't a lot of details
7  we talked about.  I think Tim Walker was actually
8  sitting next to me and Dr. Grady-Benson was sitting on
9  the other side, so we didn't have a big conversation
10  about it.  It might have been something in passing.
11      Q.  You've given me all the recollection that
12  you've got; true?
13      A.  Yes.
14          MR. ELVIN:  We have decided, as Mr. Reardon
15  knows in this case, to proceed with statute
16  of limitations brief before we do anything
17  else.  Consequently, there has been no
18  discovery of -- no written discovery of the
19  Bogdans, for example, and we've decided that
20  that's how we'll proceed.  Because of that
21  I'm not going to terminate the deposition.
22  I'm going to reserve and see how events
23  unfold with that statute of limitations
24  motion and other discovery, but for the time
25  being I don't have any further questions.

---

24 (Pages 90 to 93)

8f276995-3a32-434b-929b-4adb068c296b

Dunn vs. Zimmer, Inc., et al

10/31/2002                                                    Bruce H. Moeckel, MD

Page 94

1    RECROSS-EXAMINATION BY MR. REARDON:
2
3    Q. I just have a quick question. Just so we're
4    clear for the record, Doctor, on the October 18, 1995
5    x-ray of Mrs. Bogdan; am I correct that this
6    radiolucency is the proximal lateral side of the femoral
7    component?
8    A. Yes.
9    Q. It is proximal and lateral. And at the
10   metal/cement interface --
11   A. I can't. It looks like it is actually in both
12   places.
13   Q. That's right. And there's a little spot in
14   the middle between --
15   A. Right.
16   Q. And if we can describe it, it looks like there
17   is a radiolucency --
18   A. A little island of cement.
19   Q. A little island of cement. And on one side of
20   the island would be -- well, on the left side of the
21   island as you look at it would be radiolucency
22   at the cement/metal interface; correct?
23   A. Yeah, it looks possible. And also the more I
24   look at this, you might argue there is a little
25   radiolucency up on the shoulder of the prosthesis

Page 95

1    between the prosthesis and the cement.
2    Q. Lateral again but very high up right below the
3    collar?
4    A. Actually, on the other side of the collar.
5    Q. On the other side of the collar?
6    A. On the shoulder. What a lot of people call
7    the shoulder.
8    MR. REARDON: Thank you. I don't have any
9    other questions. I just wanted to identify
10   it for the record.
11
12   (The deposition concluded at 3:45 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 96

1    CERTIFICATE OF REPORTER
2
3    I, Mary Z. Armando, a Notary Public duly
4    commissioned and qualified in and for the State of
5    Connecticut, do hereby certify that pursuant to Notice,
6    there came before me, on the 31st day of October, 2002,
7    at 1:49 p.m., the following named person, to wit:
8    BRUCE H. MOECKEL, M.D., who was by me duly sworn to
9    testify to the truth and nothing but the truth; that he
10   was thereupon carefully examined upon his oath and his
11   examination reduced to writing under my supervision;
12   that this deposition is a true record of the testimony
13   given by the witness.
14   I further certify that I am neither attorney nor
15   counsel for, nor related to, nor employed by any of the
16   parties to the action in which this deposition is taken,
17   and further, that I am not a relative or employee of any
18   attorney or counsel employed by the parties hereto, or
19   financially interested in the action
20
     IN WITNESS THEREOF, I have hereunto set my hand and
21   affixed my seal this 8th day of November, 2002.
22
         Mary Z. Armando
23       Notary Public
         CT License No. 00222
24
25   My Commission expires: 5/31/07

Page 97

1            CORRECTION SHEET
2        I, BRUCE H. MOECKEL, M.D., do hereby certify
     that the following corrections and additions of the
3    transcript taken on October 31, 2002 are true and
     accurate to the best of my knowledge and belief.
4
     CORRECTION   PAGE   LINE   REASON
5
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   DATE _____ BRUCE H. MOECKEL, M.D.
21   At _____ in said County of
     _____, this _____ day of
22   _____, 2002, personally appeared
     BRUCE H. MOECKEL, M.D., and he made oath to the truth of
23   the foregoing corrections by him subscribed.
24
     Before me, _____, Notary Public
25   My Commission expires: _____
     (MZA)

                                        25 (Pages 94 to 97)

8f276995-3a32-434b-929b-4adb068c296b

Dunn vs. Zimmer, Inc., et al

10/31/2002                                                          Bruce H. Moeckel, MD

Page 98

```
 1          CERTIFICATE OF DEPONENT
 2          I, BRUCE H. MOECKEL, M.D., do hereby certify
    that the foregoing testimony, taken on October 31, 2002,
 3  is true and accurate to the best of my knowledge and
    belief.
 4
 5
 6      DATE              BRUCE H. MOECKEL, M.D.
 7
 8      At             in said County of
               , this       day of   , 2002,
 9  personally appeared BRUCE H. MOECKEL, M.D., and he made
    oath to the truth of the foregoing answers by him
10  subscribed.
11  Before me,              , Notary Public.
12  My Commission expires:
13
14
15
16
17
18
19
20
21
22
23
24  (MZA)
25
```

26 (Page 98)

Brandon Smith Reporting Service

8f276995-3a32-434b-929b-4adb068c296b